FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.

★ NOV 0 2 2010 ★

BROOKLYN OFFICE

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

CV 10 - 5064

|  |  |
|---|---|
| STEVE ENDRESS, on behalf of himself and all others similarly situated, | CASE NO. _____ |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| GENTIVA HEALTH SERVICES, INC., RONALD A. MALONE, ANTHONY H. STRANGE, and JOHN R. POTAPCHUK, | SPATT, J |
| Defendants. | WALL, M.J. |

## CLASS ACTION COMPLAINT

Plaintiff, Steve Endress, by his attorneys, on behalf of himself and all others similarly situated, alleges the following based upon the investigation by plaintiff's counsel, except as to allegations specifically pertaining to plaintiff, which are based on personal knowledge. The investigation by counsel included, among other things, a review of Gentiva Health Services, Inc. ("Gentiva" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"), press releases issued by the Company, public conference calls, media and news reports about the Company, publicly available trading data relating to the price and volume of Gentiva common stock and interviews with former Gentiva employees.

### I.     INTRODUCTION

1.     This is a federal class action brought on behalf of a class consisting of all persons who purchased the publicly traded common stock of Gentiva between July 31, 2008 and July 20, 2010, inclusive (the "Class Period").

2.      This is a securities fraud action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC by plaintiff on behalf of all those who purchased the publicly traded common stock of Gentiva during the Class Period to recover damages caused to the Class by defendants' violations of the securities laws.

3.      According to Gentiva's Annual Report for the fiscal year ended January 3, 2010 filed with the SEC on Form 10-K on March 17, 2010, the Company describes itself as a leading provider of home health services throughout most of the United States and is a provider of hospice services in the southeast United States.

4.      Throughout the Class Period, a material portion of the Company's reported net revenue was derived from reimbursements by Medicare. Respectively, in 2008 and 2009, 52% and 68% of Gentiva's reported net revenues came from Medicare.

5.      Gentiva was reimbursed for its services from Medicare through the prospective payment system ("PPS") for Medicare home health services.

6.      Under PPS, Medicare pays home health agencies, like Gentiva, a predetermined base payment. This estimate is based upon the patient's condition and care needs (the "Case-Mix Assignment"). The payment is adjusted for the health condition and care needs of the beneficiary. This adjustment is the "Case-Mix Adjustment."

7.      After a physician prescribes a home health plan of care, at the beginning of an episode of care, Gentiva assesses the patient's condition and the likely skilled nursing care, therapy, medical social services and home health aide service needs.

8.      A nurse or therapist from Gentiva uses the Outcome and Assessment Information Set ("OASIS") protocols to assess the patient's condition.

9.     OASIS items describing the patient's condition, as well as the expected therapy needs (physical, speech-language pathology, or occupational) are used to determine the Case-Mix Adjustment.

10.     Throughout the Class Period, Defendants reported growth in revenue and earnings that were, in large part, based on material increases in Medicare revenues and admissions in the Company's Home Health segment.  But defendants failed to disclose that the Company improperly increased the number of in-home therapy visits to patients for the purpose of triggering higher reimbursement rates under the Medicare PPS.

11.     For example, Gentiva manipulated the Case-Mix Adjustment in order to increase reimbursement from Medicare by including therapies that were not medically necessary.  Further, Gentiva recertified patients for further episodes of care without verifying the medical need of patients.

12.     As a result of the Company's improper conduct, its reported sales and earnings were materially inflated and, based on the foregoing, defendants lacked a basis for their positive statements about the Company, its prospects and growth.

13.     On May 13, 2010, the *Wall Street Journal* reported that the United States Senate Finance Committee launched an investigation into the practices of companies that provide in-home therapy visits reimbursed by Medicare, including Gentiva.  The article stated, in part, that "The committee is investigating whether the companies deliberately boosted the number of home therapy visits to trigger higher Medicare reimbursements."

14.     On May 14, 2010, Gentiva shares declined from a closing price on May 13, 2010 of $29.75 per share to close at $27.55 per share, a decline of $2.20 per share or approximately 7% on heavier than usual volume.

3

15.     Over the next several trading days, Gentiva shares declined an additional $1.76 per share or approximately 6% to close at $25.79 on May 19, 2010.

16.     On July 13, 2010, after the close of trading, Gentiva disclosed that it was "informed by the Securities and Exchange Commission that the Commission has commenced an investigation relating to Gentiva's participation in the Medicare Home Health Prospective Payment System (HH PPS). The Company believes the investigation is similar to the Commission's ongoing investigations and the Senate Finance Committee inquiry previously disclosed by Gentiva and other home health companies. The Commission requested that the company preserve all documents from January 1, 2000 to the present relating to its participation."

17.     On July 13, 2010, Gentiva shares closed at $22.30 per share. On July 14, 2010, during intra-day trading, Gentiva shares declined to $19.91 per share, a decline of 11%, before closing at $21.99 per share, on heavier than usual volume.

18.     On July 20, 2010, after the close of trading, Gentiva disclosed its financial results for the quarter ended July 4, 2010. Among other things, the Company disclosed that "in light of recent softness in home health episodic volumes and the anticipated seasonality in third quarter volumes as experienced by the Company historically, Gentiva has reduced its full-year revenue guidance to a range of $1.20 billion to $1.23 billion from its prior guidance of between $1.23 billion to $1.26 billion."

19.     On July 21, 2010, Gentiva shares declined from a close on July 20, 2010 of $21.60 per share, to close at $19.96 per share, a decline of $1.64 per share or approximately 8% on heavier than usual volume.  The next trading day, Gentiva shares declined an additional $0.56 per share, for a two day decline of approximately 10%.

4

20.   During the Class Period, certain of the Company's top executives and/or directors sold approximately 531,279 Gentiva shares at artificially inflated prices for proceeds of approximately $12.8 million.

## II.   JURISDICTION AND VENUE

21.   The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.   Jurisdiction is conferred by Section 27 of the Exchange Act.   Venue is proper pursuant to Section 27 of Exchange Act because during the Class Period defendant Gentiva and/or the Individual Defendants conducted business in and wrongful conduct took place in this District.

## III.   THE PARTIES

22.   Plaintiff purchased Gentiva's publicly traded common stock as detailed in the attached Certification and was damaged thereby.

23.   Defendant Gentiva is incorporated in Delaware and its current principal executive offices are located at 3350 Riverwood Parkway, Suite 1400, Atlanta, GA 30339.   During the Class Period, Gentiva maintained executive offices in Melville, New York.

24.   Defendant Ronald A. Malone ("Malone") was the Company's Chief Executive Officer until January 1, 2009 and, at all relevant times, has been the Company's Chairman of the Board of Directors.   During the Class Period, Malone acquired approximately 146,000 Gentiva shares through the exercise of options and he sold nearly all of them for proceeds of approximately $3.1 million.

