**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

IN RE GENTIVA SECURITIES LITIGATION      **MEMORANDUM OF**
**DECISION AND ORDER**
10-cv-5064 (ADS)(WDW)

----------------------------------------------------------X

**APPEARANCES:**

**Robbins Geller Rudman & Dowd, LLP**
*Attorneys for the Movant Indiana Laborers Pension Fund*
58 South Service Road
Suite 200
Melville, NY 11747
       By:    Davis A. Rosenfeld, Esq.
               Samuel H. Rudman, Esq., of Counsel

**Kaplan Fax & Kilsheimer LLP**
*Attorneys for the Intervenor Plaintiff Minneapolis Police Relief Association and the*
*Movant Los Angeles City Employees' Retirement System*
850 Third Avenue, 14th Floor
New York, NY 10022
       By:    Frederic S. Fox, Esq.
               Joel B. Strauss, Esq.
               Jeffrey P. Campisi, Esq., of Counsel

**Bernstein Litowitz Berger & Grossmann LLP**
*Attorneys for the Movants Arkansas Teacher Retirement System and*
*the Metropolitan Water Reclamation District Retirement Fund*
1285 Avenue of the Americas
New York, NY 10019
       By:    Gerald Harlan Silk, Esq.
               Avi Josefson, Esq.
               Laurence J. Hasson, Esq., of Counsel

**Labaton Sucharow LLP**
*Attorneys for the Movants Arkansas Teacher Retirement System and*
*the Metropolitan Water Reclamation District Retirement Fund*
140 Broadway
New York, NY 10005
        By:    Christopher J. Keller, Esq.
                Eric J. Belfi, Esq.
                Michael W. Stocker, Esq., of Counsel

**Grant & Eisnehofer P.A.**
*Attorneys for the Movant International Union of Operating Engineers Pension*
*Fund of Eastern Pennsylvania and Delaware*
485 Lexington Avenue
New York, NY 10017
        By:    James J. Sabella, Esq., of Counsel

**Weil, Gotshal & Manges LLP**
*Attorneys for the Defendants Gentiva Health Services, Inc., Ronald A. Malone,*
*Anthony H. Strange, and John R. Potapchuk*
767 Fifth Avenue
New York, NY 10153
        By:    John A. Neuwirth, Esq., of Counsel

**SPATT, District Judge.**

The present case is a consolidated securities fraud class action on behalf of all persons who purchased the publicly traded common stock of Gentiva Health Services during the relevant class period. Pursuant to an Order issued on November 2, 2011, presently before the Court are four motions by five putative class members to be appointed lead plaintiff in this action in accordance with the Private Securities Litigation Reform Act, 15 U.S.C. §78u-4 et seq., ("PSLRA").

# I. BACKGROUND

## A. Procedural Background

On November 2, 2010, former named plaintiff Steve Endress filed a securities fraud class action on behalf of all persons who purchased the publicly traded common stock of Gentiva Health Services ("Gentiva") between July 31, 2008 and July 20, 2010.  The action was filed against the Defendant Gentiva and three of its executives, the Defendants Ronald A. Malone, Anthony H. Strange, and John R. Potapchuk.  Endress alleged that Gentiva, which is a publicly traded health care provider, artificially inflated its stock price through a scheme that involved ordering unnecessary medical care for clients, and then billing the federal government for these illegitimate expenses.  Endress further alleged that when the scheme came to light, Gentiva's stock price dropped precipitously, and, as a person who had purchased Gentiva stock while its price was artificially inflated, he was harmed.  Endress sought relief on behalf of himself and all persons who purchased Gentiva stock during the period of the alleged fraud, which he identified as being from July 31, 2008 to July 20, 2010.

On January 21, 2011, the Minneapolis Police Relief Association ("MPRA") filed a motion to intervene as a plaintiff in the Endress action pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 24(b)(1)(B).  MPRA also requested to be lead plaintiff pursuant to the PSLRA.  MPRA is a public pension fund that purchased an undisclosed amount of Gentiva stock during from July 31, 2008 to July 20, 2010.  The Defendants did not oppose MPRA's motion to intervene.  However, they did oppose MPRA's motion to be named as lead plaintiff, on the

ground that MPRA had not satisfied certain prerequisites for this designation that are set forth in the PSLRA.  On July 19, 2011, the Court ordered that MPRA's motion to intervene was granted, but that its motion to be appointed lead plaintiff was denied without prejudice.

On July 25, 2011, Endress sought to withdraw as a named plaintiff and MPRA renewed its motion to be appointed lead plaintiff, pursuant to the PSLRA. However, while this motion was pending before the Court, four other almost identical federal class actions were subsequently filed by Cement Masons & Plasterers Joint Pension Trust ("Cement Masons") on September 14, 2011; International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware ("International Union") on October 11, 2011; Arkansas Teacher Retirement System ("Arkansas Teacher") on October 20, 2011; and Douglas Dahlgard ("Dahlgard") on October 25, 2011.  All five actions were on behalf of the same class of investors who purchased Gentiva publicly traded securities during a similar class period, and based upon the same facts alleging violations of the same laws.  Following the filing of all five actions, the Plaintiffs in each case wrote a letter to the Court articulating their support for consolidation.  In addition, all five parties requested the Court to consider them as a suitable lead plaintiff in the proposed consolidated action.

On November 2, 2011, the Court granted the motion by the Plaintiff Steve Endress to withdraw as named plaintiff.  In addition, the Court ordered that the five Gentiva actions should be consolidated to economize both judicial resources and the resources of the parties.  However, due to the unique circumstances in the case with

regard to the procedure of appointing a lead plaintiff under the PSLRA, the Court

reopened the lead plaintiff process and allowed any plaintiff to move to be

appointed lead plaintiff within 60 days of the Court's Order, which was the date of

the withdrawal of the only eligible lead plaintiff.  See Endress v. Gentiva Health

Services, Inc., --- F.R.D. ---, 2011 WL 5220475, at *5 (E.D.N.Y. Nov. 2, 2011)

(Spatt, J.).

