UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: GENTIVA SECURITIES LITIGATION | ) | Case No. 10-CV-5064 (ADS) (WDW) |
| | ) | |
| | ) | ECF Case |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Defendants Gentiva Health Services,*
*Inc., H. Anthony Strange, Ronald A. Malone, John*
*R. Potapchuk and Eric R. Slusser*

Dated: June 15, 2012

## TABLE OF CONTENTS

**Page:**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ...................................................................... 4

    A.    Plaintiff ................................................................................. 4

    B.    Defendants ............................................................................ 4

    C.    The HH PPS ......................................................................... 5

    D.    The SFC And SEC Investigations............................................... 6

    E.    Procedural History of This and Other Home Health Provider Litigation.............. 7

ARGUMENT ...................................................................................... 8

I.    PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b) OF THE 1934 ACT AND RULE 10b-5 THEREUNDER ............................................ 8

    A.    Plaintiff Fails To Allege Any Facts Giving Rise To A Strong Inference Of Scienter ............................................................. 9

        1.    Competing Inferences Under Tellabs ...................................... 10

            a.    Plaintiff's Confidential Witnesses Do Not Give Rise To A Strong Inference Of Scienter ............................. 10

                (1)    The Absence Of Any Link Between The CW Allegations And The Individual Defendants .................. 12

                (2)    The Absence Of Time, Place And Other Details About The Alleged Wrongful Conduct........................... 13

            b.    The More "Compelling" Inference Is That Gentiva Acted Appropriately Within The Confines Of The Medicare Regime ................................................................. 15

        2.    Plaintiff's Motive And Opportunity Allegations Are Insufficient.......... 19

        3.    Plaintiff's Conscious Misbehavior And Recklessness Allegations Are Insufficient ................................................................ 21

        4.    Plaintiff Has Failed To Plead Corporate Scienter.................................... 23

    B.    Plaintiff Fails To Plead Particularized Facts Demonstrating Materially False Or Misleading Statements Or Material Omissions.................................... 23

        1.    The Complaint Does Not Identify Actionable Misstatements Or Omissions Regarding Gentiva's Reported Financial Results ................. 24

        2.    The Complaint Does Not Identify Actionable Misstatements Regarding The Opinion That Gentiva Was Acting In Compliance With Medicare ................................................................. 25

i

# TABLE OF CONTENTS
### (continued)

3.   The Complaint Does Not Identify Actionable Omissions Regarding Gentiva's Internal Compliance Practices ............................... 26

4.   The Complaint Does Not Identify Any Actionable Misstatements Or Omissions Regarding Defendants' Sarbanes-Oxley Certifications ................................................................................................ 27

5.   The Complaint Relies Upon Non-Actionable Statements Of Puffery And/Or Corporate Speak ............................................................ 28

C.   Plaintiff Fails To Adequately Plead Loss Causation ........................................... 29

1.   Announcements of Governmental And Regulatory Investigations Are Not Per Se "Corrective" ................................................................. 30

2.   Disappointing Earnings Announcements Are Not Per Se "Corrective" ................................................................................................ 31

3.   The SFC Report Is Not "Corrective" ..................................................... 33

II.   PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 20(a) OF THE 1934 ACT ...................................................................................................................... 34

III.   PLAINTIFF LACKS STANDING TO ASSERT A CLAIM UNDER SECTION 11 OF THE 1933 ACT ................................................................................................ 34

IV.   PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 11 OF THE 1933 ACT ...................................................................................................................... 36

A.   Plaintiff's Section 11 Claim Sounds In Fraud And, Thus, Plaintiff's Failure to Satisfy Rule 9(b) Mandates Dismissal ................................................. 36

B.   Plaintiff Has Failed To Allege A Materially False Or Misleading Statement Or A Material Omission ...................................................................... 37

1.   Plaintiff Has Not Established That The Offering Documents Contain Materially Misleading Statements Or Omissions ...................... 37

2.   Even If The Bond Offering Documents Were False Or Misleading, Purchasers In The Bond Offering Cannot Establish That Any Of The Alleged Misstatements Or Omissions Were Material ..................... 38

C.   Plaintiff's Section 11 Claim Is Untimely ............................................................ 39

D.   Purchasers In The Bond Offering Cannot Establish Damages ............................ 40

V.   PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 15 OF THE 1933 ACT ...................................................................................................................... 40

CONCLUSION ...................................................................................................................... 40

ii

## TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s):**

Acito v. IMCERA Grp. Inc.,
    47 F.3d 47 (2d Cir. 1995)...............................................................................19, 23

In re Alcatel Sec. Litig.,
    382 F. Supp. 2d 513 (S.D.N.Y. 2005).........................................................................24

In re Almost Family, Inc. Sec. Litig.,
    2012 WL 443461 (W.D. Ky. Feb. 10, 2012) ................................................. passim

In re Alpharma Inc. Sec. Litig.,
    372 F.3d 137 (3d Cir. 2004).......................................................................................20

In re Alstom SA Sec. Litig.,
    406 F. Supp. 2d 402 (S.D.N.Y. 2005).........................................................................36

Ashcroft v. Iqbal,
    556 U.S. 662 (2009)...........................................................................................8, 37, 38

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,
    493 F.3d 87 (2d Cir. 2007).....................................................................................18, 20

In re Axis Capital Holdings Ltd. Sec. Litig.,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006)....................................................................25, 36

In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.,
    2012 WL 1353523 (S.D.N.Y. Apr. 12, 2012)............................................................29

Beecher v. Able,
    435 F. Supp. 397 (S.D.N.Y. 1975) ............................................................................40

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007).......................................................................................................8

Bd. of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Oao,
    811 F. Supp. 2d 853 (S.D.N.Y. 2011), aff'd sub nom.
    Frederick v. Oao, 2012 wl 1193724 (2d Cir. Apr. 11, 2012)......................................27

In re Bristol-Myers Squibb Sec. Litig.,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004)...................................................................19, 20

In re Bristol-Myers Squibb Co. Sec. Litig.,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)........................................................................31

iii

Campo v. Sears Holding Corp.,
    2010 WL 1292329 (2d Cir. Apr. 6, 2010) .......................................................................10, 11

In re Citigroup Inc. S'holder Derivative Litig.,
    2009 WL 2610746 (S.D.N.Y. Aug. 25, 2009) ........................................................................24

In re Citigroup Inc. Sec. Litig.,
    753 F. Supp. 2d 206 (S.D.N.Y. 2010)....................................................................................11

In re Citigroup Inc. Sec. Litig.,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004), aff'd sub nom.
    Albert Fadem Trust v. Citigroup, Inc., 165 F. App'x 928 (2d Cir. 2006) ...................25, 26, 27

Civilian Emps.' Ret. Sys. v. CBS Corp.,
    2012 WL 1624022 (2d Cir. May 10, 2012) .............................................................................26

Coronel v. Quanta Capital Holdings Ltd.,
    2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ...........................................................................37

In re Diebold Sec. Litig.,
    2008 WL 3927467 (N.D. Ohio Aug. 22, 2008), aff'd sub nom.
    Konkol v. Diebold, Inc., 590 F.3d 390 (6th Cir. 2009) ..........................................................13

Dura Pharms., Inc. v. Broudo,
    544 U.S. 336 (2005)............................................................................................... passim

ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.,
    553 F.3d 187 (2d Cir. 2009).................................................................................... passim

In re Elan Corp. Sec. Litig.,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008).....................................................................................12

Erica P. John Fund, Inc. v. Halliburton Co.,
    131 S. Ct. 2179 (2011)............................................................................................................29

In re eSpeed, Inc. Sec. Litig.,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006).....................................................................................20

Fadem v. Ford Motor Co.,
    352 F. Supp. 2d 501 (S.D.N.Y.), aff'd,
    157 F. App'x 398 (2d Cir. 2005) .............................................................................................22

Fait v. Regions Fin. Corp.,
    655 F.3d 105 (2d Cir. 2011)....................................................................................................26

In re Ferro Corp. Sec. Litig.,
    2007 WL 1691358 (N.D. Ohio June 11, 2007)........................................................................14

First Nationwide Bank v. Gelt Funding Corp.,
    27 F.3d 763 (2d Cir. 1994)..................................................................................33

Fishbaum v. Liz Claiborne, Inc.,
    189 F.3d 460 (text available at 1999 WL 568023) (2d Cir. July 27, 1999)...........................20

Freudenberg v. E*Trade Fin. Corp.,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................31

Frith v. Hill,
    2009 WL 3073716 (S.D.N.Y. Sept. 23, 2009).........................................................5

Gavish v. Revlon, Inc.,
    2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004)........................................................25

Glaser v. The9, Ltd.,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)..............................................11, 19, 20, 21

Gross v. Summa Four, Inc.,
    93 F.3d 987 (1st Cir. 1996)................................................................................24

In re Hansen Natural Corp. Sec. Litig.,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) ...............................................................31

In re Healthsouth Corp. Sec. Litig.,
    261 F.R.D. 616 (N.D. Ala. 2009)...................................................................38, 39

In re Initial Public Offering Sec. Litig.,
    399 F. Supp. 2d 261 (S.D.N.Y. 2005).................................................................32

Janbay v. Canadian Solar, Inc.,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ...............................28, 30, 31, 32

Kalnit v. Eichler,
    264 F.3d 131 (2d Cir. 2001)..............................................................................10

Key Equity Investors, Inc. v. Sel-Leb Mktg. Inc.,
    246 F. App'x 780 (3d Cir. 2007) ........................................................................18

Konkol v. Diebold, Inc.,
    590 F.3d 390 (6th Cir. 2009) .............................................................................17

Ladman Partners, Inc. v. GlobalStar, Inc.,
    2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008)......................................................37

Lapin v. Goldman Sachs Grp., Inc.,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006)..................................................................34

US_ACTIVE:\44027970\1\47756.0017

Lattanzio v. Deloitte & Touche L.L.P.,
    476 F.3d 147 (2d Cir. 2007)................................................................................29

In re Lehman Bros. Sec. & ERISA Litig.,
    684 F. Supp. 2d 485 (S.D.N.Y. 2010), aff'd sub nom.
    In re Lehman Bros. Mortgage-Backed Sec. Litig., 650 F.3d 167 (2d Cir. 2011). .............34, 35

Lentell v. Merrill Lynch & Co.,
    396 F.3d 161 (2d Cir. 2005).............................................................................. 29, 30, 33

Ley v. Visteon Corp.,
    543 F.3d 801 (6th Cir. 2008) ...........................................................................13

Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010), aff'd,
    430 F. App'x 63 (2d Cir. 2011) ........................................................................12, 14

Metzler Inv. GmbH v. Corinthian Colls., Inc.,
    540 F.3d 1049 (9th Cir. 2008) .........................................................................34

Mizzaro v. Home Depot, Inc.,
    544 F.3d 1230 (11th Cir. 2008) .......................................................................11

Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.,
    2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011).......................................................28

In re Moody's Corp. Sec. Litig.,
    274 F.R.D. 480 (S.D.N.Y. 2011) ......................................................................31

