**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Gentiva Securities Litigation | Civil Action No: 10-5064 (ADS) (WDW) <br><br> **ELECTRONICALLY FILED** |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT**

KAPLAN FOX & KILSHEIMER LLP
Frederic S. Fox
Joel B. Strauss
Jeffrey P. Campisi
Gwendolyn N. Cutini
850 Third Avenue, 14th Floor
New York, New York 10022
Tel:  (212) 687-1980
Fax:  (212) 687-7714

KAPLAN FOX & KILSHEIMER LLP
Justin B. Farar
11111 Santa Monica Boulevard, Suite 620
Los Angeles, California 90025
Tel: (310) 575-8604
Fax: (310) 575-8697

KAPLAN FOX & KILSHEIMER LLP
Laurence D. King
350 Sansome Street, Suite 400
San Francisco, California 94104
Tel: (415) 772-4700
Fax: (415) 772-4707

*Lead Counsel for Lead Plaintiff the Los Angeles City Employees' Retirement System
and the Proposed Class*

<u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     PRELIMINARY STATEMENT ....................................................................... 1

II.    FACTUAL BACKGROUND ....................................................................... 3

    1.    Relevant Background on Medicare's Standards and Regulations ......................... 3

    2.    The SFC Finds Gentiva Was Abusing, If Not Outright
        Defrauding, Medicare ....................................................................... 5

    3.    Numerous Former Gentiva Employees Confirm Company
        Wide Abuse, If Not Outright Defrauding, of Medicare ....................................... 7

III.    LEGAL ARGUMENT ....................................................................... 9

    1.    The Complaint Adequately Alleges Exchange Act Claims ................................... 10

        a.    The Complaint Adequately Alleges Material Misstatements and
            Omissions ....................................................................... 10

            i.    Defendants' Representations that Gentiva Complied
                with Medicare Rules and Regulations Are Actionable ................. 12

            ii.    The Complaint Adequately Alleges Gentiva's
                Reported Financial Results Were Materially False
                and Misleading and Omitted Material Facts ................................ 13

            iii.    Defendants' Representations about Gentiva's
                Compliance Program Are Actionable ........................................... 15

            iv.    Defendants Falsely Certified Gentiva Complied
                with Sarbanes-Oxley ................................................................ 16

            v.    Defendants' Representations are Not Puffery
                or "Corporate Speak" .............................................................. 17

        b.    The Complaint Adequately Alleges a Strong Inference
            of Scienter ....................................................................... 18

            i.    Internal Gentiva Documents Support an
                Inference of Scienter ................................................................ 19

i

ii.     The CW Allegations Corroborate the SFC's
        Findings and Further Support a Strong Inference of Scienter ...... 21

iii.    The SEC and SFC Investigations Support an
        Inference of Scienter .................................................................. 25

iv.     False SOX Certifications Support an
        Inference of Scienter .................................................................. 26

v.      Gentiva's Scienter Has Been Adequately
        Alleged ....................................................................................... 26

vi.     Defendants' Sales of Gentiva Securities
        Support an Inference of Scienter ................................................ 27

c.   The Complaint Adequately Alleges Loss Causation ................................ 30

i.      The Disclosure of the SFC Report was
        a Corrective Disclosure .............................................................. 31

ii.     Disclosures of the SEC's and SFC's
        Investigations of Gentiva and Related
        Stock Price Declines Allege Loss Causation ............................... 34

iii.    Gentiva's August 4, 2011 and July 20, 2010
        Announcements Are Partial Disclosures ..................................... 36

d.   The Complaint States Valid Control Person Claims
     Under Section 20(a) ................................................................................ 37

2.   The Complaint Adequately Alleges Securities Act Claims ................................. 37

IV.  CONCLUSION ............................................................................................................ 40

ii

TABLE OF AUTHORITIES

<u>Cases</u>                                                                    <u>Page</u>

*Akerman v. Arotech Corp.*,
    608 F. Supp. 2d 372 (E.D.N.Y. 2009) ........................................................... 18

*Am. Pipe & Constr. Co. v. Utah*,
    414 U.S. 538 (1974)..................................................................................... 39

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................... 9

*Bach v. Amedisys, Inc.*,
    Civil Action No. 10-395-BAJ-CN, slip op. (M.D. La. June 28, 2012)............................ 32

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................... 10

*Campo v. Sears Holding Corp.*,
    No. 09-3589-cv, 2010 WL 1292329 (2d Cir. Apr. 6, 2010)................................... 25

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003)........................................................................... 40

*Greenfield v. Prof'l Care, Inc.*,
    677 F. Supp. 110 (E.D.N.Y. 1987) ................................................................. 14

*Grubka v. WebAccess Int'l, Inc.*,
    Civil Case No. 05-CV-02483-LTB-OES,
    2006 WL 2527815 (D. Colo. Aug. 31, 2006) .................................................. 39

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)..................................................................................... 38

*Hutchins v. NBTY, Inc.*,
    No. CV 10-2159 (LDW) (WDW),
    2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012)..................................... 9, 15, 29

*In re Alcatel Sec. Litig.*,
    382 F. Supp. 2d 513 (S.D.N.Y. 2005)............................................................ 11

*In re Almost Family, Inc. Sec. Litig.*,
    Civil Action No. 3:10-CV-00520,
    2012 WL 443461 (W.D. Ky. Feb. 10, 2012)................................. 24, 32, 33, 35

*In re ArthroCare Corp. Sec. Litig.*,
　　726 F. Supp. 2d 696 (W.D. Tex. 2010) .......................................................... 29

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
　　324 F. Supp. 2d 474 (S.D.N.Y. 2004)..................................................... 19, 24

*In re Bristol Myers Squibb Co. Sec. Litig.*,
　　586 F. Supp. 2d 148 (S.D.N.Y. 2008)..................................................... 32, 34

*In re Citigroup Inc. S'holder Der. Litig.*,
　　No. 07 Civ 9841, 2009 WL 2610746 (S.D.N.Y. Aug. 25, 2009) .................... 11

*In re Countrywide Fin. Corp. Der. Litig.*,
　　554 F. Supp. 2d 1044 (C.D. Cal. 2008) ........................................................ 22

*In re Electronic Data Sys. Corp. Sec. & "ERISA" Litig.*,
　　298 F. Supp. 2d 544 (E.D. Tex. 2004) ......................................................... 32

*In re Enron Corp. Sec., Der. & ERISA Litig.*,
　　258 F. Supp. 2d 576 (S.D. Tex. 2002) .......................................................... 11

*In re Fannie Mae 2008 Sec. Litig.*,
　　742 F. Supp. 2d 382 (S.D.N.Y. 2010)..................................................... 18, 37

*In re Fannie Mae 2008 Sec. Litig.*,
　　Civil Action Nos. 08-7831 (PAC), slip op.
　　09 MD 2013 (PAC) (S.D.N.Y. Apr. 11, 2011)............................................. 28

*In re Gen. Elec. Sec. Litig.*,
　　No. 09 Civ. 1951 (RJH), 2012 WL 90191 (S.D.N.Y. Jan. 11, 2012)................. 31, 33, 37

*In re Gentiva Sec. Litig.*,
　　281 F.R.D. 108 (E.D.N.Y. 2012) ............................................. 30, 31, 32, 36, 38

*In re Initial Public Offering Sec. Litig.*,
　　399 F. Supp. 2d 261 (S.D.N.Y. 2005)........................................................... 37

*In re Majesco Sec. Litig.*,
　　No. CIV A 05CV-3557 PGS, 2006 WL 2846281 (D.N.J. Sep. 29, 2006) ...................... 29

*In re Mannkind Sec. Actions*,
　　835 F. Supp. 2d 797 (C.D. Cal. 2011) .......................................................... 29

*In re Moody's Corp. Sec. Litig.*,
　　274 F.R.D. 480 (S.D.N.Y. 2011) .................................................................. 35

iv

*In re MSC Indus. Direct Co., Inc.*,
   283 F. Supp. 2d 838 (E.D.N.Y. 2003) ........................................................... 28

*In re NTL, Inc. Sec. Litig.*,
   347 F. Supp. 2d 15 (S.D.N.Y. 2004) ............................................................. 19

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) .................................................................. 12

*In re Parmalat Sec. Litig.*,
   375 F. Supp. 2d 278 (S.D.N.Y. 2005) ........................................................... 30

*In Salomon Analyst Metromedia Litig.*,
   544 F.3d 474 (2d Cir. 2008) .................................................................. 10, 32

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) .......................................................................... 28

*In re SunPower Sec. Litig.*,
   No. C 09-5473, 2011 WL 7404238 (N.D. Cal. Dec. 19, 2011) ........................ 26

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006) ........................................................................ 38

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008) ........................................................... 34

*In re Tyco Int'l, Ltd.*,
   No. 02-cv-1335, 2004 WL 2348315 (D.N.H. Oct. 14, 2004) ........................... 11

*In re Winstar Commc'ns*,
   No. 01 CV 3014 (GBD), 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ............... 32

*Janbay v. Canadian Solar, Inc.*,
   No. 10 Civ. 4430 (RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ....... 26, 35

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) .................................................................. 18, 19

*Lapin v. Goldman Sachs Group, Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006) ........................................................... 17

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005) ................................................... 30, 31, 33, 34, 35

*Local No. 38 Int'l. Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010) ............................................................................. 25

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................... 39, 40

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S. Ct. 1309 (2011) ....................................................................................... 14, 18

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .................................................................................... 33

*Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
    No. 10 Civ. 2835 (NRB), 2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011) ....................... 26

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
    No. 08 Civ 5653 (PAC), 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ......................... 39

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) .................................................................. 10, 12, 13, 17, 19

*Richman v. Goldman Sachs Group, Inc.*,
    No. 10 Civ. 3461 (PAC), 2012 WL 2362539 (S.D.N.Y. June 21, 2012) ....... 26, 30, 32, 34

*Shapiro v. UJB Fin. Corp.*,
    964 F. 2d 272 (3d Cir. 1992) ..................................................................................... 17

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008) ...................................................................................... 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................... 2, 10, 18, 19, 23, 26

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ................................................................................................. 14

*VTech Holdings, Ltd. v. PricewaterhouseCoopers, LLP*,
    348 F. Supp. 2d 255 (S.D.N.Y. 2004) .......................................................................... 9