25.   Defendant Anthony H. Strange ("Strange") was the Company's Chief Executive Officer starting on January 1, 2009 and, prior to January 1, 2009, he served as

President of the Company.   During the Class Period, Strange sold 4,609 shares for proceeds of approximately $97,184.

26.     Defendant John R. Potapchuk ("Potapchuk") was the Company's Chief Financial Officer at all relevant times.  During the Class Period, Potapchuk sold 111,219 shares for proceeds of approximately $3.1 million.

27.     The individuals named as defendants in ¶¶ 24-26 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Gentiva's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV.     CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons who purchased the

publicly traded common stock of Gentiva during the quarter from July 31, 2008 through July 20, 2010, inclusive (the "Class").

29.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at the present time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members of the Class located throughout the United States. Throughout the Class Period, Gentiva had over approximately 30 million shares of common stock outstanding, which were actively traded on the Nasdaq in an efficient market.

30.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have sustained damages because of defendants' unlawful activities alleged herein.  Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously. The interests of the Class will be fairly and adequately protected by plaintiff.  Plaintiff has no interests which are contrary to or in conflict with those of the Class that plaintiff seeks to represent.

31.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)     whether defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

(c)     whether defendants participated directly or indirectly in the course of conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and the proper measure of such damages.

## V.     FALSE AND MISLEADING STATEMENTS

33.     The Class Period begins on July 31, 2008, when the Company issued a press release announcing its financial results for the fiscal quarter ended June 29, 2008, which stated, in part, the following:

**Gentiva Reports Strong Second Quarter led by Home Health Segment Raises Full Year Financial Outlook**

MELVILLE, N.Y., July 31, 2008 /PRNewswire-FirstCall via COMTEX News Network/ -- Gentiva Health Services, Inc. (Nasdaq: GTIV), the nation's leading provider of comprehensive home health services, today reported strong second quarter results, led by double-digit increases in Medicare revenues and admissions in the Company's Home Health segment.

Performance highlights for the quarter ended June 29, 2008 included:
-- A 13% increase in net revenues to $346.2 million versus the second quarter ended July 1, 2007.
-- A 34% rise in net income to $12.0 million, or $0.41 per diluted share, versus $9.0 million, or $0.31 per diluted share, for the prior-year period. Average diluted shares were 29.2 million versus 28.5 million in the second quarter of 2007 . . . .

"Gentiva has generated a strong first half that puts us well on track to achieve our goals for the year," said Chairman and CEO Ron Malone. "We are building our Home Health segment with a focus on growing Medicare admissions, expanding our pioneering specialty programs, and

8

increasing our capacity both organically and through acquisitions, including two transactions completed so far this year. We also saw sequential improvement at both CareCentrix and within our Other Related Services segment.

"These achievements, along with the stable reimbursement outlook indicated in the recently passed Medicare legislation, position Gentiva for continued strength in performance through the balance of 2008 and lead us to increase our financial outlook for the year."

34.     On July 31, 2008, Gentiva shares increased $3.12 per share or approximately 14% to close at $25.54 per share on heavier than usual volume.

35.     On August 7, 2008, Gentiva filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended June 29, 2008 (the "Q2 2008 10-Q"). The Q2 2008 10-Q, signed by defendants Malone and Potapchuk, repeated the Company's financial results set forth in the July 31, 2008 press release.

36.     Further, the Q2 2008 10-Q stated, in part, the following:

**Home Health**

Home Health segment revenues are derived from all three payer groups: Medicare, Medicaid and Local Government and Commercial Insurance and Other . . . Revenues generated from Medicare were $161.3 million in the second quarter of 2008 as compared to $136.8 million in the second quarter of 2007, an increase of $24.5 million or 17.9 percent. For the first six months of 2008, revenues generated from Medicare were $306.3 million as compared to $272.1 million for the first six months of 2007, an increase of $34.2 million or 12.6 percent. The increases in Medicare revenues, for the second quarter and first six months of 2008, resulted from (i) growth in episodes of care of 11 percent and 10 percent, respectively, driven primarily by increased volume in specialty programs in both existing and new markets; (ii) the impact of the HHCA and PHHC acquisitions as noted below; and (iii) for the second quarter of 2008, improvements in revenue per episode. Factors contributing to the improvements in the revenue per episode for the second quarter of 2008 include growth in the Company's therapy-based Specialty programs that have a higher level of reimbursement and a shift in mix toward higher acuity cases. The Company has updated its estimates for revenue generated by episodes of care and, as a result, Medicare revenues for the second quarter of 2008 included approximately $1.5 million representing a

9

positive change in estimate resulting from activity during the first quarter of 2008.

*     *     *

There are certain standards and regulations that the Company must adhere to in order to continue to participate in Medicare . . . As part of these standards and regulations, the Company is subject to periodic audits, examinations and investigations conducted by, or at the direction of, governmental investigatory and oversight agencies. Periodic and random audits conducted or directed by these agencies could result in a delay or adjustment to the amount of reimbursements received under these programs. Violation of the applicable federal and state health care regulations can result in our exclusion from participating in these programs and can subject the Company to substantial civil and/or criminal penalties. The Company believes that it is currently in compliance with these standards and regulations . . . .

37.    On October 30, 2008, Gentiva issued a press release announcing its financial results for the fiscal quarter ended September 28, 2008, which stated, in part, the following:

**Gentiva Reports Third Quarter Revenue and Profit Growth**
**Company Raises 2008 EPS Outlook and Announces 2009 Operating**
**Preview**

MELVILLE, N.Y., Oct 30, 2008 /PRNewswire-FirstCall via COMTEX News Network/ -- Gentiva Health Services, Inc. (Nasdaq: GTIV), a leading provider of comprehensive home health services, today reported third quarter results, led by 17% revenue growth and 26% operating contribution growth from its Home Health segment, as the Company continued to invest in clinical innovation, quality and productivity to enhance its industry leadership.

Performance highlights for the quarter ended September 28, 2008 included the following total Company results compared to the third quarter ended September 30, 2007:
-- A 12% increase in net revenues to $347.6 million.
-- Net income of $120.9 million, or $4.07 per diluted share, which included a non-recurring pre-tax gain, net of transaction costs, of $107.9 million or $3.67 per diluted share from the sale of a 69% interest in its CareCentrix unit. These results compare to net income of $8.2 million or $0.28 per diluted share in the 2007 third quarter . . . .

10

-- Excluding the net gain from the CareCentrix transaction and special charges, adjusted net income was $12.6 million, up 48% as compared with $8.5 million in the year-ago period. On a diluted earnings per share basis, adjusted net income was $0.42 compared with $0.30 in the 2007 third quarter. Special charges excluded from adjusted net income represented about $0.02 per diluted share in both periods and included restructuring and integration costs, and costs and professional fees associated with merger and acquisition activities . . . .

"Our Home Health segment had an outstanding third quarter, continuing a trend of solid gains," said Gentiva Chairman and CEO Ron Malone. "This performance results from continued growth and margin expansion while we invest in our specialty programs and add new tools to benefit our patients and the dedicated clinicians who serve them."