Thereafter, four motions were filed by five putative class members to be

appointed lead plaintiff in this action in accordance with the PSLRA:  Indiana

Laborers Pension Fund ("Indiana Laborers"); Los Angeles City Employees'

Retirement System ("LACERS"); Arkansas Teacher and the Metropolitan Water

Reclamation District Retirement Fund ("Metropolitan Water") (collectively, the

"Arkansas  Group"); and International Union.

## II. DISCUSSION

### A. The Relevant Law

The naming of a lead plaintiff generally takes place early in the life of a

putative securities class action, and begins with the publication of a notice by the

plaintiff, within twenty days of filing, that identifies the claims asserted in the case

and the proposed class period. 15 U.S.C. § 78u–4(a)(3)(A)(i).  Upon the publication

of this notice, any putative class member may move the court, within sixty days, to

be named lead plaintiff.  Id.  Following this sixty day period, but not more than

ninety days after the original notice is published, the court may appoint a lead

plaintiff.  15 U.S.C. § 78u–4(a)(3)(B)(i).  The Court must consider all motions

made by purported class members seeking to be appointed lead plaintiff and

determine the "member or members of the purported plaintiff class that . . . [is] most capable of adequately representing the interests of the class members."  Id.; see Metro Servs. Inc. v. Wiggins, 158 F.3d 162, 164 (2d Cir. 1998).

The PSLRA sets forth express considerations that a trial court must consider when appointing a lead plaintiff.  In determining the appropriate lead plaintiff, the Court adopts a rebuttable presumption that the most adequate plaintiff in any private action . . . is the person or group of persons that—"

> (aa) has either filed the complaint or made a motion in response to a notice . . . ;

> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(aa)-(cc). This presumption "may be rebutted only upon proof offered by another member of the purported class that the presumptively most adequate plaintiff—(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)(aa)-(bb).

In the present case, 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(aa) is not applicable as every proposed lead plaintiff has timely complied with the procedure described in the Court's November 2, 2011 Order and thus, at this juncture, all movants have equal standing.   Therefore, the Court must determine which movant has the largest financial interest in the relief sought by the class and otherwise satisfies the

requirements of Fed. R. Civ. P. 23, while remaining cognizant of the goals and values underlying the PSLRA.

### 1. Largest Financial Interest Requirement

The language of the PSLRA itself is not explicit as to the proper methodology for courts to use in determining which plaintiff has the largest financial interest in the relief sought by the Class.  The Second Circuit has also not definitively ruled on the proper method.  See City of Monroe Employee's Ret. Sys. v. Hartford Fin., 269 F.R.D. 291, 293 (S.D.N.Y. 2010).  One clear method utilized by courts in this Circuit is a four factor test, as initially set forth by the Northern District of Illinois in Lax v. First Merchants Acceptance Corp., Nos. 97 Civ. 2715 et al., 1997 WL 461036, at *5 (N.D. Ill. Aug.11, 1997) and adopted in In re Olsten Corp. Sec. Litig., 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998), now known as the "Olsten factors" or "Lax test".   See In re Orion Securities Litig., No. 08 Civ. 1328, 2008 WL 2811358, at *5 (S.D.N.Y. July 8, 2008) (adopting the four Olsen factors); Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co., 229 F.R.D. 395, 404 (S.D.N.Y. 2004) (same); In re eSpeed, Inc. Sec. Litig., 232 F.R.D. 95, 100 (S.D.N.Y. 2005) (same).

The four relevant factors are: "(1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period); (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and (4) the

approximate losses suffered." <u>City of Monroe Employee's Ret. Sys.</u>, 269 F.R.D. at 293.  However, most courts "place the most emphasis on the last of the four factors: the approximate loss suffered by the movant."  <u>Baughman v. Pall Corp.</u>, 250 F.R.D. 121, 125 (E.D.N.Y. 2008).

**2.  Rule 23 Requirements**

Under the PSLRA, the presumed most adequate plaintiff also must satisfy the requirements of Fed. R. Civ. P. 23.  <u>See</u> 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Under Rule 23, there are four prerequisites to be considered in evaluating class certification:  numerosity, commonality, typicality, and adequacy.  <u>See</u> Fed. R. Civ. P. 23(a).  In selecting a lead plaintiff, Courts will typically focus on the typicality and adequacy requirements.  <u>See Baughman</u>, 250 F.R.D. at 126; <u>In re Symbol Techs., Inc. Secs. Litig.</u>, No. 05 Civ 3923, 2006 WL 1120619, at *2 (E.D.N.Y. Apr. 26, 2006) ("Only the typicality and adequacy criterions are relevant to the selection of lead plaintiff.") (citations omitted).  At this stage of the litigation, the moving party "need only make a preliminary showing that it satisfies the typicality and adequacy requirements of Rule 23."  <u>In re Olsten Corp. Secs. Litig.</u>, 3 F. Supp. at 296 (citations omitted); <u>Martingano v. Am. Intern. Group, Inc.</u>, No. 06 Civ. 1625, 2006 WL 1912724 at *4 (E.D.N.Y. July 11, 2006) ("wide-ranging analysis under Rule 23 is not appropriate [at this initial stage of the litigation] and should be left for consideration of a motion for class certification") (citations omitted).

Rule 23(a)'s "typicality" requirement is satisfied "where the claims arise from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  <u>In re Symbol Techs., Inc. Secs.</u>

<u>Litig.</u>, 2006 WL 1120619, at *3 (citing <u>Robinson v. Metro–North Commuter R.R.</u> <u>Co.</u>, 267 F.3d 147, 155 (2d Cir. 2001)).