In re Morgan Stanley Info. Fund. Sec. Litig.,
    592 F.3d 347 (2d Cir. 2010)..............................................................................35

In re MRU Holdings Sec. Litig.,
    769 F. Supp. 2d 500 (S.D.N.Y. 2011)............................................................10, 15

In re MSC Indus. Direct Co. Sec. Litig.,
    283 F. Supp. 2d 838 (E.D.N.Y. 2003) ............................................................ passim

N.J. Carpenters Health Fund. v. DLJ Mortg. Capital, Inc.,
    2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ......................................................35

Novak v. Kasaks,
    216 F.3d 300 (2d Cir. 2000)..............................................................11, 13, 21, 22

Palm Beach Strategic Income, L.P. v. Salzman,
    2011 WL 1655575 (E.D.N.Y. May 2, 2011) ..........................................................8

vi

Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
   Commerce, 694 F. Supp 2d 287 (S.D.N.Y. 2010) ....................................................22

Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Trust v. J.P. Morgan
   Acceptance Corp. I, 2012 WL 601448 (E.D.N.Y Feb. 23, 2012)......................................34, 35

Police & Fire Ret. Sys. v. SafeNet, Inc.,
   645 F. Supp. 2d 210 (S.D.N.Y. 2009)...........................................................................22

Ray v. Citigroup Global Mkts., Inc.,
   482 F.3d 991 (7th Cir. 2007) ......................................................................................33

In re Refco, Inc. Sec. Litig.,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007)......................................................................38, 39

Rombach v. Chang,
   355 F.3d 164 (2d Cir. 2004).........................................................................23, 28, 36, 37

In re Safety-Kleen Corp.,
   2002 WL 32349819 (D.S.C. Mar. 27, 2002) ...................................................................40

In re Salomon Analyst Level 3 Litig.,
   350 F. Supp. 2d 477 (S.D.N.Y. 2004)...........................................................................26

Steinberg v. Ericsson LM Tel. Co.,
   2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) .................................................................22

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,
   531 F.3d 190 (2d Cir. 2008)....................................................................................22, 23

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
   551 U.S. 308 (2007)....................................................................................................3, 9

In re Tellium, Inc. Sec. Litig.,
   2005 WL 2090254 (D.N.J. Aug. 26, 2005) ....................................................................30

T.P. ex rel. Patterson v. Elmsford Union Free School Dist.,
   2012 WL 860367 (S.D.N.Y. Feb. 27, 2012).....................................................................5

In re Wachovia Equity Sec. Litig.,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011).................................................................12, 15, 21, 28

## Statutes & Rules:

15 U.S.C. § 77........................................................................................................39

15 U.S.C. § 77k...................................................................................................35, 40

15 U.S.C. § 78u-4 .................................................................................................1, 9, 29

42 C.F.R. § 409.43 .......................................................................................................6

42 C.F.R. § 484.18 .......................................................................................................6

Fed. R. Civ. P 9(b) ...............................................................................................passim

Fed. R. Civ. P 12(b)(6) ...........................................................................................1, 8

viii

Defendants Gentiva Health Services, Inc. ("Gentiva" or the "Company"), H. Anthony Strange, Ronald A. Malone, John R. Potapchuk and Eric R. Slusser (collectively, the "Individual Defendants," and together with Gentiva, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss, in its entirety and with prejudice, the Consolidated Class Action Complaint (the "Complaint" or "Compl.") filed by Lead Plaintiff the Los Angeles City Employees' Retirement System ("Plaintiff" or "LACERS") under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) (the "PSLRA").

## PRELIMINARY STATEMENT

Plaintiff purports to represent purchasers of Gentiva publicly-traded securities over a more than three-year period, from July 31, 2008 through October 4, 2011 (the purported "Class Period"), and asserts claims under Sections 11 and 15 of the Securities Act of 1933 (the "1933 Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), and Rule 10b-5 thereunder, in connection with an alleged scheme to defraud Medicare. Specifically, Plaintiff alleges that, "in its effort to report ever increasing revenues and profit margins, Gentiva and its most senior management caused Gentiva's employees and clinicians to seek reimbursement from Medicare for medically unnecessary services -- in direct violation of Medicare standards and regulations." Compl. ¶ 11. However, as discussed below, there is nothing to substantiate that allegation and no basis to believe that Defendants actually committed fraud. For example, no charges have been brought (or even recommended) against Gentiva (despite more than two years of governmental and regulatory investigations), and no restatement or retraction of its financial statements has occurred.

Rather, this is a case in which supposition and bald accusations have taken the place of actual facts. Faced with mounting pressure for healthcare reform, in May 2010, the U.S.

Senate Finance Committee (the "SFC") launched a public investigation into the four largest publicly-traded home health providers, a group that included Gentiva, concerning perceived abuses in the Medicare home health prospective payment system (the "HH PPS").  (In July 2010, the U.S. Securities and Exchange Commission (the "SEC") commenced its own investigation relating to Gentiva's participation in the HH PPS.)  A year-and-a-half later, in October 2011, the SFC issued its "findings," including that the clustering of patient visits (by <u>all</u> of the studied providers) around the HH PPS's reimbursement "bonus" thresholds "'at best represent abuses of the Medicare home health program [and] [a]t worst, they <u>may</u> be examples of for-profit companies defrauding the Medicare home health program at the expense of taxpayers.'"  Compl. ¶ 13 (emphasis added).

Based on little more than the announcement of the investigations and the SFC's mere suggestion of the <u>possibility</u> of fraud (with <u>no</u> analysis at all of whether the home health providers' patient visits were or were not medically necessary), Plaintiff brings the instant action alleging that Defendants violated the federal securities laws and injured Gentiva's public security holders.  But one federal court, in similar litigation involving another publicly-traded home health provider investigated by the SFC, Almost Family, Inc. ("Almost Family"), has already rejected the theory of Plaintiff's case at the pleading stage.  <u>See</u> <u>In re Almost Family, Inc. Sec. Litig.</u>, 2012 WL 443461, at *1 n.1 (W.D. Ky. Feb. 10, 2012).  The same reasoning applies here <u>a fortiori</u>.

Even putting aside the Complaint's conceptual shortcomings, a multitude of pleading deficiencies separately, and <u>independently</u>, require its dismissal.  Although Plaintiff's claims under both the 1933 and 1934 Acts sound in fraud and are therefore subject to the heightened pleading requirements of Rule 9(b) (<u>see</u> Point IV.A, <u>infra</u>), absent from the

2

Complaint are particularized factual allegations sufficient to plead either scienter or an actionable misstatement or omission. First, with respect to scienter, Plaintiff principally relies on certain "confidential" sources, along with a couple of named former Gentiva employees. But the vague allegations attributed to those sources are insufficient, as there are no allegations (as there must be to avoid dismissal) that the sources met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them during the Class Period. Plaintiff's motive and recklessness allegations fare no better. Nor can Plaintiff's scienter allegations survive in light of the more "compelling" inference (Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007)), confirmed by the disclosures that Plaintiff itself challenges, that Gentiva implemented a business strategy focused on specialty programs, higher acuity patients and the needs of the geriatric population -- all of which necessarily require a greater number of visits per patient. See Point I.A, infra.

Second, with respect to the alleged misstatements and omissions, although Plaintiff spends approximately 60 pages of the Complaint on this subject, it engages only in impermissible "laundry list" or "puzzle" pleading. Plaintiff quotes in block from Gentiva SEC filings, press releases and interviews -- without identifying the specific portion of each block quote that allegedly constitutes a false or misleading statement, and without providing particulars about how or why any specific portion was false or misleading when made. Then, Plaintiff summarily asserts that the block quotes are false and misleading based on an unparticularized list of reasons. See, e.g., Compl. ¶¶ 65, 67-68. Moreover, Plaintiff fails to offer particularized facts establishing: (i) how the alleged manipulation of the HH PPS (supposedly concealed via the challenged statements) caused Gentiva's financial statements to be inflated during the Class Period, and by how much; or (ii) that various opinions expressed by Defendants during the Class

3

Period were false when made and deliberately misrepresented.  See Points I.B and IV.B, infra.

In addition, Plaintiff fails to state a claim under the 1934 Act because it has not, and cannot, allege "loss causation" -- i.e., that Defendants' alleged misstatements and omissions directly "caused" Plaintiff's alleged loss.  See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 345-46 (2005).  Plaintiff relies on alleged revelations of fraud -- including the announcements of the SFC and SEC investigations, negative earnings releases and the SFC report -- that, as a matter of law, are not "corrective."  See Point I.C, infra.

Finally, Plaintiff's claim under Section 11, relating to Gentiva's November 18, 2010 sale of $325 million in 11.5% Notes (the "Bond Offering"), suffers from several other fatal defects, each of which independently requires its dismissal, including, among other things, that: Plaintiff lacks standing to assert the claim (see Point III, infra); the claim is untimely (see Point IV.C, infra); and purchasers in the offering suffered no damages (see Point IV.D, infra).

## STATEMENT OF FACTS

### A.   Plaintiff

Defendants refer the Court to Paragraph 17 of, and Schedule A to, the Complaint for a description of Plaintiff and its securities transactions.

### B.   Defendants

Gentiva is a Delaware corporation with its principal headquarters located at 3350 Riverwood Parkway, Suite 1400, Atlanta, Georgia 30339.  Compl. ¶ 18.

The Individual Defendants are current and/or former directors and/or officers of Gentiva.  Id. ¶¶ 19-22.  Ronald A. Malone served as Gentiva's Chief Executive Officer from June 2002 until December 2008, and as Chairman of Gentiva's Board of Directors until May 2011.  Id. ¶ 19.  H. Anthony Strange served as Gentiva's President beginning in 2007, and as its Chief Operating Officer from November 2007 until May 2009.  Mr. Strange became Gentiva's

4

Chief Executive Officer in January 2009, and its Chairman in May 2011.  Id. ¶ 21.  John R. Potapchuk served as Gentiva's Chief Financial Officer and Treasurer until May 2010.  Id. ¶ 20. He was succeeded in May 2010 by Eric R. Slusser, who now serves as Gentiva's Chief Financial Officer, Treasurer and Executive Vice President.  Id. ¶ 22.

C.    **The HH PPS**

Gentiva, as a home health provider, receives reimbursements from the HH PPS based on, among other things, "a predetermined rate schedule established by Medicare" and "a pre-treatment assessment of the given patient's condition and proposed plan of care during a 60-day time period."  Id. ¶ 28.  Until the end of 2007, the HH PPS provided an additional payment of up to $2,200 for "providing a patient with 10 therapy visits" in connection with any individual treatment cycle.  Id. ¶ 32.  In 2008, this "bonus" threshold was modified and replaced with new thresholds of six, 14 and 20 therapy visits per treatment cycle.  Id. ¶ 33.