<u>Statutes & Regulations</u>

42 C.F.R. § 484.55 ................................................................................................................ 4

15 U.S.C. § 77(k), (o) ...................................................................................................... 38, 40

Federal Rules of Civil Procedure

9(b) .................................................................................................................. 10, 11, 30

12(b)(6) ............................................................................................................ 9, 15, 31

15(a)(2) ................................................................................................................... 40

23 ............................................................................................................................ 39

## I. **PRELIMINARY STATEMENT**

Throughout the Class Period (July 31, 2008 through October 4, 2011), Gentiva Health Services, Inc. ("Gentiva" or the "Company"), a home health care provider that derived the majority of its revenues from Medicare and reported ever increasing revenues and margins, repeatedly represented to investors that it was "in compliance" with Medicare "standards and regulations."  (*E.g.*, ¶ 78) ("¶ __" refers to a paragraph in the Consolidated Class Action Complaint or "Complaint").  Through a series of partial disclosures, investors began to learn that the representations of Gentiva and the individual defendants (Anthony M. Strange  (CEO and Chairman) ("Strange"), Ronald A. Malone (former CEO and Chairman) ("Malone"), John R. Potapchuk (former CFO) ("Potapchuk") and Eric R. Slusser  (CFO) ("Slusser") (the "Individual Defendants" and, collectively, "Defendants")) were materially false and misleading because Gentiva was providing medically unnecessary services and visits to patients in order to meet enhanced payment thresholds from Medicare in direct contravention of Medicare standards and regulations.  At the end of the Class Period, the U.S. Senate Finance Committee (the "SFC"), which has jurisdiction over the Medicare program, issued a report finding that the home healthcare practices at Gentiva "*at best represent abuses of the Medicare home health program. At worst, they may be examples of for-profit companies defrauding the Medicare home health program at the expense of taxpayers.*" (¶ 13) (emphasis added).  In response to this disclosure, the price of Gentiva's common stock plummeted 33% that day from the prior day close and dropped another 18% the next day to close around $3 per share, a massive decline of approximately 90% from the Class Period high of approximately $30 per share.  (¶¶ 16, 266, 268).  Moreover, as cited in the Complaint, internal Gentiva emails and documents, as well as information from numerous former Gentiva employees throughout the Company who were

1

interviewed by Lead Plaintiff's Counsel, demonstrate that Gentiva's senior management planned and implemented a scheme to defraud the Medicare system and bilk taxpayers.  (¶¶ 37-61).  The Complaint's allegations, when viewed holistically, as required by the U.S. Supreme Court under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), give rise to a cogent and compelling inference that Defendants knew, or at least recklessly disregarded, that their representations to investors were materially false and misleading when made in violation of the anti-fraud provisions of the Securities Exchange Act of 1934 (the "Exchange Act").

Defendants' motion to dismiss ignores key allegations of the Complaint and disputes the Complaint's fact allegations.  For example, Defendants argue that their conduct reflected a purported new business strategy to go after higher acuity patients requiring more services and visits and utilizing "specialty programs."  (Mem. of Law in Supp. of Defs.' Mot. to Dismiss the Consolidated Class Action Compl. ("Defs.' Mem.") (ECF No. 61-1), at 17-18).  However, courts uniformly hold that such factual disputes cannot be adjudicated on a motion to dismiss before any discovery.  *Tellabs*, 551 U.S. at 328 (stating that the jury has "authority to assess the credibility of witnesses, resolve any genuine issues of fact, and make the ultimate determination whether [defendants] acted with scienter").  Moreover, Defendants' factual assertions fly in the face of the Complaint's allegations, including internal documents and interviews of Gentiva former employees from offices Company-wide that demonstrate widespread abuse of the Medicare system.  (*E.g.*, ¶ 53(b) (former Orthopedics Director describing pressure to utilize specialty programs where no medical need in order to increase visits and hit Medicare bonus thresholds); ¶ 61(c)-(f) (former director of clinical practices/branch director alleging pressure by superiors to place patients in Gentiva's Safe Strides specialty program even when medically unnecessary); ¶¶ 54(a), 55(a), 56(a), 58, 59, 60(d) (describing pressure to provide medically

unnecessary services)).  Accordingly, for these reasons, and for the reasons discussed below, the Complaint adequately alleges violations of the Exchange Act, as well as non-fraud claims under the Securities Act of 1933 ("Securities Act") (relating to Gentiva's $325 million note offering in November 2010) and therefore Defendants' motion should be denied in its entirety.

## II.    FACTUAL BACKGROUND

### 1.    Relevant Background on Medicare's Standards and Regulations

The Social Security Act requires that for patients to be eligible for Medicare home health benefits, such as nursing care, physical therapy and occupational therapy, the beneficiaries must be homebound and there must be a medical necessity for the services provided.   (¶ 25). Medicare pays for home health services through a prospective payment system or "PPS," under which home health service providers, such as Gentiva, are paid in advance for a substantial portion of the total payment to which they are entitled for a given patient based on, *inter alia*: (a) a predetermined rate schedule established by Medicare; and (b) a pre-treatment assessment of a patient's condition and proposed plan of care during a 60 day time period, known as an "episode."  (¶ 28).  The Centers for Medicare and Medicaid Services ("CMS") also developed a patient classification system to adjust payments for home health services under the PPS, known as the "case-mix adjustment," that considers each patient's health characteristics and use of services.  (¶ 29).

Gentiva played a critical role in determining how much money Medicare would pay for its services *after* the physician prescribed a home health plan of care (¶ 30), an important fact conspicuously missing from Defendants' recitation of the "facts," in an apparent attempt to exculpate themselves from liability.  (*See* Defs.' Mem. at 6).  Indeed, after the physician prescribed the home health plan of care, a Gentiva nurse or therapist assessed the patient's

3

condition and needs at the beginning of the initial episode of care and each subsequent episode. (¶ 30). The assessment requires completion of a form called the Outcome and Assessment Information Set or "OASIS." OASIS items describing a patient's condition, as well as expected therapy needs (*i.e.*, physical, occupational, speech) are used to determine the case-mix adjustment to the standard Medicare payment rate for the episode. (*Id.*) Accordingly, "proper completion of the OASIS [was] of critical importance" because it determined *how much Medicare would pay Gentiva for its services*. (¶ 31); *see also* 42 C.F.R. § 484.55 ("Each patient must receive, and an HHA [home health agency, such as Gentiva] must provide, a patient-specific, comprehensive assessment that *accurately* reflects the patient's current health status . . . [and] must be updated and revised (including the administration of the OASIS) as frequently as the patient's condition warrants due to a major decline or improvement in the patient's health status . . . .") (emphasis added). Thus, proper completion of the OASIS by Gentiva (not the physician) was a key and critical driver in determining how much Gentiva would be paid for its services by Medicare.

Through 2007, Medicare paid Gentiva a substantial "bonus" that could be as much as $2,200 when it provided at least 10 therapy visits to a patient within an episode. (¶ 32). Effective January 1, 2008, the number of therapy visits required for home health care providers to receive a bonus payment changed from 10 visits to 6, 14 and 20 visits. (¶ 33). Accordingly, Gentiva could reap substantially higher payments from Medicare if patients reached these new thresholds within each 60-day episode period. (*Id.*) Although Gentiva would generally receive an upfront payment from Medicare of approximately 60% of the estimated payment entitlement, final payment was ultimately based on the actual number of visits provided to the patient. (¶ 34). Towards the end of the initial episode of care, Gentiva had to determine whether to "recertify" a

patient for an additional episode of care.  (¶ 35).  Recertifications increased the Company's profits because less paperwork was associated with such patients.  (*Id.*)

The PPS also has a Low Utilization Payment Adjustment, or "LUPA," for patients who receive fewer than five visits during an episode. (¶ 36).  LUPAs may result from a variety of circumstances, including the patient refusing to accept more than four visits. (*Id.*)  LUPAs are paid a standardized service-specific per visit amount which is generally less than what Gentiva would have otherwise received from Medicare and profit margins associated with LUPA patients were generally lower because fixed costs associated with the patient, such as intake and medical billing, were spread out over fewer visits.  (*Id.*)  Moreover, an episode involving a LUPA could have resulted in Gentiva having to pay a substantial amount of money back to Medicare – that being the difference between the amount of money originally paid to Gentiva under the PPS based on the original OASIS form and plan of care and the lower amount payable under the per-visit formula applicable to LUPAs.  (*Id.*)

### 2.  The SFC Finds Gentiva Was Abusing, If Not Outright Defrauding, Medicare

On October 3, 2011, after a seventeen month investigation of Gentiva and other home health care providers, the SFC issued the *Staff Report on Home Health and the Medicare Therapy Threshold* (the "SFC Report").  (¶ 37).  The SFC found, *based on nonpublic data provided to it by Gentiva*, that when Medicare changed the number of visits required for home health care providers to receive bonus payments in 2008 from 10 visits to 6, 14 and 20 visits, there was a statistically significant drop of 25% in the number of patients Gentiva provided with 10 visits and, at the same time, a statistically significant *increase* of up to 31% in the number of Gentiva patients who were suddenly receiving 6, 14 and 20 visits.  (¶¶ 38-39).

5

Further, the SFC uncovered emails and documents that clearly show that the statistical shift was not an accident. (¶¶ 37-51). Multiple internal email exchanges among senior Gentiva executives, including several of the Individual Defendants, as well as other internal Gentiva documents make clear that in the months leading up to and subsequent to the January 1, 2008 changes in therapy visit thresholds required for Medicare bonus payments, Defendants were trying to determine not only how the changes would impact the Company's revenue and earnings (*e.g.*, ¶ 44), but also how they could game the new system to increase Medicare revenues and earnings. (*See* ¶¶ 42-51). Notably, these emails and other documents *do not* mention increasing visits to patients because of a shift to higher acuity patients (as Defendants now claim) or due to other patient medical needs. The focus, rather, was on how much more money Gentiva could make by increasing therapy visits enough to push the episode into the next highest Medicare reimbursement "bucket." By way of example, in a September 7, 2007 email, Perri Southerland of Gentiva's Finance Department told Defendant Strange (among others) that, as a follow-up to a discussion they had, Southerland performed an analysis in which he figured out a way for Gentiva to increase its per episode reimbursements by $350 to $550 under the new Medicare reimbursement visit threshold requirements, stating:

> In the analysis I increased the therapy visits by an average of two visits to determine the additional revenue from moving to the next highest therapy bucket. The lowest episodes that I added the two visits to were 4 therapy visits, since 3 visits to 5 visits would not increase reimbursement . . . . In summary, increasing therapy visits by an average of 2 visits per episode will increase revenue by approximately $350 to $550 per episode. Adding therapy services (6 visits) to patients with high functional needs will increase revenue by about $700 per episode.