*     *     *

Full-Year 2008 and Preliminary 2009 Outlook

Gentiva adjusted its revenue outlook and raised its earnings outlook for the 2008 fiscal year to reflect the performance of its Home Health business year to date, as well as the sale of a majority interest in CareCentrix. Gentiva now anticipates that 2008 net revenues will range between $1.28 billion to $1.30 billion, as compared to prior guidance of $1.32 billion to $1.35 billion, and now expects its diluted earnings per share to be between $1.47 and $1.51, up from the $1.36 to $1.43 range provided earlier this year. Projected earnings exclude the net gain from the CareCentrix transaction and special charges as described above.

Gentiva also announced a preliminary outlook for 2009. Full-year net revenues are expected to be in a range of $1.12 billion to $1.17 billion, reflecting anticipated growth in the Company's businesses as compared with 2008, offset by the absence of revenues from CareCentrix. Diluted earnings per share are expected to be in a range between $1.62 and $1.72. Excluding the impact of the CareCentrix divestiture on the Company's 2008 results, Gentiva's 2009 outlook represents a diluted earnings per share increase of approximately 20% to 25% as compared with expected 2008 performance.

38.     On November 7, 2008, Gentiva filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended September 28, 2008 (the "Q3 2008 10-Q"). The Q3 2008 10-Q, signed by defendants Malone and Potapchuk, repeated the Company's financial results set forth in the October 30, 2008 press release.

11

39.     Further, the Q3 2008 10-Q stated, in part, the following:

**Home Health**
Home Health segment revenues are derived from all three payer groups:
Medicare, Medicaid and Local Government and Commercial Insurance
and Other. Third quarter 2008 net revenues were $239.3 million, up $34.9
million, or 17.1 percent, from $204.4 million in the prior year period. For
the first nine months of fiscal 2008, net revenues were $693.2 million, a
$78.9 million or 12.8 percent increase compared to $614.3 million for the
corresponding period of fiscal 2007.

Revenues generated from Medicare were $165.2 million in the third
quarter of 2008 as compared to $137.1 million in the third quarter of 2007,
an increase of $28.1 million or 20.5 percent. For the first nine months of
2008, revenues generated from Medicare were $471.5 million as
compared to $409.1 million for the first nine months of 2007, an increase
of $62.4 million or 15.2 percent. The increases in Medicare revenues, for
the third quarter and first nine months of 2008, resulted from (i) growth in
episodes of care of 11 percent and 10 percent, respectively, driven
primarily by increased volume in specialty programs in both existing and
new markets and the impact of the HHCA and PHHC acquisitions as
noted below; and (ii) increases in revenue per episode of approximately 8
percent for the third quarter of 2008 and 5 percent for the first nine months
of 2008. Factors contributing to the improvements in the revenue per
episode for the third quarter of 2008 include growth in the Company's
therapy-based Specialty programs that have a higher level of
reimbursement and a shift in mix toward higher acuity cases.

Medicare revenue growth, excluding the impact of HHCA and PHHC
acquisitions, was approximately 14 percent and 11 percent for the third
quarter and first nine months of 2008, respectively.

                              *       *       *

In August 2007, the Centers for Medicare and Medicaid Services ("CMS")
published the "Home Health Prospective Payment System Refinement and
Rate Update for Calendar Year 2008" that contains significant changes to
the Medicare home health PPS reimbursement methodology including,
among other things, a multi-year reduction in the home health system
payment rates to offset coding changes since the original implementation
of PPS in 2000, referred to in various CMS documents as "case mix
creep", and a 3.0 percent market basket update, effective January 1, 2008.
On June 29, 2007, CMS released a transmittal that confirmed an increase
of 3.3 percent to the fiscal 2008 Medicare hospice annual update payment.
On July 31, 2008, CMS announced that hospices serving Medicare

beneficiaries would receive a 2.5 percent increase in their fiscal 2009 hospice payments.

There are certain standards and regulations that the Company must adhere to in order to continue to participate in Medicare, Medicaid and other federal and state healthcare programs. As part of these standards and regulations, the Company is subject to periodic audits, examinations and investigations conducted by, or at the direction of, governmental investigatory and oversight agencies. Periodic and random audits conducted or directed by these agencies could result in a delay in or adjustment to the amount of reimbursements received under these programs. Violation of the applicable federal and state health care regulations can result in our exclusion from participating in these programs and can subject the Company to substantial civil and/or criminal penalties. The Company believes that it is currently in compliance with these standards and regulations.

40.     On February 18, 2009, Gentiva issued a press release announcing its financial results for the fiscal quarter and year ended December 28, 2008, which stated, in part, the following:

**Gentiva Reports Fourth Quarter and Fiscal 2008 Results**
**--Company Raises 2009 Performance Outlook**
MELVILLE, N.Y., Feb 18, 2009 /PRNewswire-FirstCall via COMTEX News Network/ -- Gentiva Health Services, Inc. (Nasdaq: GTIV), a leading provider of comprehensive home health services, today reported fourth quarter results, led by 20% revenue growth and 39% operating contribution growth from its Home Health segment, as the Company continued to execute on its strategy of delivering clinical innovation and quality care to patients . . . .

• Net revenues of $1.30 billion versus $1.23 billion in the prior year. Net revenues in 2008 and 2007 included approximately $233 million and $291 million, respectively, relating to CareCentrix. Excluding the revenue contribution from CareCentrix in both years, 2008 net revenues would have been $1.07 billion, an increase of $129 million, or 14%.
• Net income of $153.5 million, or $5.21 per diluted share, which included a non-recurring pre-tax gain, net of transaction costs, of $107.9 million or $3.72 per diluted share from the sale of a majority interest in its CareCentrix unit in the third quarter. Excluding the net gain from CareCentrix and special charges, adjusted net income was $45.5 million, up 33% compared with $34.3 million in the year-ago period. On a diluted earnings per share basis, adjusted net income was $1.55 compared with $1.20 in 2007 . . . .

13

"We achieved our results both for the fourth quarter and all of 2008 while focusing on two key objectives: delivering clinical excellence to a more acute patient population and positioning our Company as the employer of choice for clinicians," said Gentiva CEO Tony Strange. "During the fourth quarter we continued the launch of innovative specialty care programs across our branch network and again achieved strong performance in the hiring of new clinicians. Gentiva will continue to address the needs of the nation's growing senior population, for which home healthcare is a cost-effective and patient-preferred solution for the nation's healthcare challenges."