The "adequacy" requirement of Rule 23 is satisfied where "(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) the class members' interests are not antagonistic to one another; and (3) the class has a sufficient interest in the outcome of the case to ensure vigorous advocacy." <u>In re</u> <u>Symbol Techs., Inc. Secs. Litig.</u>, 2006 WL 1120619, at *3 (citing <u>In re eSpeed, Inc.</u> <u>Sec. Litig.</u>, 232 F.R.D. 95, 102 (S.D.N.Y. 2005); <u>In re Initial Public Offering Sec.</u> <u>Litig.</u>, 214 F.R.D. 117, 121 (S.D.N.Y. 2002)).

### 3. Institutional Investor

Finally, although not explicitly stated in the PSLRA, the Court bears in mind that many courts have demonstrated a clear preference for institutional investors to be appointed as lead plaintiffs. <u>See In re eSpeed, Inc. Secs. Litig.</u>, 232 F.R.D. 95, 99–100 (S.D.N.Y. 2005) (citing <u>In re Goodyear</u>, No. 03 Civ. 2166, 2004 WL 3314943, at *3 (N.D. Ohio May 12, 2004) ("The legislative history of the PSLRA reflects a preference for institutional investors in the lead plaintiff role."); <u>Malasky v. IAC/Interactivecorp</u>, No. 04 Civ. 7447, 2004 WL 2980085, at *4 (S.D.N.Y. Dec. 21, 2004) (discussing the PSLRA's preference for institutional investors)); <u>see also</u> H.R. Conf. Rep. No. 104-369, at 34 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 733 ("The Conference Committee believes that increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions.").

This preference has been determinative in other cases, even when an institutional investor has a slightly lower loss than another potential lead plaintiff. See, e.g., Juliar v. SunOpta Inc., Nos. 08 CV 933 et. al, 2009 WL 1955237, at *2 (S.D.N.Y. Jan. 30, 2009) (citing Police & Fire Ret. Sys. v. SafeNet, Inc., 2007 U.S. Dist. LEXIS 97959, at *6 (S.D.N.Y. Feb. 21, 2007)) ("This difference [of $40,000] is minimal and, in this case, does not overcome a presumption inherent in Congress' enactment of the PSLRA that institutional investors serve as better lead plaintiffs.").

In the present case, every movant is an institutional investor. Therefore, the Court need not address this consideration as part of its analysis.

**B. As to the Appropriate Class Period**

As stated above, an important consideration in determining the appropriate lead plaintiff in a securities class action is the financial losses that occurred as a result of the alleged fraud. Thus, in order to properly compare the four present movants, the Court must as an initial matter determine a single class period to operate as a reference point.

It is undisputed that the class period should begin on July 31, 2008, when the Defendant issued a press release announcing its financial results for the fiscal quarter ending June 29, 2008. However, varying end dates for the class period have been asserted by the previous named plaintiffs and the present movants.

The initial class period utilized in the original complaint was from July 31, 2008 through July 20, 2010. This end date is relevant as it was the day on which Gentiva issued a press release announcing its preliminary financial results for the second quarter of 2010, which further reduced its full-year revenue guidance. The

second action filed by Cement Masons also utilized this class period.  However, the two actions that were filed by International Union and Arkansas Teacher, both now moving for lead plaintiff, requested a class period from July 31, 2008 through September 30, 2011.  This end date is relevant because it is the last full day of trading before October 3, 2011, the date on which the Senate Finance Committee released the investigative report that found that Gentiva tailored the care they provided to Medicare patients to maximize their reimbursements from the federal program.   Finally, the complaint filed by Douglas Dahlgard recommended a class period ending on October 4, 2011, the date after the investigative report became public and supposedly when investors finally realized that Gentiva's positive financial results and gains were tainted by allegedly defrauding the government.

Of the four present movants, Indiana does not specify its proposed class period but provides the Court with purchases and losses as late as October 5, 2011. International Union again recommends that the class period end on September 30, 2011.  LACERS and the Arkansas Group both encourage the Court to adopt the most inclusive time, so that the class period would end on October 4, 2011.

For the purpose of determining a lead plaintiff, the Court finds that the use of the longer, most inclusive class period identified by the present movants, July 31, 2008 through October 4, 2011, is proper, as it encompasses more potential class members.  See In re Bank of America Corp. Secs., Deriv. and ERISA Litig., 258 F.R.D. 260, 269 (S.D.N.Y. 2009) (determining the largest financial interest based upon "the longest class period identified"); In Re Doral Fin. Corp. Secs. Litig., 414 F. Supp. 2d 398, 403 (S.D.N.Y. 2006) ("For the purpose of determining lead

plaintiff, I find that the use of the longer, most inclusive class period of May 15, 2000 through May 26, 2005 is proper, as it encompasses more potential class members"); In re Elan Corp. Sec. Litig., No. 08 Civ. 8761, 2009 U.S. Dist. LEXIS 39859, at *5 (S.D.N.Y. May 8, 2009) ("I do not find the claims which anchor the longer . . . class period to be implausible, and I find that it is appropriate to use that more inclusive period for present purposes.").  In addition, the Court finds that "nothing in the PSLRA limits the class period to the period identified in the first notice."  See Plumbers & Pipefitters Local 562 Pension Fund v. MGIC Corp., 256 F.R.D. 620, 625 (E.D. Wis. 2009).

Moreover, "[t]he end date of a class period in securities fraud litigation depends on the particular fraud theory advanced."  See In Re Omnicom Group, Inc. Secs. Litig., 2007 WL 1280640, at *9.  The allegations here are based upon a "fraud-on-the-market" theory, where the Defendants' actions allegedly prevented an efficient market from accurately valuing inflated stock prices.  (See Endress Compl. at ¶ 68-69.)   When a publicly available "corrective disclosure", such as a newspaper article, provides information that allows an efficient market to adjust, then this marks the end of the class period.  See In re Salomon Analyst Metromedia Litig., 544 F.3d 474, 481 n.4 (2d Cir. 2008) (acknowledging a district court's restriction of class period to the interval beginning on the date of the first alleged misrepresentation, and ending on the date the alleged misrepresentation was corrected); see, e.g., Menkes v. Stolt-Nielsen S.A., 270 F.R.D. 80, 99 (D. Conn. 2010) (finding the end date of the class period to be February 20, 2003, "the date of

publication for the second Wall Street Journal report describing SNTG's involvement in the unlawful market allocation scheme.").