Although Plaintiff suggests that Gentiva has near absolute discretion to dictate the terms and frequency of patient care to achieve these "bonus" thresholds, both federal regulations and Medicare's Policy Manual make clear that independent physicians -- and not the home health provider itself -- direct and oversee the process.  See, e.g., T.P. ex rel. Patterson v. Elmsford Union Free School Dist., 2012 WL 860367, at *3, *4 (S.D.N.Y. Feb. 27, 2012) ("The Court can take judicial notice of [government] policies and guidelines on a motion to dismiss and review them."); Frith v. Hill, 2009 WL 3073716, at *16 (S.D.N.Y. Sept. 23, 2009) (similar); see also Almost Family, 2012 WL 443461, at *1 n.1 (explaining that "Almost Family personnel have no direct ability to manipulate or increase treatment" because their "facilities provide medical care only pursuant to the order of physicians who are independent of the company") (emphasis added).

5

Specifically, while Plaintiff acknowledges that a patient receives treatment under Medicare only "[a]fter a physician prescribes a home health plan of care" (Compl. ¶ 30), it neglects to mention that this "plan of care" must "indicate the type of services to be provided to the patient, . . . the professional who will provide [those services,] . . . the nature of the individual services, <u>as well as the frequency of the services</u>."  Ex. 1 (Medicare Benefit Policy Manual ("Manual")) at § 30.2.2 (emphasis added); <u>see</u> <u>also</u> 42 C.F.R. § 409.43(b) (same).  Plaintiff also ignores that "[a]ny changes in the plan of care must be signed and dated <u>by a physician</u>."  Ex. 1 (Manual) at §§ 10.6B and 30.2.4B (emphasis added); <u>see</u> <u>also</u> 42 C.F.R. § 409.43(c) (same). Finally, Plaintiff contends that home health providers, including Gentiva, recertify patients on their own "because it allows . . . them to maintain their patient census" and "reap[] a higher profit margin."  Compl. ¶ 35.  However, this too ignores that it is the obligation of the <u>physician</u> to recertify a patient after 60 days for care to continue.  <u>See</u> Ex. 1 (Manual) at § 30.2.6; 42 C.F.R. § 484.18.

### D.   <u>The SFC And SEC Investigations</u>

On May 13, 2010, the <u>Wall Street Journal</u> reported that "the SFC launched an investigation into the practices of companies that provide in-home therapy visits reimbursed by Medicare, including Gentiva."  Compl. ¶ 248.  On July 13, 2010, Gentiva "disclosed that the SEC [had also] commenced an investigation relating to Gentiva's participation in the [HH PPS]." <u>Id.</u> ¶ 253.

On October 3, 2011, the SFC Staff released its <u>Report on Home Health and the Medicare Therapy Threshold</u> (the "SFC Report").  <u>Id.</u> ¶ 37.  Despite Plaintiff's allegations to the contrary, the SFC did <u>not</u> conclude that "Gentiva and its most senior management caused Gentiva's employees and clinicians to seek reimbursement from Medicare for medically unnecessary services -- in direct violation of Medicare standards and regulations."  <u>Id.</u> ¶ 11.

6

Rather, the SFC examined the home health therapy practices of each of the four largest publicly-traded home health companies.  And, while the SFC Report commented on those practices, as Plaintiffs themselves concede, it did <u>not</u> contain any <u>findings</u> of fraud.  <u>Id.</u> ¶ 13.  Indeed, despite the fact that more than eight months have passed since the issuance of the SFC Report (and almost two years have passed since the SEC commenced its investigation), neither the SEC, nor <u>any</u> other governmental or regulatory agency has instituted <u>any</u> action or proceeding alleging wrongdoing arising from Gentiva's participation in the HH PPS.

     **E.**     <u>**Procedural History of This and Other Home Health Provider Litigation**</u>

     On November 2, 2010, Steve Endress, a purported Gentiva stockholder, represented by Kaplan, Fox & Kilsheimer LLP ("Kaplan Fox"), filed a putative class action complaint in this Court.  The <u>Endress</u> complaint named Gentiva and certain of its officers and directors as defendants, and alleged violations of Sections 10(b) and 20(a) of the 1934 Act and Rule 10b-5 thereunder.  Almost a year later, following the release of the SFC Report, four additional purported Gentiva stockholders filed putative class action complaints in this Court, each containing similar allegations.  On November 2, 2011, the Court consolidated the five actions and, on January 27, 2012, appointed LACERS as Lead Plaintiff and Kaplan Fox as Lead Counsel.  On April 16, 2012, Plaintiff filed the Complaint, which, in addition to claims under the 1934 Act, added claims under Sections 11 and 15 of the 1933 Act with respect to alleged material misstatements and omissions in the registration statement and prospectus for the Bond Offering.  <u>See</u> Compl. ¶¶ 290-344.

     Nearly identical actions (alleging claims exclusively under the 1934 Act) have been commenced against two other publicly-traded home health providers, Almost Family and Amedisys, Inc. ("Amedisys"), in the U.S. District Courts for the Western District of Kentucky and the Middle District of Louisiana, respectively.  <u>See</u> <u>In re Almost Family, Inc. Sec. Litig.</u>,

3:10-CV-00520-H (W.D. Ky.), and <u>Bach</u> v. <u>Amedisys, Inc.</u>, 3:10-cv-00395-BAJ-CN (M.D. La.). On August 2, 2010, the <u>Almost Family</u> court dismissed the complaint in that action with prejudice.  <u>See</u> <u>Almost Family</u>, 2012 WL 443461.  A motion to dismiss (with prejudice) in the <u>Amedisys</u> action is fully briefed and awaits disposition by the court.

## ARGUMENT

In deciding a motion to dismiss under Rule 12(b)(6), the Court must assume that well-pled factual allegations in the complaint are true.  <u>See</u> <u>Bell Atl. Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 555 (2007).  But the Court need not accept legal conclusions, naked assertions, mere conclusory statements or implausible inferences.  <u>See</u> <u>Ashcroft</u> v. <u>Iqbal</u>, 556 U.S. 662, 677-78 (2009) (citing <u>Twombly</u>, 550 U.S. at 555).  Nor is it required to "'accept as true any allegations that are contradicted by documents deemed to be part of the complaint, or materials amenable to judicial notice.'" <u>Palm Beach Strategic Income, L.P.</u> v. <u>Salzman</u>, 2011 WL 1655575, at *7 n.12 (E.D.N.Y. May 2, 2011) (citation omitted).  A claim must raise more than the "mere possibility of misconduct" -- a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678-79.  Considered together, the allegations of the Complaint fail to satisfy the plausibility standard set forth in <u>Twombly</u>, 550 U.S. at 555 (and confirmed in <u>Iqbal</u>, 556 U.S. at 678), much less the heightened pleading standards of Rule 9(b) and the PSLRA.

## I.   PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b) OF THE 1934 ACT AND RULE 10b-5 THEREUNDER

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege (i) a material misrepresentation or omission, (ii) with scienter, (iii) in connection with the purchase or sale of a security, (iv) reasonable reliance by the plaintiff on the representation or omission, (v) economic loss, and (vi) a loss proximately caused by the misrepresentation or omission.  <u>See</u>

8

Dura, 544 U.S. at 341-42.   As demonstrated below, Plaintiff has failed to plead these elements with the requisite particularity, and its claim under Section 10(b) and Rule 10b-5, accordingly, must be dismissed.

>    **A.    Plaintiff Fails To Allege Any Facts Giving Rise To A Strong Inference Of Scienter**

To sufficiently plead a violation of Section 10(b) and Rule 10b-5, the PSLRA requires that, for each alleged misrepresentation and omission, a complaint must "state with particularity facts giving rise to a strong inference" of scienter for each defendant.  15 U.S.C. § 78u-4(b)(2).  When a complaint fails to do so, "the court shall, on the motion of any defendant, dismiss the complaint."  15 U.S.C. § 78u-4(b)(3)(A).

In Tellabs, the Supreme Court clarified the meaning of a "strong inference" of scienter under the PSLRA.  "To qualify as 'strong,'" the inference of scienter "must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."   551 U.S. at 314.   The analysis requires a "comparative evaluation," under which courts consider "not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged."   Id. (emphasis added).  "A complaint will survive . . . only if a reasonable person would" -- not just "could" -- "deem the inference of scienter cogent and at least as compelling as any opposing inference [of nonfraudulent intent] one could draw from the facts alleged."   Id. at 324 (emphasis added); see also id. at 314 ("An inference of fraudulent intent may be plausible, yet less cogent then other, nonculpable explanations for the defendant's conduct.").

In addition, the Second Circuit has held that a plaintiff pleads the requisite strong inference of scienter by alleging with particularity facts showing either (i) "that defendants had the motive and opportunity to commit fraud" or (ii) "strong circumstantial evidence of conscious

misbehavior or recklessness." <u>ECA & Local 134 IBEW Joint Pension Trust</u> v. <u>JP Morgan Chase Co.</u>, 553 F.3d 187, 198 (2d Cir. 2009) (citation omitted); <u>Kalnit</u> v. <u>Eichler</u>, 264 F.3d 131, 138 (2d Cir. 2001).

Under both <u>Tellabs</u> and the Second Circuit's two-pronged test, Plaintiff has not adequately pled a strong inference of scienter.

### 1. <u>Competing Inferences Under *Tellabs*</u>

#### a. **Plaintiff's Confidential Witnesses Do Not Give Rise To A Strong Inference Of Scienter**

Plaintiff relies on the statements of seven anonymous confidential witnesses, Holly McComas and Kim Shah (collectively, the "CWs") to attempt to show that Defendants acted with scienter.  <u>See</u> Compl. ¶¶ 52-61, 65.  However, Plaintiff's CW allegations do not plausibly -- much less cogently or at least as compellingly as any opposing inference of nonfraudulent intent -- support an inference that the Individual Defendants were engaged in (or even aware of) an alleged scheme to manipulate the HH PPS by "providing medically unnecessary services to increase Medicare reimbursement revenues and margins."  <u>Id.</u> ¶ 65.  Indeed, confidential witness allegations, as a general matter, "'must be discounted'" because "'[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or how [the Court] could take account of plausible opposing inferences.  Perhaps these confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even exist.'"  <u>In re MRU Holdings Sec. Litig.</u>, 769 F. Supp. 2d 500, 516 (S.D.N.Y. 2011) (citation omitted).  As the Second Circuit held in <u>Campo</u> v. <u>Sears Holding Corp.</u>, 2010 WL 1292329 (2d Cir. Apr. 6, 2010), "[t]he anonymity of the sources of plaintiffs' factual allegations concerning scienter frustrates the requirement, announced in <u>Tellabs</u>, that a court weigh competing inferences to determine whether a complaint gives rise to an inference of scienter that is 'cogent and at least as

compelling as any opposing inference of non-fraudulent intent.'" Id. at *5 n.4 (citation omitted).

Moreover, it is well-settled that confidential witness allegations "cannot be used to 'merely parrot [] . . . conclusory allegations contained in the complaint.'" Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011) (citation omitted).  Instead, a plaintiff must allege "facts from which a reasonable person would infer that it is at least as likely as not that the individual high-ranking defendants either orchestrated the alleged fraud (and thus always knew about it), or learned about the alleged fraud . . . , or were otherwise severely reckless in not learning of the claimed fraud." Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1247 (11th Cir. 2008); see also Glaser, 772 F. Supp. 2d at 591 (confidential witness allegations must "show that [the] individual defendants actually possessed the knowledge highlighting the falsity of public statements"); In re Citigroup Inc. Sec. Litig., 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) ("Plaintiffs cannot rely on assertions that the information presented by confidential witnesses was known or common knowledge within the company").