(¶ 45).

Similarly, other internal emails among Gentiva executives focused solely on the revenue impact for the Company if clinicians increased therapy visits enough to at least hit the 6 visit

6

threshold for enhanced Medicare payment.  (*See, e.g.*, ¶¶ 47-48).  Again, the medical needs of patients are not mentioned or even hinted at in these emails as a factor in the analysis.  The SFC also uncovered evidence that Defendants measured the performance of Gentiva's business regions and their management using a competitive ranking system that would increase a region's rank based on the percentage of therapy visits that fell in the most profitable therapy visit range, thus creating incentives to pressure Gentiva's clinicians to drive therapy visit patterns toward the more profitable thresholds.  (*See* ¶¶ 50-51).

### 3.     Numerous Former Gentiva Employees Confirm Company Wide Abuse, If Not Outright Defrauding, of Medicare

Numerous former Gentiva employees from offices throughout the country, corroborate the SFC's findings and tell a remarkably similar story that in order to increase revenues and margins per episode (earnings) without regard for medical necessity, Gentiva's clinicians and managers were pressured by senior executives to provide patients with medically unnecessary visits and services in order to hit enhanced payment thresholds from Medicare.  (*See* ¶¶ 52-61) (collectively the "CW allegations").  The former employees, in detailed allegations that span over 16 pages of the Complaint, describe how Gentiva executives, including Area and Regional Vice Presidents, not only knew of but, in many instances, themselves applied pressure on Gentiva clinicians and managers, through instructions at periodically scheduled and *ad hoc* meetings, as well as through emails and conference calls, to violate Medicare rules in order to increase Medicare payments by practices including: (i) providing medically unnecessary visits to patients in order to hit thresholds required by Medicare to receive bonus payments (¶¶ 52-61); (ii) wrongfully "upcoding" in order to increase a patient's "case-mix weight" (*id.*); (iii) avoiding LUPAs by adding medically unnecessary therapy visits (¶¶ 45-46, 55-56, 59); (iv) recertifying patients for added episodes of care even if additional visits were not medically necessary (¶¶ 56-

60); (v) manipulating OASIS forms to increase reimbursement from Medicare (¶¶ 53-61); (vi) wrongly manipulating diagnostic codes in order to generate the greatest reimbursement from Medicare (¶¶ 59-60); and (vii) providing medically unnecessary services to increase Medicare reimbursement revenues and margins. (¶¶ 52-61).   Notably, several of these former employees sounded alarm bells about Medicare fraud, but were ignored.  For example,

> (i) On May 3, 2010, a Gentiva Orthopedics Director (CW 1) sent an email directly to Defendant Strange complaining about the Company's push to treat to thresholds rather than patients' medical needs (the "Parting Comments Email") (¶¶ 49, 53(c));

> (ii) In February 2010, the Director of Gentiva's Las Vegas Branch (CW 2) told his/her Area and Regional Vice Presidents at the "Going into the Roar" meeting that he/she was "uncomfortable" with their request to add unnecessary therapies and patient visits and he/she was "not going to jail for anyone." (¶ 54(a));

> (iii) CW 5, a Gentiva Compliance Specialist, received reports in 2008-09 from Gentiva clinicians in upstate New York expressing that they felt management was asking them to add or provide unnecessary treatments.  (¶ 57). In fact, based on the calls, CW 5 had the impression that these clinicians were being *trained* by Gentiva managers to add extra therapies that the clinicians did not believe were medically necessary.  (*Id.*);

> (iv) During a dinner in Georgia in late 2009 or early 2010, a Nurse/Branch Manager from Gentiva's Binghamton and Norwich, New York offices, along with three other branch managers from various parts of the country, told Gentiva's V.P. of Human Resources, Kathleen Shanahan, that they felt Gentiva clinicians in the field were making decisions for financial reasons rather than patients' medical needs and that Gentiva had created an environment wherein patient care was often driven by money as opposed to medical need.  (¶ 59(h)); and

> (v) On January 22, 2010, Holly McComas, a former nurse at Gentiva's Charleston, West Virginia branch, complained to Gentiva's Regional Director of Human Resources, Edwina Simpson, about fraudulent Medicare billing practices taking place at her branch, including manipulation of OASIS forms.  Then, along with other employees of the Charleston branch, she participated in a meeting with Ms. Simpson on February 2, 2010 at which Ms. Simpson was told about a pattern and practice of Medicare fraud being committed by Gentiva, including the forging of Ms. McComas' initials on OASIS forms assessment documents in order to perpetuate billing fraud.  (¶¶ 60(h),(j)-(k)).

In the face of all of the above, throughout the Class Period, Defendants repeatedly represented in SEC filings and other public statements that Gentiva was "in compliance" with Medicare "standards and regulations" and even went so far as to claim that Gentiva maintained a "robust" and "best-in-class" compliance department that did not condone manipulation of the Medicare reimbursement system.  (*See, e.g.*, ¶¶ 9, 78, 107; ¶ 137 (Strange representing that "everything that we are doing is clinically appropriate."); ¶ 181 (Strange representing that Gentiva has a "robust compliance program" that is "best-of-class.")).  Moreover, Defendants falsely represented to investors that Gentiva's ever increasing revenues from Medicare, which was the source of the majority of the Company's revenues, as well as the source of its growing profit margins per episode (a metric closely watched by investors), were being legitimately earned.  (*See, e.g.*, ¶¶ 67-68, 76, 150).  As noted above, a series of partial disclosures (¶¶ 248-68) revealed the risks concerning Gentiva's business that were concealed by Defendants' misrepresentations, culminating in the disclosure of the SFC Report at the end of the Class Period.

## III.   <u>LEGAL ARGUMENT</u>

A motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure must be denied if the complaint in question "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In reviewing a complaint under Rule 12(b)(6), the court must "assume that all allegations in the complaint are true and draw all inferences in favor of the nonmoving party."  *Hutchins v. NBTY, Inc.*, No. CV 10-2159(LDW)(WDW), 2012 WL 1078823, at *2 (E.D.N.Y. Mar. 30, 2012).  Ultimately, "[t]he issue is not whether the plaintiff . . . will prevail but whether the plaintiff is entitled to offer evidence to support its claims."  *VTech Holdings, Ltd. v.*

*PricewaterhouseCoopers, LLP*, 348 F. Supp. 2d 255, 261 (S.D.N.Y. 2004).  Furthermore, the court "must consider the complaint in its entirety." *Tellabs*, 551 U.S. at 322.  A court may not dismiss the complaint if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  As set forth below, the Complaint easily satisfies the pleading standards for each of its claims.

  **1.**   **The Complaint Adequately Alleges Exchange Act Claims**

  To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misstatement or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance . . . (5) economic loss, and (6) loss causation." *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 478 n.1 (2d Cir. 2008) (quotations omitted).  Federal Rule of Civil Procedure 9(b) requires that the Complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (citation and quotations omitted).  Defendants argue that the Complaint fails to sufficiently allege: (i) that they made material misstatements and omissions; (ii) that they did so knowing of their falsity, or they acted with at least reckless disregard; and (iii) that disclosure of Defendants' wrongful conduct caused losses to Lead Plaintiff and the proposed class (loss causation).  As demonstrated below, Defendants are wrong.

  **a.**   **The Complaint Adequately Alleges Material Misstatements and Omissions**

  Section III.C. of the Complaint (¶¶ 65-244) satisfies the particularity requirements of Rule 9(b) and the PSLRA by identifying Defendants' materially false and misleading representations and material omissions, noting who made the statement and when the statement was made, and explaining in detail *why* the representation was materially false and misleading

10

when made.  (*See, e.g.*, ¶¶ 77, 83, 90, 94, 106, 108).  Specifically, the Complaint alleges four

categories of materially false and misleading statements:

> (i) representations that Gentiva was "in compliance" with Medicare "standards and regulations" (*see, e.g.*, ¶¶ 78, 91, 210);

> (ii) representations that Gentiva's increasing revenue and margins per episode were based on increased utilization of therapies that were medically necessary (*see, e.g.*, ¶¶ 76, 82, 89, 116, 146, 150);

> (iii) representations that Gentiva's compliance program allowed Defendants to operate with "the highest levels of operating, financial and regulatory integrity" and was "best-of-class." (*see, e.g.*, ¶¶ 137, 181); and

> (iv) certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") representing that Gentiva's SEC filings (10-Ks and 10-Qs) were complete, accurate and not misleading (*see, e.g.*, ¶¶ 80, 93, 109).

Accordingly, Defendants' argument that the Complaint fails to identify a "single

actionable misstatement or omission" (Defs.' Mem. at 23-24) is completely meritless and should

be rejected by the Court.  Further, the Complaint's use of cross-referencing simply informs the

Court why each statement is false, as required by Rule 9(b) and the PSLRA, while avoiding

repetition, a pleading style endorsed by several courts in other complex securities actions.  *See*

*e.g. In re Tyco Int'l, Ltd.*, No. MDL 02-1335-B, 02-266-B, 2004 WL 2348315, at *9 (D.N.H.

Oct. 14, 2004); *In re Enron Corp. Sec., Der. & ERISA Litig.*, 258 F. Supp. 2d 576, 611 (S.D.

Tex. 2003).  In each of the cases cited by Defendants, the structure of the complaint was very

different from that of the Complaint at issue here.  *See In re Alcatel Sec. Litig.*, 382 F. Supp. 2d

513, 534 (S.D.N.Y. 2005) (plaintiffs failed "to set forth specific, false statements or misleading

omissions of material fact that are accompanied with identification of the speaker, time, and

place of each statement and an explanation of why each statement is fraudulent."); *In re*

*Citigroup Inc. S'holder Der. Litig.*, No. 07 Civ. 9841, 2009 WL 2610746, at *10 (S.D.N.Y. Aug.

25, 2009) (where plaintiffs in derivative action did not specify the alleged false statements or

explain why they were false).   Accordingly, Defendants' objection to the Complaint's use of cross-referencing should be rejected.