*      *      *

Full-Year 2009 Outlook

Gentiva also announced that it has raised its outlook for fiscal 2009, which was previewed in the Company's third quarter earnings release issued October 30, 2008. Full-year net revenues are expected to be in a range of $1.14 billion to $1.18 billion, as compared to the preview of $1.12 billion to $1.17 billion. Diluted earnings per share is expected to be in a range between $1.72 and $1.80, up from the $1.62 to $1.72 range provided in October, based on an estimated 30.5 million average outstanding shares. Gentiva's 2009 outlook represents an increase in diluted earnings per share of 20% to 30% when compared with 2008 pro forma financial results, which reflect the Company's performance as if the CareCentrix divestiture had occurred at the beginning of fiscal 2008. The 2009 outlook excludes the impact of special items, restructuring or non-recurring charges and any future acquisitions.

41.     On March 12, 2009, Gentiva filed its annual report with the SEC on Form 10-K for the fiscal year ended December 28, 2008 (the "2008 10-K"). The 2008 10-K, signed by defendants Malone, Strange, and Potapchuk repeated the Company's financial results set forth in the February 18, 2009 press release.

42.     Further, the 2008 10-K stated, in part, the following:

**Government Regulations**

The Company's business is subject to extensive federal, state and, in some instances, local regulations which govern, among other things:

• Medicare, Medicaid, TRICARE (the Department of Defense's managed healthcare program for military personnel and their families) and other government-funded reimbursement programs . . . .

The Company's compliance with these regulations may affect its participation in Medicare, Medicaid, TRICARE and other federal and state healthcare programs. For example, to participate in the Medicare program, a Medicare beneficiary must be under the care of a physician, have an intermittent need for skilled nursing or physical or other therapy care, must be homebound and must receive home healthcare services from a Medicare certified home healthcare agency. The Company is also subject to a variety of federal and state regulations which prohibit fraud and abuse in the delivery of healthcare services. These regulations include, among other things . . . . laws against the filing of false claims . . . .

As part of the extensive federal and state regulation of the home health services business, the Company is subject to periodic audits, examinations and investigations conducted by, or at the direction of, governmental investigatory and oversight agencies. Periodic and random audits conducted or directed by these agencies could result in a delay in receipt or an adjustment to the amount of reimbursements due or received under Medicare, Medicaid, TRICARE and other federal health programs. Violation of the applicable federal and state healthcare regulations can result in excluding a healthcare provider from participating in the Medicare, Medicaid and/or TRICARE programs and can subject the provider to substantial civil and/or criminal penalties.

The Prospective Payment System ("PPS") for reimbursement of Medicare-certified home health services was initially implemented on October 1, 2000. Although there were few structural changes in the reimbursement methodology from the implementation date of PPS through fiscal 2007, there were periodic adjustments to reimbursement rates during this period. In August 2007, CMS issued its final rule that contained the first significant refinements to the home health PPS system since its initial implementation. Changes to the PPS system resulting from the rule, which became effective January 1, 2008, included among other things, a multi-year reduction in the home health system payment rates to offset coding changes since the original implementation of PPS in 2000 and rate update for calendar year 2008. In October 2008, CMS provided for a 2.9 percent market basket index update, effective January 1, 2009.

\*       \*       \*

**Home Health**

15

Home Health segment revenues are derived from all three payer groups: Medicare, Medicaid and Local Government and Commercial Insurance and Other. Fiscal 2008 net revenues were $942.5 million, an increase of $120.7 million or 14.7 percent from $821.8 million in fiscal 2007.

Revenues generated from Medicare were $648.0 million during fiscal 2008, an increase of 18.0 percent as compared to $549.2 million in fiscal 2007. Medicare revenues represented approximately 69 percent of total Home Health revenues in the 2008 fiscal year as compared to 67 percent of total Home Health revenues in the 2007 fiscal year.

The increases in Medicare revenues resulted from (i) growth of 11 percent in episodes of care driven primarily by increased volume in specialty programs in both existing and new markets and the impact of the HHCA and PHHC acquisitions; and (ii) increases in revenue per episode of approximately 7 percent. Factors contributing to the improvements in the revenue per episode include growth in the Company's therapy-based specialty programs that have a higher level of reimbursement and a shift in mix toward higher acuity cases. Medicare revenue growth, excluding the impact of HHCA and PHHC acquisitions, was approximately 13 percent. As a percentage of total Home Health Medicare revenues, Medicare revenues derived from the Company's specialty programs were approximately 31 percent in 2008 and 26 percent in 2007.

43. On April 30, 2009, Gentiva issued a press release announcing its financial results for the fiscal quarter ended March 29, 2009, which stated, in part, the following:

**Gentiva Reports First Quarter 2009 Results**
**-- Reaffirms 2009 Performance Outlook -**
ATLANTA, April 30, 2009 /PRNewswire-FirstCall via COMTEX News Network/ -- Gentiva Health Services, Inc. (Nasdaq: GTIV), a leading provider of comprehensive home health services, today reported the following 2009 first quarter results:

-- Net revenues of $288.9 million for the quarter ended March 29, 2009 compared to $321.6 million, which included net revenues of $77.8 million from its CareCentrix business unit, for the quarter ended March 30, 2008. Excluding prior year's first quarter net revenues from CareCentrix, Gentiva's net revenues grew about $45 million, or 18% in the 2009 first quarter. The Company sold a majority interest in CareCentrix to Water Street Healthcare Partners on September 25, 2008.

-- Net income of $18.0 million, or $0.60 per diluted share, which included a non-recurring pre-tax net gain of $5.8 million or $0.19 per diluted share resulting from the 2009 first quarter sale of certain branch

offices that specialized primarily in pediatric home health care services. These results compared to net income of $7.7 million or $0.27 per diluted share in the 2008 first quarter.

-- Excluding the net gain from the sale of the home health branch offices referred to above and special charges related to restructuring and integration activities, adjusted net income for the 2009 first quarter was $12.7 million, up 61% compared with the prior year period. On a diluted earnings per share basis, adjusted net income in the 2009 first quarter was $0.43, excluding special charges of $0.02 per diluted share, compared with $0.27 in the corresponding period of 2008. . . .

"Gentiva is off to a good start to 2009, both financially and operationally," said Gentiva CEO Tony Strange. "Our results for the quarter were again led by our Home Health segment as we focus on meeting the needs of the nation's growing senior population, for which home healthcare is a cost-effective and patient-preferred solution. The aggregate results of our other businesses also showed improved performance in the quarter, primarily driven by growth in hospice. Based on these solid first quarter results and our confidence that the Company will continue to execute on its strategy during the remainder of the year, we are today reaffirming our revenue and earnings outlook for 2009."

\*       \*       \*

Full-Year 2009 Outlook

Gentiva also reaffirmed its outlook for fiscal 2009 of full-year net revenues in a range of $1.14 billion to $1.18 billion. On a diluted earnings per share basis, adjusted net income is expected to be in a range between $1.72 and $1.80, excluding restructuring and integration costs which are estimated to range from $3 million to $5 million for the year. Gentiva's 2009 outlook represents an increase in net revenues of 8% to 11% and an increase in diluted earnings per share of 20% to 30% when compared with 2008 pro forma financial results, which reflect the Company's performance as if the CareCentrix divestiture had occurred at the beginning of fiscal 2008. The 2009 outlook excludes the $0.19 per diluted share net gain resulting from the sale of branches specializing primarily in pediatric home health services in the first quarter.