While the final corrective disclosure did take place on October 3, 2011, when the Senate Finance Committee report was released, the Court nevertheless finds that the class period shall close on October 4, 2011; at least for purposes of this motion. This conclusion is based on the reasoning that "the class period ends when the full truth has been disclosed to the market <u>and</u> the natural market forces have had a reasonable period of time to receive, digest and reflect the bad news in the market price of the security." <u>In re Oxford Health Plans, Inc.</u>, 191 F.R.D. 369, 378 (S.D.N.Y. 2000) (emphasis in original). <u>See In re Dynergy, Inc. Secs. Litig.</u>, 226 F.R.D. 263, 292 (S.D. Tex. 2005) ("to end the class period on the day that corrective disclosures were filed with the SEC would close the class period before natural market forces had a reasonable time to receive, digest, and reflect the bad news in the market price of the security. . . . the precise day on which natural market forces had a reasonable time to digest and reflect the bad news in the market price is, necessarily, a question of fact."). <u>Cf. In re Veeco Instruments, Inc., Securities Litigation</u>, 235 F.R.D. 220, 241 (S.D.N.Y.2006) (limiting class period to interval beginning on the date of the first actionable misrepresentation, and ending on the day *before* the corrective disclosure).

At this early stage in the proceedings, it is inappropriate for the Court to adjudicate whether the truth regarding Gentiva's alleged fraud had fully been disclosed to and reflected by the market by a specified date. Thus, the Court favors

a broader class period at this time.  However, the Court's decision to end the class

period on a different date is subject to modification after further discovery.

## C. As to the Appointment of Lead Plaintiff

Of the four present movants, Indiana Laborers and International Union have

asserted approximate losses at the end of the class period that are much smaller than

those asserted by LACERS and the Arkansas Group.  Indiana Laborers asserts a

loss of $451,974.49 and International Union asserts a loss of $80,996, as compared

to LACERS' asserted loss of $2,176,430 and the Arkansas Group's asserted loss of

$2,143,758.80.  Thus, this Court's determination at the outset appears to exclude

both Indiana Laborers and International Union.

### 1.   "In-and-Out" Trader Argument

Nevertheless, Indiana Laborers contends that it should still be appointed

lead plaintiff because it held the largest number of shares of any movant through

October 4, 2011, the end of the class period, due to the fact that LACERS and the

Arkansas Group both sold the vast majority of their Gentiva stock in August 2011.

Consequently, Indiana Laborers argues that the other movants "improperly included

regular trading losses from earlier stock sales that they made at a loss—losses that,

based on the current record, are likely not recoverable under the federal securities

laws."  (See Indiana Supp. Mem. at 2.)

There are several cases in the Second Circuit which demonstrate an

avoidance to appoint "in-and-out traders" as lead plaintiffs—"those individuals or

entities that purchase and sell shares within the class period and, thus, obfuscate

loss calculations."  Montoya v. Mamma.com Inc., No. 05 Civ. 3444, 2005 WL

1278097, at *2 (S.D.N.Y. May 31, 2005). This sort of concern is not usually raised in the context of who has the largest financial interest, but rather, whether a potential lead plaintiff may suffer from unique adequacy and typicality defenses if it cannot prove a causal connection between the alleged fraudulent conduct and its losses. See Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 345–46, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005) (holding that there must be proof of a causal connection between a securities plaintiff's loss and the defendant's fraudulent conduct); In re Bally Total Fitness Sec. Litig., No. 04 Civ. 3530 et. al, 2005 WL 627960, at *6 (N.D. Ill. Mar. 15, 2005) ("Plaintiffs suing under the PSLRA must prove that the defendant's purported fraudulent statement or omission was the cause of their loss") (citing 15 U.S.C. § 78u–4(b)(4)). Nevertheless, the Court will consider the issue in this context so that it may be dealt with at the outset. See Juliar, 2009 WL 1955237, at *2 (addressing the issue in both the contexts of financial loss and typicality under Rule 23).

Indiana Laborers raises a plausible argument concerning in-and-out trading, in that both LACERS and the Arkansas Group sold most, if not all, of their Gentiva stock by the end of August 2011, although the class period does not conclude until October 4, 2011. Arkansas Teachers sold all of its 127,554 shares of stock by August 4, 2011, two months before the final corrective disclosure which marks the end of the class period. LACERS sold most of its stock between August 1, 2011 and August 5, 2011, again two months before the final disclosure of Gentiva's alleged fraud. Therefore, the relevant question is whether the fact that these two movants sold most of their shares in August 2011, prior to the final corrective

disclosure in October 2011, prevents them from being appointed as lead plaintiff in this action.

Certainly, courts have been reluctant to appoint a plaintiff who has sold the majority or a portion of its stock prior to a corrective disclosure. See, e.g., Bensley v. FalconStor Software, Inc., No. 10 Civ. 4572, 2011 WL 3849541, at *9 (E.D.N.Y. Aug. 29, 2011) ("Having considered the parties' respective arguments, the Court finds that the Fund has failed to demonstrate that it will be an adequate lead plaintiff because it was a total in-and-out trader and may be unable to demonstrate loss causation."). However, most Courts who have refrained from appointing such lead plaintiffs have done so in the complete absence of partial corrective disclosures or in light of speculative or highly questionable partial disclosures. See id. ("they have made no allegation that the public was aware, prior to the [final] disclosure, that the reason the Company was not making its projected revenues was because of the alleged fraud"); In re McKesson HBOC, Inc. Sec. Litig., 97 F. Supp. 2d 993, 998 (N.D. Cal. 1999) (where there was "little evidence of partial corrective disclosures reaching investors," the court declined to count losses by 'in-and-out' traders when determining the plaintiff with the greatest financial interest in the litigation).