Whether considered separately or together, Plaintiff's CW allegations lack the requisite particularity to support an inference of scienter.  Specifically, the allegations fail to:  (i) establish that any of the CWs had any contact with the Individual Defendants, nor link such Defendants to contemporaneous information demonstrating the falsity of the challenged statements; or (ii) identify the time, place and other details about the alleged wrongful conduct (e.g., actual instances of "medically unnecessary" patient visits or improper Medicare billing). See, e.g., Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000) (finding no scienter when plaintiffs did not describe confidential witnesses "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged").

11

### (1) The Absence Of Any Link Between The CW Allegations And The Individual Defendants

The CWs are all "former Gentiva branch and other managers and clinicians." Compl. ¶ 52; see also id. ¶¶ 53-61. They are all many levels removed from, and are not alleged to have had any contact with, the Individual Defendants. See id. ¶¶ 53-61; see also, e.g., Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co., 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010), aff'd, 430 F. App'x 63 (2d Cir. 2011) (discounting allegations regarding confidential sources "employed in rank-and-file positions . . . who had no contact with the individual defendants"); In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (similar).

Given the lack of contact between the CWs and the Individual Defendants, it is hardly surprising that none of the CW allegations establish (as they must) that the Individual Defendants possessed or were aware of information that rendered Gentiva's statements false and misleading when made. See, e.g., Local No. 38, 724 F. Supp. 2d at 461 (confidential witness allegations did "not establish what specific contradictory information the Individual Defendants received or when they received it"); see also In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) (because "the majority of the CW allegations are either undated or pegged to an indefinite time period[,] . . . the task of matching CW allegations to contrary public statements [is] all but impossible, since allegations about an unspecified time period cannot supply specific contradictory facts available to Defendants at the time of an alleged misstatement").

Indeed, with one exception, none of the CWs make any mention of the Individual Defendants. As for the one exception, the fact that CW 1 sent an email to Mr. Strange outlining his or her "thoughts and concerns" (Compl. ¶ 49) simply does not suffice. While the email is

addressed to Mr. Strange, there is no allegation that he read it.  Even assuming he did, the Complaint fails to demonstrate how a <u>single</u> <u>email</u> from a <u>former</u> <u>employee</u> -- who otherwise had <u>no</u> contact with Mr. Strange -- stating that he or she generally observed what he or she <u>believed</u> to be a "push to treat by metrics not by what the patients need," could somehow make Mr. Strange aware that the Company's financial results were (allegedly) false and misleading.  <u>See</u>, <u>e.g.</u>, <u>Almost Family</u>, 2012 WL 443461, at *9 ("The Court struggles to understand how a single letter from a former employee could somehow make [the defendant] aware that the entire company's financial statements were inaccurate.").

### (2) The Absence Of Time, Place And Other Details About The Alleged Wrongful Conduct

Each of the CWs offer sweeping and generalized allegations regarding the alleged wrongdoing at Gentiva, but <u>none</u> provide the type of specificity required to establish a "strong inference" of scienter on the part of the Individual Defendants.  <u>See</u> <u>Novak</u>, 216 F.3d at 314 (to rely on confidential sources, plaintiffs must "supply sufficient <u>specific</u> facts to support their allegations") (emphasis added); <u>Ley</u> v. <u>Visteon Corp.</u>, 543 F.3d 801, 817 (6th Cir. 2008) (discounting confidential witness allegations that lack "particularized facts about the who, what, where, when, and how"); <u>see also</u> <u>In re Diebold Sec. Litig.</u>, 2008 WL 3927467, at *7 (N.D. Ohio Aug. 22, 2008) (discounting bare-bones confidential witness allegation that there was "'pressure from corporate'"), <u>aff'd</u> <u>sub</u> <u>nom.</u> <u>Konkol</u> v. <u>Diebold, Inc.</u>, 590 F.3d 390 (6th Cir. 2009).

For example, CW 1 claims that certain "periodic meetings and/or emails" and "monthly reports" were "used as a means to pressure [employees] to increase visits per episode" (Compl. ¶¶ 53(a), 53(b)), but there are <u>no</u> allegations regarding <u>when</u> these meetings occurred, <u>who</u> attended them, <u>who</u> sent the emails or <u>how</u> the reports were used to "pressure" employees. Similarly, despite "fe[eling] frequently pressured" to "pressure clinicians to provide medically

13

unnecessary visits" or "increase case mix weights assigned to patients in a way that would result in increased payments from Medicare" (id. ¶ 54(a)), CW 2 provides not a single, specific example.  And, the remaining allegations -- e.g., unspecified "periodic comments" (id. ¶ 55(a)), "weekly teleconference calls" with unnamed "Gentiva executives" (id. ¶ 56(a)), and "pressure" from unnamed members of "Gentiva management" (id. ¶ 59(f)) -- fare no better.

Indeed, the lack of such detail, in and of itself fatal, is not at all surprising, given that Plaintiff's CW allegations are based on nothing more than general "'observ[ations]'" and "'belie[fs]'" -- i.e., precisely the type of "anecdotes and conclusory statements" that courts have repeatedly rejected.  Local No. 38, 724 F. Supp. 2d at 460; see also, e.g., In re Ferro Corp. Sec. Litig., 2007 WL 1691358, at *12 (N.D. Ohio June 11, 2007) ("[A] shared opinion among confidential witnesses does not necessarily indicate either falsity or a strong inference of scienter if the allegations themselves are not specific enough.") (citation omitted).  For instance, it was merely CW 5's "impression" that "clinicians were being trained by Gentiva managers to add extra therapies that the clinicians did not believe were necessary."  Compl. ¶ 57; see also, e.g., id. ¶ 53(c) (CW 1 "believed" there was "inappropriate pressure to provide medically unnecessary services"); id. ¶ 58(b) (it was CW 6's "understanding that the Branch Manager [brought CW 6's concerns] to the attention of senior Gentiva management"); id. ¶ 59(e) ("CW 7 believes that many Gentiva clinicians succumbed to pressures placed on them by management [] out of fear of losing their jobs.").  Yet, the Complaint provides the Court with no facts to support these "impressions" and "beliefs."

Likewise, there is no basis in the Complaint to substantiate (i) Ms. McComas' "belie[f]" that "the number of visits being entered on the OASIS [forms] by Beane were not medically necessary" (id. ¶ 60(d)), or (ii) Ms. Shah's "concern[] that medically unnecessary

14

visits were being ordered by Gentiva supervisors" and "belie[f] [that] these pressures were exerted because Gentiva made more money from Medicare for the provision of therapy visits than for nursing" (id. ¶ 61(e)). Again, the Complaint is devoid of any facts establishing that even one medically unnecessary visit (much less a multitude of them) was ordered and/or billed by Gentiva -- or that any of the Individual Defendants were aware of (or condoned) such alleged practice. Relatedly, the fact that CW 4 "interpreted" the message that clinicians "'were not putting in enough therapies'" to "mean the provision of unnecessary services" (id. ¶ 56(a); see also id. ¶ 59(g)) does not establish that any unnecessary services were provided (nor is CW 4's interpretation the only possible inference to be drawn).

In short, Plaintiff's reliance on the CWs to establish scienter fails, as none of the allegations support a "'strong' or 'cogent' inference that the Individual Defendants acted with an 'intent to deceive, manipulate, or defraud.'" MRU, 769 F. Supp. 2d at 517. With the exception of the one email sent to Mr. Strange (discussed at pp. 12-13, supra), "there is no allegation that any CW met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them during the Class Period. The absence of such communication undermines the inference that Defendants" (Wachovia, 753 F. Supp. 2d at 352) were engaged in (or even aware of) alleged manipulation of the HH PPS.

### b.  The More "Compelling" Inference Is That Gentiva Acted Appropriately Within The Confines Of The Medicare Regime

The therapy "bonus" thresholds at issue, as even Plaintiff acknowledges, were set by the Center for Medicare and Medicaid Services ("CMS"). See Compl. ¶¶ 32-33. CMS "implemented the [initial 10 therapy] bonus measure, in part, to discourage . . . health care providers [from] providing the lowest level of service necessary to collect a 'bonus.'" Id. ¶ 32 (emphasis added). In 2008, CMS decided to change "the number of therapy visits required for a

15

service provider to receive a 'bonus' payment [to] . . . 6, 14 and 20 visits." <u>Id.</u> ¶ 33.  As a result, to the extent any incentives existed to target certain therapy thresholds, those incentives were <u>not</u> of the home health providers' making (as Plaintiff suggests).  Plaintiff asks this Court to ignore the very system created by CMS, as well as the many nonfraudulent inferences apparent in the Complaint itself, to conclude that there is only one possible explanation for the "post-2007 shift in the number of visits Gentiva's Medicare patients were receiving" (<u>id.</u> ¶ 40):  that "Gentiva and its most senior management caused Gentiva's employees and clinicians to seek reimbursement from Medicare for medically unnecessary services." <u>Id.</u> ¶ 11.  Plaintiff is wrong.

To start, as discussed above (pp. 5-6, <u>supra</u>), it is the attending <u>physician</u> -- <u>not</u> the home health provider -- who "prescribes a home health plan of care."  Compl. ¶ 30.  As a recent decision (by the only court that has reached these issues to date) makes clear, home health providers (like Gentiva) "<u>have no direct ability to manipulate or increase treatment</u>" because their "<u>facilities provide medical care only pursuant to the order of physicians who are independent of the company</u>." <u>Almost Family</u>, 2012 WL 443461, at *1 n.1 (emphasis added).  Nothing in the Complaint here even remotely suggests (much less alleges with particularity) that such physicians were conspiring with Gentiva to fraudulently bill Medicare for in-home therapy visits and, further, that the Individual Defendants were aware of the same.

In this regard, the documents that Plaintiff references from the SFC Report (<u>see</u> Compl. ¶¶ 42-51) are plainly insufficient.  Although Plaintiff suggests something nefarious, these documents are simply evidence of corporate responsibility -- <u>not</u> an improper intent to direct patient care "regardless of medical need." <u>Id.</u> ¶ 12; <u>see also id.</u> ¶¶ 45-49.  For example, Plaintiff makes much of a January 5, 2007 email purportedly sent to Messrs. Strange and Malone stating that an "internal group" was "crunching utilization and outcomes data to determine whether

revisions to [Gentiva's] therapy protocols [we]re clinically defensible." Id. ¶¶ 42-43.   Even putting aside that this email pre-dates the most recent rule change to the therapy thresholds (from the historical 10 visits to the new system of six, 14 and 20 visits), it, like all of the other Gentiva documents cited in the SFC Report and the Complaint, merely illustrates that Gentiva, a for-profit, publicly-traded company, was doing exactly what it should have been doing:  analyzing the potential business impact of Medicare-related rule changes.   In addition, there is nothing improper about Gentiva developing a "ranking system" based on "several metrics, including . . . therapy visits per episode." Id. ¶ 50 (emphasis added); see, e.g., Konkol v. Diebold, Inc., 590 F.3d 390, 398 (6th Cir. 2009) ("[Plaintiff] alleges that the Defendants had access to 'Scorecards' in which sales and service employees were ranked based on the amount of revenue they brought in.   But ranking employees based on the amount of revenue they produce is not relevant to whether the Defendants knew that Diebold was reporting false earnings unless these reports clearly reflected the revenue-recognition scheme, which is not alleged in the complaint.").