### i.   Defendants' Representations that Gentiva Complied with Medicare Rules and Regulations Are Actionable

Defendants represented that Gentiva was "in compliance" with Medicare "standards and regulations" in every quarterly and annual report filed with the SEC during the Class Period, and continued to do so after the SFC raised questions about Gentiva's conduct.   Now, in this litigation, for the first time, Defendants argue that their representations were just "opinion," and, in essence, investors should not have relied upon managements' representations.   (Defs.' Mem. at 25-26).   However, Defendants' representations can hardly be considered statements of opinion.   Rather, they are demonstrably false statements of historical and current facts.   *Novak*, 216 F.3d at 315 ("defendants may be liable for misrepresentations of existing facts").   As discussed above, when Defendants represented that the Company was in compliance with Medicare standards and regulations, they were at the same time aware of widespread abuse of the Medicare PPS at Gentiva that was a direct result of Defendants' efforts to game the system.   (¶¶ 37-61).

Even assuming, *arguendo*, that Defendants' representations about Gentiva's compliance with Medicare rules are characterized as opinion, they are nonetheless actionable because the Complaint alleges facts that demonstrate they were not honestly held by Defendants. *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) (holding that statements based upon defendants' "beliefs" were actionable because there was "evidence that the defendants were aware of undisclosed facts that seriously undermined the accuracy of their alleged opinions or beliefs"); *Novak*, 216 F.3d at 315 ("Here, the complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape'

12

or 'under control' while they allegedly knew that the contrary was true. . . . these statements were plainly false and misleading."). Here, as discussed above, the Complaint amply alleges facts from which the Court can conclude that the Defendants could not have honestly or reasonably believed that Gentiva was complying with Medicare standards and regulations. (¶¶ 37-61).

> **ii. The Complaint Adequately Alleges Gentiva's Reported Financial Results Were Materially False and Misleading and Omitted Material Facts**

The Complaint alleges that Gentiva's reported financial results were materially false and misleading when issued because Defendants failed to disclose that such results were achieved, in material part, due to the Company's improper and abusive manipulation of Medicare. (*See, e.g.*, ¶¶ 9, 66, 73, 77, 83, 90, 96). These allegations are based upon internal Gentiva documents and multiple internal email exchanges among senior executives, including several of the Individual Defendants, that show Defendants' efforts to determine, in the months leading up to January 1, 2008, how changes in therapy visit thresholds required for Medicare bonus payments might impact the Company's revenue and earnings (*e.g.*, ¶ 44), and how Defendants could manipulate the new system to increase profits. (*See* ¶¶ 42-45). These allegations are bolstered by the numerous CW allegations that reflect top-down pressure to increase therapy visits enough to push an episode into the next highest Medicare reimbursement "bucket" without regard for the medical needs of patients. Indeed, the CWs and other Gentiva former employees tell very similar accounts of how Gentiva management exerted pressure to hit revenue or budget targets, regardless of medical needs of patients. (*See supra,* Section II.3, at 7-9). In direct contrast, Defendants publicly represented that Gentiva's revenues and margins (especially revenue and profits per episode) were growing, and that Gentiva was doing so in compliance with Medicare

standards and regulations. (*See, e.g.*, ¶¶ 70-71, 76, 82). Defendants' failure to disclose the illicit nature of at least part of Gentiva's earnings, and that Defendants' wrongful conduct exposed the Company to possible financial loss as a result of regulatory actions, caused the Company's reported financial results to be materially misleading. *See Greenfield v. Prof'l Care, Inc.*, 677 F. Supp. 110, 112-15 (E.D.N.Y. 1987) (denying motion to dismiss 10b-5 claims and finding failure to disclose certain portions of defendant's earnings were illegally obtained caused SEC filings to be materially false and misleading) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)); *see also NBTY*, 2012 WL 1078823, at *5-6. Indeed, Gentiva's most recent quarterly report filed with the SEC states, in part, that the Company faces "potential liability", including financial loss, relating to the SFC's and SEC's respective investigations that focus on, among other things, Gentiva's "compliance with fraud and abuse laws." *See* "Note 13. Legal Matters" to Gentiva's financial statements reported in its quarterly report for the quarter ended June 30, 2012 filed with the SEC on Aug. 8, 2012 on Form 10-Q, at 23-24 (Ex. A to the Decl. of Joel B. Strauss in Supp. of Lead Pls.' Opp. to Defs.' Mot. to Dismiss the Consolidated Class Action Compl., dated August 14, 2012 ("Strauss Decl.")) (filed contemporaneously herewith).

Defendants' argument that the Complaint fails to allege the amount by which Gentiva's financial results were inflated mischaracterizes the Complaint's allegations and improperly recasts the Complaint as alleging an accounting fraud. At issue here, however, was Defendants' failure to disclose that Gentiva's reported revenue and profits were, in part, derived from Medicare fraud. These metrics were important to investors because revenue from the Medicare PPS represented approximately 69%-78% of the Company's revenue. (¶ 8). Indeed, based on the Company's reported continually increasing revenues per episode and margins, research analysts rated Gentiva a "buy." (*See, e.g.*, ¶¶ 86-87, 104, 128). Accordingly, the nature and

14

source of Gentiva's reported financial results were important facts that a reasonable investor would have wanted to know. *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323 (2011) (holding defendants had a duty to disclose information "indicating a significant risk to [the company's] leading revenue-generating product," Zicam, in light of the company's projections "that revenues were going to rise 50 and then 80 percent."). The importance of this information to investors is illustrated by the massive decline in Gentiva's stock price when Defendants disclosed that Company revenues and margins declined as a result of having to curtail their wrongful conduct. (¶¶ 257-64) (alleging Gentiva's common stock price declined 34% after August 4, 2011 disclosure of reduced margins in the face of heightened regulatory scrutiny). Finally, "materiality is a mixed question of law and fact" and in the context of a Fed. R. Civ. P. 12(b)(6) motion, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *NBTY*, 2012 WL 1078823, at *3. Accordingly, the Court should not resolve disputes concerning the materiality of Defendants' false representations at this juncture.

### iii. Defendants' Representations about Gentiva's Compliance Program Are Actionable

Defendants argue that the "Complaint provides absolutely *no* support for the allegation that Gentiva's compliance program was ineffective or that any member of management" ignored any complaints. (Defs.' Mem. at 26-27). Defendants are wrong. The Complaint alleges with particularity that, in sharp contrast to Defendants' public representations that Gentiva's compliance program was "best-of-class," in truth, it was a sham. Indeed, specific complaints from employees about Medicare fraud were ignored by senior management, including Strange. (¶¶ 49, 53(c), 57, 59(h), 60(j)-(k)). For example, CW 7, along with other branch managers,

advised Gentiva's Vice President of Human Resources that patient care was often driven by money as opposed to medical need (¶ 59(h)), CW 2 told a Regional Vice President "I am not going to jail for anyone" (¶ 54(a)), and CW 1 emailed Defendant Strange directly to warn him about Gentiva's culture of "[t]reating by numbers" and "pushing to thresholds" (¶¶ 49, 53(c)).  In addition, Gentiva's purported compliance program failed to respond to CW 7's complaints about pressure to add unnecessary treatments (¶ 59(i)), and a Compliance Specialist (CW 5) reported to management that complaints were received on the Company's compliance hotline about improper Medicare billing practices (¶ 57).  Nevertheless, Defendant Strange represented that Gentiva's compliance program "really separates Gentiva from our competitors" and allows him to "sleep really good at night."  (¶ 137).  By the time Strange represented that Gentiva had a "robust compliance program" in July 2010, he had already received and ignored the Parting Comments Email.  (¶¶ 49, 181-82).

### iv. Defendants Falsely Certified Gentiva Complied with Sarbanes-Oxley

Throughout the Class Period, and in connection with Gentiva's quarterly and annual filings with the SEC, Defendants certified to the sufficiency of Gentiva's internal and disclosure controls and the accuracy of the Company's financial statements pursuant to the Sarbanes-Oxley Act, stating that: (i) Gentiva's reports did not contain material misstatements or omissions; (ii) Gentiva's financial information was fairly presented; and (iii) the Individual Defendants were responsible for establishing and maintaining disclosure controls and internal control over financial reporting.  (*See* ¶¶ 80, 93, 109, 120, 133, 144, 157, 170, 188, 201, 212, 233, 241). The SOX Certifications were materially false and misleading because at the time they were signed, Defendants knew, or recklessly disregarded, that contrary to Gentiva's representations the Company was not in compliance with Medicare rules and regulations and that the Company's

reported financial results were achieved, in material part, through improper manipulation of the Medicare reimbursement system.  (*E.g.*, ¶¶ 81, 110, 202).

**v.     Defendants' Representations are Not Puffery or "Corporate Speak"**

Defendants' representations that the Company's financial reporting was "very conservative" (*see, e.g.*, ¶ 84) and that the Company's compliance program was "robust" are not inactionable "puffery" or "corporate speak."  (Defs.' Mem. at 28-29).  Courts have very narrowly defined puffery as "rosy predictions" or "vague" statements.  *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (rejecting defendants' contention that their statements were simple puffery because "Defendants were aware of undisclosed facts that seriously undermined the accuracy of their professed opinions or beliefs").  That is not the case here.  Defendants' representations that Gentiva's financial reporting was "very conservative" (*e.g.*, ¶ 84) were directly at odds with their knowledge that Gentiva was proscribing medically unnecessary medical services in order to wrongfully increase revenue and margins.  "[W]here," as here, "a defendant affirmatively characterizes management practices as . . . 'conservative,' . . . and the like, the subject is 'in play' . . . . By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully."  *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992); *Novak*, 216 F.3d at 315 ("[D]efendants may be liable for misrepresentations of existing facts" and defendants' statements that "the inventory situation was 'in good shape' or 'under control'" were actionable false and misleading statements). Thus, Defendants' alleged misstatements were not harmless general expressions of optimism or "puffery."