44.     On May 8, 2009, Gentiva filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended March 29, 2009 (the "Q1 2009 10-Q"). The Q1 2009

10-Q, signed by defendants Strange and Potapchuk, repeated the Company's financial results set forth in the April 30, 2009 press release.

45.     Further, the Q1 2009 10-Q stated, in part, the following:

**Home Health**
Home Health segment revenues are derived from all three payer groups: Medicare, Medicaid and Local Government and Commercial Insurance and Other. First quarter 2009 net revenues were $257.7 million, up $40.7 million, or 18.8 percent, from $217.0 million in the prior year period.

Revenues generated from Medicare were $186.1 million in the first quarter of 2009 as compared to $145.1 million in the first quarter of 2008, an increase of $41.0 million or 28.2 percent . . . .

*       *       *

There are certain standards and regulations that the Company must adhere to in order to continue to participate in Medicare, Medicaid and other federal and state healthcare programs. As part of these standards and regulations, the Company is subject to periodic audits, examinations and investigations conducted by, or at the direction of, governmental investigatory and oversight agencies. Periodic and random audits conducted or directed by these agencies could result in a delay in or adjustment to the amount of reimbursements received under these programs. Violation of the applicable federal and state health care regulations can result in our exclusion from participating in these programs and can subject the Company to substantial civil and/or criminal penalties. The Company believes that it is currently in compliance with these standards and regulations. The Company's HME and respiratory therapy business operates in certain markets that are subject to a competitive bidding process for Medicare, which is currently delayed.

46.     On July 30, 2009, Gentiva issued a press release announcing its financial results for the fiscal quarter ended June 28, 2009, which stated, in part, the following:

**Gentiva Reports Second Quarter 2009 Results**
**- Company Raises 2009 Financial Outlook -**

ATLANTA, July 30, 2009 /PRNewswire-FirstCall via COMTEX News Network/ -- Gentiva Health Services, Inc. (Nasdaq: GTIV), a leading provider of comprehensive home health services, today reported the following 2009 second quarter results:

-- Net revenues of $298.1 million for the quarter ended June 28, 2009 compared to $344.2 million, which included net revenues of $79.3 million from its CareCentrix business unit, for the quarter ended June 29, 2008. Excluding prior year's second quarter net revenues from CareCentrix, Gentiva's net revenues grew about $33 million, or 12% in the 2009 second quarter. The Company sold a majority interest in CareCentrix to Water Street Healthcare Partners on September 25, 2008.

-- Net income of $17.1 million, or $0.58 per diluted share compared to net income of $12.0 million or $0.41 per diluted share in the 2008 second quarter.

-- Adjusted net income for the 2009 second quarter was $17.5 million, up 43% compared with the prior year period. On a diluted earnings per share basis, adjusted net income in the 2009 second quarter was $0.59 compared with $0.42 in the corresponding period of 2008.  Adjusted net income for both second quarter periods excludes special charges of $0.01 per diluted share relating to restructuring and integration activities . . . .

"Gentiva had a very good second quarter driven by continued success in executing our core strategies: rolling out our specialty programs, serving the needs of higher acuity seniors and increasing both the capacity and productivity of our growing clinician base," said Gentiva CEO Tony Strange. "Our performance demonstrates the commitment of our employees as well as the growing belief of the healthcare community in the power of home care as a key part of the solution to the nation's healthcare challenges."

*     *     *

Full-Year 2009 Outlook
Gentiva announced that it is raising its revenue and earnings outlook for fiscal 2009 based on its year-to-date performance and prospects for the remainder of this year. Gentiva now anticipates full-year 2009 net revenues will range between $1.19 billion to $1.21 billion, as compared to prior guidance of $1.14 billion to $1.18 billion. On a diluted earnings per share basis, adjusted net income is expected to be in a range between $2.04 and $2.10, up from the $1.72 and $1.80 range provided earlier this year. Gentiva's 2009 outlook represents an increase in net revenues of 12% to 14% and an increase in diluted earnings per share of 45% to 50% when compared with 2008 pro forma financial results, which reflect the Company's performance as if the CareCentrix divestiture had occurred at the beginning of fiscal 2008. The 2009 outlook excludes special charges relating to restructuring and integration costs which are expected to range between $3 million and $4 million for the year and non-recurring charges

and credits. The outlook includes the impact of recently announced acquisitions and also reflects 53 weeks of activity in fiscal 2009.

47.   On August 7, 2009, Gentiva filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended June 28, 2009 (the "Q2 2009 10-Q"). The Q2 2009 10-Q, signed by defendants Strange and Potapchuk, repeated the Company's financial results set forth in the July 30, 2009 press release.

48.   The Q2 2009 10-Q stated, in part, the following:

**Home Health**
Home Health segment revenues are derived from all three payer groups: Medicare, Medicaid and Local Government and Commercial Insurance and Other. Second quarter 2009 net revenues were $265.6 million, up $28.7 million, or 12.1 percent, from $236.9 million in the prior year period. For the first six months of fiscal 2009, net revenues were $523.3 million, a $69.4 million or 15.3 percent increase compared to $453.9 million for the corresponding period of fiscal 2008. The Company's episodic revenues grew at 22.1 percent and 25.6 percent for the second quarter and first six months of 2009, respectively.

\*        \*        \*

On July 31, 2008, CMS announced that hospices serving Medicare beneficiaries would receive a 2.5 percent increase in their fiscal 2009 hospice payments. As a result of the federal stimulus package enacted in 2009, the fiscal 2009 updated increase for hospice services serving Medicare beneficiaries changed from 2.5 percent to 3.6 percent retroactive to October 1, 2008. Effective January 1, 2009, CMS implemented a 9.5 percent reduction in rates on certain HME. There are certain standards and regulations that the Company must adhere to in order to continue to participate in Medicare, Medicaid and other federal and state healthcare programs. As part of these standards and regulations, the Company is subject to periodic audits, examinations and investigations conducted by, or at the direction of, governmental investigatory and oversight agencies. Periodic and random audits conducted or directed by these agencies could result in a delay in or adjustment to the amount of reimbursements received under these programs. Violation of the applicable federal and state health care regulations can result in our exclusion from participating in these programs and can subject the Company to substantial civil and/or criminal penalties. The Company believes that it is currently in compliance with these standards and regulations.