Here, there are several plausible and legitimate partial disclosures prior to October 4, 2011, including that: (1) on May 13, 2010, the Wall Street Journal reported that the United States Senate Finance Committee launched an investigation into the practices of companies that provide in-home therapy visits reimbursed by Medicare, including Gentiva; (2) on July 13, 2010, Gentiva issued a press release stating that the SEC was investigating Gentiva's participation in the Medicare

16

Home Health Prospective System; (3) on July 20, 2010, Gentiva disclosed its financial results for the fiscal quarter and disclosed, among other things, that "in light of recent softness in home health episodic volumes . . . Gentiva has reduced its full-year revenue guidance"; and (4) on August 4, 2011, the Company revised and lowered its outlook for the year, in part due to the "difficult operating conditions driven by the implementation of new regulations."   The fact that the initial securities fraud class action was filed on November 2, 2010, on behalf of all persons who purchased the publicly traded common stock of Gentiva between July 31, 2008 and July 20, 2010, further supports the notion that the public was aware, prior to the final disclosure on October 3, 2011, that the Company was not making its projected revenues because of the alleged fraud.

Therefore, although it is typically true that the announcement of an earnings revision, without more, is not considered a partial disclosure of fraud, see Bensley, 2011 WL 3849541, at *9, Gentiva's announcement on August 4, 2011 of its second quarter 2011 financial results and revised guidance were done in the context of the earlier disclosure of the Senate Finance Committee's investigation.  The statements regarding "new regulations" and "difficult operating conditions" cannot be viewed in a vacuum.  Based upon earlier events such as these, there is a sufficient basis for this Court to find, at this stage of the litigation, that the movants here have "adequately alleged partial disclosure of [Gentiva's] trouble prior to its [official] disclosure [on October 3, 2011]." Juliar, 2009 WL 1955237, at *2).  See Montoya, 2005 WL 1278097, at *2 (indicating that the Dura loss causation requirements do not require full disclosure and can be established by partial disclosure during the

17

class period which causes the price of shares to decline).  Indiana Laborer's argument, that only losses after the official disclosure of the Senate Finance Committee's investigative report on October 3, 2011 will be relevant to causation in this case, is particularly unpersuasive considering that the initial complaint in this case was filed on November 2, 2010.

Moreover, other "[c]ourts in this District have found that where a putative lead plaintiff sold all its shares after a partial disclosure of misconduct by the defendant but before the final disclosure that led to the lawsuit, that putative lead plaintiff does not face the unique defense of having to show loss causation to the extent that it cannot serve as lead plaintiff."  Juliar, 2009 WL 1955237, at *2. Montoya, 2005 WL 1278097, at *2 ("[L]oss causation does not require full disclosure and can be established by partial disclosure during the class period which causes the price of shares to decline.") (emphasis in original).

Indiana Laborers points out that even if there had been a partial disclosure that could result in recoverable damages, courts defer the question, finding it to be too complicated at the lead plaintiff appointment stage of the litigation to make findings of fact regarding any potential partial disclosures and the effect, if any, these disclosures had on the price of the stock.   However, the case cited to in order to support that proposition, Ruland v. InfoSonics Corp., Nos. 06 CV 1231, 06 CV 1233, 06 CV 1309, 06 CV 1331, 06 CV 1378, 06 CV 1435, 2006 WL 3746716, at *5 (S.D. Cal. Oct. 23, 2006), is one where there did not appear "to be any allegation that the truth began to leak out" prior to the end of the class period.  Id.  As

explained above, there are sufficient facts alleged for the Court to make this determination at this juncture for purposes of the appointment of a lead plaintiff.

Putting aside the issue of partial disclosures, "[i]n any event, selling shares during the class period does not disqualify a class member from being appointed lead plaintiff." Ellenburg v. JA Solar Holdings Co. Ltd., 262 F.R.D. 262, 268 (S.D.N.Y. 2009). See Freudenberg v. E*Trade Fin. Corp., No. 07 Civ. 8538, 2008 WL 2876373, at *7 (S.D.N.Y. July 16, 2008) ("Nor does the sale by KSG of their E*Trade securities by August 20, 2007, prior to the end of the alleged class periods in the current complaints, render them inadequate or atypical under the PSLRA, absent a showing that such divestiture creates divergent interests."); Weiss v. Friedman, Billings, Ramsey Group, Inc., No. 05 Civ. 4617 et al., 2006 WL 197036, at *5 (S.D.N.Y. Jan. 25, 2006) ("despite the fact that all the Operating Engineers Trust's shares were sold before the class period ended, one would not necessarily have to conclude that the Trust's losses are unattributable to the alleged fraudulent inflation."); In re Gaming Lottery Sec. Litig., 58 F. Supp. 2d 62, 69–71 (S.D.N.Y. 1999) (rejecting defendants' argument that an in-and-out purchaser was an inadequate class representative because he sold as well as purchased at inflated prices); see also Montoya v. Mamma.com, Inc., 2005 WL 1278097 (appointing lead plaintiff that was out of the subject stock before the end of the class period).

Therefore, the Court rejects Indiana Laborers' contention that the other movants improperly included regular trading losses from earlier stock sales that are not recoverable under the federal securities laws. Accordingly, the financial interests asserted by LACERS and the Arkansas Group will be considered by the

Court.  However, by comparison, Indiana Laborers' losses are too minor by comparison to be afforded the presumption of lead plaintiff under the PSLRA.

Finally, the Court is aware that other facts may come to light throughout the course of this litigation, and therefore the Court "reserves the right to modify this lead plaintiff structure in the event that litigation is stalled, expenses become unnecessarily duplicative or wasteful, or the structure becomes otherwise unmanageable." Weiss, 2006 WL 197036, at *5.  However, for the time being, the only potential lead plaintiffs the Court will continue to consider are LACERS and the Arkansas Group.

**2.  Application of the <u>Olsen</u> Factors**

As stated above, the four relevant Olsen factors that guide this Court's analysis are: (1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period; (3) the net funds expended during the class period; and (4) the approximate losses suffered.