Moreover, despite Plaintiff's conclusion that the alleged fraud is the only explanation for the supposed correlation between the change in therapy thresholds and Gentiva's Medicare patient visits, the Complaint itself makes clear that there are many other possible explanations, none of which involve fraud.   Indeed, the approximately 60 pages of alleged misrepresentations quoted in the Complaint raise several nonfraudulent inferences, which, whether viewed separately or together, are far more compelling than any inference of culpable scienter.   For example, Mr. Strange explained that:

- Gentiva "shifted some of [its] business to some higher therapy utilization type services [such as the] Safe Strides program and [other] specialities. . . .   [As a result,] we would expect that case mix in revenue per episode to go up even further because that is a different kind of patient requiring a different kind of service." Compl. ¶ 72.
- As Gentiva "roll[s] out these speciality programs, a lot of these specialty programs really bring us a higher level of acuity in the patients we are serving.   And those patients for

17

example coming out of rehab settings or coming out of skilled nursing facilities are more acute patients demanding a higher level of service, and that's really what is changing the mix." Id. ¶ 99.

- Gentiva's "newest speciality" is the "neurorehabilitation program.  The typical profile of the patient that enters into the program is a post-CVA patient. That patient is going to be on our service longer than a patient who . . . has just had his knee replaced and is working his way back onto the golf course. . .  [As Gentiva] bring[s] out more and more of these highly sophisticated specialty programs related to senior health, related to neurorehabilitation, we would expect length of stay to increase."  Id. ¶ 101.

Similarly, Mr. Potapchuk noted that one of Gentiva's strategies was to "focus on serving the needs of the geriatric population."  Id. ¶ 126.  And, Mr. Malone stated that "[t]he change in revenue per episode . . . is all coming from the different kind of patient or the different level of acuity, or better capturing through this training we've been talking about, i.e. secondary diagnosis and those things on existing patients."  Id. ¶ 72.

In other words, the most cogent and compelling inference to be drawn from the facts alleged is that Gentiva, recognizing the incentives created by CMS, implemented a business strategy focused on specialty programs, higher acuity patients and the needs of the geriatric population -- all of which necessarily (and appropriately) require a greater number of visits per patient.  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 104 (2d Cir. 2007) ("A strong inference of scienter is not raised by alleging that a legitimate investment vehicle . . . creates an opportunity for profit through manipulation," and, thus, "there is a 'plausible nonculpable explanation[]' for the defendants' actions that is more likely than any inference that the defendants intended to manipulate the market"); see also Key Equity Investors, Inc. v. Sel-Leb Mktg. Inc., 246 F. App'x. 780, 786 n.10 (3d Cir. 2007) (dismissing case where "the complaint sets out nothing more than an ordinary business motive, which is typically insufficient to support a strong inference of fraud").

18

## 2.      **Plaintiff's Motive And Opportunity Allegations Are Insufficient**

"In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiff[] must allege that [the defendants] 'benefited in some concrete and personal way from the purported fraud.'" ECA, 553 F.3d at 198 (citation omitted).  However, "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive.'" Id. (citation omitted).  Here, Plaintiff alleges that:  (i) Messrs. Strange, Malone and Potapchuk "collectively sold approximately 291,979 Gentiva shares at artificially inflated prices for proceeds of approximately $7.1 million;" and (ii) Defendants "needed to acquire Odyssey [Health Care ('Odyssey')] in order to diversify their business beyond home health care which was becoming less profitable as regulatory scrutiny of Gentiva's business practices increased." Compl. ¶¶ 276, 277.  Neither allegation raises an inference of scienter.

First, as a general matter, "executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent." In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).  Instead, the trading must be "unusual" to support the necessary inference.  See Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995); see also, e.g., In re MSC Indus. Direct Co. Sec. Litig., 283 F. Supp. 2d 838, 848 (E.D.N.Y. 2003) (Spatt, J.) ("'Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling.'") (citation omitted).

Plaintiff simply states -- in wholly conclusory fashion -- that Messrs. Strange, Malone and Potapchuk reaped "proceeds of approximately $7.1 million" as a result of their stock sales during the entire Class Period.  Compl. ¶ 276 (emphasis added).  However, "without identifying net profits, . . . proceeds alone say nothing about a seller's motive." Glaser, 772 F.

19

Supp. 2d at 592.  Moreover, "it is well established that trades under 10b-5-1 plan[s] do not raise a strong inference of scienter."  Id.  (citation omitted).  Because many of the stock sales by Messrs. Strange and Potapchuk were made pursuant to 10b-5-1 plans (and other pre-determined contractual arrangements), no inference can be drawn from them.  See Ex. 2; see also, e.g., ATSI, 493 F.3d at 98 (on a motion to dismiss, courts "may consider," among other things, "legally required public disclosure documents filed with the SEC").

Further, Mr. Strange, despite his Class Period sales, actually increased his Gentiva holdings by the end of the Class Period, further negating any inference of scienter.  See Ex. 3; e.g., MSC, 283 F. Supp. 2d at 848 (trading is not "unusual" when the "individual with the greatest ownership interest . . . increased his ownership in the company during the Class Period"); see also Fishbaum v. Liz Claiborne, Inc., 189 F.3d 460 (text available at 1999 WL 568023, at *4) (2d Cir. July 27, 1999) ("[I]nferences of scienter can be undermined when an insider's sales of stock are offset by even larger stock acquisitions during the relevant time period."); Bristol-Myers, 312 F. Supp. 2d at 561 (same).  And, while Mr. Malone sold much of his Gentiva common stock during the Class Period, he still held hundreds of thousands of options at the end of the Class Period.  See Ex. 3; see also, e.g., In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266, 290 (S.D.N.Y. 2006) ("[S]tock options held by [the defendants] must be considered along with shares actually held in determining whether insider sales are significant.") (internal citations omitted).  Finally, Mr. Slusser is not alleged to have sold any Gentiva stock during the Class Period, which also negates any inference of scienter.  See, e.g., eSpeed, 457 F. Supp. 2d at 291 ("[T]he dispositive factor [in finding no inference of scienter] is that other insiders, including . . . other . . . defendants, did not sell during the putative class period."); see also In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 152 (3d Cir. 2004) (same); Glaser, 772 F.

20

Supp. 2d at 592 (same).

Second, Plaintiff's allegation that Defendants were somehow motivated to commit fraud in order to acquire Odyssey (Compl. ¶ 277) is also without merit.  Plaintiff appears to suggest that Defendants participated in the alleged fraud to inflate Gentiva's stock price as currency for the Odyssey acquisition.  Yet, while "'the artificial inflation of stock prices in order to acquire another company may, in some circumstances, be sufficient for scienter[,] . . . the inquiry is an extremely contextual one.'"  Wachovia, 753 F. Supp. 2d at 350 (citation omitted).  The acquisition was announced in May 2010 (almost two years after the start of the Class Period) and completed in August 2010 (more than one year prior to the close of the Class Period).  See Exs. 4, 5.  It thus strains credulity that a transaction spanning four months in the latter half of a 40-month Class Period somehow creates an inference of motive to inflate Gentiva's share price in the two years prior to the acquisition and the year after.  See, e.g., Wachovia, 753 F. Supp. 2d at 350 ("The Court is unpersuaded that a transaction announced and completed within the first five months of the Class Period creates an inference of motive to inflate Wachovia's share price in the two years that followed.").

### 3.     Plaintiff's Conscious Misbehavior And Recklessness Allegations Are Insufficient

Where, as here, Plaintiff cannot allege that Defendants had a motive to commit fraud, its allegations of conscious misbehavior or recklessness must be "'correspondingly greater.'"  ECA, 553 F.3d at 199 (citation omitted).  To plead conscious misbehavior, a plaintiff must allege with particularity that a defendant engaged in "deliberate illegal behavior."  Novak, 216 F.3d at 308.  The bar for pleading recklessness is equally high:  a plaintiff must plead "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or

21

so obvious that the defendant must have been aware of it."  Id. (citation omitted).  Recklessness in the scienter context cannot be "merely enhanced negligence."  Steinberg v. Ericsson LM Tel. Co., 2008 WL 5170640, at *12 (S.D.N.Y. Dec. 10, 2008).

Plaintiff does not come close to meeting these standards.  Rather, Plaintiff merely alleges that "[b]ecause of their positions and their access to material non-public information, each of the [Individual Defendants] knew, or at least recklessly disregarded, that the adverse material facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading."  Compl. ¶ 23; id. ¶ 273; see also Police & Fire Ret. Sys. v. SafeNet, Inc., 645 F. Supp. 2d 210, 234 (S.D.N.Y. 2009) (holding that complaint failed to allege scienter against defendants because plaintiffs did "not even attempt to distinguish between the mental states of the four individuals").  However, alleging that Defendants "'had access to contrary facts'" is not enough -- Plaintiff also "'must specifically identify the reports or statements containing this information.'"  Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 196 (2d Cir. 2008) (quoting Novak, 216 F.3d at 309); see also Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010) ("Plaintiff has not 'specifically identified any reports or statements' or any dates or time frame in which Defendants were put on notice of contradictory information.") (citations omitted); Fadem v. Ford Motor Co., 352 F. Supp. 2d 501, 523 (S.D.N.Y. 2005) (refusing to "accept that the existence of an internal communication network, in and of itself, sufficiently supports a theory of scienter based upon reckless conduct"), aff'd, 157 F. App'x 398 (2d Cir. 2005).  Simply put, the level of specificity required to avoid dismissal is wholly absent from the Complaint.

### 4.    Plaintiff Has Failed To Plead Corporate Scienter

For the many reasons set forth above, Plaintiff has failed to adequately allege scienter on the part of any Gentiva employee that could be attributed to Gentiva.  See, e.g., Dynex, 531 F.3d at 195 ("When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.").   Nor has Plaintiff alleged statements so "dramatic[ally]" false that the statements raise a strong inference of corporate scienter.  See id. at 195-96 (citation omitted).

### B.    Plaintiff Fails To Plead Particularized Facts Demonstrating Materially False Or Misleading Statements Or Material Omissions

To satisfy the requirements of Rule 9(b) and the PSLRA, "the complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  MSC, 283 F. Supp. 2d at 846 (quoting Acito, 47 F.3d at 51) (emphasis added); Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004).  In other words, "plaintiffs cannot rest on their say-so that these statements are fraudulent; they must explain why."  Rombach, 355 F.3d at 175.