17

### b.    The Complaint Adequately Alleges a Strong Inference of Scienter

The Complaint more than adequately alleges facts that, when read holistically, give rise to a cogent and compelling inference that Defendants acted with scienter.  The Supreme Court has ruled that the PSLRA's "strong inference" standard is satisfied if, "[w]hen the allegations are accepted as true and taken collectively . . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference[.]"  *Tellabs*, 551 U.S. at 326; *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 396 (S.D.N.Y. 2010) ("A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inferences one could draw from the facts alleged.") (internal quotation marks and citation omitted); *accord Matrixx*, 131 S. Ct. at 1324; *see also Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009) ("When the competing inferences rest in equipoise, the tie . . . goes to the plaintiff") (internal quotations omitted).  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even 'the most plausible of competing inferences.'"  *Tellabs*, 551 U.S. at 324.  Further, the Complaint's allegations should not be "cherry-picked" and read piecemeal.  The "court's job is not to scrutinize each allegation in isolation but to assess all the allegations **holistically**."  *Id.* at 326 (emphasis added).

A complaint establishes a strong inference of scienter where facts are alleged: (i) demonstrating a mental state embracing "an intent to deceive, manipulate, or defraud;" (ii) conduct which rises to the level of recklessness or (iii) allegations of "motive and opportunity."  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).  The Second Circuit has found that "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting

their public statements." *Id.* at 142; *Novak*, 216 F.3d at 308; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (scienter adequately pled where available facts contradict a high-level officer's public statements); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 28 (S.D.N.Y. 2004) (allegations of defendant's knowledge of facts or access to contradictory information are sufficient to state a claim based on recklessness).

In arguing that the Complaint's allegations do not support a strong inference of scienter, Defendants focus entirely on the CW allegations, claiming that such allegations do not support an inference that the Individual Defendants were engaged in, or even aware of, the scheme to manipulate the Home Health PPS by providing medically unnecessary services in order to increase Medicare payments. Defendants' approach is wrong for several reasons. First, it ignores the allegations citing emails and other documents uncovered by the SFC that show how Gentiva executives, including Defendants Malone, Strange, Slusser and Potapchuk, were focused on how Gentiva could increase revenues and margins by adapting its number of patient visit protocols to the new Medicare thresholds for enhanced payments without regard for patients' medical needs. (*See* ¶¶ 41-51). Then, in complete contravention of *Tellabs*, Defendants ask the Court to consider the "CW allegations" (¶¶ 52-61) in isolation from other allegations of the Complaint and ignore that such allegations corroborate the allegations based on the SFC Report, including that the statistical shifts in the number of visits Gentiva provided to patients were driven by Medicare's January 1, 2008 changes to the number of visits required to trigger bonus payments, and not the medical needs of patients.

### i. Internal Gentiva Documents Support an Inference of Scienter

The Complaint alleges that in the months leading up to Medicare's changes in the number of visits required for enhanced payments, Gentiva's top executives, including the Individual

Defendants, were apprised of changes to the PPS and how Gentiva could take advantage of such changes, regardless of patients' medical needs.  (*See* ¶ 42 (email to defendants Malone and Strange concerning the proposed PPS refinements and three new therapy thresholds and case mix changes to be implemented in January 2008); ¶ 43 (email from Gentiva's Chief Clinical Executive to Malone and Strange (among others) stating:  "FYI – we also have an internal group . . . crunching utilization and outcomes data to determine whether revisions to our therapy protocols are clinically defensible.")).  Additionally, it should be noted that during the Class Period defendant Malone was a member of Gentiva's Clinical Quality Committee which was charged with responsibility for oversight and monitoring of clinical practices.  (¶ 274).

Particularly telling is the September 7, 2007 email to defendant Strange and others, from Perri Sutherland of Gentiva's Finance Department, analyzing how much more money per episode Gentiva could make by increasing therapy visits just enough to push the episode into the next highest Medicare reimbursement "bucket."  Notably, patient needs are not mentioned as being part of the analysis.  (*See* ¶ 45 ("In the analysis, I increased the [number of] therapy visits by an average of two visits to determine the additional revenue from moving to the next highest therapy bucket.  The lowest episodes that I added the two visits to were 4 therapy visits, since 3 visits to 5 visits would not increase reimbursement. . . . In summary, increasing therapy visits by an average of 2 visits per episode will increase revenue by approximately $350 to $550 per episode.")).

Documents cited in the Complaint reveal that during the Class Period the Individual Defendants and other Gentiva executives continued to focus on the financial benefit of pushing for more therapy visits in order to meet the new 6, 14 and 20 visit thresholds for enhanced Medicare payments without taking into consideration patients' medical needs.  (*See, e.g.*, ¶ 48

(January 7, 2009 email from Charlotte Weaver, Sr. V.P. and Chief Clinical Officer to defendant Strange stating that "operations did a [2 part] . . . management assignment . . . and the 2nd part addressed ***getting more therapy visits in an episode of care***.") (emphasis added); *see also* ¶ 47 (September 29, 2008 email from Pete Cavanaugh, Area Vice President Financial Operations to various subordinates focusing on financial impact of pushing episodes with 5 visits to 7—"I'd like to know what overall impact we'll get if we push for an increase in therapy.").

Indeed, Gentiva developed a competitive ranking system for management that served to drive therapy visit patterns toward the more profitable thresholds through *Key Indicator Reports*. (¶ 50).  And, as noted in the Complaint, defendants Strange, Slusser and Potapchuk, as well as many other Senior and Regional V.P.'s and directors were well aware that Gentiva ranked the financial performance of its various regions based on, among other metrics, whether visits per episode fell within 7 and 20 visits.  (¶ 51).  Finally, as discussed above, on May 3, 2010 defendant Strange was sent the Parting Comments Email.  (¶ 49).  This email is further evidence of defendant Strange's awareness of Gentiva's scheme to reap financial rewards in violation of Medicare rules.  Defendants are simply not entitled to an inference on this motion, as they suggest (Defs.' Mem. at 13), that Mr. Strange did not read the Parting Comments email.

### ii.  The CW Allegations Corroborate the SFC's Findings and Further Support a Strong Inference of Scienter

The CW allegations are particularly compelling and demonstrate that Defendants knew of, if not recklessly disregarded, a company-wide culture that at every level pressured clinicians and branch managers to provide patients with medically unnecessary visits and services in order to wrongfully receive higher payments from Medicare.  Indeed, the fact that the CWs come from geographically diverse areas and held various positions within the Company yet told similar stories of pressure to violate Medicare rules, as well as of actual violations of such rules, along

with the other allegations of the Complaint, support a strong inference of scienter. *In re Countrywide Fin. Corp. Der. Litig.*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008) (Strong inference of scienter on the part of company executives inferred by allegations attributed to multiple former employees who, notwithstanding their geographic diversity, told similar stories of pressure by upper management to disregard the very loan underwriting standards that the company told investors it complied with, as well as a compensation structure that promoted such wrongful practices, thus inferring a company-wide culture of wrongful conduct and implicating senior executives with scienter.).

The CW allegations here set forth with particularity, based on each CW's respective experience at the Company during the Class Period, how they were regularly pressured to increase the number of patient visits in order to hit the next highest enhanced Medicare reimbursement threshold, regardless of patients' medical needs. Indeed, the names of the supervisors and company executives who were applying the pressure and/or outright instructing employees to violate Medicare rules are alleged. (*See, e.g.*, ¶¶ 53(a); 54(a) (CW 2, a Branch Manager from Las Vegas, noting, *inter alia*, a specific meeting at which he/she told Koch and Aurelio, Gentiva Area and Regional V.P.'s, respectively, of being uncomfortable with their requests to add unnecessary therapies to patient visits); ¶ 56(a) (CW 4, a Manager of Clinical Practice from Florida, describing weekly conference calls with specifically named superiors, including Area Directors and V.P.'s, during which patient files were discussed and Gentiva superiors instructed CW 4 to relay the message to clinicians that they were not putting in enough therapies and to apply pressure to hit the 6, 14 and 20 visit thresholds (known as "hitting the magic numbers") for enhanced Medicare payments); ¶ 59 (CW 7, a Gentiva Branch Manager from New York, explaining chronic pressure from a Gentiva Director of Clinical Operations,

Hine, to improperly modify OASIS forms in a way that would result in medically unnecessary services being provided and/or to pressure clinicians under CW 7's supervision to push for enough patient visits in order to hit the next highest payment threshold, regardless of medical need and further noting that clinicians were being trained and advised by Gentiva to manipulate patients, if necessary, into accepting more care than the patient needed or wanted, especially to avoid LUPAs). Notably, the allegations attributed to CW 7 regarding training of clinicians by Gentiva to violate Medicare rules by providing medically unnecessary services and/or avoiding LUPAs are corroborated by the SFC report and by allegations of other CWs. (*See* ¶ 46 (citing internal Gentiva educational materials); ¶ 57 (CW 5, a Gentiva Compliance Specialist); ¶ 58 (CW 6, a Gentiva nurse from New York)).

Specific examples of Gentiva executives pressuring clinicians and managers to improperly manipulate Medicare documentation, as well as examples of outright manipulation, in order to get higher payments are compelling because of their commonality and further evidence a pervasive culture of Medicare abuse and fraud at Gentiva that Defendants knew of and/or countenanced. (*See, e.g.*, ¶ 58(a) (pressure to complete OASIS forms in a way that did not reflect patients' true medical condition but would result in higher payments from Medicare); ¶ 59 (c) (same); ¶ 59(f) (pressure to manipulate diagnostic codes to increase Medicare payments); ¶ 60 (wrongful completion of OASIS forms and manipulation of diagnostics codes)).

These allegations, especially when considered collectively (as they must be under *Tellabs*) with the documents implicating the Individual Defendants' awareness of Gentiva's push to provide therapy visits driven by Medicare reimbursement thresholds, rather than medical need, the internal competitive ranking system that served to drive therapy visit patterns to the more profitable thresholds, as well as the actual statistical shift in patient visits after changes to the

PPS, all support a strong inference of scienter on the part of Defendants. *See Atlas Air*, 324 F. Supp. 2d at 493 (scienter inferred by viewing statements of confidential sources as a whole).

Defendants' heavy reliance on *In re Almost Family, Inc. Sec. Litig.*, Civil Action No. 3:10-CV-00520-H, 2012 WL 443461, at *8-9 (W.D. Ky. Feb. 10, 2012) is misplaced because the allegations here are clearly distinguishable. In *Almost Family* the Court found the scienter allegations lacking because: (i) they failed to implicate a company-wide fraudulent scheme which might impute actual knowledge or recklessness on defendants because the allegations were essentially based on three former employees who only implicated two local offices; (ii) other than a single complaint letter to the CEO implicating only two local offices, there were no other allegations to implicate the CEO with awareness of company-wide abuse of Medicare; and (iii) the SFC essentially exonerated Almost Family, noting in its report that it had seen no documents showing that Almost Family executives pushed therapists to target thresholds or to pursue more profitable clinical regimes. *Id.* at *8-9, 14 n.9.