49.     On October 29, 2009, Gentiva issued a press release announcing its
financial results for the fiscal quarter ended September 27, 2009, which stated, in part, the
following:

**Gentiva(R) Health Services Reports Third Quarter 2009 Results**
**-- Company Reaffirms 2009 Financial Outlook --**

ATLANTA, Oct 29, 2009 /PRNewswire-FirstCall via COMTEX News
Network/ -- Gentiva Health Services, Inc. (Nasdaq: GTIV), a leading
provider of comprehensive home health services, today reported the
following 2009 third quarter results:

    -- Net revenues of $295.6 million for the quarter ended September 27,
2009 compared to $345.2 million, which included net revenues of $75.5
million from its CareCentrix business unit, for the quarter ended
September 28, 2008. Excluding prior year's third quarter net revenues
from CareCentrix, Gentiva's net revenues grew over $25 million, or 9% in
the 2009 third quarter. The Company sold a majority ownership interest in
CareCentrix to Water Street Healthcare Partners on September 25, 2008.

    -- Net income of $15.4 million, or $0.52 per diluted share compared to
net income of $120.9 million or $4.07 per diluted share in the 2008 third
quarter. Third quarter 2008 results included a non-recurring gain of
$107.9 million or $3.67 per diluted share relating to the sale of a
majority ownership interest in CareCentrix.

    -- Adjusted net income for the 2009 third quarter was $15.9 million, up
27% compared with the prior year period. On a diluted earnings per share
basis, adjusted net income in the 2009 third quarter was $0.54 per
diluted share compared with $0.42 per diluted share in the corresponding
period of 2008.  Adjusted net income for both third quarter periods
excludes special charges of $0.02 per diluted share relating to
restructuring and merger and acquisition activities. In addition,
adjusted 2008 third quarter results exclude a non-recurring gain
relating to the sale of a majority ownership interest in CareCentrix . . . .

"Gentiva continues to execute well on its business strategy and we are
well on track to achieve our full year 2009 financial outlook, with
expectations toward the higher end of the earnings range," said Gentiva
CEO Tony Strange. "Growth trends in both our Home Health and Hospice
business units remain solid as we intensify our focus on serving the needs
of the nation's growing high-acuity senior population. We are delivering
on the key initiatives that will grow our company, including increasing the
penetration of our specialty care programs, recruiting and retaining the

21

best caregivers in the business, and operating efficiently, with a strong balance sheet."

\*        \*        \*

*Full-Year 2009 Outlook*

Gentiva announced that it is reaffirming its revenue and earnings outlook for fiscal 2009. Gentiva anticipates full-year 2009 net revenues will range between $1.19 billion to $1.21 billion. On a diluted earnings per share basis, adjusted net income is expected to be in a range between $2.04 and $2.10 per diluted share. Gentiva's 2009 outlook represents an increase in net revenues of 12% to 14% and an increase in adjusted net income per diluted share of 45% to 50% when compared with 2008 pro forma financial results, which reflect the Company's performance as if the CareCentrix divestiture had occurred at the beginning of fiscal 2008. The 2009 outlook excludes special charges relating to restructuring and merger and acquisition costs which are expected to range between $3 million and $4 million for the year and non-recurring charges and credits. The outlook includes the impact of recently announced acquisitions and also reflects 53 weeks of activity in fiscal 2009.

50.     On November 6, 2009, Gentiva filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended September 27, 2009 (the "Q3 2009 10-Q"). The Q3 2009 10-Q, signed by defendants Strange and Potapchuk, repeated the Company's financial results set forth in the October 29, 2009 press release.

51.     The Q3 2009 10-Q stated, in part, the following:

**Home Health**

Home Health segment revenues are derived from all three payer groups: Medicare, Medicaid and Local Government and Commercial Insurance and Other. Third quarter 2009 net revenues were $261.4 million, up $22.1 million, or 9 percent, from $239.3 million in the prior year period. For the first nine months of fiscal 2009, net revenues were $784.8 million, a $91.6 million or 13 percent increase compared to $693.2 million for the corresponding period of fiscal 2008.

The Company's episodic revenues grew at 17.5 percent and 22.7 percent for the third quarter and first nine months of 2009, respectively.

\*        \*        \*

22

Effective January 1, 2008, CMS implemented refinements to the Medicare home health Prospective Payment System ("PPS") including, among other things, a 3.0 percent market basket index update and a multi-year reduction in the home health system payment rates (2.75 percent for each of the years 2008 through 2010 and 2.71 percent in 2011) to offset coding changes since the original implementation of PPS in 2000, known as "case mix creep". Effective January 1, 2009, the market basket index was updated by an additional 2.9 percent. In October 2009, CMS announced policy and payment updates for Medicare home health effective January 1, 2010. These final rules included a 2.0 percent market basket update, a modification to the home health outlier policy with a related increase in home health base rates of 2.5 percent and a continuation of its current policy of a 2.75 percent reduction in home health system payment rates . . . .

There are certain standards and regulations that the Company must adhere to in order to continue to participate in Medicare, Medicaid and other federal and state healthcare programs. As part of these standards and regulations, the Company is subject to periodic audits, examinations and investigations conducted by, or at the direction of, governmental investigatory and oversight agencies. Periodic and random audits conducted or directed by these agencies could result in a delay in or adjustment to the amount of reimbursements received under these programs. Violation of the applicable federal and state health care regulations can result in our exclusion from participating in these programs and can subject the Company to substantial civil and/or criminal penalties. The Company believes that it is currently in compliance with these standards and regulations.

52.     On February 18, 2010, Gentiva issued a press release announcing its financial results for the fiscal quarter and year ended January 3, 2010, which stated, in part, the following:

**Gentiva(R) Health Services Reports Fourth Quarter and Fiscal 2009 Results**
**Issues 2010 Financial Outlook –**

ATLANTA, Feb 18, 2010 /PRNewswire via COMTEX News Network/ -- Gentiva Health Services, Inc. (Nasdaq: GTIV), a leading provider of home health and hospice services, today reported fourth quarter and full year fiscal 2009 results.  Highlights for the three and twelve months ended January 3, 2010 are presented as results from continuing operations. This presentation reflects the sale of Gentiva's respiratory therapy and home medical equipment and infusion therapy businesses in February 2010,

which are reported as discontinued operations for all periods presented in this press release. Fourth quarter 2009 highlights, which reflect 14 weeks of activity compared to 13 weeks in 2008, include:

• Total net revenues from continuing operations of $310.0 million, an increase of 16% compared to $267.3 million for the quarter ended December 28, 2008. Total net revenues included home health episodic revenues of $235.6 million, up 23% compared to $191.1 million in the comparable 2008 period; and hospice revenues of $19.8 million, up 16% from $17.1 million in the 2008 fourth quarter.

• Income from continuing operations of $19.0 million, or $0.63 per diluted share compared to net income of $11.9 million or $0.40 per diluted share in the 2008 fourth quarter.

• Adjusted income from continuing operations of $18.8 million, up 54% compared with the prior year period. Adjusted income from continuing operations, which excludes non-recurring transaction gains and special charges related to restructuring and merger and acquisition activities, was $0.63 per diluted share in the 2009 fourth quarter compared with $0.41 per diluted share in the corresponding period of 2008 . . . .