"The amount of financial loss is the most significant of [the Olsen-style] elements." In re Vicuron Pharma., Inc. Sec. Litig., 225 F.R.D. 508, 510-11 (E.D. Pa. 2004); Takara Trust v. Molex Inc., 229 F.R.D. 577, 579 (N.D. Ill. 2005) (in determining largest financial interest, "most courts simply determine which potential lead plaintiff has suffered the greatest total losses"); In re Bally Total Fitness Sec. Litig., 2005 WL 627960, at *4 ("some of the lead plaintiff candidates who are in the middle of the pack in terms of losses . . . contend that we should also examine factors such as the number of shares purchased, the number of net shares purchased, and the total net funds expended by the plaintiff during the class period .

. . It is not self-evident, though, what weight these factors should be given in relation to the amount of loss, or even why we should consider them at all . . . We believe that the best yardstick by which to judge 'largest financial interest' is the amount of loss, period.  The inquiry need not and should not be complicated by also considering the number of shares or the net expenditures involved because those statistics do not advance the ball.").

The Arkansas Group itself, in its initial briefing to the Court, stressed that the most important inquiry is financial loss and stated that "in actions where it is alleged that the truth about the subject company was revealed over time through a series of partial corrective disclosures, as is in the case here, courts give little weight to the second and third Olsten factors –net shares purchased and net funds expended."  (Ark. Mem. at 8.)   It was further stated that "[t]his is so because while losses incurred on sales made following a partial corrective disclosure are clearly attributable to the alleged fraud, an analysis of net shares purchased and net funds expended during the full class period can yield the misleading conclusion that the movant did not suffer harm attributable to the fraud."  (Id.)

Thus, if the Court were to follow the line of thinking that "the largest loss is the critical ingredient in determining the largest financial interest and outweighs net shares purchased and net expenditures",  Richmond v. Goldman Sachs Group, Inc., 2011 WL2360291, at *6 (S.D.N.Y.), then LACERS would undoubtedly prevail as the presumptive lead plaintiff.  As the movant with the largest losses, $2,176,430.63, LACERS appears to have the largest financial interest in this matter, although by only a small margin.

21

However, the Arkansas Group urges the Court to hold that the $32,671.82 difference in loss between itself and LACERS is negligible, and instead to take note of the remaining Olsen factors: the number of gross shares and the number of net shares purchased during the class period, as well as the total net funds expended during the class period. The Arkansas Group emphasizes that it purchased 50,412 more shares in gross than LACERS did during the class period, that its net purchases were greater by 16,450 shares, and that it expended $17,216.94 more in net funds. Based upon the Court's own calculations, it finds that Arkansas Group actually expended $32,671.82 less net funds than LACERS. But the Court will assume, for the sake of argument, that the Arkansas Group's calculations are correct and that it surpasses LACERS with regard to certain Olsen factors.

Given that there is such a small difference in the financial interest between the two movants, the Court considers that LACERS' marginally greater loss may not outweigh the other Olsen factors in terms of relevance in determining who has the greatest financial interest. While $32,671.82 is not negligible, it is also not a substantial difference. Other courts in this circuit have stated that a $40,000 difference should not be outcome determinative. See, e.g., Police & Fire Ret. Sys. v. SafeNet, Inc., No. 06 Civ. 5797, 2007 U.S. Dist. LEXIS 97959, at *6 (S.D.N.Y. Feb. 21, 2007) (finding that $40,000—the difference in losses of 1.78 million and 1.82 million— was only a 2% difference, and thus could not "dictate such an important result"). Here, the difference between LACERS' loss and that of the Arkansas Group is only 1.5%.

22

However, the only reason that the calculations of the Arkansas Group come close to that of LACERS with regard to total shares purchased, total net funds expended, and financial loss, is because of the combined totaling of its two members—Arkansas Retirement and Metropolitan Water.  It does not appear that the Second Circuit has addressed whether unrelated class members may aggregate their claims in order to establish a larger financial interest.  In addition, courts in this circuit are divided on the issue.  Compare In re Veeco Instruments Inc. Sec. Litig., 233 F.R.D. 330, 334 (S.D.N.Y. 2005) ( "Courts (including this one) view such aggregations of individual shareholders with disapproval."), and In re Pfizer Inc. Sec. Litig., 233 F.R.D. 334, 337 (S.D.N.Y.2005) ("To allow an aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the purpose of choosing a lead plaintiff."), with Barnet v. Elan Corp., 236 F.R.D. 158, 162 (S.D.N.Y. 2005) ("[T]here can be no doubt that the PSLRA contemplates that some 'groups' can serve as lead plaintiff . . . ."), and Weltz v. Lee, 199 F.R.D. 129, 132-33 (S.D.N.Y. 2001) (noting that some courts "have permitted the aggregation of claims for the purposes of becoming lead plaintiff").  However, it is clear that the express language of the PSLRA permits the appointment of a person or group of persons to be lead plaintiff.

In light of the text of the PSLRA and most of the precedent in this circuit, the Court now finds that it is entirely proper to appoint a two member group as lead plaintiff.  See City of Monroe Employees' Ret. Sys. V. Hartford Fin., 269 F.R.D. 291, 294 (S.D.N.Y. 2010) ("the only grouping at issue here is the pairing of Stichting and SURSI, two institutional investors of the type that the drafters of the

PSLRA sought to encourage be appointed as lead counsel.  This type of pairing has been approved by this and other courts, and we see no reason that such a pairing would be counter to the PSLRA."); <u>Juliar</u>, 2009 WL 1955237, at *2 (granting application for lead counsel of "two institutional investors, each with significant losses"); <u>Reimer</u>, 2008 WL 2073931, at *3 (granting lead plaintiff status to grouping of three institutional investors); <u>Weltz</u>, 199 F.R.D. at 132 (noting that the "majority of courts . . . have permitted the aggregation of claims for the purposes of becoming lead plaintiff" and collecting cases).  Thus, the present motion for lead plaintiff by the Arkansas Group is permissible and may be considered by the Court.