Here, Plaintiff attempts to support its claims with approximately 60 pages of block quotes from SEC filings, press releases and investor conferences during the Class Period.  But in so doing, Plaintiff fails to identify a single actionable misstatement or omission.  Instead, Plaintiff merely recites a litany of wholly conclusory assertions that the block-quoted statements were fraudulent.  See Compl ¶¶ 65, 67-68.  This "laundry list" style of pleading fails to meet the level of particularity required to state a securities fraud claim.  See, e.g., In re Citigroup Inc. S'holder Derivative Litig., 2009 WL 2610746, at *10 n.19 (S.D.N.Y. Aug. 25, 2009) (plaintiffs

failed to satisfy Rule 9(b) and the PSLRA by not specifying "which of the scores of statements contained in the quotations plaintiffs allege to be fraudulent"); see also In re Alcatel Sec. Litig., 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) (dismissing complaint because plaintiffs failed "to make it clear what portion of each quotation constitutes a false representation, or which statements link up with which issues in the laundry list").

In addition, as set forth below, Plaintiff fails to plead facts sufficient to show that a single challenged statement was false when made.

### 1. The Complaint Does Not Identify Actionable Misstatements Or Omissions Regarding Gentiva's Reported Financial Results

Plaintiff repeatedly (and conclusorily) asserts that Gentiva's "representations concerning [its] financial results, including reported increases in revenue and profit margins (specifically revenue per episode and margins per episode) and the purported reasons behind those increases were materially false and misleading because they failed to disclose that these reported figures were materially and artificially inflated as a result of the improper manipulations of the Medicare reimbursement system." Compl. ¶ 66; see also id. ¶¶ 65, 67-68. But these types of threadbare conclusions are insufficient where, as here, they are not accompanied by any particularized facts. See, e.g., Gross v. Summa Four, Inc., 93 F.3d 987, 996 (1st Cir. 1996) (holding that a "'general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation'") (citation omitted). Indeed, entirely absent from the Complaint is any explanation of how the alleged manipulation of the HH PPS caused Gentiva's financial statements to be inflated during the Class Period. See, e.g., MSC, 283 F. Supp. 2d at 846 ("The amended complaint does not explain how the defendants' use of reserve manipulation caused earnings figures that were materially inflated for fiscal years 1999, 2000, 2001 and the first three quarters of 2002.").

Nor does Plaintiff provide, as it must, the amount by which Gentiva's financial results were allegedly inflated -- i.e., Plaintiff fails to plead the materiality of the allegedly false financial disclosures.  See MSC, 283 F. Supp. 2d at 846 ("[T]he amended complaint does not allege what the inventory reserve . . . should have been . . . [nor] specify the amounts at which the alleged improper write-downs of acquisition inventory or the other alleged reserve manipulation caused MSC to overstate its earnings."); see also Gavish v. Revlon, Inc., 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004) (dismissing complaint where plaintiff failed "to even attempt to approximate the magnitude . . . of [the alleged] misstatements in relation to Revlon's total financial picture").  Instead, Plaintiff does nothing more than allege that Gentiva's "reported figures were materially and artificially inflated as a result of the improper manipulation of the Medicare reimbursement system."  Compl. ¶¶ 69-73; see also id. ¶¶ 74-244.

Finally, the federal securities laws "do not require a company to accuse itself of wrongdoing."  In re Citigroup Inc. Sec. Litig., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), aff'd, sub nom. Albert Fadem Trust v. Citigroup, Inc., 165 F. App'x 928 (2d Cir. 2006).  Where, as here, a "complaint fails to allege facts which would establish [the existence of an alleged] illegal scheme, . . . the securities law claims premised on the nondisclosure [sic] of the alleged scheme are fatally flawed."  In re Axis Capital Holdings Ltd. Sec. Litig., 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006).

### 2. The Complaint Does Not Identify Actionable Misstatements Regarding The Opinion That Gentiva Was Acting In Compliance With Medicare

According to Plaintiff, the opinions (expressed by Mr. Strange during investor conferences and set forth in Gentiva's SEC filings) that Gentiva's practices were "in compliance with [Medicare] standards and regulations" and "clinically appropriate" (e.g., Compl. ¶¶ 78, 91, 107, 137, 175, 190) were materially false.  But "liability under section 10(b) can be predicated on

25

statements of opinion" <u>only</u> "where it can be shown not merely that a proffered opinion was incorrect or doubtful, but that the speaker <u>deliberately misrepresented his actual opinion</u>."  <u>In re Salomon Analyst Level 3 Litig.</u>, 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004) (emphasis added); <u>accord</u> <u>Fait</u> v. <u>Regions Fin. Corp.</u>, 655 F.3d 105, 110 (2d Cir. 2011) (holding, in connection with claims under Sections 11 and 12 of the 1933 Act, that a statement of "belief or opinion" is actionable "only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed"); <u>Civilian Emps.' Ret. Sys.</u> v. <u>CBS Corp.</u>, 2012 WL 1624022, at *2 (2d Cir. May 10, 2012) (holding that the reasoning of <u>Fait</u> also "applies under Sections 10(b) and 20(a) of the 1934 Act").

Here, Plaintiff has not sufficiently alleged that Gentiva's actions were not in compliance with "[Medicare] standards and regulations" or not "clinically appropriate."  <u>See</u> pp. 9-18, <u>supra</u>.  Nor has Plaintiff adequately alleged that Mr. Strange (or any of the other Individual Defendants) deliberately misrepresented his actual opinion regarding the same.  <u>Id.</u>  Because Plaintiff has failed to plead particularized facts showing that the stated opinions were "both objectively false and disbelieved" at the time they were expressed, Plaintiff's claim with respect to such opinions must be dismissed.

### 3.    The Complaint Does Not Identify Actionable Omissions Regarding Gentiva's Internal Compliance Practices

Plaintiff conclusorily asserts that "representations concerning Gentiva's compliance practices were materially false and misleading because the [1934] Act Defendants failed to disclose that . . . Gentiva's compliance program was materially defective because complaints to Gentiva's executives and officers concerning the Company's wrongful conduct were ignored."  Compl. ¶ 67; <u>see also id.</u> ¶ 211.  Putting aside, again, that the federal securities laws "do not require a company to accuse itself of wrongdoing" (<u>Citigroup</u>, 330 F. Supp. 2d at

26

377), the Complaint provides absolutely <u>no</u> support for the allegation that Gentiva's compliance program was ineffective or that any member of management (including, but not limited to, the Individual Defendants) ignored any complaints made to them.   <u>See</u>, <u>e.g.</u>, <u>Bd. of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys.</u> v. <u>Oao</u>, 811 F. Supp. 2d 853, 874 (S.D.N.Y. 2011) ("It is well established that [the] securities laws do not impose a duty on corporate officials to be clairvoyant; company personnel 'are only responsible for revealing those material facts reasonably available to them.'") (citation omitted), <u>aff'd</u> <u>sub</u> <u>nom.</u> <u>Frederick</u> v. <u>Mechel</u>, 2012 WL 1193724 (2d Cir. Apr. 11, 2012).

For example, although CW 5 "recalled receiving several calls" on the compliance hotline that she referred "to Margo Nemet," with the understanding that Ms. Nemet reported to John Camperlengo, Gentiva's then-Chief Compliance Officer (Compl. ¶ 57), that alleged "fact" does not establish that the Company's compliance program was defective, or that any complaints were actually received, let alone ignored, by Gentiva management.   And, just because CW 7 allegedly "called Gentiva's internal compliance hotline," but did not believe there was any "follow-up to such call" (<u>id.</u> ¶ 59(i)), does not establish that any complaints were actually received and/or ignored by Gentiva management, especially considering that CW 7 left Gentiva only two months later.   <u>Id.</u> ¶ 59(j).

### 4.   The Complaint Does Not Identify Any Actionable Misstatements Or Omissions Regarding Defendants' Sarbanes-Oxley Certifications

Plaintiff next claims that the representations in Defendants' Sarbanes-Oxley certifications (the "SOX Certifications") were misleading because Gentiva's disclosure controls, procedures and internal controls were not "effective," thus permitting Gentiva "to report financial results on behalf of Gentiva that were, in material part, the product of the wrongful manipulation of the Medicare reimbursement system." Compl. ¶¶ 68, 81.  Yet, Plaintiff does not

allege any particularized facts suggesting that the actions and processes articulated in the SOX Certifications were not undertaken by the Individual Defendants, nor does the Complaint contain any facts regarding Gentiva's financial reporting processes (let alone any deficiencies therewith). (None of the CWs are alleged to have had any involvement in Gentiva's financial reporting.) Thus, Plaintiff's conclusory allegation that "Gentiva's disclosure controls and procedures and internal controls over financial reporting were not effective" cannot survive this motion. Id. ¶ 94; see Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc., 2011 WL 4357368, at *22 & n.60 (S.D.N.Y. Sept. 19, 2011) (dismissing Section 10(b) claim based on Sarbanes-Oxley certifications when "plaintiffs have not alleged any facts pertaining to the Company's internal structure for financial reporting, much less that [the Company] lacked adequate internal controls," and "plaintiffs d[id] not actually challenge defendants' accounting in any of the SEC filings"); see also Janbay v. Canadian Solar, Inc., 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012) (dismissing internal control claims when "[p]laintiffs have failed to allege specific facts concerning the purported deficient internal controls, including how they were deficient, when, and why," because "general assertions regarding the existence of deficient controls . . . fall far short of satisfying the exacting pleading requirements of Rule 9(b) and the PSLRA").

### 5.    The Complaint Relies Upon Non-Actionable Statements Of Puffery And/Or Corporate Speak

Plaintiff recites a litany of non-actionable statements of puffery and/or corporate speak. See, e.g., Rombach, 355 F.3d at 173-74 (puffery and corporate optimism are not actionable). For example, the fact that Mr. Strange noted that Gentiva "took a very conservative approach to how [it is] recognizing revenue" (Compl. ¶ 84) is nothing more than non-actionable puffery. See, e.g., Wachovia, 753 F. Supp. 2d at 354 (statements regarding "conservative" underwriting and risk management constitute corporate puffery, not actionable

misrepresentations).   The same applies to statements that Gentiva had a "robust" compliance program that was "best-in-class."  Compl. ¶ 181; see, e.g., ECA, 553 F.3d at 205-06 (statements regarding bank's "'highly disciplined'" risk management, its "standard-setting reputation for integrity" and its commitment to "'focus on financial discipline'" were non-actionable puffery); see also In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig., 2012 WL 1353523, at *10 (S.D.N.Y. Apr. 12, 2012) ("'[G]eneralizations regarding 'business practices' do not 'amount to a guarantee' to shareholders.'") (citation omitted).