In stark contrast, here, the scienter allegations are based on accounts from nine former employees from geographically diverse areas with consistent stories of a company-wide culture of abusing Medicare rules. Also, CEO Strange is alleged to have not only received the Parting Comments Email, but various other documents indicating his awareness of Company efforts to drive therapies to reimbursement thresholds regardless of patient medical needs. Finally, as alleged in the Complaint, the SFC, with respect to Gentiva, stated that there is evidence, based on documents Gentiva provided to the SFC, "of a direct push toward therapy thresholds in Gentiva's internal educational materials" (¶ 46) and that "Gentiva developed a competitive ranking system for management that served to drive therapy visit patterns toward the more profitable thresholds." (¶ 50). The SFC further cited documents, referred to in the Complaint,

indicating Gentiva's top executives' awareness of the drive to push therapy towards to the more profitable thresholds.  (*See* ¶¶ 42-51).  Defendants' reliance on *Campo v. Sears Holding Corp.*, No. 09-3589-cv, 2010 WL 1292329 (2d Cir. Apr. 6, 2010) and *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447 (S.D.N.Y. 2010), along with other cases they cite, are similarly misplaced because here, unlike in those cases, CWs (¶¶ 52-59) and disclosed former Gentiva employees (McComas (¶ 60) and Shah (¶ 61)) offer firsthand accounts of the allegations attributed to them, including pressure to violate Medicare rules and their attempts to alert senior management.  Moreover, the Complaint cites to specific emails and documents indicating senior executives, including the Individual Defendants knew about the drive to push therapies to hit enhanced reimbursement thresholds, regardless of patients' medical needs.  (*See, e.g.*, ¶¶ 42-51).

### iii.    The SEC and SFC Investigations Support an Inference of Scienter

Defendants suggest that the Court should grant their motion because governmental agencies or regulators have not yet instituted any action or proceeding alleging wrongdoing arising from Gentiva's participation in the Home Health PPS.  (Defs.' Mem. at 1, 7).  Defendants are wrong.  There is nothing in the record to suggest that the SEC or SFC have either closed their investigations or determined not to take action against Defendants.  Indeed, Gentiva itself recently acknowledged that it still faces potential liability specifically from the matters raised in the SFC's and the SEC's investigations relating to Gentiva's participation in the PPS.  *See* Strauss Decl. Ex. A, at 23-24.  In any event, whether or when governmental agencies or regulators decide to take action against Defendants should not be dispositive as to how this Court should rule on Defendants' motion.  Indeed, the Supreme Court has repeatedly recognized the vital role played by private litigation as a supplement to government enforcement.  *See, e.g.*,

*Tellabs*, 551 U.S. at 313 ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the [DOJ] and the [SEC].").

### iv.    False SOX Certifications Support an Inference of Scienter

The Individual Defendants' SOX Certifications, when viewed holistically, support a strong inference of scienter. *See In re SunPower Sec. Litig.*, No. C 09-5473, 2011 WL 7404238, at *5 (N.D. Cal. Dec. 19, 2011) (holding that scienter was adequately alleged where "[u]nder a 'holistic' view" allegations regarding Sarbanes-Oxley certifications signed by the company's officers supported an inference that the officers were aware of accounting manipulation at the company). The Complaint's allegations are unlike the facts in *Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10 Civ. 2835 (NRB), 2011 WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011) and *Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012), cited by Defendants (Defs.' Mem. at 28), where plaintiffs failed to allege any specific facts about the defendants' internal controls.

### v.    Gentiva's Scienter Has Been Adequately Alleged

As demonstrated above, scienter as to the Individual Defendants has been adequately alleged and, therefore, the Complaint has, adequately alleged scienter as to Gentiva. *Richman v. Goldman Sachs Group, Inc.*, No. 10 Civ. 3461 (PAC), 2012 WL 2362539, at *12 n.10 (S.D.N.Y. June 21, 2012). However, assuming *arguendo*, this Court determines that scienter has not been adequately alleged as to the Individual Defendants, it is well settled in this Circuit that this Court can still find that the allegations support a strong inference that Gentiva itself acted with the requisite scienter because the allegations here strongly suggest that multiple executives at Gentiva, including but not limited to Area and Regional Vice Presidents and human resource

executives were aware of the wrongful conduct alleged in the Complaint.  (*See, e.g.*, ¶¶ 50-61); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc*., 531 F.3d 190, 195 (2d Cir. 2008) ("[I]t is possible to raise the required [scienter] inference with regard to a corporate defendant without doing so with regard to a specific individual defendant.").  The allegations of the Complaint, taken collectively, support a strong inference of corporate scienter.

### vi. Defendants' Sales of Gentiva Securities Support an Inference of Scienter

The Complaint alleges that Defendants were motivated to engage in the wrongful conduct alleged in the Complaint in order to sell inflated Gentiva securities.   When considered holistically along with all of the facts supporting scienter set forth above, the Complaint's motive allegations strengthen and buttress a strong inference of Defendants' scienter.   The Complaint alleges facts that demonstrate Malone, Potapchuk, and Strange sold Gentiva stock in unusual amounts and at suspicious times.   Malone, Potapchuk, and Strange respectively sold 98%, 96% and 28% of the Gentiva shares they acquired during the Class Period for proceeds of $3.1 million, $3.2 million and $756,712.  (¶¶ 19-21, 276).  Further, the SEC filings that Defendants themselves ask the Court to review reflect sales perfectly timed to maximize profit around the Class Period high of over $30 per share.  (Ex. 2 to Decl. of Stefania D. Venezia, dated June 15, 2012 (ECF No. 61-4), at 19, 27, 31, 35, 39, 43, 47, 51).   By the end of the Class Period, Gentiva's stock crashed, trading at $3.02 per share, a decline of approximately 90% from the Class Period high.  (¶ 16).  These facts, when viewed holistically, demonstrate that Malone, Strange and Potapchuk's respective sales were unusual, supporting an inference of scienter.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d Cir. 2001) (stating allegations of insider sales are decided on a case by case basis).  The Court's decision in *In re MSC Indus. Direct Co., Inc.*, 283 F. Supp. 2d 838, 844 (E.D.N.Y. 2003) is inapplicable because in *MSC* the Court found

that the complaint did not allege facts providing the percentage of shares sold and plaintiffs conceded that they overstated insider sales.

The Individual Defendants do not dispute the amount of their sales or that they occurred, but instead raise defenses and ask the Court to accept innocent explanations for their stock sales. For example, Malone concedes he "sold much of his Gentiva common stock during the Class Period" but asks the Court to completely ignore this damning fact and instead conclude, as a matter of law, that he did nothing wrong because he continued to hold Gentiva stock options at the end of the Class Period. Similarly, Strange argues that he increased his Gentiva holdings, negating an inference of scienter. (Defs.' Mem. at 20). However, Strange conveniently omits to state that *none* of his (or any of the other Individual Defendants') acquisitions of Gentiva common stock were open market purchases, rather he exercised stock options. Although it is not alleged that Slusser sold stock, an absence of stock sales does not negate scienter in light of the Complaint's allegations, discussed above, demonstrating Defendants' recklessness. *In re Fannie Mae 2008 Sec. Litig.*, Civil Action Nos. 08-7831 (PAC), 09 MD 2013 (PAC), slip op. at 4-5 (S.D.N.Y. Apr. 11, 2011) (Strauss Decl. Ex. B) ("[T]here is no *per se* rule that stock purchases negate any inference of scienter, including an inference based on recklessness."). Finally, Strange and Potapchuk argue that "many" of their stock sales were pursuant to "10b-5-1 plans" and no "inference can be drawn from them." (Defs.' Mem. at 20). These purported sales plans are not in the record and accordingly this argument should not be credited on a motion to dismiss. "[W]hether or not the stocks in this case were sold pursuant to a 10b5-1 trading plan is irrelevant at this stage in the proceedings, as the existence of such a plan is an affirmative defense, which requires evidence of the plan itself and of details such as the date the plan was entered into and whether it wholly removed trades from the defendant's discretion." *In re*

*ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 722 (W.D. Tex. 2010); *NBTY*, 2012 WL 1078823, at *5-6 (rejecting defendants' argument that there was no motive and opportunity to commit fraud because their stock sales were not unusual and were made pursuant to a Rule 10b5–1 trading plan).  Assuming, *arguendo*, that the Court considers the plans, Defendants only identify ***one*** of Strange's sales pursuant to a trading plan, which accounted for less than 40% of Strange's sales.

The Complaint further alleges that Defendants were motivated to engage in the fraudulent conduct so that they could expand their business by acquiring Odyssey by way of Gentiva's $325 million 11.5% Note Offering.  (*See* ¶¶ 277-78, 292).  The Complaint alleges "Defendants needed to acquire Odyssey in order to diversify their business beyond home health care which was becoming less profitable as regulatory scrutiny of Gentiva's business practices increased." (¶ 277).  Courts have found that similar allegations support an inference of scienter.  *See, e.g.*, *In re Mannkind Sec. Actions*, 835 F. Supp. 2d 797, 813 (C.D. Cal. 2011) (finding defendants desire to keep share price above particular level in order to raise capital "buttresses a finding of scienter"); *In re Majesco Sec. Litig.*, No. CIV A 05CV-3557 PGS, 2006 WL 2846281, at *7 (D.N.J. Sep. 29, 2006) (finding complaint adequately alleged motive where defendants sold company securities).  Defendants argue that motive is unsupported by the Odyssey transaction because it occurred in the "latter half" of the Class Period.  This argument should be rejected because it improperly takes the Odyssey transaction out of context and considers it in a vacuum.  The Complaint alleges that Defendants sought to diversify their business through the Odyssey acquisition at the same time as the SFC and SEC began scrutinizing Gentiva's business practices.  Accordingly, Defendants were motivated to continue misleading investors so that they could close the

Odyssey transaction.  When read together with the rest of the Complaint, these allegations support a cogent and compelling inference of Defendants' scienter.