"Gentiva finished 2009 with strong fourth quarter results, and we have set the stage for solid growth in 2010 as well," said Gentiva CEO Tony Strange. "We have done that by executing on core strategic initiatives and narrowing our focus to our home health and hospice operations. We enter 2010 with a business that is performing well and a strong balance sheet that gives us the financial flexibility to invest both internally and externally in initiatives that will further solidify our industry leadership." Gentiva reported these highlights from continuing operations for the twelve months ended January 3, 2010, reflecting 53-weeks of activity in 2009 compared to 52-weeks in 2008:

*       *       *

**Full-Year 2010 Outlook**
Gentiva announced its financial outlook for fiscal 2010. The Company expects net revenues will range between $1.23 billion to $1.26 billion and adjusted net income on a diluted earnings per share basis will range between $2.57 and $2.67. The 2010 estimates exclude the results from the divested businesses and corresponding charges, any future acquisitions and special items. Gentiva's outlook is consistent with the past several years of strong episodic revenue growth in the Home Health business. Revenue growth in 2010 is expected to be driven primarily by organic volume growth and expansion of the Company's innovative specialty programs. Gentiva's 2010 revenue guidance incorporates the policy and

payment updates for Medicare Home Health announced by the Centers for Medicare & Medicaid Services (CMS) on October 30, 2009. These updates to 2010 reimbursement rates include, among other items, a 2.0% market basket update, a 2.5% increase in the Medicare home health base rate resulting from the lowering of total outlier payment targets and a "case mix creep" reduction of 2.75%. Any changes to these published rates resulting from a healthcare reform bill currently being discussed in Washington would likely impact Gentiva's 2010 outlook.

53.    On March 17, 2010, Gentiva filed its annual report with the SEC on Form 10-K for the fiscal year ended January 3, 2010 (the "2009 10-K"). The 2009 10-K, signed by defendants Strange, Potapchuk, and Malone, repeated the Company's financial results set forth in the February 18, 2010 press release.

54.    The 2009 10-K stated, in part, the following:

**Government Regulations**
The Company's business is subject to extensive federal, state and, in some instances, local regulations which govern, among other things:

• Medicare, Medicaid, TRICARE (the Department of Defense's managed healthcare program for military personnel and their families) and other government-funded reimbursement programs;
• reporting requirements, certification and licensing standards for certain home health agencies and hospice; and
• in some cases, certificate-of-need requirements.

The Company's compliance with these regulations may affect its participation in Medicare, Medicaid, TRICARE and other federal and state healthcare programs. For example, to participate in the Medicare program, a Medicare beneficiary must be under the care of a physician, have an intermittent need for skilled nursing or physical or other therapy care, must be homebound and must receive home healthcare services from a Medicare certified home healthcare agency. The Company is also subject to a variety of federal and state regulations which prohibit fraud and abuse in the delivery of healthcare services. These regulations include, among other things . . . laws against the filing of false claims . . . .

As part of the extensive federal and state regulation of the home health services business, the Company is subject to periodic audits, examinations and investigations conducted by, or at the direction of, governmental investigatory and oversight agencies. Periodic and random audits conducted or directed by these agencies could result in a delay in receipt

25

or an adjustment to the amount of reimbursements due or received under Medicare, Medicaid, TRICARE and other federal health programs. Violation of the applicable federal and state healthcare regulations can result in excluding a healthcare provider from participating in the Medicare, Medicaid and/or TRICARE programs and can subject the provider to substantial civil and/or criminal penalties.

55.    On May 6, 2010, Gentiva issued a press release announcing its financial results for the fiscal quarter ended April 4, 2010, which stated, in part, the following:

**Gentiva(R) Health Services Reports First Quarter 2010 Results**

ATLANTA, May 6, 2010 /PRNewswire via COMTEX News Network/ -- Gentiva Health Services, Inc. (Nasdaq: GTIV), a leading provider of home health and hospice services, today reported first quarter 2010 results . . . .

First quarter 2010 highlights include:

•     Total net revenues of $297.1 million, an increase of 7.5% compared to $276.4 million for the quarter ended March 29, 2009. Net revenues included home health episodic revenues of $228.5 million, up 13% compared to $202.2 million in the comparable 2009 period, and hospice revenues of $19.7 million, up approximately 12% from $17.6 million in the 2009 first quarter.

•     Income from continuing operations of $10.3 million, or $0.34 per diluted share which included special pre-tax charges of $15.5 million or $0.31 per diluted share relating primarily to the impact of recent settlements of two previously disclosed open legal matters . . . .

•     Adjusted income from continuing operations of $19.7 million, up 53% compared with the prior year period. Adjusted income from continuing operations, which excludes the aforementioned special charges as well as the non-recurring transaction gain, was $0.65 per diluted share in the 2010 first quarter compared with $0.44 per diluted share in the corresponding period of 2009.

"Gentiva's solid first quarter performance was driven by patient admission growth of more than 10% and improving profitability as we continue to narrow our strategic focus to our home health and hospice operations," said Gentiva CEO Tony Strange. "The recent passage of healthcare reform legislation brings with it clarity on reimbursement for the next several years and we will continue to work closely with policymakers on future refinements to these regulations as they are implemented." . . . .

26

**Full-Year 2010 Outlook**

Gentiva reaffirmed its outlook for fiscal 2010 full-year net revenues in a range of $1.23 billion to $1.26 billion and raised its outlook for adjusted net income from continuing operations on a diluted earnings per share basis to between $2.67 and $2.75 as compared to prior guidance of between $2.57 and $2.67. Gentiva raised its earnings outlook for fiscal 2010 based on its strong first quarter operating earnings performance and the passage of the *Patient Protection and Affordable Care Act* which created a 3% add-on to Medicare payments made for home health services to patients in rural areas effective April 1, 2010. The 2010 estimates exclude net special charges of between $0.30 and $0.35 per diluted share, the results of discontinued operations and the impact of any future acquisitions.

56.     On May 13, 2010, Gentiva filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended March 29, 2010 (the "Q1 2010 10-Q"). The Q1 2010 10-Q, signed by defendants Strange and Potapchuk, repeated the Company's financial results set forth in the May 6, 2010 press release.

57.     The Q1 2010 10-Q stated, in part, the following:

**Home Health**
Home Health segment revenues are derived from all three payer groups: Medicare, Medicaid and Local Government and Commercial Insurance and Other. First quarter 2010 net revenues were $277.5 million, up $18.7 million, or 7 percent, from $258.8 million in the prior year period.

*          *          *

There are certain standards and regulations that the Company must adhere to in order to continue to participate in Medicare, Medicaid and other federal and state healthcare programs. As part of these standards and regulations, the Company is subject to periodic audits, examinations and investigations conducted by, or at the direction of, governmental investigatory and oversight agencies. Periodic and random audits conducted or directed by these agencies could result in a delay in or adjustment to the amount of reimbursements received under these programs. Violation of the applicable federal and state health care regulations can result in our exclusion from participating in these programs and can subject the Company to substantial civil and/or criminal penalties. The Company believes that it is currently in compliance with these standards and regulations.