However, when the combination of two institutional investors is the only reason for its possible advantages with regard to certain factors, this fact cannot be ignored.  The Court is particularly skeptical of the proposed amalgamation, because this is not the situation where there is a pre-existing relationship or where the incurred losses of the separate institutional investors individually exceed the losses of any other.  <u>See Freudenberg</u>, 2008 WL 2876373, at * 5 ("KSG has only three members, who submit that they have a longstanding pre-litigation relationship and . . . [t]he appropriateness . . . is further supported by the fact that . . . Straxton's losses alone would qualify it as the party with the largest financial interest in the litigation."); <u>Canson v. WebMD Health Corp.</u>, Nos. 11 Civ. 5382 and 11 Civ. 6031, 2011 WL 5331712, at *3 (S.D.N.Y. Nov. 7, 2011) ("there is no evidence that the Michigan Funds combined their litigation efforts in bad faith; the two parties have a pre-existing relationship . . . Moreover, each member of the Michigan Funds standing alone purchased more than twice as many shares, and incurred

24

significantly higher losses, than Cleveland Bakers and Teamsters"); Barnet, 236

F.R.D. at 162 ("Indeed, even were the Court to deconstruct the Group, two of its

individual members would still have the "largest financial interest" pursuant to 15

U.S.C. § 78u–4(a)(3)(B)(iii).").

Here, there is no indication that the two individual investors at issue had any

pre-existing relationship whatsoever.  Arkansas Teacher is headquartered in Little

Rock, Arkansas, and is "a combination contributory/non-contributory retirement

system governed by the State of Arkansas' retirement law that provides retirement,

disability, and survivor benefits to employees of Arkansas public schools and

educationally related agencies."  (See Joint Decl. at ¶ 1.)  Metropolitan Water is "a

defined benefit, single employer benefit plan established in 1931 under Article 13

of the Illinois Pension Code . . . to provide disability and retirement benefits to

qualified employees of the Metropolitan Water Reclamation District of Greater

Chicago."  (See Joint Decl. at ¶ 4.)   It is also clear that, taken individually, the two

institutional investors' losses are minimal as compared to LACERS.  Arkansas

Teacher's loss is only $1,292,808.54 when disentangled from that of Metropolitan

Water, meaning that LACERS loss is approximately 40% greater.  Metropolitan

Water's loss is only $850,950.27, meaning that LACERS' loss is approximately

156% greater.  Thus, when taken alone, neither comes close to the losses asserted

by LACERS and thus lends further support to the presumption of LACERS as lead

plaintiff.

Moreover, the reasons offered for the combination are not particularly

compelling, especially in light of the fact that Arkansas Teachers previously

brought one of the consolidated actions in its own name, adequately and without any assistance from Metropolitan Water.  The Arkansas Group states that they "determined to explore the possibility of partnering with one another because Arkansas Teacher and Metropolitan Water are similarly situated sophisticated institutional investors that share common goals, suffered substantial losses as a result of the fraud perpetrated by Gentiva, and believe in the importance of cooperation among members of the institutional investor community."  (See Joint Decl. at ¶ 7.)  Further, it states that their decision to jointly prosecute the action was due in part to their "shared belief regarding the role of corporate governance in detecting and preventing securities fraud."  (See Joint Decl. at ¶ 8.)

These statements by the Arkansas Group are admirable, and the Court agrees with its sentiments.  Nevertheless, there is no reason for the Court to overlook LACERS's marginally greater financial interest based upon the asserted benefits of joint leadership that the Arkansas Group asserts.  See City of Monroe, 269 F.R.D. at 194 n.5 ("While Stichting-SURSI argues that appointing two investors to serve as the lead plaintiff would allow the two investors to act as a check on one another, we find this outcome no more plausible than a situation where disagreements within the lead plaintiff appointees end up disadvantaging the class.").

Furthermore, by allowing unrelated groups to aggregate losses in an effort to generate the "largest financial interest", the possibility emerges that lawyers will form such groups to manipulate the selection process, and in that way gain control of the litigation.  Barnet, 236 F.R.D. at 160.  One of the primary concerns in

adopting the PSLRA was preventing "the manipulation by class action lawyers of the clients whom they purportedly represent." H.R. Conf. Rep. 104-369, at 31, <u>as reprinted in</u> 1995 U.S.C.C.A.N. 730, 730.  "To allow an aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the purpose of choosing a lead plaintiff. . . .To allow lawyers to designate unrelated plaintiffs as a "group" and aggregate their financial stakes would allow and encourage lawyers to direct the litigation. Congress hoped that the lead plaintiff would seek the lawyers, rather than having the lawyers seek the lead plaintiff."  <u>Pfizer</u>, 233 F.R.D. at 337 (internal citation omitted); <u>see also Maiden v. Merge Tech., Inc.</u>, Nos. 06-C-349, 06-C-356, 06-C-375, 06-C-431, 06-C-483, 06-C-493, 06-C-519, 2006 WL 3404777, at *3 (E.D. Wis. Nov. 21, 2006) (stating that allowing lawyers to "designate unrelated plaintiffs as a 'group' " would thwart the purpose of the PSLRA").  This is not to say that there is any evidence in this case that the lawyers of the Arkansas Group proceeded in any manner other than good faith.  However, the Court seeks to avoid the impression that "a group of unrelated investors has been cobbled together . . . to displace a single competing institutional investor".  <u>Barnet</u>, 236 F.R.D. at 163.

Finally, the Arkansas Group asserts that the Court should remove any sales of LACERS prior to August 4, 2011, the key "alleged prior disclosure".  In other words, the Arkansas Group urges the Court to assess largest financial interest not by total losses but rather by computing only "net numbers for comparison among the candidates."  <u>In re Network Associates, Inc., Securities Litigation</u>, 76 F. Supp. 2d 1017, 1027 (N.D. Cal. 1999).  In support of this argument, the Arkansas Group

asserts that on each of the relevant partial disclosure dates, it had a greater amount of net shares than LACERS.