**C.    Plaintiff Fails To Adequately Plead Loss Causation**

Under the PSLRA, "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4); see also Dura, 544 U.S. at 345 (securities fraud actions are not intended "to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause").  Thus, Plaintiff must establish a "'causal connection between the material misrepresentation and the [economic] loss.'"  Erica P. John Fund, Inc. v. Halliburton Co., 131 S. Ct. 2179, 2183 (2011) (quoting Dura, 544 U.S. at 342).  A failure to plead loss causation requires dismissal.  See Lattanzio v. Deloitte & Touche L.L.P., 476 F.3d 147, 157-58 (2d Cir. 2007); see also Dura, 544 U.S. at 346-47.

To adequately plead loss causation, "'a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered,' i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005) (citation omitted).  But "the logical link between the inflated share purchase price and any later economic loss is not invariably strong . . . [because] that lower price may reflect, not the

29

earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." Dura, 544 U.S. at 342-43.

Plaintiff identifies a handful of "partial disclosures" that allegedly revealed "the truth about the condition of Gentiva's business and the negative adverse factors that had been impacting Gentiva's business during the Class Period." Compl. ¶ 246. Because none of these disclosures -- namely, (i) announcements of the SFC and SEC investigations, (ii) negative earnings releases and (iii) the SFC Report -- are actually "corrective" (including because Plaintiff has failed to allege an actionable misstatement or omission that required correction), Plaintiff has failed to adequately plead loss causation. See Canadian Solar, 2012 WL 1080306, at *14 ("An alleged corrective disclosure that does not reveal the falsity of Defendants' challenged public statements cannot establish loss causation, a pleading failure that 'is fatal under Second Circuit precedent.'") (quoting Lentell, 396 F.3d at 175); see also In re Tellium, Inc. Sec. Litig., 2005 WL 2090254, at *4 (D.N.J. Aug. 26, 2005) ("Dura itself makes clear that loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud.").

### 1.   Announcements of Governmental And Regulatory Investigations Are Not Per Se "Corrective"

Plaintiff identifies three "partial disclosures" relating to the commencement of investigations by the SFC and SEC. See Compl. ¶¶ 248, 251, 253. However, as Judge Sweet of the Southern District of New York recently made clear, "[t]he announcement of an SEC subpoena or an internal investigation is itself insufficient to plead loss causation. A disclosure must reveal more than just the existence of a subpoena or investigation. It must link the subpoena or investigation to the actual fraudulent conduct alleged in the complaint." Canadian

30

Solar, 2012 WL 1080306, at *15; see, e.g., In re Moody's Corp. Sec. Litig., 274 F.R.D. 480, 488 (S.D.N.Y. 2011) ("A broad call for an investigation into the rating industry's structured finance ratings practices, without more, does not necessarily reveal that there are any problems with the ratings industry since an investigation could turn up nothing of consequence. . . .  Thus, it cannot serve as a corrective disclosure.") (emphasis added); see also Almost Family, 2012 WL 443461, at *13 (disclosures regarding the commencement of SFC and SEC investigations relating to Almost Family's participation in the HH PPS were not "corrective" because they fell "far short of a disclosure of fraud"); In re Hansen Natural Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) ("'[T]he mere existence of [an] investigation cannot support any inferences of wrongdoing.'") (citation omitted).

Because there has been no revelation (even to this day) that Gentiva engaged in any actual wrongdoing, the alleged "corrective" disclosures are not "linked" to any fraudulent conduct and, thus, are insufficient to plead loss causation.  It is for this very reason that the cases finding loss causation adequately pled on the basis of disclosures regarding the commencement of investigations -- i.e., where "the announcement of the investigation was not an isolated event in itself," but "instead the 'tip of the iceberg'" (In re Bristol-Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008)) -- are inapposite and inapplicable.  See, e.g., id. at 157 (company pled guilty to multiple criminal counts); see also Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 178 (S.D.N.Y. 2010) (company recorded financial impairments of $2.45 billion and faced a "'run on the bank'" that "threatened E*TRADE's continued existence").

### 2.     Disappointing Earnings Announcements Are Not Per Se "Corrective"

According to Plaintiff, Gentiva's earnings releases on July 20, 2010 and August 4, 2011 also constituted "partial disclosures" of the alleged fraud.  See Compl. ¶¶ 255-60.  But an announcement that a company earned less than expected, or that its earnings expectations have

31

changed, is not a corrective disclosure and, thus, cannot establish loss causation.  See, e.g., Canadian Solar, 2012 WL 1080306, at *15 (finding that press releases reducing expected margins were not "corrective" because they were "about revised future projections rather than about past financial results" and did not "reveal any 'relevant truth' about the purported fraud").  Although "a failure to meet earnings forecasts has a negative effect on stock prices," it does not have a "corrective effect" because

> [s]uch a failure does not imply that defendants concealed a scheme to depress earnings estimates and drive up prices.  It does not disclose the scheme; therefore, it cannot correct the artificial inflation caused by the scheme. . . .  If downturns in stock prices based on such mundane events as failures to meet forecasts and downward revisions of forecasts were legally sufficient to constitute disclosure of securities fraud, then any investor who loses money in the stock market could sue to recover for those losses without alleging that a fraudulent scheme was ever disclosed and that the disclosure caused their losses.  That would effectively convert the securities laws into an insurance policy for investors.

In re Initial Public Offering Sec. Litig., 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005).

Ignoring this well-established precedent, Plaintiff alleges that Gentiva's negative earnings announcements somehow revealed that Defendants curtailed "their fraudulent conduct as a result of regulatory scrutiny of Gentiva's business practices."  Compl. ¶¶ 255-56; see also id. ¶¶ 257-60.  However, neither of the earnings announcements contained any disclosure of the alleged fraud:  the first announced that Gentiva was reducing its full-year revenue guidance for 2010 due to "'recent softness in home health episodic volumes'" (id. ¶ 255); and the second announced, along the same lines, that Gentiva was lowering earnings expectations due to "'[t]he complexity of the new regulatory requirements along with the overall softness in health care services volumes'" (id. ¶ 258).  Other than Plaintiff's sheer (and impermissible) speculation, there is nothing linking the "softness" in episodic volumes and the "new regulatory requirements" to Gentiva's allegedly fraudulent billing of Medicare for in-home therapy visits.  Indeed, as Plaintiff itself acknowledges, in the summer of 2011, CMS "announced a number of

32

proposed changes" (id.) to the HH PPS, which had an industry-wide impact on the profitability and performance of home health providers like Gentiva.  See, e.g., Ex. 6 (Form 10-Q, filed Aug. 8, 2011) at 68 ("In July 2011, CMS announced proposed changes to Medicare home health payments for 2012 that, if finalized, would result in a net 3.6 percent decrease in the Medicare base rate to home health agencies."); see also Ex. 7 (Amedisys Form 8-K, Exhibit 99.1, filed Sept. 14, 2011) at 17 (identifying "2012 and future reimbursement/rebasing" as an industry "challenge[]"); Ex. 8 (Almost Family Form 10-Q, filed Aug. 8, 2011) at 16 (discussing "the broad and far reaching" impact of CMS policy changes, "which may be material and adverse"). Courts have routinely dismissed claims for failure to plead loss causation in such circumstances. See, e.g., Lentell, 396 F.3d at 174 (a "'marketwide phenomenon causing comparable losses to other investors'" suggests that an "'intervening event,'" not fraud, caused investors' losses) (citation omitted); First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994); see also Ray v. Citigroup Global Mkts. Inc., 482 F.3d 991, 993 (7th Cir. 2007) (affirming dismissal on loss causation grounds where "the undisputed facts showed that [the issuer's] competitors suffered the same fate").

### 3.   The SFC Report Is Not "Corrective"

Not surprisingly, Plaintiff overstates the findings of the SFC Report by claiming that it revealed Medicare fraud at Gentiva.  The SFC did not conclude that Gentiva committed any "violation[s] of Medicare standards and regulations," or that Gentiva's executives discussed "providing patients with additional therapy visits and services, regardless of medical need." Compl. ¶¶ 11-12.  Rather, after investigating the home health therapy practices at each of the four largest publicly-traded home health companies, the SFC generally concluded that certain of these practices "'at best represent abuses of the Medicare home health program'" and "'[a]t worst [] may be examples of for-profit companies defrauding the Medicare home health program

33

at the expense of taxpayers.'"  Id. ¶ 13 (emphasis added).  Thus, at most, the SFC Report

revealed the mere risk of or potential for fraud at Gentiva, which is insufficient to plead loss

causation.  See, e.g., Metzler Inv. GmbH v. Corinthian Colls., Inc., 540 F.3d 1049, 1062-65 (9th

Cir. 2008) (affirming dismissal on loss causation grounds and holding that Dura does not

"support the notion that loss causation is pled where a defendant's disclosure reveals a 'risk' or

'potential' for widespread fraudulent conduct"); see also Almost Family, 2012 WL 443461, at

*13 (holding that "nothing more than a risk, a possibility, that Defendants may have made

misrepresentations" does not "satisf[y] the[] pleadings standards of loss causation").

## II.  PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 20(a) OF THE 1934 ACT

Because Plaintiff has failed to state a claim for a primary violation of Section

10(b) and Rule 10b-5, its control person claim under Section 20(a) likewise fails.  See MSC, 283

F. Supp. 2d at 849.  Plaintiff's Section 20(a) claim also fails because, as detailed above (see pp.

9-23, supra), Plaintiff has not sufficiently alleged that the Individual Defendants acted with

scienter -- and Plaintiff has thus failed to plead the requisite "culpable participation."  See, e.g.,

Lapin v. Goldman Sachs Grp., Inc., 506 F. Supp. 2d 221, 246, 249 n.10 (S.D.N.Y. 2006).

## III.  PLAINTIFF LACKS STANDING TO ASSERT A CLAIM UNDER SECTION 11 OF THE 1933 ACT

Standing is a "threshold constitutional requirement that mandates an allegation of

injury traceable to the conduct of which plaintiffs complain."  In re Lehman Bros. Sec. & ERISA

Litig., 684 F. Supp. 2d 485, 490 (S.D.N.Y. 2010), aff'd sub nom. In re Lehman Bros. Mortgage

Backed Sec. Litig., 650 F.3d 167 (2d Cir. 2011); see also Plumbers' & Pipefitters' Local No. 562

Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I, 2012 WL 601448, at *5

(E.D.N.Y Feb. 23, 2012) ("[T]o adequately allege an 'injury in fact,' the plaintiff must have

sustained an injury 'in a personal and individual way.'") (citation omitted).  The standing

requirement cannot be "dispensed with by styling the complaint as a class action." Lehman Bros., 684 F. Supp. 2d at 490. Rather, in a class action, as in any other lawsuit, "the named plaintiffs must 'show that they personally have been injured, not that the injury has been suffered by other, unidentified members of the class . . . they purport to represent.'" Id. at 490-91 (emphasis added) (citation omitted).