### c.      The Complaint Adequately Alleges Loss Causation

In the Second Circuit, loss causation (proximate cause) may be pleaded by alleging: i) a corrective disclosure; *or* ii) facts that demonstrate Defendants' misrepresentations concealed the subject that caused the loss, *i.e.*, a materialization of the concealed risk.  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 306 (S.D.N.Y. 2005) (stating that *Lentell* provides that loss causation may be pleaded by a corrective disclosure *or* where the subject of the misrepresentation caused the plaintiff's loss: "[t]he use of the word 'or' indicates that a corrective disclosure is not necessary where, as here, plaintiffs allege that the subject of the misrepresentations and omissions caused their loss").

The Complaint's "Loss Causation/Economic Loss" allegations, which span 24 paragraphs over 5 pages (¶¶ 245-68), easily satisfy the Second Circuit's standard.  *Richman*, 2012 WL 2362539, at *13 ("Allegations of loss causation are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA.  Rather, a 'short and plain statement'—the standard of Rule 8(a)—'is all that is necessary at this stage of the litigation.'") (citation omitted).  Indeed, this Court has already stated that the release of the SFC Report and subsequent decline in Gentiva's stock price is the "final corrective disclosure which marks the end of the class period" and that there are "several plausible and legitimate partial disclosures prior to October 4, 2011," each of which is alleged in the Complaint.  *Compare In re Gentiva Sec. Litig.*, 281 F.R.D. 108, 115-16 (E.D.N.Y. 2012) ("Jan. 26 Op.") *with* (¶¶ 248-50, 253-64) (alleging partial disclosures on May 13, July 13, and July 20, 2010 and August 4, 2011)).

Ignoring this Court's Jan. 26 Op. and the Second Circuit's opinion in *Lentell*, Defendants argue that the Complaint's loss causation allegations are inadequate because "none" of the alleged disclosures reveal Defendants' wrongful conduct.  (Defs.' Mem. at 30).  As explained below, Defendants' arguments are meritless.

### i.        The Disclosure of the SFC Report was a Corrective Disclosure

Defendants downplay the SFC Report's conclusions concerning Gentiva's conduct and argue that the SFC Report "at most" revealed "the mere risk of or potential for fraud" and that "to this day" there has been no revelation that Defendants have engaged in wrongdoing.  (Defs.' Mem. at 31, 34 (emphasis in original)).  Defendants, heavily relying on authority from courts outside the Second Circuit, essentially argue that anything short of an admission of liability cannot constitute a corrective disclosure.  Defendants' arguments miss the mark, as they ignore the facts alleged in the Complaint (which must be accepted as true on a motion to dismiss) and ignore well-settled Second Circuit law.

As noted above, the Complaint alleges that the SFC Report disclosed much more than a risk or potential for fraud at Gentiva.  Defendants' arguments to the contrary improperly raise questions of fact that cannot be resolved on a motion to dismiss.  *See In re Gen. Elec. Sec. Litig.*, No. 09 Civ. 1951 (RJH), 2012 WL 90191, at *29 (S.D.N.Y. Jan. 11, 2012) (stating loss causation "is a matter of proof at trial and not to be decided on Rule 12(b)(6) motion to dismiss.").  Furthermore, this Court, as well as numerous other courts, have recognized that in addition to a corrective disclosure by a defendant, the market may learn of fraud from a number of sources, including from regulators, whistleblowers, analysts questioning financial results, resignation of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals.  *See* Jan. 26 Op. at 114 ("When a publicly available

'corrective disclosure', such as a newspaper article, provides information that allows an efficient market to adjust, then this marks the end of the class period.") (citing *Metromedia*, 544 F.3d at 481 n.4 (where disclosure of analyst report ended class period); *see also In re Winstar Commc'ns*, No. 01 CV 3014 (GBD), 2006 WL 473885, at *13-14 (S.D.N.Y. Feb. 27, 2006) (citing cases). "'[A] corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events.'" *Richman*, 2012 WL 2362539, at *13 (citing *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008)). Indeed, numerous courts have rejected the narrow view Defendants urge the Court to adopt because, in effect, it would allow a company to avoid liability for material misstatements or omissions to investors by simply denying an alleged fraud. *Winstar*, 2006 WL 473885, at *14 (rejecting as contrary to *Dura* defendants' arguments that corrective disclosure must be based on fact-specific information, and cannot simply be opinions or speculation); *In re Electronic Data Sys. Corp. Sec. & "ERISA" Litig.*, 298 F. Supp. 2d 544, 561 (E.D. Tex. 2004) ("Defendants cannot escape liability for fraud simply by not admitting the fraud.").

Defendants' reliance upon *Almost Family* (and anticipated reliance upon *Bach v. Amedisys, Inc.*, Civil Action No. 10-00395-BAJ-SCR (M.D. La. June 28, 2012) (Strauss Decl. Ex. C), is misplaced because both decisions, and the authorities upon which they rely, require a disclosure of "actual misconduct," which as discussed above, is not the standard in the Second Circuit. *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062-65 (9th Cir. 2008) (applying a rigid loss causation analysis inconsistent with *Lentell* and finding that alleged disclosures could not be reasonably read to reveal *widespread* manipulation). Notably missing from the *Almost Family* and *Amedisys* decisions is *any* discussion of the corrective disclosure of the SFC Report that ends the Class Period here and the alleged decline in the price

of Gentiva securities on October 3-4, 2011.  (¶¶ 265-68).  In fact, the complaint in *Almost Family*

ended the class period on July 1, 2010 and, in *Amedisys*, the class period ended on September 28,

2010.  Further, it is not surprising that the court in *Almost Family* found that the alleged

disclosures did not reveal "new, unknown information, which would allow the market to respond

to the actual revelation of misconduct" (2012 WL 443461, at *13) because, in contrast to the

SFC Report's findings with respect to Gentiva, the SFC essentially exonerated Almost Family of

wrongdoing.  *Id.* at *13 n.9 (finding "none of the documents provided to the Committee by

Almost Family show that executives ever pushed therapists to target thresholds or pursue more

profitable clinical regimens").

Even assuming, *arguendo*, that the Court finds that the release of the SFC Report and the

subsequent stock drop is a not "corrective disclosure," the Complaint alleges facts that, at

minimum, adequately plead loss causation under the "zone of risk theory" as the disclosure of

the SFC Report revealed to investors that Defendants' class period representations (identified

*supra*, Section III.1.a.) were materially false and misleading.  *See, e.g.*, *Gen. Elec.*, 2012 WL

90191, at *30 (finding plaintiff adequately alleged loss causation because "the risk that caused

the loss was within the zone of risk concealed by the misrepresentations and omissions alleged

by a disappointed investor . . . . In other words, even if there was no explicit corrective disclosure

regarding the falsity of a specific misstatement, the subject matter of the concealed difficulties

contributed to the decline in stock value that plaintiff claims as its loss.") (quoting *Lentell*, 396

F.3d at 173).  Accordingly, the disclosure of the SFC Report and the following stock drop

adequately alleges loss causation at this stage of the litigation.

ii.     **Disclosures of the SEC's and SFC's Investigations of Gentiva and Related Stock Price Declines Allege Loss Causation**

Defendants argue that the Complaint fails to allege a "link" between the disclosures of the SEC's and SFC's respective investigations and Defendants' wrongful conduct. (Defs.' Mem. at 30-31).  Defendants' argument is meritless.  Each of these alleged disclosures specifically identifies that Gentiva's conduct relating to the Medicare PPS was the subject of the SEC's and SFC's respective investigations, linking the disclosures to declines in Gentiva's stock price. (¶¶ 248-50 (alleging on May 13, 2010 the SFC launched an investigation of Gentiva's practices regarding in-home therapy visits reimbursed by Medicare); ¶¶ 251-52 (alleging on July 1, 2010 Gentiva disclosed that it was responding to SFC requests concerning its investigations of the PPS); ¶¶ 253-54 (alleging on July 13, 2010 Gentiva disclosed that the SEC commenced an investigation relating to Gentiva's participation in the Medicare Home Health PPS)).

The disclosures of the SFC's and SEC's investigations are alleged partial disclosures that led up to the disclosure of the SFC Report, and like the court found in *In re Bristol Myers Squibb Co. Sec. Litig.* 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008), were the "tip of the iceberg." Numerous courts have found that similar allegations are sufficient to allege loss causation on a motion to dismiss.  *See Richman*, 2012 WL 2362539, at *13 (finding disclosure of SEC investigation and U.S. Senate's disclosure of internal emails reflecting Goldman's wrongful conduct adequately alleged loss causation); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 286-87 (S.D.N.Y. 2008) (finding disclosure that the "SEC was 'conducting an informal non-public investigation into certain stock option grants . . . clearly revealed that Take-Two's options-granting practices were the subject of an investigation carried out by a governmental entity charged with ensuring compliance with the federal securities laws").

Defendants' heavy reliance on *Canadian Solar* is misplaced. In *Canadian Solar*, defendants allegedly recognized revenue through improper "sham sales transactions" in violation of the Exchange Act.  2012 WL 1080306, at *4.  The *Canadian Solar* court found that none of the alleged disclosures "reveal[ed] the sham sales upon which Plaintiffs base their fraud claims" or even "concerned improper revenue recognition, sham transactions or deficient controls."  *Id*. at *15.  Indeed, in *Canadian Solar*, the complaint's basis for the sham sales transaction was revealed in an unrelated litigation commenced over seven months after the end of the alleged class period, and therefore, could not have been disclosed through one of the alleged partial disclosures.  *Id*. at *5.

Defendants' other authorities are inapposite.  *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480 (S.D.N.Y. 2011), is distinguishable because the disclosure at issue in *Moody's* – general remarks by one member of Congress calling for a "broad" investigation – is vastly different than the disclosures linking the SEC's and SFC's respective investigations to Defendants' conduct regarding the PPS.  *Almost Family* and *Amedisys* are distinguishable because, in contrast to the law in the Second Circuit, disclosure of a government investigation was found insufficient to allege loss causation without an accompanying disclosure of "actual misconduct."  *In re Almost Family*, 2012 WL 443461, at *13.  As discussed above, under *Lentell*, facts alleging a corrective disclosure *or* a materialization of wrongful conduct are sufficient to allege loss causation, a standard Defendants do not even dispute.  (Defs.' Mem. at 29 (citing the materialization of the risk standard set forth in *Lentell*)).  Accordingly, the Complaint's alleged partial disclosures concerning the SFC's and SEC's investigations are more than enough at the motion to dismiss stage to sustain loss causation allegations.