58.     The statements referenced above in ¶¶ 33-57 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them: (1) that the Company improperly increased the number of in-home therapy visits to patients for the purpose of triggering higher reimbursement rates under the Medicare home health prospective payment system; (2) as a result of the Company's improper conduct, its reported sales and earnings were materially and wrongfully inflated; (3) and based on the foregoing, defendants lacked a basis for their positive statements about the Company, its prospects and growth.

## VI.     THE TRUTH BEGINS TO EMERGE

59.     On May 13, 2010, the *Wall Street Journal* reported that the United States Senate Finance Committee launched an investigation into the practices of companies that provide in-home therapy visits reimbursed by Medicare, including Gentiva.

60.     On May 14, 2010, Gentiva shares declines from a closing price on May 13, 2010 of $29.75 per share to close at $27.55 per share, a decline of $2.20 per share or approximately 7% on heavier than usual volume.

61.     On July 13, 2010 Gentiva disclosed that the SEC commenced an investigation relating to Gentiva's participation in the Medicare Home Health Prospective Payment System.

62.     On July 14, 2010, Gentiva shares declines from a close on July 13, 2010 of $22.30 per share, to close at $21.99 per share, a decline of $0.31 per share on heavier than usual volume.

63.    On July 20, 2010, after the close of trading, Gentiva disclosed its financial results for the fiscal quarter ended July 4, 2010. Among other things, the Company disclosed that "in light of recent softness in home health episodic volumes and the anticipated seasonality in third quarter volumes as experienced by the Company historically, Gentiva has reduced its full-year revenue guidance to a range of $1.20 billion to $1.23 billion from its prior guidance of between $1.23 billion to $1.26 billion."

64.    On July 21, 2010, Gentiva shares declined from a close on July 20, 2010 of $21.60 per share, to close at $19.96, a decline of $1.64 per share or approximately 8% on heavier than usual volume.   The next trading day, Gentiva shares declined an additional $0.56 per share, for a two day decline of approximately 10%.

## VII.   LOSS CAUSATION/ECONOMIC LOSS

65.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Gentiva stock price and operated as a fraud or deceit on Class Period purchasers of Gentiva stock by misrepresenting the Company's operating condition and future business prospects. Defendants achieved this by making positive statements about Gentiva's business and projecting strong earnings for the Company while they knew that the Company was suffering from a variety of adverse factors which were then negatively impacting its financial results, as alleged herein. Later, however, when defendants' prior misrepresentations were disclosed and became apparent to the market, the price of Gentiva stock fell precipitously as the prior artificial inflation came out of Gentiva' stock price. As a result of their purchases of Gentiva stock during the Class Period, plaintiff

and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

66.     As a direct result of the public revelations regarding the truth about the condition of Gentiva's business and the negative adverse factors that had been impacting Gentiva's business during the Class Period, the price of Gentiva's stock materially declined.   This drop removed the inflation from Gentiva's stock price, causing real economic loss to investors who purchased the stock during the Class Period.

67.     The decline in Gentiva's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Gentiva's stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the defendants' fraudulent conduct.

## VIII.   FRAUD-ON-THE-MARKET DOCTRINE

68.     At all relevant times, the market for Gentiva's common stock was an efficient market for the following reasons, among others:

(a)     The Company's common stock met the requirements for public listing and was listed and actively traded on the Nasdaq, a highly efficient market;

(b)     As a regulated issuer, the Company filed periodic public reports with the SEC; and

(c)     The Company regularly issued press releases which were carried by national news wires. Each of these releases was publicly available and entered the public marketplace.

69.     As a result, the market for the Company's publicly traded common stock promptly digested current information with respect to Gentiva from all publicly available sources and reflected such information in the price of the Company's common stock. Under these circumstances, all purchasers of the Company's publicly traded common stock during the Class Period suffered similar injury through their purchase of the publicly traded common stock of Gentiva at artificially inflated prices and a presumption of reliance applies.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

70.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issues or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Gentiva, their control over, and/or receipt and/or modification of Gentiva's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Gentiva, participated in the fraudulent scheme alleged herein.

71.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and

complicity of the personnel at the highest level of the Company, including the Individual Defendants.

72.     Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because the Individual Defendants were the most senior officers of Gentiva, issued statements and press releases on behalf of Gentiva and had the opportunity to commit the fraud alleged herein.  During the Class Period, the Individual Defendants collectively sold approximately 261,828 Gentiva shares at artificially inflated prices for proceeds of approximately $6.3 million.

## X.     NO SAFE HARBOR

73.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Gentiva who knew that those statements were false when made.

**FIRST CLAIM FOR RELIEF**
**For Violation of Section 10(b) of the 1934 Act**
**and Rule 10b-5 Against All Defendants**

74.     Plaintiff incorporates ¶¶ 1-73 by reference.

75.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

76.     Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Gentiva publicly traded common stock during the Class Period.

77.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Gentiva's publicly traded common stock. Plaintiff and the Class would not have purchased Gentiva common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

78.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Gentiva common stock during the Class Period.

**SECOND CLAIM FOR RELIEF**
**For Violation of Section 20(a) of the 1934 Act**
**Against the Individual Defendants**

79.    Plaintiff incorporates ¶¶ 1-73 by reference.

80.    The Individual Defendants acted as a controlling person of Gentiva within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

81.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

34

82.     As set forth above, Gentiva and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Gentiva's and the Individual Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: November 2, 2010                    KAPLAN FOX & KILSHEIMER LLP


                                           Joel B. Strauss
                                           Jeffrey P. Campisi
                                           850 Third Avenue, 14th Floor
                                           New York, NY 10022
                                           Tel: (212) 687-1980
                                           Fax: (212) 687-7714

                                           *Attorneys for Plaintiff*

**KAPLAN*FOX***

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Steve Endress, hereby certify and swear as follows:

1. I have reviewed the attached Complaint against Gentiva Health Services, Inc. alleging violations of the securities laws and authorize its filing;

2. I am willing to serve as a representative party on behalf of a class, or to be a member of a group representing a class, including providing testimony at deposition and trial, if necessary;

3. I have not within the 3-year period preceding the date hereof sought to serve, or served, as a representative party on behalf of a class in an action brought under the federal securities laws, unless noted hereafter:

The following is a description of my transactions during the class period specified in the Complaint in the common stock of Gentiva Health Services, Inc.:

| Transaction Type | Trade Date | Number of Shares | Price Per Share |
|---|---|---|---|
| Purchase | 3/19/2010 | 300 | $29.20 |

4. I did not purchase common stock of Gentiva Health Services, Inc. at the direction of my counsel or in order to participate in any private action under the federal securities laws;

5. I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

STEVE ENDRESS

Date: 10/28/2010