However, even on this basis, the Court does not find that LACERS is an inferior lead plaintiff to the Arkansas Group.  First, net shares purchased is only one factor to be considered under Olsen, and thus the Arkansas group cannot solely rely on this basis to support their motion for lead plaintiff, especially in light of the Court's prior discussion.  Cf. Hodges v. Akeena Solar, Inc., 263 F.R.D. 528, 531-32 (N.D. Cal. 2009) (utilizing the "net shares" method to calculate a plaintiff's financial interest).  In any event, "the second [Olsen] factor (net shares purchased) diminishes in importance upon the realization that, here, partial corrective disclosures were reaching investors on a periodic basis."  Weiss v. Friedman, Billings, Ramsey Group, Inc., 2006 WL 197036, at *4 (S.D.N.Y. Jan. 25, 2006).  In addition, it is not necessarily true that an investor with more net shares on certain dates throughout the class period means greater actual financial losses.  This proposition is a variation of the in-and-out trader argument that the Court dismissed above.  Thus, even if the Arkansas Group held a greater number of net shares on certain partial disclosure dates, the Court finds that this does not affect the appointment of lead plaintiff in this case.

In sum, the Court will rely on "the largest loss [as] the critical ingredient in determining the largest financial interest [which] outweighs net shares purchased and net expenditures",  Richmond v. Goldman Sachs Group, Inc., 2011 WL2360291, at *6 (S.D.N.Y.), and finds that LACERS has the largest financial interest.

### 3.   Rule 23 Requirements

As set forth above, a lead plaintiff must also make a preliminary showing that it satisfies Rule 23's typicality and adequacy requirements.  See Kaplan, 240 F.R.D. at 94.  Typicality is established where "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir.1992), cert. dismissed sub nom., Hart Holding Co. Inc. v. Drexel Burnham Lambert Group, Inc., 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993).  However, "the Lead Plaintiff's claims do not have to be identical to the other class members' claims."  Weinberg v. Atlas Air Worldwide Holdings, Inc., 216 F.R.D. 248, 253 (S.D.N.Y. 2003).  When considering adequacy, "the Court scrutinizes (1) whether the proposed class counsel is qualified, experienced, and generally able to conduct the litigation; (2) whether the proposed lead plaintiff has interests that are antagonistic to other class members; and (3) whether the proposed lead plaintiff and the class possess sufficient interest to pursue vigorous prosecution of their claims."  Constance Sczesny Trust v. KPMG LLP, 223 F.R.D. 319, 324 (S.D.N.Y.2004) (internal citations and quotation marks omitted).

In this case, LACERS' claims, similar to the other members of the proposed class, arise from their reliance on allegedly false and misleading statements in purchasing Gentiva shares during the class period.   Moreover, beyond the in-and-out trader allegations discussed in extensive detail above, there is nothing to suggest that LACERS' claims are markedly different from other class members.  Therefore,

LACERS has made the requisite preliminary showing of typicality.  In addition, there is no evidence that LACERS' interest would in any way conflict with those of other class members.  They have a significant financial stake in the outcome of this litigation and this will motivate their vigorous pursuit of recovery for all other class members.  Finally, LACERS has retained competent counsel, in the firm of Kaplan Fox & Kilsheimer LLP, to assist them in zealously pursuing the claims of all class members.

Accordingly, the Court finds that LACERS is the presumptive lead plaintiff under the PSLRA.  Further, because there is no indication that LACERS is subject to unique defenses,  see 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa), or will be unable to fairly and adequately protect the interests of the class, see 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb), this presumption is not rebutted.  Therefore, the motion by LACERS to be appointed lead plaintiff is granted.

**D. Lead Counsel**

The PSLRA provides that the lead plaintiff "shall, subject to approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u–4(a)(3)(B)(v).  LACERS has selected Kaplan Fox & Kilsheimer LLP ("Kaplan Fox") to serve as lead counsel.  In support of this request, Frederic S. Fox, Esq., a member of the firm, has submitted a Declaration and the firm's resume, to demonstrate that Kaplan Fox has served as lead or co-leading counsel in numerous securities class actions, as well as several cases filed in the district courts within the Second Circuit.  See, e.g., Schueneman v. Arena Pharmaceuticals, Inc., Nos. 10 Civ. 1959 et al., 2011 WL 3475380, at *7 (S.D. Cal. Aug. 8, 2011) ("It appears that

Kaplan Fox has substantial experience in the area of securities litigation and can fulfill the role of lead counsel."); In re Bank of America Corp. Securities, Derivative and ERISA Litig., 258 F.R.D. 260, 271 (S.D.N.Y. 2009) ("Kaplan Fox . . . [is] highly experienced in prosecuting securities class actions."); In re OCA, Inc. Securities and Derivatives Litig., No. 05 Civ. 2165, 2008 WL 4681369, at *10 (E.D. La. Oct. 17, 2008) ("Kaplan Fox has litigated numerous complex class actions throughout the country in the past three decades and has been substantially involved in over 25 securities class actions with recoveries of over $10 million.").

Therefore, based upon Kaplan Fox's extensive experience and proven track record as counsel in securities class actions, Kaplan Fox is approved as Lead Counsel.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the motion by class member Los Angeles City Employee's Retirement System ("LACERS") to be appointed as lead plaintiff in this action, pursuant to 15 U.S.C. § 78u–4(a)(3)(B), as amended by the Private Securities Litigation Act of 1995, is **GRANTED**; **and it is further**

**ORDERED** that the motion by class member Los Angeles City Employee's Retirement System ("LACERS") for the appointment of Kaplan Fox & Kilsheimer LLP as lead counsel, is **GRANTED**.

**SO ORDERED.**

Dated: Central Islip, New York
January 26, 2012

                                                          ___/s/ Arthur D. Spatt____
                                                           ARTHUR D. SPATT
                                                        United States District Judge