To state a claim under Section 11, a plaintiff must allege, among other things, that it "purchased a registered security, either directly from the issuer or in the aftermarket following the offering." In re Morgan Stanley Info. Fund. Sec. Litig., 592 F.3d 347, 358-59 (2d Cir. 2010) (emphasis added); see also 15 U.S.C. § 77(k)(a) (defining the universe of individuals with standing to bring a Section 11 claim as "any person acquiring such security"). Here, Plaintiff asserts a claim "on behalf of all persons that purchased Gentiva securities in connection with the [Bond] Offering" (Compl. ¶ 294), but does not allege that it actually purchased any of the 11.5% Notes. Accordingly, Plaintiff has not established, as it must, that it suffered any injury in connection with the Bond Offering. See, e.g., J.P. Morgan Acceptance, 2012 WL 601448, at *6 ("Lead Plaintiff cannot demonstrate any injury flowing from Certificates in the twenty-five offerings it never held, even if it is proven that the Offering Documents underlying them contain violations of the securities laws."). Plaintiff's Section 11 claim must therefore be dismissed. See, e.g., N.J. Carpenters Health Fund. v. DLJ Mortg. Capital, Inc., 2010 WL 1473288, at *3 (S.D.N.Y. Mar. 29, 2010) (where a "lead plaintiff asserting Section 11 claims . . . lacks standing to sue on claims arising from [] offerings [in] which he did not purchase," the Court "should dismiss these claims even at the pre-class certification stage"); Lehman Bros., 684 F. Supp. 2d at 491 (same).

IV.    **PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 11 OF THE 1933 ACT**

Even assuming, <u>arguendo</u>, that Plaintiff has standing to assert a Section 11 claim (it does not), the Complaint nevertheless fails to state a claim under that provision.  Accordingly, the Section 11 claim must be dismissed on the following independent grounds.

A.    **Plaintiff's Section 11 Claim Sounds In Fraud And, Thus, Plaintiff's Failure to Satisfy Rule 9(b) Mandates Dismissal**

It is well-settled that Rule 9(b) applies to a Section 11 claim sounding in fraud. <u>See</u>, <u>e.g.</u>, <u>Rombach</u>, 355 F.3d at 171 ("[T]he heightened pleading standard of Rule 9(b) applies to Section 11 . . . claims insofar as the claims are premised on allegations of fraud.").  The Complaint's boilerplate disclaimer of "any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct" (<u>e.g.</u>, Compl. ¶ 323) does not excuse Plaintiff from satisfying Rule 9(b).  <u>See</u> <u>Rombach</u>, 355 F.3d at 172; <u>see</u> <u>also</u> <u>Axis</u>, 456 F. Supp. 2d at 598 ("Courts have repeatedly noted that the insertion of a simple disclaimer of fraud is insufficient. . . .  'Plaintiffs cannot so facilely put the fraud genie back in the bottle.'") (citation omitted); <u>In re Alstom SA Sec. Litig.</u>, 406 F. Supp. 2d 402, 410 (S.D.N.Y. 2005) (same).

Here, Plaintiff's allegations sound in fraud because the allegations underlying the 1933 and 1934 Act claims are almost identical.  <u>Compare</u>, <u>e.g.</u>, Compl. ¶ 320 (1933 Act claim); with <u>id.</u> ¶¶ 65-68 (1934 Act claim); <u>see</u> <u>also</u> <u>Axis</u>, 456 F. Supp. 2d at 598 ("Because the sole allegations supporting the falsity element of the Section 11 and Section 12(a)(2) claims are all inextricably intertwined with the allegations underlying plaintiffs' fraud claims[,] . . . these claims undisputedly sound in fraud.").  Moreover, Rule 9(b) also applies to 1933 Act claims, as here, comprised of allegations that are "classically associated with fraud" -- <u>e.g.</u>, "that the Registration statement was 'inaccurate and misleading;' that it contained 'untrue statements of material facts;' and that 'materially false and misleading written statements' were issued."

US_ACTIVE:\44005576\8\47756.0017

Rombach, 355 F.3d at 172 (citation omitted); see also Coronel v. Quanta Capital Holdings, Ltd., 2009 WL 174656, at *15 (S.D.N.Y. Jan. 26, 2009) (holding that 1933 Act allegations that "infer an intent to defraud" are "subject to the heightened pleading requirements of Rule 9(b)").

Despite the fact that its Section 11 claim undisputedly sounds in fraud, Plaintiff expressly disclaims all allegations of scienter and recklessness.  See Compl. ¶ 291.  Plaintiff thus fails to comply with Rule 9(b).  See, e.g., Coronel, 2009 WL 174656, at *16 (dismissing 1933 Act claims when complaint failed to "convey through factual allegations that the defendants made materially false statements, and that they did so with scienter"); see also pp. 9-23, supra.

**B.    Plaintiff Has Failed To Allege A Materially False Or Misleading Statement Or A Material Omission**

**1.    Plaintiff Has Not Established That The Offering Documents Contain Materially Misleading Statements Or Omissions**

For the reasons discussed above (pp. 23-29, supra), Plaintiff has not sufficiently alleged that any of the challenged disclosures were materially false or misleading.  See, e.g., Rombach, 355 F.3d at 172 (affirming dismissal of claim under Section 11 when "nothing in the complaint explains with adequate specificity how th[e] statements were actually false or misleading"); see also Ladman Partners, Inc. v. GlobalStar, Inc., 2008 WL 4449280, at *13, *16 (S.D.N.Y. Sept. 30, 2008) (similar).

Moreover, even if the heightened pleading standards of Rule 9(b) were inapplicable, because Plaintiff does "not incorporate any of [its prior] allegations" into its claims under the 1933 Act (Compl. ¶ 291), the Complaint fails to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.  Indeed, Plaintiff does no more than conclusorily assert that the Bond Offering documents contained "untrue statements of material facts and omitted material facts" by failing to disclose that Gentiva "violat[ed] Medicare standards and regulations," and that its

"compliance program was materially defective."  Compl. ¶¶ 325, 320.  But "[t]hreadbare recitals

of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to

"'state a claim for relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (citation omitted).

    **2.**    **Even If The Bond Offering Documents Were False Or Misleading, Purchasers In The Bond Offering Cannot Establish That Any Of The Alleged Misstatements Or Omissions Were Material**

In the Bond Offering, Gentiva allowed holders of unregistered bonds to exchange

their bonds for registered bonds.  See Ex. 9 (Prospectus, dated November 18, 2010) at i

("Gentiva Health Services, Inc. is offering to exchange up to $325,000,000 aggregate principal

amount of registered 11.5% Senior Notes due 2018, or the 'New Notes,' for a like principal

amount of its outstanding, unregistered 11.5% Senior Notes due 2018, or the 'Original Notes.'

The terms of the New Notes are substantially identical to the terms of the Original Notes, except

that the New Notes are registered under the Securities Act of 1933."); Ex. 10 (Registration

Statement, dated October 27, 2010), at i (same).  This transaction, known as an "Exxon Capital

exchange," In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 624 (S.D.N.Y. 2007), was

contemplated by the terms of a prior private placement.  See Ex. 9 (Prospectus) at 3 ("In

connection with [the August 17, 2010] private placement, we entered into a registration rights

agreement pursuant to which we agreed to complete a registered exchange offer for the Original

Notes."); Ex. 10 (Registration Statement) at 3 (same).

In other words, purchasers of the unregistered bonds "knew [at the time of

purchase] that they would most likely exchange the unregistered bonds for registered bonds once

the registration occurred because a registered bond is more freely tradable and, hence, far more

valuable, than the same bond when it is unregistered."  In re Healthsouth Corp. Sec. Litig., 261

F.R.D. 616, 647 (N.D. Ala. 2009).  As a result, because "a registration statement cannot be the

basis for an investment decision where an investor made its investment decision before the

38

registration statement had been filed," purchasers "who acquired registered bonds through a voluntary . . . Exxon Capital exchange are precluded from asserting claims under Section 11." Id. (emphasis in original); see also Refco, 503 F. Supp. 2d at 636-37 (dismissing Section 11 claim "as to any plaintiff who obtained registered bonds in the Exxon Capital exchange" because "plaintiffs have not alleged that unregistered bondholders would have been any less likely to go through with the . . . exchange had the Bond Registration Statement been accurate").

C.    **Plaintiff's Section 11 Claim Is Untimely**

According to Plaintiff, the Bond Offering documents were "false and misleading" because they "incorporated by reference" allegedly false and misleading representations relating to Gentiva's participation in the HH PPS.  Compl. ¶¶ 302-19.   Specifically, Plaintiff alleges that "Gentiva's reported financial results, including reported increases in revenue and profit margins . . . failed to disclose that such results were materially and artificially inflated [due to] the Company's violation of Medicare standards and regulations."  Id. ¶ 320.  The facts underlying Plaintiff's Section 11 claim, however, were known to Plaintiff (and its counsel) well over a year before the Complaint was filed on April 16, 2012.  Indeed, on November 2, 2010, Kaplan Fox, on behalf of Mr. Endress (see p. 7, supra), filed a complaint in this Court (the "November 2010 Complaint") asserting claims under the 1934 Act against certain of Defendants and alleging that Gentiva's "reported sales and earnings were materially inflated" as a result of its alleged manipulation of the HH PPS.  See Ex. 11 (November 2010 Complaint) at ¶¶ 10-12; see also id. ¶¶ 53-57 (identifying certain of the same allegedly false and misleading statements underlying the Section 11 claim here).  As such, the one-year statute of limitations applicable to Section 11 claims began to run, at the latest, on December 16, 2010 (the effective date of the Bond Offering), rendering Plaintiff's Section 11 claim untimely.  See 15 U.S.C. § 77(m).

US_ACTIVE:\44005576\8\47756.0017

### D.   Purchasers In The Bond Offering Cannot Establish Damages

Because the Bond Offering was an Exxon Capital exchange, "no damages can be demonstrated because the transaction involves two sets of identical bonds."  In re Safety-Kleen Corp., 2002 WL 32349819, at *1 (D.S.C. Mar. 27, 2002); see also Ex. 9 (Prospectus) at i; Ex. 10 (Registration Statement) at i.  Even putting that aside, because Plaintiff does not allege there to have been any sale of the 11.5% Notes (much less any purchase (see p. 35, supra)), any recovery is limited to "such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and . . . the value thereof as of the time such suit was brought."  15 U.S.C. § 77k(e) (emphasis added).  The "time such suit was brought" is generally viewed as the date upon which the first complaint was filed in the action -- here, November 2, 2010.  See Beecher v. Able, 435 F. Supp. 397, 401-02 (S.D.N.Y. 1975).  Because the November 2010 Complaint pre-dated the effective date of the Bond Offering, there can be no damages under Section 11.

## V.   PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 15 OF THE 1933 ACT

Plaintiff has failed to state a claim under Section 15 because it has failed to allege a primary violation under Section 11.  See, e.g., ECA, 553 F.3d at 206-07.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Complaint be dismissed in its entirety and with prejudice.

US_ACTIVE:\44005576\8\47756.0017

Dated:  New York, New York
          June 15, 2012

Respectfully submitted,


*/s/ John A. Neuwirth*

John A. Neuwirth
Joshua S. Amsel
Stefania D. Venezia
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Gentiva Health Services, Inc.,*
*H. Anthony Strange, Ronald A. Malone,*
*John R. Potapchuk and Eric R. Slusser*