> ### iii. Gentiva's August 4, 2011 and July 20, 2010 Announcements Are Partial Disclosures

Defendants, again ignoring this Court's Jan. 26 Op., argue that "an announcement that a company earned less than expected" cannot "establish" loss causation and that Lead Plaintiff's allegations are "sheer (and impermissible) speculation." (Defs.' Mem. at 31-32). This argument is baseless and should be rejected. This Court has already found that:

> although it is typically true that the announcement of an earnings revision, without more, is not considered a partial disclosure of fraud . . . Gentiva's announcement on August 4, 2011 of its second quarter 2011 financial results and revised guidance were done in the context of the earlier disclosure of the Senate Finance Committee's investigation . . . . "[N]ew regulations" and "difficult operating conditions" cannot be viewed in a vacuum. Based upon earlier events such as these, there is a sufficient basis for this Court to find, at this stage of the litigation, that the movants here have "adequately alleged partial disclosure of [Gentiva's] trouble prior to its [official] disclosure [on October 3, 2011]."

Jan. 26 Op. at 116.

Indeed, Defendant Strange's own statements (¶ 258) link the August 4, 2011 disclosure and stock drop to the alleged wrongful conduct. The Complaint alleges that on August 4, 2011, Strange disclosed that Gentiva's growth and margins had already been negatively "impacted" as a result of "regulatory requirements" and further alleges that the regulatory requirements to which Strange referred were changes to PPS rates to "'decrease incentives for upcoding'" and "reduce 'billing practices [] not related to changes in the health status of patients'" – the very same wrongful conduct alleged in the Complaint (¶¶ 53-61 (alleging wrongful upcoding); ¶¶ 45-46, 53-61 (alleging Gentiva provided unnecessary medical services unrelated to patient health)). The rationale of the Jan. 26 Op. with respect to the August 4, 2011 disclosure and stock drop applies with equal force to the alleged partial disclosure on July 20, 2012 which, like the August 4, 2011 disclosure, was not made in a vacuum, as it followed announcements of the SEC's and SFC's investigations. In contrast, the plaintiffs in *In re Initial Public Offering Sec. Litig.*, 399 F.

Supp. 2d 261, 266 (S.D.N.Y. 2005), a case relied upon by Defendants (Defs.' Mem. at 32), failed to adequately allege loss causation because none of the plaintiffs' alleged disclosures referenced *any* facts concerning an alleged market manipulation scheme.

Finally, Defendants' argument that Gentiva's stock price decline on August 4, 2011 was part of an industry-wide decline improperly raises a question of fact that cannot be decided on a motion to dismiss. *See Gen. Elec.*, 2012 WL 90191, at *29 (rejecting arguments on a motion to dismiss of a market-wide decline as cause of GE's alleged stock price decline); *Fannie Mae*, 742 F. Supp. 2d at 414 (rejecting defendants' arguments on motion to dismiss that the housing market decline caused investors' losses). For all of these reasons, the Court should reject Defendants' arguments and find that, at this stage of the litigation, Lead Plaintiff has adequately alleged facts supporting loss causation.

> **d.     The Complaint States Valid Control Person Claims Under Section 20(a)**

Given that the Complaint amply alleges Defendants' violation of Section 10(b) and the Individual Defendants' culpable participation, their motion to dismiss the Complaint's control person claims under Section 20(s) should be denied.

> **2.     The Complaint Adequately Alleges Securities Act Claims**

Counts III and IV of the Complaint assert violations of the Securities Act in connection with Gentiva's offering of $325 million of 11.5% Notes (the "Offering"). (¶¶ 290-339). Specifically, Lead Plaintiff alleges that the registration statement and prospectus issued in connection with the Offering (the "Offering Documents") incorporated by reference certain materially false and misleading statements and that these statements contained untrue statements of material facts and/or omitted material facts required to be stated in order to make the statements contained therein not misleading. (¶¶ 302-19 (alleging untrue statements); ¶ 320

(alleging reasons for falsity)).   The Securities Act claims are separate from and expressly disclaim the Complaint's fraud allegations and therefore do not "sound in fraud." (¶¶ 323, 333); *see, e.g.*, *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 272 (3d Cir. 2006).  That is all that is required under Section 11 and Rule 8(a) to plead a claim against Gentiva for strict liability.  15 U.S.C. § 77k(a); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Further, because the Complaint adequately alleges a Section 11 claim, a control person claim under Section 15 has been adequately alleged. 15 U.S.C. § 77o; (¶¶ 335-37 (alleging Malone, Strange and Slusser's respective control of Gentiva)).

Defendants' arguments (Defs.' Mem. at 34-40) with respect to the statute of limitations, standing, and damages are meritless.  Defendants argue that the statute of limitations for the Section 11 claims expired on December 16, 2011, before the filing of the Complaint on April 16, 2012.  However, Defendants fail to mention that several class actions were filed between July and October 2011 on behalf of investors who purchased Gentiva's "publicly traded securities" well within the 1 year statute of limitation under Defendants' theory.  These complaints were consolidated by this Court's Nov. 2, 2011 Order (ECF No. 25) and expanded the proposed class beyond purchasers of common stock.  Jan. 26 Op. at 111.  Further, these complaints provided Defendants notice that the proposed class included purchasers of Gentiva common stock as well as purchasers of Gentiva's publicly traded 11.5% Notes, thus tolling the statute of limitations. Accordingly, Defendants' use of the Complaint – rather than the originally-filed class complaints – as the operative complaint for tolling purposes is a red-herring and not justified by the case law.  *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 541-42, 553 (1974) (tolling statute of limitations as of date of the original class action suit).  "Application of the [*American Pipe*] tolling doctrine turns on the question whether the defendants received fair notice of potential

claims against them." *Grubka v. WebAccess Int'l, Inc.*, Civil Case No. 05-CV-02483-LTB-OES, 2006 WL 2527815, at *1 (D. Colo. Aug. 31, 2006) *amending* 445 F. Supp. 2d 1259, 1270 (D. Colo. 2006). Defendants were clearly on notice within the statute of limitations and, accordingly, the Securities Act claims are timely.

Defendants' standing arguments are similarly unavailing. The Lead Plaintiff unquestionably has alleged a personal injury traceable to Defendants' allegedly unlawful conduct that similarly affected purchasers of both Gentiva common stock and 11.5% Notes. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Tellingly, Defendants do not argue (and therefore concede) that Lead Plaintiff has standing to bring Exchange Act claims on behalf of purchasers of Gentiva 11.5% Notes. (¶¶ 283(c), 285). Consistent with Rule 23, if required, Lead Plaintiff could likely identify a purchaser of Gentiva 11.5% Notes in connection with its motion for class certification to represent a subclass of note purchasers for the Section 11 claims. *See* Rule 23(4),(5) (providing for certification of subclasses and particular issues, when appropriate). The cases relied upon by Defendants are wholly inapposite because, in each case the court found that an investor in certain mortgage-backed securities ("MBSs") could not bring claims on behalf of investors that purchased *different* MBSs sold by *different* trusts comprised of *distinct* mortgage assets that were originated by *different* lenders, using *different* underwriting criteria. *See, e.g.*, *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ 5653 (PAC), 2010 WL 1473288, at *4 (S.D.N.Y. Mar. 29, 2010) (finding no Article III standing because "[t]he Certificates in each of the four Offerings were based upon a distinct pool of mortgages, originated largely by different mortgage lenders, and governed by a different prospectus supplement with different underwriting requirements and disclosures"). In contrast, the

Complaint alleges the same course of conduct by the same Defendants caused similar harm to purchasers of Gentiva securities.  Accordingly, Lead Plaintiff has standing under *Lujan*.

Finally, Defendants argue that the Section 11 claims must be dismissed because certain members of the proposed class acquired Gentiva 11.5% Notes by exchanging unregistered Gentiva notes for publicly traded Gentiva notes, a so-called "Exxon Capital" exchange.  This argument should be rejected as it prematurely raises affirmative defenses relating to investors' knowledge as well as materiality, and suggests that the Complaint fails to allege "reliance," which is not even an element of Section 11.  *See* 15 U.S.C. § 77(k).  Assuming, *arguendo* that the Court dismisses the Section 11 claims of investors who acquired Gentiva 11.5% notes in the exchange offering, the Court should, at minimum, deny Defendants' motion with respect to purchasers of Gentiva 11.5% Notes "traceable" to the false and misleading registration statement *on the open market*.  *DeMaria v. Andersen*, 318 F.3d 170 (2d Cir. 2003); (¶ 324).  Indeed, Defendants concede that open market purchasers may allege Section 11 claims.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, the Complaint adequately alleges claims under the Exchange Act and Securities Act and, therefore, Defendants' motion to dismiss should be denied in its entirety.  In the event the Court grants part or all of Defendants' motion, Lead Plaintiff requests an opportunity to replead.  *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.") (alteration added).

Dated: August 14, 2012    KAPLAN FOX & KILSHEIMER LLP

        By:   s/ Joel B. Strauss    
        Frederic S. Fox
        Joel B. Strauss
        Jeffrey P. Campisi
        Gwendolyn N. Cutini
        850 Third Avenue, 14th Floor
        New York, New York 10022
        Tel: (212) 687-1980
        Fax: (212) 687-7714

        KAPLAN FOX & KILSHEIMER LLP
        Justin B. Farar
        11111 Santa Monica Boulevard, Suite 620
        Los Angeles, California 90025
        Tel: (310) 575-8604
        Fax: (310) 575-8697

        KAPLAN FOX & KILSHEIMER LLP
        Laurence D. King
        350 Sansome Street, Suite 400
        San Francisco, California 94104
        Tel: (415) 772-4700
        Fax: (415) 772-4707

        *Lead Counsel for Lead Plaintiff the Los*
        *Angeles City Employees' Retirement System*
        *and the Proposed Class*

**CERTIFICATE OF SERVICE**

I, Joel B. Strauss, hereby certify that on August 14, 2012, I electronically filed the

foregoing using the Court's CM/ECF system, which will automatically send a notice of

electronic filing to counsel of record.

/s/ Joel B. Strauss
Joel B. Strauss