**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

**FILED**
**CLERK**
3/25/2013 3:52 pm
**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

IN RE GENTIVA SECURITIES LITIGATION

**MEMORANDUM OF**
**DECISION AND ORDER**
10-cv-5064 (ADS)(WDW)

--------------------------------------------------------X

**APPEARANCES:**

**Kaplan Fox & Kilsheimer LLP**
*Attorneys for the Plaintiff Los Angeles City Employees' Retirement System*
850 Third Avenue, 14th Floor
New York, NY 10022
  By: Frederic S. Fox, Esq.
     Joel B. Strauss, Esq.
     Jeffrey P. Campisi, Esq., of Counsel

**Weil, Gotshal & Manges LLP**
*Attorneys for the Defendants Gentiva Health Services, Inc., Ronald A. Malone, Anthony H.*
*Strange, and John R. Potapchuk*
767 Fifth Avenue
New York, NY 10153
  By: John A. Neuwirth, Esq., of Counsel

**SPATT, District Judge.**

The present case is a consolidated securities fraud class action brought on behalf of a class consisting of all persons or entities that purchased the publicly traded securities of Gentiva Health Services ("Gentiva") between July 31, 2008 and October 4, 2011. Presently before the Court is the Defendants' motion to dismiss. For the reasons set forth below, this motion is granted.

## I. BACKGROUND

**A.  Factual Background**

The following facts are drawn from the Plaintiff's class action complaint and are construed in a light most favorable to the Plaintiff.

1

## 1.  The Parties

The Defendant Gentiva is a corporation with its principal headquarters in Atlanta, Georgia.  The Individual Defendants are current and/or former directors and/or officers of the company.  Ronald A. Malone previously served as Gentiva's Chief Executive Officer from June 2002 until December 2008, and as Chairman of the Board of Directors until May 2011.  H. Anthony Strange served as Gentiva's President beginning in 2007, and served as its Chief Operating Officer from November 2007 through May 2009.  Mr. Strange then became the company's Chief Executive Officer in January 2009, and it's Chairman in May 2011.  John R. Potapchuck served as Gentiva's Chief Financial Officer and Treasurer until May 2010.  He was succeeded in May 2010 by Eric R. Slusser, who currently serves as the company's Chief Financial Officer, Treasurer, and Executive Vice President.

## 2.  The HH PPS

The Social Security Act requires that for patients to be eligible for home health benefits such as nursing care, the beneficiaries must be homebound and there must be a medical necessity for the services that are provided.  Medicare pays for these home health services through a prospective payment system or "PPS".  Under this home health prospective payments system (the "HH PPS"), a home health service provider is paid in advance for a substantial portion of the total payment to which they are entitled to for a given patient.  These payments are based on things such as "a predetermined rate schedule established by Medicare", as well as "a pre-treatment assessment of the given patient's condition and proposed plan of care during a 60-day time period."  (Compl. ¶ 28.)  Gentiva is one such home health provider that receives payments from Medicare through the HH PPS.

According to the Defendants, both federal regulations and Medicare's Policy Manual make clear that independent physicians, as opposed to the home health provider itself, direct and oversee the billing process.  In other words, a patient will only receive treatment after a physician prescribes a home health plan of care, which includes: the type of services to be provided; the professional who will provide the services; the nature of the individual services; and the frequency of the services.  See 42 C.F.R. §409.43(b) ("The physician's orders for services in the plan of care must specify the medical treatments to be furnished as well as the type of home health discipline that will furnish the ordered services and at what frequency the services will be furnished.").  In addition, any changes in the plan of care must be approved by a physician.  See id. at § 409.43(c).

On the other hand, the Plaintiff claims that Gentiva had near absolute discretion to dictate the terms and frequency of patient care in order to achieve these particular "bonus" thresholds.  The Plaintiff alleges that Gentiva played a critical role in determining how much money Medicare would pay for its services *after* a physician prescribed a home health plan.  In this regard, the complaint alleges that after a physician prescribed a home health plan of care, a Gentiva nurse or therapist assessed the patient's condition and needs at the beginning of each episode of care.  As part of this assessment, a form was completed entitled the Outcome and Assessment Information Set ("OASIS"), which detailed a patient's condition and expected therapy needs.  This information was used to classify patients in accordance with a classification system known as the "case-mix adjustment" to adjust payments for home health services under the PPS.  This system was developed by the Centers for Medicare and Medicaid Services ("CMS").  Accordingly, the OASIS was utilized to determine how much money Medicare ultimately paid Gentiva for its services.  The Plaintiff alleges that the proper completion of the

OASIS by Gentiva—not the physician—was a key and critical driver in determining how much Gentiva would be paid for its services by Medicare.

The above described system is prospective, hence the prospective payment system. Gentiva would generally receive an upfront payment from Medicare of approximately sixty percent of the estimated payment entitlement.  However, the final payment was ultimately based on the actual number of visits provided to the patient.  (Compl. ¶ 34.)

Prior to and through 2007, the HH PPS provided an additional payment or "bonus" of up to $2,200 if Gentiva provided a patient with ten therapy visits in connection with one individual's treatment cycle, otherwise known as an "episode".  However, in 2008 this "bonus" threshold was modified and the new thresholds became six, fourteen, and twenty therapy visits per treatment cycle.  As a result, Gentiva could potentially obtain higher payments from Medicare if the number of patient visits reached these new thresholds.

Also relevant is that the thresholds needed to be reached within each sixty-day episode period, which is the time period covered by the physician's initial proposed plan of care. Gentiva would determine after the initial episode of care whether to "recertify" a patient for an additional episode of care.  According to the Complaint, re-certifications increased the company's profits because less paperwork was associated with these patients.

In light of the HH PPS and the modified threshold levels for Medicare reimbursement, the Plaintiff alleges that in order to increase revenues and margins per episode, Gentiva's clinicians and managers were pressured by senior executives to provide patients with medically unnecessary visits and services in order to reach the enhanced payment thresholds from Medicare.

### 3.  Former Gentiva Employees as Confidential Witnesses

The Plaintiff's complaint is largely based upon interviews with former Gentiva

employees, including clinicians and managers.  The allegations from most of these former

employees appear in the complaint as those of confidential witnesses ("CWs").  According to the

Plaintiff, these former employees describe how Gentiva executives knew of and themselves

applied pressure on Gentiva clinicians and managers, through periodically scheduled and *ad hoc*

meetings, emails, and conference calls, to violate Medicare rules in order to increase Medicare

payments.  Specifically, these executives are alleged to have urged employees (1) to provide

medically unnecessary visits to patients in order to hit the thresholds required by Medicare to

receive bonus payments (Compl. ¶¶ 52–61); (2) to wrongfully "upcode" in order to increase a

patient's "case-mix weight"; (3) to recertify patients for added episodes of care even if additional

visits were not medically necessary (Compl. ¶¶ 56–60); (4) to manipulate OASIS forms to

increase reimbursement from Medicare (Compl. ¶¶ 53–61); (5) to wrongfully manipulate

diagnostic codes in order to generate the greatest reimbursement from Medicare (Compl. ¶¶ 59–

60); and (6) to provide medically unnecessary services to increase Medicare reimbursement

revenues and margins (Compl. ¶¶ 52–61).  The CWs' accounts of Gentiva's purported illegal

activity are summarized as follows:

- CW1, a Physical Therapist, was an Orthopedics Director at Gentiva from April 2004 until May 2010, and played a supervisory role over certain branch offices. CW 1 stated that throughout the Class Period, either by way of periodic meetings and/or emails, he/she was subjected to pressure from supervisors—an "Area Vice President" (Area VP) and a "Regional Vice President" (Regional VP)—to increase the number of patient visits provided in order to hit the next highest enhanced Medicare reimbursement threshold, regardless of the patients' medical needs.  CW 1 left Gentiva because of the "threshold pressure."  (Compl. ¶ 53.)
- CW2 was Director of Gentiva's Las Vegas, Nevada branch office from July 2006 through April 25, 2010.  From at least January 2010 until this CW's resignation, CW 2 felt frequently pressured by an Area VP to either pressure clinicians to provide medically unnecessary visits to patients to meet the budget projections

and/or to pressure clinicians under CW 2's supervision to increase case mix weights assigned to patients in a way that would result in increased payments from Medicare.  In April 2010, CW 2 resigned from Gentiva, primarily because of what CW 2 believed to be undue pressure to engage in improper business practices.  (Compl. ¶ 54.)

- CW3 was the former Branch Director of Gentiva's Albuquerque, New Mexico Office from 2007 through 2010, and was under the same regional direction as CW2.  CW 3 believes that periodic comments made to him/her by an Area VP were intended to put pressure on CW 3 to increase revenue for the Albuquerque branch by providing medically unnecessary services.  This is the same Area VP who allegedly pressured CW2.  (Compl. ¶ 55.)

- CW4, a nurse employed by Gentiva from February 2008 through October 2009, was the manager of Clinical Practice during that time period.  CW 4 described being subjected to pressure from superiors to meet the enhanced Medicare payment thresholds of 6, 14 or 20 visits and noted how this was often referred to internally as "hitting the magic numbers."  CW4 also alleges that during weekly teleconference calls with his/her immediate supervisors and certain unidentified Gentiva executives, he/she was regularly instructed by superiors to relay the message to clinicians that "they were not putting in enough therapies," and that they needed to increase the number of patient visits, which CW 4 interpreted to mean the provision of unnecessary services.  (Compl. ¶ 56.)

- CW5 was employed as a Compliance Specialist at Gentiva from December 2002 through May 2009.  CW5 assisted with various internal audits and was also responsible for handling "first line screening" of incoming calls to the Company's compliance hotline.  CW 5 recalled receiving several calls in the 2008 to 2009 time-frame from Gentiva employees from the upstate New York area that felt they were being asked by management to add or provide treatments to patients that were not needed and that at least one therapist described as "not ethically correct."  CW5 passed these complaints along to an individual named Margo Nemet, who in turn reported to the Company's Chief Compliance Officer.  (Compl. ¶ 57.)

- CW6 was a nurse who worked at Gentiva's Binghamton, New York branch from January 2010 through September 2011.  CW6 alleges to have been frequently pressured by her supervisors to complete initial OASIS forms in a way that would result in a higher need for home health services than a patient actually needed and would therefore result in higher payments to Gentiva from Medicare.  CW6 allegedly told his/her Branch Manager that he/she was uncomfortable with patient assessment and Medicare billing practice instructions, and it was CW6's "understanding" that the Branch Manager shared these concerns with unidentified senior Gentiva management.  (Compl. ¶ 58.)

- CW7 was also a nurse who worked at Gentiva's Binghamton, New York branch from January 2009 through August 2011.  CW7 alleges that his/her supervisor, Gentiva's Area Director of Clinical Operations, would ask CW 7 to improperly modify OASIS forms in a way that would result in medically unnecessary services being provided to patients in order to increase Medicare revenue, and also to press clinicians under CW 7's supervision to push for enough visits to patients to hit the next highest enhanced Medicare payment threshold, regardless

of the patients' needs or even the patients' desires for such treatment.  The types of wrongful pressures were often exerted through informal discussions between Gentiva management and branch managers and clinicians.  However, according to CW7, it was also exerted through and during more formal and periodic in person and/or telephone meetings during which data listed in various periodic reports was discussed.  In June 2011, CW 7 called Gentiva's internal compliance hotline to complain about Gentiva clinicians being unduly pressured to provide patients with unnecessary visits and/or therapies.  CW 7 sent a resignation letter to his/her supervisor in which CW 7 noted that the reasons for CW 7's resignation included the belief that the Company exerted continuous pressure on employees to put finances over patient care.  (Compl. ¶ 59.)

The complaint also includes allegations from two identified witnesses.  Former Gentiva employee Holly McComas is a registered nurse who was employed by Gentiva as a case manager at its Charleston, West Virginia branch beginning in 2007.  She alleges that notwithstanding the fact that she was the person who made the intake assessment for patients in OASIS, she was not permitted to code for the diagnoses and treatments related to her assessments.  Instead, this coding was done by the manager of clinical practice at that branch office, which McComas would then write in her own handwriting.  In many instances McComas believed she was being required to write the codes on the forms in a manner that maximized reimbursement from Medicare rather than being truly reflective of the patients' medical conditions and/or that the number of visits being entered on the OASIS were not medically necessary.  In addition, during her tenure at Gentiva, McComas regularly observed practices aimed at pressuring physical therapists employed by Gentiva to continue physical therapy notwithstanding that the patient had reached maximum medical improvement.  Finally, on January 22, 2010, McComas placed a telephone call to Gentiva's Regional Director of Human Resources to complain about fraudulent Medicare billing practices at Gentiva's Charleston branch.  (Compl. ¶ 60.)

The final witness put forth by the Plaintiff is Kim Shah, a Registered Nurse, who began working for Gentiva on or about February 12, 2001 as a manager of clinical practices at the Charleston, West Virginia branch, and was then promoted to director of clinical practices and later to branch director. According to Shah, employees were regularly told by Gentiva's Regional VP during weekly conference calls that anyone over 65 needed more than 12 therapy visits, and that such therapy should be provided as a matter of course. Shah further related that she was regularly subjected to pressure by this Regional VP and unidentified others at periodic meetings to try to get clinicians in the office to increase the number of visits to patients to hit enhanced payment thresholds from Medicare, even if such visits were not medically necessary.

### 4. Alleged Misrepresentations

During the Class Period, the Defendants repeatedly represented in SEC filings and other public statements that Gentiva was "in compliance" with Medicare "standards and regulations". Furthermore, Gentiva also represented that it maintained a "robust" and "best-in-class" compliance department. (Compl. ¶ 181.) In addition, Gentiva represented to its investors that its revenues, including its growing profit margins per episode—a metric closely observed by investors—were being legitimately earned. However, according to the Plaintiff, a series of partial disclosures revealed the risks concerning Gentiva's business.

### 5. The SFC and SEC Investigations

On May 13, 2010, the <u>Wall Street Journal</u> reported that "the [U.S. Senate Finance Committee or] SFC launched an investigation into the practices of companies that provide in-home therapy visits reimbursed by Medicare, including Gentiva." (Compl. ¶ 248.) Further, on July 13, 2010, Gentiva disclosed that the U.S. Securities and Exchange Commission ("SEC") had also commenced an investigation relating to Gentiva's participation in the HH PPS.

On October 3, 2011, after a seventeen month investigation, the SFC released a <u>Report on Home Health and the Medicare Therapy Threshold</u> (the "SFC Report").  The SFC examined the home health therapy practices of each of the four largest publicly-traded home health companies.  The Plaintiff alleges that the SFC found, based on nonpublic data provided to it by Gentiva, that when Medicare changed the number of visits required for home health care providers to receive bonus payments in 2008 from ten visits to six, fourteen, and twenty visits, there was a statistically significant drop of twenty-five percent in the number of patients Gentiva provided with ten visits, and at the same time, a statistically significant increase of up to thirty-one percent in the number of Gentiva patients who were suddenly receiving 6, 14, and 20 visits.  Further, the SFC Report describes certain emails and documents that, according to the Plaintiff, demonstrate that the statistical shift was not an accident.  For example, multiple internal email exchanges among senior Gentiva executives, including the Defendant Strange, make clear that in the months leading up to and subsequent to the January 1, 2008 changes in therapy thresholds, the Defendants were attempting to ascertain how the changes would impact the Company's revenue and earnings, as well as how they could increase Medicare revenues in light of the new system.

One particular email emphasized by the Plaintiff—and the only communication directly involving one of the Individual Defendants—was from Perri Southerland of Gentiva's Finance Department to Defendant Strange.  This communication stated that as a follow-up to a discussion they had, Southerland performed an analysis where he figured out a way for Gentiva to increase it's per episode reimbursements by $350 to $550 under the new Medicare threshold requirements.  It was made clear that the goal was to reach the six visit threshold for enhanced Medicare payments.  As the Plaintiff points out, the medical needs of the patients were not mentioned as a factor in the analysis.

In response to these allegations, the Defendants maintain that the SFC did not conclude that Gentiva and its senior management caused Gentiva's employees and clinicians to seek reimbursement from Medicare for medically unnecessary services in direct violation of Medicare standards and regulations.  In this regard, the complaint does not contain any allegation that the SEC or any other governmental or regulatory agency has instituted any action or proceeding alleging wrongdoing arising from Gentiva's participation in the HH PPS.

**B.  Procedural Background**

On November 2, 2010, former named plaintiff Steve Endress filed a securities fraud class action on behalf of all persons who purchased the publicly traded securities of Gentiva Health Services ("Gentiva") between July 31, 2008 and July 20, 2010.  The putative class action was filed against the Defendant Gentiva and three of its executives, the Defendants Ronald A. Malone, Anthony H. Strange, and John R. Potapchuk.  Endress alleged that Gentiva artificially inflated its stock price through a scheme that involved ordering unnecessary medical care for clients, and then billing the federal government for these illegitimate expenses.  Endress further alleged that when the scheme came to light, Gentiva's stock price dropped precipitously, and, as a person who had purchased Gentiva stock while its price was artificially inflated, he was harmed.  Endress sought relief on behalf of himself and all persons who purchased Gentiva stock during the period of the alleged fraud, which he identified as being from July 31, 2008 to July 20, 2010.  He brought causes of action based upon alleged violations of Sections 10(b) and 20(a) of the 1934 Act and Rule 10b-5.

On January 21, 2011, the Minneapolis Police Relief Association ("MPRA") filed a motion to intervene as a plaintiff in the Endress action pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 24(b)(1)(B).  MPRA also requested to be lead plaintiff pursuant to

the Private Securities Litigation Reform Act ("PSLRA").  MPRA is a public pension fund that purchased an undisclosed amount of Gentiva stock during from July 31, 2008 to July 20, 2010. The Defendants did not oppose MPRA's motion to intervene.  However, they did oppose MPRA's motion to be named as lead plaintiff, on the ground that MPRA had not satisfied certain prerequisites for this designation that are set forth in the PSLRA.  On July 19, 2011, the Court ordered that MPRA's motion to intervene was granted, but that its motion to be appointed lead plaintiff was denied without prejudice.

On July 25, 2011, Endress sought to withdraw as a named plaintiff and MPRA renewed its motion to be appointed lead plaintiff, pursuant to the PSLRA.  However, while this motion was pending before the Court, four other almost identical federal class actions were subsequently filed by Cement Masons & Plasterers Joint Pension Trust ("Cement Masons") on September 14, 2011; International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware ("International Union") on October 11, 2011; Arkansas Teacher Retirement System ("Arkansas Teacher") on October 20, 2011; and Douglas Dahlgard ("Dahlgard") on October 25, 2011.  All five actions were on behalf of the same class of investors who purchased Gentiva publicly traded securities during a similar class period, and based upon the same facts alleging violations of the same laws.  Following the filing of all five actions, the plaintiffs in each case wrote a letter to the Court articulating their support for consolidation.  In addition, all five parties requested the Court to consider them as a suitable lead plaintiff in the proposed consolidated action.

On November 2, 2011, the Court granted the motion by the Plaintiff Steve Endress to withdraw as named plaintiff.  In addition, the Court ordered that the five Gentiva actions should be consolidated to economize both judicial resources and the resources of the parties.  However,

due to the unique circumstances of the case with regard to the procedure of appointing a lead plaintiff under the PSLRA, the Court reopened the lead plaintiff process and allowed any plaintiff to move to be appointed lead plaintiff within 60 days of the Court's Order, which was the date of the withdrawal of the only eligible lead plaintiff.  See Endress v. Gentiva Health Services, Inc., 278 F.R.D. 78, 83 (E.D.N.Y. 2011) (Spatt, J.).

Thereafter, four motions were filed by five putative class members to be appointed lead plaintiff in this action in accordance with the PSLRA:  Indiana Laborers Pension Fund ("Indiana Laborers"); Los Angeles City Employees' Retirement System ("LACERS"); Arkansas Teacher and the Metropolitan Water Reclamation District Retirement Fund ("Metropolitan Water") (collectively, the "Arkansas Group"); and International Union.  On January 27, 2012, the Court granted LACERS' motion to be appointed as lead plaintiff in this action pursuant to 15 U.S.C. § 78u-4(a)(3)(B), as amended by the Private Securities Litigation Act of 1995.  The Court also granted the motion by LACERS for the appointment of Kaplan Fox & Kilsheimer LLP as lead counsel.  An amended complaint was filed by LACERS on April 16, 2012.  This pleading included not only claims under the 1934 Act, but also added claims under Sections 11 and 15 of the 1933 Act with respect to alleged material misstatements and omissions.  Thereafter, on June 15, 2012, the Defendants filed the present motion to dismiss for failure to state a claim.

In addition, it is important to note that nearly identical actions have been commenced against two other publicly-traded health providers, Almost Family and Amedisys, Inc. ("Amedisys") in the U.S. District Courts for the Western District of Kentucky and the Middle District of Louisiana, respectively.  See In re Almost Family, Inc. Sec. Litig., 10 Civ. 00520 (W.D. Ky.); Bach v. Amedisys, Inc., 10 Civ. 00395 (M.D. La.).  On February 10, 2012, the Almost Family court dismissed the complaint in that action with prejudice.  On June 28, 2012,

the Amedisys court also dismissed the complaint in that action.  A motion for reconsideration is still pending in the Amedisys action.

## II. DISCUSSION

### A.  Legal Standard

Under the now well-established Twombly standard, a complaint should be dismissed pursuant to Rule 12(b)(6) only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U .S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929, 570 (2007).  The Second Circuit has explained that, after Twombly, the Court's inquiry under Rule 12(b)(6) is guided by two principles.  Harris v. Mills, 572 F.3d 66 (2d Cir. 2009) (citing Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)).

"First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'"  Id. at 72 (quoting Iqbal, 129 S. Ct. at 1949).  As explained by the Second Circuit, "[i]n considering a motion to dismiss a 10(b) action, we must accept all factual allegations in the complaint as true and must consider the complaint in its entirety."  Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010); see Tellabs, Inc. v. Makor Issues & Rights, 551 U.S. 308, 127 S. Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007) ("faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true").

"'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss' and '[d]etermining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Iqbal, 129 S. Ct. at 1950). Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and . . . determine whether they plausibly give rise to an entitlement of relief." Iqbal, 129 S. Ct. at 1950. This plausibility standard is applicable to securities fraud pleadings. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (observing that to survive 12(b)(6) dismissal, securities fraud plaintiffs "must provide the grounds upon which [their] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level'") (quoting Twombly, 127 S. Ct. at 1965). The issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

Of particular importance here, "[a] complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Federal Rule of Civil Procedure 9(b) by stating with particularity the circumstances constituting fraud." Slayton, 604 F.3d at 766.

### B. As to Whether the Plaintiff States a Claim Under Section 10(b) of the 1934 Act and Rule 10b-5

Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, prohibit fraudulent activities in connection with securities transactions. Specifically, section 10(b) makes it unlawful

> [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b–5 describes certain types of behavior proscribed by the statute, including:

> [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . .

17 C.F.R. § 240.10b–5.

"To state a claim under [Section 10(b) and] Rule 10b–5 for misrepresentations, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Commc'ns, 493 F.3d at 105.  As set forth above, a complaint alleging securities fraud is required to satisfy the heightened pleading standard of the Private Litigation Securities Reform Act ("PSLRA"), Pub. L. No. 104–67, 109 Stat. 737, and Federal Rule of Civil Procedure 9(b).

Accordingly, the circumstances constituting the fraud must be stated with particularity. Id. at 99.  "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.  Allegations that are conclusory or unsupported by factual assertions are insufficient." Id. (internal citation omitted). "Thus '[a] plaintiff cannot base securities fraud claims on speculation and conclusory allegations.'" Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 297 (S.D.N.Y. 2010) (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)).

### 1.  Materially False or Misleading Statements or Material Omissions

The Court will first address the initial element that a plaintiff must sufficiently allege under the PSLRA in order to withstand a motion to dismiss.  With regard to misstatements or omissions of material fact, a plaintiff must (1) specify the statements that the plaintiff contends were fraudulent or misleading; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were misleading or fraudulent.  See Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004).

The Defendants' position is that despite the complaint's inclusion of approximately sixty pages of quotations from SEC filings, press releases, and investor conferences during the Class Period, the Plaintiff has failed to identify a single actionable misstatement or omission.  The Defendants argue that the Plaintiff has merely set forth a "laundry list" style of pleading, which fails to meet the requisite level of particularity.  See In re Citigroup Inc. S'holder Deriv. Litig., No. 07 Civ. 9841, 2009 WL 2610746, at *10 n.19 (S.D.N.Y. Aug. 25, 2009).  On the other hand, the Plaintiff contends that it adequately identifies the Defendants' materially false and misleading representations and material omissions, including who made the statement; when the statement was made; and why the representation was materially false and misleading.  There are four materially false and misleading statements contained in the complaint.  The Court will address each one in turn.

### a. Reported Financial Results

One of the allegations in the complaint concerning a misstatement or omission is summarized as follows: the company's "representations concerning [its] financial results, including reported increases in revenue and profit margins (specifically revenue per episode and margins per episode) and the purported reasons behind those increases were materially false and

misleading because they failed to disclose that these reported figures were materially and artificially inflated as a result of the improper manipulations of the Medicare reimbursement system." (Compl. ¶ 66.)  The Defendants contend that this is merely a general allegation that the practices at issue resulted in a false report of the company's earnings, which is not sufficiently particularized.  For instance, they argue that the complaint is devoid of any allegations as to how the alleged manipulation of Medicare billing via the HH PPS caused Gentiva's financial statements to be inflated during the Class Period.  Further, the Plaintiff also does not allege the amount by which Gentiva's financial results were allegedly inflated.  The essence of the Defendants' arguments is that the Plaintiff has not satisfied the materiality requirement for this alleged misrepresentation.

"At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."  Ganino v. Citizens Utilities Co., 228 F.3d 154, 161 (2d Cir. 2000).  "'[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"  See Basic Inc. v. Levinson, 485 U.S. 224, 231–32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988) (quoting TSC Indus., 426 U.S. at 449, 96 S. Ct. 2126).  "The materiality of allegedly false financials may not be pled in a conclusory or general fashion; a complaint must contain allegations tending to demonstrate the materiality of the alleged overstatements in light of the defendant's total financial picture."  Gavish v. Revlon, Inc., No. 00 Civ. 7291, 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004).  As one court explained, while there is no "numerical benchmark" for assessing the materiality of misstatements in financial reports, Ganino 228 F.3d at 162–65, defendants are still "entitled to be appraised of the approximate amount of

overstatement involved." Jacobson v. Peat, Marwick, Mitchell & Co., 445 F. Supp. 518, 522 (S.D.N.Y. 1977).

Here, the complaint alleges that the Defendants publicly represented that Gentiva's revenues and margins—especially revenue and profits per episode—were growing, and that Gentiva was doing so in compliance with Medicare standards and regulations.  In this regard, in the company's financial results, it reported that Home Health Medicare revenue was growing, in part driven by increased patient admissions and revenue per episode.  (See, e.g., Compl. ¶ 70.) The complaint goes on to allege that the failure to disclose the illicit nature of at least a part of Gentiva's earnings, such as the provision of medically unnecessary visits to patients in order to hit thresholds required by Medicare to receive bonus payments, caused these statements in the Company's reported financial results to be materially misleading.

The Court agrees with the Defendants that while the complaint describes the financial misstatements it alleges as "material," claiming that the company's reported figures were materially and artificially inflated, it fails to even attempt to approximate the magnitude or degree of those misstatements in relation to Gentiva's overall financial picture.  There are no factual allegations regarding how the financial figures were artificially inflated or the monetary consequences of doing so.

However, the complaint does not allege accounting fraud or the failure to disclose the specifics of a securities markup, or any other type of numerical manipulation.  Rather, the complaint alleges that the Defendants failed to disclose that a portion—any portion—of the company's reported revenue and profits were derived from Medicare fraud.  Thus, while the complaint does not specify the exact percentage of the revenue and profits that was a

misstatement because it was earned solely as a result of alleged Medicare fraud, this is not of importance.

The Court has no doubt that information relating to Gentiva's purported push to provide medically unnecessary services to secure extra reimbursement from Medicare, even if only accounting for a small percentage of Gentiva's actual profits, was not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." ECA & Local 134, 553 F.3d at 197. It is plausible that a reasonable investor would view this information significant to an investment decision under the circumstances, regardless of the financial consequences. Any alleged Medicare fraud could have serious consequences for the company, including both civil and criminal liability. For this reason, even though the Plaintiff does not quantify the effect of the claimed misrepresentations contained in the various financial reports at issue, due to the nature of the allegations, the Court concludes that with respect to the reported financial results, the Plaintiff has sufficiently pleaded with particularity the material misstatements or omissions by the Defendants.

The Defendants contend that Gentiva had no duty to accuse itself of wrongdoing, and thus the failure to disclose here is not sufficient under the PSLRA. See In re Van der Moolen, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) ("Defendants argue that the second category of alleged misstatements— i.e., that VDM Holding's financial statements failed to disclose that VDM Specialists' revenue had been generated, at least in part, by trading practices that violated NYSE rules—are non-actionable because federal securities laws do not require a company to accuse itself of wrongdoing."). However, while "a defendant does not have a Rule 10b-5 duty to speculate about the risk of future investigation or litigation, if it puts the topic of the cause of its financial success at issue, then it is 'obligated to disclose information concerning the source of its

19

success, since reasonable investors would find that such information would significantly alter the mix of available information.'"  Id. (quoting In re Providian Fin. Corp. Sec. Litig., 152 F. Supp. 2d 814 (E.D. Pa. 2001)).  The statements by Gentiva put the source of its Medicare revenue at issue, and such, the alleged failure to disclose the true sources of this revenue could give rise to liability under Section 10(b).

### b. Compliance with Medicare

The complaint also alleges that specific statements expressed by corporate officers and set forth in SEC filings that Gentiva's practices were "in compliance with [Medicare] standards and regulations" and "clinically appropriate" were materially false.  (Compl. ¶¶ 78, 91, 210.) However, according to the Defendants, these statements are mere opinions and thus can only qualify for this purpose if it is shown that a speaker misrepresented his actual opinion.  The Defendants contend that here, the Plaintiff does not allege that any individual defendants deliberately misrepresented their opinion that Gentiva's actions were not in compliance with Medicare standards.

In response, the Plaintiff argues first, that these statements were not opinions but rather statements of fact, because despite these representations the speakers were aware of widespread abuse of the Medicare PPS at Gentiva.  Second, the Plaintiff claims that even if opinions, they are nonetheless actionable because the complaint sufficiently alleges that they were opinions not honestly held by the Defendants.

The Court does not agree with the Defendants' characterization of these statements as "opinions".  Instead, the Court finds that these are statements of historical and current facts. Courts often find material misstatements where defendants claim to be compliant with standards promulgated by themselves or regulatory agencies.  See, e.g., In re Bear Stearns Cos. Inc. Sec.,

Derivative, and ERISA Litig., 763 F. Supp. 2d 423, 459 (S.D.N.Y. 2011) (finding defendant's statement that it was "in compliance with CSE regulatory capital requirements" was materially false); In re Ambac Financial Grp., Inc. Secs. Litig., 693 F. Supp. 2d 241, 277 (S.D.N.Y. 2010) (determining there was a material misstatement when defendant claimed to be in "compliance with current Ambac Assurance underwriting standards" when it was not); In re CitiGroup Inc. Bond Litig., 723 F. Supp. 2d 568, 580 (S.D.N.Y. 2010) (ruling that the plaintiff pleaded a material misstatement by alleging that the defendant had falsely represented that its financial statements complied with Generally Accepted Accounting Principles). Cf. In re FBR Inc. Secs. Litig., 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) (finding no material misstatement where the defendants "never claimed that the company was in full compliance with all regulations, or that it had no outstanding regulatory issues" (citation and internal quotation marks omitted)).

In the Court's view, the statement that the company was in compliance with Medicare standards and regulations is alleged to be an untrue statement of material fact, and thus sufficient for pleading purposes. "Whether or not [the D]efendants . . . actually violated various provisions of [Medicare]—and thus whether the representation that the [Company's practices] complied with [Medicare] was actually an "untrue" statement—are not issues for resolution at this stage." In re Citigroup, 723 F. Supp. 2d at 594.

### c. Internal Compliance Practices and Corporate Puffery

Next, the Plaintiff asserts that representations concerning Gentiva's compliance practices were materially false and misleading because the Defendants omitted the fact that its compliance program was materially defective—namely, that complaints to Gentiva's executives and officers concerning the Company's wrongful conduct were ignored. In this regard, Gentiva executives

and/or officers made statements that Gentiva had a "robust" compliance program that was "best-in-class."  (Compl. ¶ 181.)

However, the Defendants claim that the complaint provides no support for the allegation that the company's compliance program was ineffective or that complaints to management were ignored.  Further, the Defendants explain that these types of statements were merely statements of puffery and/or corporate speak, and thus non-actionable.

With regard to whether there is support for the allegations concerning the company's compliance program, the Court finds that there are indeed some facts alleged in the complaint that arguably support this potential claim.  For example, CW 7 alleges that he or she made complaints to Corporate Compliance about unnecessary treatments, and the complaint also states that Defendant Strange received an email from CW 1 about Gentiva's culture of "[t]reating by numbers" and "pushing to thresholds."

Nevertheless, in considering whether the compliance statements are "corporate speak" or puffery, the Court concludes that the statements are not actionable under the facts of this case.  See ECA, 553 F.3d at 205–06 (holding that statements asserting a "highly disciplined" risk management process, a reputation for "integrity," and a "focus on financial discipline" were "no more than 'puffery' which does not give rise to securities violations").  Statements "too general to cause a reasonable investor to rely upon them" are not actionable.  Id. at 206.  The Court finds that the descriptions at issue here—that the compliance program was "robust" or "best-of-class" and that the company's financial reporting was "very conservative"—fall "into the category of commonplace statements too general to cause reliance by a reasonable investor."  In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 354 (S.D.N.Y. 2011).  These adjectives are not found to be actionable in this Circuit when used to describe the underwriting process.  See id.

22

Therefore, they would similarly not be actionable when used to describe a company's compliance process or financial discipline.  Accordingly, the Court finds that these statements constitute corporate puffery rather than actionable misrepresentations and the Defendants' motion to dismiss is granted with regard to this subset of misstatements.

### d. SOX Certifications

As a final potential basis for actionable material misstatements or omissions, the Plaintiff claims that the representations in the Defendants' Sarbanes-Oxley ("SOX") certifications were misleading because Gentiva's disclosure controls and procedures and internal controls over financial reporting were not "effective".  This permitted Gentiva "to report financial results on behalf of Gentiva that were, in material part, the product of the wrongful manipulation of the Medicare reimbursement system."  (Compl. ¶¶ 68, 81.)  However, the Defendants contend that the Plaintiff does not allege any particularized facts which would suggest that the actions articulated in the SOX Certifications were not undertaken by the individual defendants or for that matter any factual allegations concerning Gentiva's financial reporting processes.  Thus, the Defendants claim that the Plaintiff's conclusory allegation that "Gentiva's disclosure controls and procedures and internal controls over financial reporting were not effective" cannot survive this motion.

The Court concurs with the Defendants' position and concludes that the SOX certifications cannot constitute a misstatement or omissions for purposes of 10b-5 liability under the circumstances of this case.  "The Plaintiff has not alleged any facts pertaining to the Company's internal structure for financial reporting, much less that [Gentiva] lacked adequate internal controls."  City of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Grp., No. 10 Civ. 2835, 2011 WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011).  Further, the Plaintiff does not

even challenge the Defendants' accounting in any of the SEC filings.  The Court finds that the Plaintiff's "allegations of lack of controls . . . [are] conclusory assertion[s] without any factual support," and they cannot survive this motion to dismiss.  La Pietra v. RREEF Am., L.L.C., 738 F. Supp. 2d 432, 443 (S.D.N.Y. 2010); see also Janbay v. Canadian Solar, Inc., No. 10 Civ. 4430, 2012 WL 1080306, at *9 (S.D.N.Y. March 30, 2012) ("Plaintiffs have failed to allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why.").  Accordingly, the Defendants' motion to dismiss on the basis that the SOX certifications cannot qualify as a material misstatement is also granted.

## 2.  Scienter

Now that the Court has established which alleged material misstatements and/or omissions were pled by the Plaintiff with the requisite particularity, the Court will now assess the next pleading requirement, which is scienter.

### a.  Governing Legal Principles

In order to state a claim under Section 10(b) and Rule 10b-5, the complaint must provide "particular allegations giving rise to a strong inference of scienter"—"that the defendant acted with the required state of mind."  ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009) (internal quotation marks omitted).  The "requisite state of mind" in 10b–5 claims is "'intent to deceive, manipulate, or defraud.'"  Tellabs, 127 S. Ct. at 2504 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)).  "Recklessness" also suffices.  ECA, 553 F.3d at 198.  Accordingly, in order to satisfy the pleading requirements of § 10(b) and Rule 10b–5 with respect to scienter, the plaintiff may "alleg[e] (1) [facts] showing that the defendants had both motive and opportunity to commit the fraud; or (2) [facts] constituting strong circumstantial

evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99. "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (internal citation omitted).

The element concerning "motive and opportunity to defraud" requires a showing that the defendants "benefitted in some concrete and personal way from the purported fraud." Novak v. Kasaks, 216 F.3d 300, 307–08 (2d Cir.), cert. denied, 531 U.S. 1012, 121 S. Ct. 567, 148 L. Ed. 2d 486 (2000). But see id. at 311 ("Although litigants and lower courts need and should not employ or rely on magic words such as 'motive and opportunity,' we believe that our prior case law may be helpful in providing guidance as to how the 'strong inference' standard may be met."). Interestingly, the motives "that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation," do not establish the requisite scienter. Id. Typically, a plaintiff must show that officers made false statements in order to sell their own shares at a profit. Id. "Sufficient motive allegations must entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." In re SLM Corp. Sec. Litig., 740 F. Supp. 2d 542, 557 (S.D.N.Y. 2010). Plaintiffs must allege a "unique connection between the fraud and the [benefit]." ECA, 553 F.3d at 201 n.6.

Alternatively, if a plaintiff pleads scienter under the "strong circumstantial evidence" prong, he or she must "specifically allege [the] defendants' knowledge of facts or access to information contradicting their public statements." Novak, 216 F.3d at 308. Further, "[w]here plaintiffs contend [that] defendants had access to contrary facts, they must specifically identify

25

the reports or statements containing this information." Id. at 309 (internal citation omitted);
accord ECA, 553 F.3d at 198 (under the alternative "strong circumstantial evidence" prong,
circumstances that "may give rise to a strong inference of the requisite scienter" include
allegations that defendants "engaged in deliberately illegal behavior," or "knew facts or had
access to information suggesting that their public statements were not accurate," or "failed to
check information that they had a duty to monitor") (internal citation omitted).

  "Regardless of the manner in which a plaintiff attempts to plead scienter, at the end of its
evaluation, this Court must be convinced that the inference of scienter is at least as compelling as
any competing inferences." Fort Worth Employers' Ret. Fund v. Biovail Corp., 615 F. Supp. 2d
218, 225 (S.D.N.Y. 2009) (internal quotation marks omitted).  With regard to the strength of the
inference, the inference of scienter must be "more than merely plausible or reasonable—it must
be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs,
Inc., 127 S. Ct. at 2504–05.  Thus, the Supreme Court has held that the PSLRA's strong
inference standard is satisfied "[w]hen the allegations are accepted as true and taken collectively
. . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing
inference[.]" Tellabs, 551 U.S. at 326; see also Akerman v. Arotech Corp., 608 F. Supp. 2d 372,
382 (E.D.N.Y. 2009) ("When the competing inferences rest in equipoise, the 'tie . . . goes to the
plaintiff.'") (quoting City of Brockton Ret. Sys. v. Shaw Group Inc., 540 F. Supp. 2d 464, 472
(S.D.N.Y. 2008)).  As the PSLRA requires, a complaint must "state with particularity facts
giving rise to a strong inference" of scienter for each defendant.  15 U.S.C. § 78-u4(b)(2).

  The Second Circuit has clarified these pleading requirements in light of the passage of the
PSLRA and explained that a court need not obstinately tie itself to the ideas described above.
Rather, district courts are encouraged to look at a variety of factors and keep in mind how other

courts have approached the issue of scienter in the securities fraud context.  However, generally

speaking, the inference of scienter "may arise where the complaint sufficiently alleges that the

defendants: (1) benefited in a concrete and personal way from the purported fraud; (2) engaged

in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their

public statements were not accurate; or (4) failed to check information they had a duty to

monitor."  South Cherry St. LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009).  The

court "must assess 'whether all of the facts alleged, taken collectively, give rise to a strong

inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

standard.'"  Local No. 38 Int'l Bhd. Of Electrical Workers Pension Fund v. Am. Express Co.,

724 F. Supp. 2d 447, 458 (S.D.N.Y. 2010) (quoting Tellabs, 551 U.S. at 323, 127 S. Ct. 2499).

### b. As to the Plaintiff's Allegations of Scienter

The Plaintiff has made several factual allegations concerning the Defendants' motive and

opportunity to commit the fraud, as well as allegations that potentially constitute circumstantial

evidence of conscious misbehavior or recklessness.  The Court will assess all of the Plaintiff's

allegations with regard to scienter, keeping in mind that the Court must take a holistic approach

to the analysis.

### i. Internal Gentiva Documents and Communications

First, the complaint contains references to a number of Gentiva internal documents and

emails uncovered by the SFC which, the Plaintiff contends, supports an inference of scienter.

According to the Plaintiff, these documents and communications demonstrate that in the months

leading up to Medicare's changes in the number of visits required for enhanced payments,

Gentiva's top executives were apprised of these changes and more importantly, how Gentiva

could take advantage of these changes.  In particular, certain emails were sent to some of the

Individual Defendants, namely Defendant Strange, and these messages contained information about the new therapy thresholds, as well as a notification that an internal group at Gentiva was analyzing data "to determine whether revisions to [Gentiva's] therapy protocols [were] clinically defensible." (Compl. ¶¶ 42–43.)

One communication heavily emphasized by the Plaintiff is a September 7, 2007 email to Defendant Strange and others from Perri Sutherland of Gentiva's Finance Department, which analyzed how much more money per episode Gentiva could make by increasing therapy visits just enough to push the episode into the next highest Medicare reimbursement "bucket." (Compl. ¶ 45.) The Plaintiff makes much of the fact that these communications do not make any mention of patients' medical needs, and thus the Plaintiff makes the inference that Gentiva wanted to take advantage of the threshold modification without any consideration of medical necessity. Finally, the complaint contains an allegation that the many of the Defendants were aware that the company ranked the financial performance of its various regions based on certain metrics, including whether visits per episode fell within seven and twenty visits.

In sum, these documents could potentially lead to a conclusion that Gentiva executives focused on the financial benefit of more therapy visits in order to meet the new Medicare thresholds. Further, these communications undoubtedly evince an absence of discussion regarding patients' medical needs. However, contrary to the Plaintiff's theory of the case, the Defendants assert that these internal documents do not support allegations of medically unnecessary treatment.

In the Court's view, these email communications are not sufficient in and of themselves to establish scienter under the binding precedent of the Second Circuit. These emails solely concern maximizing revenues in light of the increased regulations and do not expressly state that

certain strategies would be taken to have therapy visits reach the new "buckets" regardless of patients' medical needs and Medicare regulations. The Defendants are correct that these emails do not demonstrate a leap in logic from legal behavior—increasing therapy visits in a medically necessary way in order to maximize profits—to illegal behavior—increasing therapy visits in ways that are *not* medically necessary in order to maximize profits.

The only communication that could potentially lend credence to this theory is what the Plaintiff refers to as the "Parting Comments Email", which was cited in the SFC Report. This email was sent to Defendant Strange on May 3, 2010 from a Gentiva Physical Therapist and Orthopedics Director, identified further below as Confidential Witness 1, which states, in part, that this individual has "see[n] the push to treat by metrics not by what the patients need . . . Treating by numbers is also making the clinicians feel their professional judgment is questioned. Again, not sitting on plateaus is understandable but pushing to thresholds based on what their diagnosis is, not by what the patient needs is just wrong." (Compl. ¶ 49.)

Even assuming that Strange read this email, in the Court's view, it does not constitute or significantly contribute to the strong circumstantial evidence necessary to demonstrate conscious misbehavior or recklessness. First, this email is quite vague—it merely outlines this low-level employee's "thoughts and concerns" about what he or she generally observed, without identifying specific events, individuals, or points in time. As observed in the factually analogous case of In re Almost Family Inc. Secs. Litig., 2012 WL 443461, at *9, "the Court struggles to understand how a single letter from a former employee could somehow make [Strange] aware that the entire company's financial results were inaccurate. After all, the crux of Plaintiff['s] allegations are that [Gentiva's] financial reportings were fraudulent because of illegal medical and billing practices. [CW 1's] letter fails to allege that fraud was widespread throughout the

29

entire company or that such behavior was somehow known by Individual Defendants." Second, and more importantly, this email does not even appear to concern the subject matter that is at issue in this case. While the allegations here concern Medicare billing through the HH PPS, this email states the very distinct concern that the company is "dropping insurance companies because they don't pay well enough. What this is making Gentiva look like cherry pickers and instead of saying all patients will get the best care, Gentiva is saying only those who will pay us well will get good care. This is discrimination in the worst[t] sense in my book and I am not comfortable with it." (Compl. ¶ 49.) Thus, the relevance of this email to the scienter analysis if any, is minimal.

Ultimately, the Court's view of scienter is not confined to these communications but rather is influenced by a holistic approach. These emails may be relevant to the Plaintiff's attempts to set forth a coherent and sufficiently cogent scienter narrative in light of other circumstantial evidence detailed below. For instance, in Dodona I, LLC v. Goldman, Sachs & Co., 847 F. Supp. 2d 624 (S.D.N.Y. 2012), the court found that at the preliminary stage of the proceedings, the plaintiff had pled with sufficient particularity that defendants had "knowledge of facts or access to information contradicting their public statements," and thus were reckless, but not because of one sole set of allegations. Rather, the court plainly looked at the variety of allegations collectively in making its determination, as follows:

> First, the Complaint quotes several emails and documents,
> authored by Goldman officials, acknowledging that in late 2006,
> Goldman embarked on a program to reduce its long exposure to
> subprime mortgages. Second, the Complaint contains detailed
> factual allegations that Goldman did unload significant subprime
> risk during the first part of fiscal year 2007. Third, the timing of
> the Hudson CDOs in December 2006 and February 2007 coincides
> with Goldman's decision to reduce subprime risk, a fact which
> circumstantially supports the allegation that the Hudson CDOs
> were in line with and part of the subprime risk reduction strategy.

Id. at 642.  Thus, while the emails in this case are not conclusive of scienter, they may be part of a bigger picture that when viewed in a timeline, paints a compelling inference of scienter.

Further, while not every individual defendant received these emails, Strange and Malone were undoubtedly recipients of at least one of these communications, and thus this is not the case where "the allegations do not specify which of the Officer Defendants 'received, saw, or otherwise knew of th[ese] email[s].'"  In re Lehman Bros. Secs. and ERISA Litig., --- F. Supp. 2d ----, 2012 WL 4866504, at *19 (S.D.N.Y. Oct. 15, 2012).

For these reasons, the Court will go on to assess the other allegations supporting an inference of scienter.  However, the internal document and communications alone are insufficient.

### ii.  Confidential Witnesses

Next, the complaint contains allegations stemming from a number of Confidential Witnesses ("CWs").  According to the Plaintiff, these allegations "are particularly compelling and demonstrate that [the] Defendants knew of, if not recklessly disregarded, a company-wide culture that at every level pressured clinicians and branch managers to provide patients with medically unnecessary visits and services in order to wrongfully receive higher payments from Medicare."  (Pl. Opp. at 21.)  The CWs' accounts are specifically detailed in the fact section above, but generally concern a number of low-level employees who had the impression and/or believed that they were being subjected to pressure from their direct supervisors to increase the number of patient visits provided in order to hit the next highest enhanced Medicare reimbursement threshold, regardless of the patients' medical needs.

Generally, confidential witnesses may be probative of scienter only where each of their accounts is "described in the complaint with sufficient particularity to support the probability

that a person in the position occupied by the source would possess the information alleged."  In re Daou Systems, Inc., 411 F.3d 1006, 1015 (9th Cir. 2005); see Novak, 216 F.3d at 314 (holding that a plaintiff may rely on confidential sources to plead facts giving rise to a strong inference of scienter so long as the confidential sources are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."); accord Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 711–712 (7th Cir. 2008) (Posner, J.), on remand from Tellabs, 127 S. Ct. 2499.  The Plaintiff urges the Court to find that the allegations here are set forth with that requisite particularity.

The Defendants urge the Court to disregard the CW allegations in their entirety.  The Defendants argue that the Plaintiff's reliance on the statements of anonymous confidential witnesses to attempt to show that the Defendants acted with scienter is insufficient and that their allegations lack the requisite particularity.  According to the Defendants, the allegations fail: (1) to establish that any of the CWs had any contact with the Individual Defendants, nor link such Defendants to contemporaneous information demonstrating the falsity of the challenged statements; or (2) to identify the time, place and other details about the alleged wrongful conduct, such as actual instances of medically unnecessary patient visits or improper Medicare billing.  In particular, they emphasize that even though there are nine employees from geographically diverse areas with consistent stories, that alone is not sufficient under the law in this Circuit.  Rather, they maintain that the allegations must include some claim that the witness communicated with the Individual Defendants or that the witness was privy to an Individual Defendant's knowledge.  The Defendants argue that the CW allegations are based upon nothing more than general observations and beliefs.

32

The use of confidential witnesses has been given conflicting treatment in this Circuit.  On the one hand, certain courts have severely undercut the viability of this method in light of the Supreme Court's decision in Tellabs.  See, e.g., In re MRU, 769 F. Supp. 2d 500, 516, 2011 WL 650792, at *14 (S.D.N.Y. 2011) ("Plaintiff's reliance on 'confidential witnesses' . . . 'must be discounted' because '[i]t is hard to see how information from anonymous sources could be deemed compelling or how [the Court] could take account of plausible opposing inferences.  Perhaps these confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even exist.'" (alterations in original) (citing Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 756–57 (7th Cir. 2007).

On the other hand, different courts have unwaveringly accepted allegations stemming from confidential witnesses.  See, e.g., In re PXRE Grp., Ltd., Secs. Litig., 600 F. Supp. 2d 510, 526 (S.D.N.Y. 2009) (quoting Higginbotham, but stating, "[t]he Court declines to follow this approach absent guidance from the Second Circuit, and will continue to consider allegations based on information provided by confidential sources without discounting those allegations due solely to the anonymity of the information's source").  The Court agrees that the most prudent approach is to wait for instruction from the Second Circuit before fully discounting allegations from confidential witnesses.  Indeed, as recently as late 2011, the Second Circuit expressly embraced the usage of confidential witnesses, finding that "[a]lthough the witnesses [we]re not identified by name in the complaint, plaintiffs' descriptions of these persons [we]re sufficiently particular to permit the strong inference of scienter necessary for plaintiffs to sustain their burden on a motion to dismiss." New Orleans Employees Retirement Sys. V. Celestica, Inc., 455 Fed. App'x 10, 14 (2d Cir. 2011).  Therefore, the Court will proceed to assess the allegations.

33

First, as mentioned above, it appears that courts are generally less hesitant in accepting factual allegations stemming from confidential witnesses when their positions and/or job positions are described in sufficient detail to indicate that it is likely they actually knew the facts underlying their allegations.  See, e.g., In re Scottish Re Group Sec. Litig., 524 F. Supp. 2d 370, 392 (S.D.N.Y. 2007) (finding that a vice president in charge of insurance claim adjudication was sufficiently described to make allegations as to management's awareness of inadequacies in the company's "internal data-gathering system."); In re EVCI Colleges Holding Corp. Sec. Litig., 469 F. Supp. 2d 88, 93, 97 (S.D.N.Y. 2006).  As such, confidential sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  Novak, 216 F.3d at 314.  See In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187, 203, 220 (S.D.N.Y. 2008); Feasby v. Industri–Matematik Int'l Corp., 99 Civ. 8761, 2003 WL 22976327, at *4 (S.D.N.Y. Dec. 19, 2003) (discounting scienter allegations of "former employees" of software developer because "nowhere [ ] does the Complaint describe the position held by or work assignments of the former employee or consultant sources, or any other information that would support an inference that the sources would possess the information attributed to them").

Here, the Court finds that the CWs are described with sufficient particularity so that the person in each respective position would have the information that each CW purports to have. The CWs' positions are all amply described, including their title, responsibilities, and duration of employment.  In addition, the CWs explain the basis for their allegations, namely the pressure and directives from various supervisors, both by expressly naming these supervisors and by providing the mode through which these mandates occurred.  For instance, CW 4 alleges that during weekly teleconference calls with his/her immediate supervisors and certain unidentified

34

Gentiva executives, he/she was regularly instructed by superiors to relay the message to clinicians that "they were not putting in enough therapies," and that they needed to increase the number of patient visits. As CW 4 was the manager of Clinical Practice during this time period, it is plausible that he/she would be in attendance at these teleconference meetings and would be subject to these types of directives.

As another example, CW 7 was told to modify OASIS forms in a way that would result in medically unnecessary services being provided to patients in order to increase Medicare revenue. As the Area Director of Clinical Operations, CW 7 would likely be in a position where he/she would have a sufficient factual underpinning to make this sort of allegation. Moreover, there is no requirement that confidential sources be named, "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Novak, 216 F.3d at 314.

Therefore, the Court finds that the Plaintiff's sources are sufficiently identified because it is probable that former employees in their positions would have the knowledge these CWs claim to possess. See In re Atlas Air Worldwide Holdings, Inc. Secs. Litig., 324 F. Supp. 2d 474, 493 (S.D.N.Y. 2004) ("Plaintiffs are not required to plead exact job titles, describe the sources' responsibilities and duties in detail or allege access to specific company documents.").

Further, these CWs are from different ranks and from different geographies. When CWs "emanate from several geographic areas" and "span different levels of the Company hierarchy" this further supports a finding of scienter. Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010). "A comprehensive survey of employees is not needed at the pleading stage." Id.; see In re Countrywide Fin. Corp. Deriv. Litig., 554 F. Supp. 2d 1044, 1058 (C.D. Cal. 2008) ("Supporting this Company-wide inference, the confidential and non-confidential

accounts cited in the Complaint (1) emanate from several geographic areas, . . . ; (2) span different levels of the Company hierarchy, . . . ; and (3) remain consistent across different time periods").  Furthermore, as in <u>Countrywide</u>, "Plaintiffs' numerous confidential witnesses [may] support a strong inference of a Company-wide culture that, at every level," employees were pressured to provide or input medically unnecessary services in order to reach certain Medicare thresholds and hence maximize profits.  <u>Countrywide</u>, 554 F. Supp. 2d at 1058 ("Strikingly, they tell what is essentially the same story—a rampant disregard for underwriting standards—from markedly different angles.").

The main issue with regard to the CW allegations, and one that is potentially fatal, concerns whether the CWs' accounts sufficiently allege that executives at the company—namely the Individual Defendants—knew or had access to information showing that Gentiva was pressuring its staff to provide as many therapy visits as possible to receive extra Medicare payments without consideration of patients' needs.  In other words, the Court must assess whether there are allegations that the CWs were privy to the Individual Defendants' knowledge or had direct contact with the Individual Defendants, such that the Individual Defendants are alleged to have knowledge of or access to contemporaneous information that would show that their representations were false.  <u>See In re Citigroup Inc. Secs. Litig.</u>, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) ("Fatal to plaintiffs' claims . . . is that they do not allege with specificity that any of the confidential witnesses relied upon in the Complaint presented information to the individual defendants.").

What is problematic here is that the "Plaintiff's allegation that the Executive Defendants tolerated [or encouraged medically unnecessary therapy visits for financial gain] is conclusory because [the] Plaintiff does not plead that any of the Executive Defendants were even aware of

36

the practice." Penn. Public School Employees' Ret. Sys. v. Bank of Am., 874 F. Supp. 2d 341,

359 (S.D.N.Y. 2012); see In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d at 360 (finding that

the plaintiff could not rely on confidential witness assertions that certain information

contradicting the defendants' public statements was "openly considered . . . within the company"

without an allegation that such information was "reported to senior management"). While the

CWs had regular contact with several regional VPs, the Plaintiff has not alleged that any of the

CWs had "any contact with . . . [Gentiva Executives] or would have knowledge of what they

knew or should have known during the Class Period." In re Am. Express Co. Sec. Litig., No. 02

Civ. 5533, 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008); see also Am. Express Co., 724 F.

Supp. 2d at 461–62.

      The fact that there are allegations to support that the Individual Defendants were

cognizant of the company's emphasis on pushing therapy visits into the next Medicare "bucket"

and utilizing the number of medial visits as a measure of an office's success, does not change the

Court's determination. See Local No. 38, 724 F. Supp. 2d at 462 ("Moreover, CW12's

assertions that certain information was the 'sort of measurement' or 'would have been' reviewed

by the Individual Defendants are too speculative to give rise to a strong inference of scienter.").

"This establishes only that the [Executives] were [potentially] aware of risks [associated with

trying to increase therapy visits in light of medical necessity], not that they knew that their

disclosures were false or misleading." Penn. Public Sch., 874 F. Supp. 2d at 360 (citing Am.

Express Co., 2008 WL 4501928, at *7 (finding allegations that management was aware of risks

associated with high yield debt was not sufficient to establish that company was not properly

valuing its debt)). Knowledge of the company's number of therapy visits and corresponding

profits "does not equate to harboring a mental state to deceive, manipulate, or defraud." CIBC,

694 F. Supp. 2d at 300; <u>see In re CRM Holdings, Ltd. Secs. Litig.</u>, 2012 WL 1646888, at *29 (S.D.N.Y. May 10, 2012) ("focusing on the Company's growth is not evidence of an intent to deceive, manipulate or defraud with respect to the company's financial well-being.").

Further, alleging that Malone served on Gentiva's Clinical Quality Committee fares no better for the Plaintiff, because it does not suggest that this individual was aware of Gentiva's omissions or misstatements.  <u>See Am. Express Co.</u>, 2008 WL 4501928, at *7 (allegation that defendant was responsible for particular investment strategy does not establish that he knew company's disclosures were false).

In sum, "even confidential high level executives' statements will be insufficient absent some allegation that the witness communicated with the individual defendants claimed against in the case, or else that the witness was privy to the individual defendants' knowledge."  <u>Glaser v. The9, Ltd.</u>, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011); <u>see In re Doral Financial Corp. Sec. Litig.</u>, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (discounting "former Doral internal auditor['s]" statement "that he personally attended [Doral] Audit Committee meetings where representatives from defendant PwC were in attendance and the reports of Internal Audit Department [which raised questions about the sufficiency of Doral's internal control] were discussed," as "so vague as to be meaningless" because the Doral auditor did not identify the PwC representatives' positions, when the meetings occurred, or how the reports were discussed), aff'd, 344 Fed. App'x. 717 (2d Cir. 2009); <u>In re American Express Co. Sec. Litig.</u>, No. 02 Civ. 5533, 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008) ("Plaintiffs have also failed to allege any facts showing that the confidential sources—[several executives at American Express Financial Advisors]—had any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period.").

38

Put another way, "confidential source allegations must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements; conclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient." Glaser, 772 F. Supp. 2d at 591.  See Campo v. Sears Holdings Corp., 371 Fed. App'x. 212, 217 (2d Cir. 2010) (agreeing with a district court's minimal consideration of allegations from a confidential source because though the source "confirmed that a Kmart officer or board member could obtain access to" the conflicting information, the source "had no knowledge of whether [individual defendants] actually accessed or reviewed the reports."); Local No. 38, 724 F. Supp. 2d at 461 ("a close examination of [the CWs'] statements reveals the absence of any allegation that such data had been presented to management around the time of Defendants' allegedly misleading statements . . . [the] allegations do not establish what specific contradictory information the Individual Defendants received or when they received it."); see also In re Citigroup, 2010 WL 4484650, at *33 ("Plaintiffs cannot rely on assertions that the information presented by confidential witnesses was known or common knowledge within the company; these assertions are too vague and conclusory to support a finding that defendants knew they were making false statements or made those statements with reckless disregard for their truth or falsity.").

Notably, the allegations here do not establish what specific contradictory information the Individual Defendants received or when they received it.  CIBC, 694 F. Supp. 2d at 299 ("Plaintiffs should, but do not, provide specific instances in which Defendants received information that was contrary to their public declarations.").  For these reasons, if the Court looks only to the CWs' allegations, these statements in the complaint are insufficient to allege scienter on behalf of any of the Individual Defendants.

### iii. SEC & SFC Investigations

Next, the Plaintiff responds to the argument by the Defendants that the Court should grant the motion to dismiss with regard to scienter in part because governmental agencies or regulators have not yet instituted any action or proceeding alleging wrongdoing arising from Gentiva's participation in the HH PPS. The Plaintiff maintains that neither agency has closed its investigation or determined not to take action, so that there is still potential liability that the company may face. On the other hand, the Defendants assert that while the investigations are not closed, the mere commencement and pendency of such investigations cannot support a strong inference of scienter, because "the fact that a regulator is fulfilling this role cannot be sufficient to allege scienter." In re Manulife Fin. Corp. Sec. Litig., 276 F.R.D. 87, 102 (S.D.N.Y. 2011).

Certainly, courts have considered a governmental investigation as one piece of the puzzle when taking a "holistic" view of the purported facts as they relate to scienter. See, e.g., In re Bristol Myers Squibb Co. Secs. Litig., 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008). The Court agrees that while the existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter, it may be considered by the Court as part of its analysis.

### iv. Motive and Opportunity: The Defendants' Sales of Gentiva Securities

Finally, the Plaintiff contends that the Defendants were motivated to engage in the wrongful conduct alleged in the complaint in order to sell inflated Gentiva securities. The complaint states that the Defendants Malone, Potapchuk, and Strange respectively sold 98%, 96%, and 28% of the Gentiva shares they acquired during the Class Period for proceeds of $3.1 million, $3.2 million, and $756,712. (Compl. ¶¶ 19–21, 276.) The Plaintiff asserts that the facts

40

as alleged in the complaint demonstrate that these sales were unusual and thus support an inference of scienter.

An additional and independent motivation to engage in fraudulent conduct is also alleged in the complaint.  Specifically, the Plaintiff alleges that the Defendants wished to expand Gentiva's business by acquiring another company called Odyssey by way of a $325 million 11.5% Note Offering.  (Compl. ¶¶ 277–78.)  In this regard, the complaint states that the Defendants needed to acquire Odyssey to diversify their business beyond home health care.  The Plaintiff cites to district courts outside of this Circuit which have found that the desire to keep shares above a particular level to raise capital demonstrates motive and thus buttresses a finding of scienter.

The Defendants offer "innocent explanations" for their stock sales, which the Plaintiff argues may not be considered on a motion to dismiss.  However, the Defendants claim that these explanations are perfectly appropriate for the Court's consideration.  For instance, the Southern District has recently noted that it is well established that trades under 10b-5 plans do not raise a strong inference of scienter, even at the pleading stage.  Glasser, 772 F. Supp. 2d 592 n.14.  With regard to the Odyssey acquisition, the Defendants emphasize that this occurred in the latter half of the Class Period, so there is not a unique connection between the fraud and the acquisition.  ECA & Local, 553 F.3d 187, 201 n.6 (2d Cir. 2009).  In response, the Plaintiff argues that the transaction should not be taken out of context and considered in a vacuum.

There is no question that "motive can be shown . . . 'when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit.'"  In re Citigroup Inc. Sec. Litig., 753 F. Supp. 2d 206, 233, 2010 WL 4484650, at *22 (S.D.N.Y. Nov. 9, 2010) (quoting ECA, 553 F.3d at 198)  "However, the mere fact that insider stock sales occurred does not

suffice . . . , [instead] [p]laintiffs must establish that the sales were 'unusual' or 'suspicious.'" In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) (internal quotation marks and citation omitted); see In re Scholastic, 252 F.3d at 75 (sufficiently unusual for single individual defendant to sell eighty percent of holdings), and In re SLM, 740 F. Supp. 2d at 558 (sufficiently unusual when individual defendant "dumped nearly all of his shares during the Class Period."). Cf. In re MRU Secs. Litig., 769 F. Supp. 2d 500, 515 (S.D.N.Y. 2011) (finding that because the individual defendants *increased* their holdings during the class period, the plaintiffs could not present strong circumstantial evidence of conscious misbehavior or recklessness).

"Whether trading was unusual or suspicious turns on factors including (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5–1 plans." Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011).

A plaintiff alleging motive and opportunity in connection with stock sales must allege not only the defendants' selling activity during the class period, but also the defendants' net profits rather than their gross proceeds, in addition to the overall percentage changes in the defendants' holdings. See In re eSpeed, 457 F. Supp. 2d at 290 ("The Complaint also omits necessary information concerning (1) the percentage increase in each defendants' holdings during the class period; and (2) the profit from defendants' sales. In particular, plaintiffs plead that Amaitis and

Noviello realized 'gross proceeds' of $2.8 million, but the Complaint does not disclose whether either made any profit from the sales.").

First, the Plaintiff alleges that Strange, Malone, and Potapchuk collectively sold approximately 291,979 Gentiva shares at artificially inflated prices for proceeds of approximately $7.1 million.  However, as the Defendants correctly point out, allegations of reaped "proceeds" are insufficient, as the complaint does not identify net profits.  As United States District Judge Richard J. Holwell explained, "proceeds alone say nothing about a seller's motive."  <u>Glaser</u>, 772 F. Supp. 2d at 592.  The complaint also makes no mention of several other relevant and essential factual allegations, including the change in volume of the insider Defendant's sales; whether sales occurred soon after statements the Defendants are alleged to know to be misleading; whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and whether sales were made pursuant to trading plans such as Rule 10b5–1 plans.  As to this last factor, while not determinative, it is relevant that the Defendants claim that many of the stock sales by Strange and Potapchuk were made pursuant to 10b-5-1 plans or other contractual arrangements.  The complaint does not allege anything to the contrary.

Furthermore, one of the Individual Defendants, Slusser, is not alleged to have sold any Gentiva stock during the class period.  <u>See In re eSpeed</u>, 457 F. Supp. 2d at 291 ("the dispositive factor is that other insiders, including the other two individual defendants, did not sell during the putative class period").  It is difficult to conclude that sales by three of the four Individual Defendants are sufficient to allege motive and opportunity when there are no factual allegations regarding their net profits or the timing of these sales, even though it appears to be a high volume of trading activity.  <u>See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip</u>

Morris Cos., Inc., 75 F.3d 801, 814 (2d Cir. 1996) (noting that the failure of some individual

defendants to sell stock during class period undermined the plaintiffs' allegations that any

defendant intended to inflate stock for personal profit); Acito v. IMCERA Group, 47 F.3d 47, 54

(2d Cir. 1995) ( "The fact that the other defendants did not sell their shares during the relevant

class period undermines plaintiffs' claim that defendants delayed notifying the public so that

they could sell their stock at a huge profit.") (quotation and citation omitted). Accord In re

Glenayre Techs., Inc. Sec. Litig., No. 96 Civ. 8252, 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30,

1998) (concluding that inference of scienter from some defendants' stock sales was undermined

when CEO and other top officers did not sell stock during class period: "Certainly, one can

assume that these high-ranking corporate officers . . . would be part of any fraudulent scheme to

benefit from insider information through pre-emptive stock sales.  The absence of sales from

these individuals, then, suggests that . . . trading by [other] defendants does not give rise to a

strong inference of scienter.").  Thus, the Court finds that the Plaintiff has failed to sufficiently

allege motive and opportunity as to any defendant.

  Second, with regard to the Plaintiff's allegation that the Defendants were somehow

motivated to commit fraud in order to acquire Odyssey, the Court agrees with the Defendants

that this allegation is insufficient, at least by itself, to allege motive and opportunity.  Although

"the artificial inflation of stock prices in order to acquire another company may, in some

circumstances, be sufficient for scienter . . . the inquiry is an extremely contextual one."  ECA,

553 F.3d at 201 n.6 (internal citation and quotation marks omitted).  The acquisition of Odyssey

was announced in May 2010, which is almost two years after the start of the Class Period, and

completed in August 2010, which is more than one year prior to the Class Period.  As in In re

Wachovia Equity Secs. Litig., 753 F. Supp. 2d 326, 350 (S.D.N.Y. 2011), "the Court is

unpersuaded that a transaction announced and completed [after almost two years after the start] of the Class Period creates an inference of motive to inflate [Gentiva's] share price in the two years that [preceded or the one year] that followed." While the Plaintiff cites to two cases to support the notion that a desire to keep share price above a particular level to raise capital buttresses a finding of scienter, these cases are from outside this Circuit and thus are not binding precedent on this Court. Indeed, the Plaintiff has not cited to a single case within this Circuit that sets forth the demonstration of scienter based upon a transaction such as the one here, which occurred over a small subset of time as compared to the lengthy class period. The Plaintiff "simply did not allege a unique connection between the fraud and the acquisition." ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co., 553 F.3d 187, 201 n.6 (2d Cir. 2009).

### v. Viewing Allegations of Scienter as a Whole

Ultimately, even when viewing all of the allegations of scienter as a whole, the Court finds that the factual allegations are lacking and thus do not give rise to a compelling inference that the Defendants engaged in the alleged conduct with an intent to deceive investors. As set forth above, under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.A. § 78u–4(b)(2)(A) (Feb. 2011 Supp.). The Plaintiff has not alleged strong circumstantial evidence of conscious misbehavior or recklessness, and so the complaint fails to raise a strong inference of scienter so as to satisfy the heightened pleading requirements of the PSLRA as interpreted by the Supreme Court in Tellabs.

In addition, although the Plaintiff also attempts to raise a compelling inference of scienter by pointing to the Individual Defendants' potential motives and opportunities, the complaint

similarly fails in this regard.  The inference that the Defendants acted intentionally or recklessly when representing that they were in compliance with Medicare regulations but were instead pressuring their employees to provide medically unnecessary therapy visits is not at least as compelling as the inference that Gentiva was looking to maximize profits in light of new regulations but in a medically defensible way.  Specifically, the inference that Gentiva implemented a business strategy focused on specialty programs, higher acuity patents, and the needs of the geriatric population to maximize the number of visits per patient is a compelling one.  In other words, while the inference of fraudulent intent is plausible, based upon the facts alleged, it is less cogent then other, nonculpable explanations for the Defendants' conduct.

Because the Plaintiff has not alleged facts showing motive and opportunity or facts constituting strong circumstantial evidence of conscious misbehavior or recklessness on the part of Gentiva, it has not established the strong inference of scienter required by the PSLRA. Accordingly, the Plaintiff has failed to allege a violation of Section 10(b) and Rule 10b–5 against the Individual Defendants, and on this ground, the Individual Defendants' motion to dismiss the Complaint is granted.

### c.   As to the Corporate Defendant

With regard to the liability of the company, the Plaintiff alleges that even if scienter as to the Individual Defendants is not found by this Court, then the allegations can nevertheless support a strong inference that Gentiva itself acted with the requisite scienter because the allegations suggest that multiple executives at the company such as Area and Regional Vice Presidents were aware of the wrongful conducted alleged in the Complaint.  See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 195 (2d Cir. 2008) (stating

that it is possible to raise a strong inference of scienter with regard to a corporate defendant without raising the same inference as to individual defendants).

To plead scienter when the defendant is a corporation, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 195 (2d Cir. 2008). "In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant." Id. However, "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." Id. For example, the scienter of an employee acting within the scope of employment can be imputed to the employer. See Vining v. Oppenheimer Holdings Inc., No 08 Civ. 4435, 2010 WL 3825722 at *12 (S.D.N.Y. Sept. 29, 2010) (citing Defer LP v. Raymond James Financial, Inc., 654 F. Supp. 2d 204, 212 (S.D.N.Y. 2009)). A strong inference of corporate scienter may also be appropriate "where a corporate statement is so important and dramatic that it 'would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.'" Vining, 2010 WL 3825722 at *13 (citing Teamsters Local 445, 531 F.3d at 196 (internal citation omitted)).

Here, it is possible that certain employees who the CWs came into direct contact with could have had the requisite state of mind. However, the complaint contains no allegations as to whether these other unnamed employees were acting within the scope of employment or if there is any other basis to impute their scienter to the employer. For this reason, the Court finds that there is no basis to conclude that there is corporate liability and thus the Complaint is also dismissed as to the corporate defendant.

### 3.  Loss Causation

Although the complaint can be dismissed on the ground of scienter alone, the Court will

nevertheless proceed to assess the next component of a securities fraud action—loss causation.

Under the PSLRA, "the plaintiff shall have the burden of proving that the act or omission of the

defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover

damages."  15 U.S.C. S 78u-4(b)(4).  Thus, a plaintiff must establish a causal connection

between the material misrepresentation and the economic loss.  As the Second Circuit has

recently noted, to adequately plead what is known as "loss causation", "a plaintiff must allege . .

. that the subject of the fraudulent statement or omission was the cause of the actual loss

suffered,' i.e., that the misstatement or omission concealed something from the market that,

when disclosed, negatively affected the value of the security."  Lentell v. Merrill Lynch & Co.,

396 F.3d 161, 173 (2d Cir. 2005) (citation omitted).  This requirement exists because private

securities fraud actions are "available, not to provide investors with broad insurance against

market losses, but to protect them against those economic losses that misrepresentations actually

cause."  Dura Pharms., 544 U.S. at 345, 125 S. Ct. 1627.

Of crucial importance is that loss causation is not adequately pled simply by allegations

of a drop in stock price following an announcement of bad news if the news did not disclose the

fraud.  Leykin v. AT&T Corp., 423 F. Supp. 2d 229, 245 (S.D.N.Y. 2006).  A plaintiff may,

however, "successfully allege loss causation by . . . alleging that the market reacted negatively to

a 'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that

allegedly material information had been omitted."  In re Merrill Lynch & Co. Research Reports

& Sec. Litig., No. 02 Civ. 9690, 2008 WL 2324111, at *5 (S.D.N.Y. June 4, 2008).  "[A]

corrective disclosure need not take the form of a single announcement, but rather, can occur

48

through a series of disclosing events."  <u>In re Bristol Myers Squibb Co. Sec. Litig.</u>, 586 F. Supp.

2d 148, 165 (S.D.N.Y. 2008) (citing cases).

In the complaint at issue, the Plaintiff specifies certain "partial disclosures" that are

alleged to have revealed the truth about the condition of Gentiva's business and "the negative

adverse factors that had been impacting Gentiva's business during the Class Period."  (Compl. ¶

246.)  Specifically, the Plaintiff identifies the following as partial corrective disclosures that

negatively affected the value of the security: (1) announcements of the SFC and SEC

investigations; (2) negative earnings releases; and (3) the SFC Report.  However, according to

the Defendants, these events were not actually "corrective" and accordingly are not adequate to

plead loss causation.  The Court will address each specific partial disclosure in turn.

### a.   Announcements of Governmental and Regulatory Investigations

First, the Plaintiff identifies certain partial disclosures in connection with the initiation of

investigations by both the SFC and the SEC.  (<u>See</u> Compl. ¶¶ 248, 251, 253.)  On May 13, 2010,

before the market opened, the Wall Street Journal reported that the SFC launched an

investigation into the practices of companies that provide in-home therapy visits reimbursed by

Medicare, including Gentiva.  This led to a seven percent decline in stock price.  On July 1,

2010, prior to the market opening, Gentiva issued a press release, filed with the SEC on Form 8-

K, that attempted to allay investors' concerns caused by the SFC's investigation by representing

the following:

> In light of recent reports from other companies in the home healthcare industry,
> Gentiva Health Services, Inc., a Delaware corporation ("Gentiva"), reported today
> that it has not received a notice of formal investigation from the Securities and
> Exchange Commission ("SEC") and has not received a subpoena for documents
> related to the matters under review by the Senate Finance Committee.

> Gentiva is actively cooperating with the Senate Finance Committee in their review of the home healthcare industry and expects to be fully compliant with the Committee's requests.

This led to an eleven percent decline in stock price. On July 13, 2010 Gentiva disclosed that the SEC commenced an investigation relating to Gentiva's participation in the Medicare Home Health PPS. This led to an approximate nine percent decline in stock price.

The issue thus presented to the Court is whether these announcements of investigations are sufficient to plead loss causation. This question is not easily resolved, as it appears to the Court that the Second Circuit has yet to rule on the issue and that there are several conflicting decisions in the various circuits as well as within the Second Circuit itself. See Am. Family, 2012 WL 443451, at *10 ("the question of whether and to what extent fraud must become known by the market before it can sufficiently be pled as causally related to economic loss remains unsettled"). The Court must ascertain whether the practices the Plaintiff contends were fraudulent were revealed to the market by these announcements and thus caused the resulting loss, or if other factors or speculation about unrevealed matters caused the decline in stock value.

On the one hand, several courts have found that the announcement of a subpoena or an investigation alone is not sufficient to plead loss causation. See, e.g., Meyer v. Greene, --- F.3d ----, 2013 WL 656500, at *8 (11th Cir. 2013) ("In our view, the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b). The announcement of an investigation reveals just that—an investigation—and nothing more. . . . To be sure, stock prices may fall upon the announcement of an SEC investigation, but that is because the investigation can be seen to portend an added risk of future corrective action. That does not mean that the investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent."); Metzler Investment GMBH v.

Corinthian Colleges Inc., 540 F.3d 1049 (9th Cir. 2008) (finding that Dura did not support

establishing loss causation where a disclosure revealed only the risk or potential for widespread

fraudulent conduct); Janbay v. Canadian Solar, Inc., No. 10 Civ. 4430, 2012 WL 1080306, at

*15 (S.D.N.Y. March 30, 2012); In re Hansen Natural Corp. Secs. Litig., 527 F. Supp.2 d 1142,

1162 (C.C. Cal. 2007); In re Avista Corp. Secs. Litig., 415 F. Supp. 2d 1214, 1220–21 (E.D.

Wash. 2005).

     These decisions indicate that disclosure concerning the existence of an investigation is

not enough—the announcement must link the investigation to the actual fraudulent conduct.  See

Am. Family, 2012 WL 443451, at *10 ("Although the Court agrees that disclosures, and more

particularly, *partial* disclosures, may suffice in some cases to establish loss causation, the

requirement of revealing fraud is not lost.").  Consequently, because the Defendants assert that

there has been no revelation of any actual wrongdoing, but only the possibility of wrongdoing,

they argue that the alleged corrective disclosures are not linked to any fraudulent conduct and

therefore are insufficient to plead loss causation.  As one district court noted:

> disclosures regarding compliance with an SEC investigation, subpoenas from the
> United States Attorney's office, and the formation of its own Special Committee
> to investigate options granting practices do not reveal the alleged fraud.  A
> reasonable investor may view these disclosures as indicators of risk because they
> reveal the potential existence of future corrective information.  However, they do
> not themselves indicate anything more than a "risk" or "potential" that
> Defendants engaged in widespread fraudulent conduct.  Thus, the Court finds that
> these statements are not corrective disclosures for which Plaintiffs can plead loss
> causation.

In re Maxim Integrated Prods., Inc. Secs. Litig., 639 F. Supp. 2d 1038, 1047 (N.D. Cal.

2009).

     In the Court's view, this line of thinking makes good sense.  The Supreme Court has

made clear that securities laws and private securities fraud actions are intended to "maintain

public confidence" in the market by protecting investors "against those economic losses that misrepresentations *actually* cause." Dura Pharm., 544 U.S. at 345 (citation omitted). Otherwise, such lawsuits will serve as no more than "broad insurance against market losses." Id.

In accordance with this school of thought, the Western District of Kentucky has found in a related case, In re Almost Family, Inc. Secs. Litig., No. 10 Civ. 520, 2012 WL 443461, at *12 (W.D. Ky. Feb. 10, 2012), that the plaintiffs had to demonstrate some revelation of the defendants' fraud—that they performed unnecessary procedures or provided unnecessary services to patients which ultimately inflated their earnings and stock value—in order to satisfy the pleading requirement of loss causation. The Almost Family court ruled that "the disclosures must amount to more than revelations of *possible risks* that Defendants were engaged in such prohibited practices." Id. In explaining its rationale, the court stated that "[i]f the disclosure of a mere *risk* of fraud was enough to trigger loss causation, a private cause of action for securities fraud would accrue every time an allegation or rumor of wrongdoing circulated." Id. Similarly, in another related case Bach v. Amedisys, Inc., No. 10 Civ. 395, 2012 WL 6947008 (M.D. La. June 28, 2012), the court ruled that a Wall Street Journal article that announced the launch of an investigation by the SFC and other similar events did not qualify for purposes of loss causation, because these announcements did not reveal any actual fraud or misrepresentations by any defendant.

On the other hand, a recent decision from the Southern District of New York has gone in a somewhat different direction. In Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Financial Holdings Ltd., 886 F. Supp. 2d 328 (S.D.N.Y. 2012), the court found that the purported relationship between a press release and the defendant company's improper accounting mechanisms was far too tenuous to support a claim, because the press release was

52

insufficiently linked to the company's alleged misrepresentations.  However, the court's decision

was not based on the idea that disclosure of an investigation can never constitute a partial

corrective disclosure.  Rather, the court made clear that this ruling was premised on the notion

that the press releases directly addressed only the investigations into finite reinsurance contracts,

and did not mention any investigation into the company's general accounting policies and

practices.  Thus, an investor would not be put on notice that the company was engaging in the

type of fraudulent accounting practices that the plaintiff alleged.

   Other courts appear to follow this rationale and conclude that a mere announcement can

suffice for loss causation, especially if it is immediately followed by a decline in stock price.

See, e.g., In re Apollo Group, Inc. Securities Litig., 2011 WL 5101787, at *17 (D. Ariz. Oct. 27,

2011) ("the October 27, 2009 earnings press release stated that the SEC was conducting an

informal inquiry into Apollo's revenue recognition practices.  This information could signal to a

reasonable investor that there were improprieties in Apollo's revenue recognition practices,

leading to a market reaction causing the stock price to drop 17.7%."); In re Take–Two, 551 F.

Supp. 2d 247, 287 (S.D.N.Y. 2008) (finding an allegation of a 7.5% drop in share price

sufficient, stating that "[o]ther courts have found that similar allegations of significant stock

drops in response to announced SEC investigations are sufficient to plead loss causation under

the framework established by Dura and its progeny"); In re IMAX Sec. Litig., 587 F. Supp. 2d

471, 485 (S.D.N.Y. 2008) (finding that an SEC inquiry could constitute a partial corrective

disclosure where it "culminated in the restatement of [the company's] earnings and revenues for

fiscal years 2002 through 2005");In re StockerYale, 453 F. Supp. 2d 345, 359 (D. N.H. 2006)

(finding that where plaintiffs alleged that shares dropped 15% per share on the day SEC

announced investigation into accuracy of press releases and shares dropped $0.84 per share in

after-hours trading when public was informed of the SEC investigation by means of a Form 8k, a causal connection was established between the release of corrective information and the decline in the price of shares).

After this review of the authorities, ultimately, the Court rejects the idea that the disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure. To embrace this notion would be to preclude any type of action such as this, where there has been no conclusive finding of fraud by a government agency, or a criminal charge initiated, or a formal corrective disclosure by the defendant.  Here, there are factual allegations of fraudulent conduct, and at this stage of the litigation, the Court must accept these factual allegations.  To preclude this suit on the basis that there has been no previous actual disclosure of fraud from sources such as whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, or newspapers, misses the mark.  The inherent veracity of the information is the paramount concern and the form that it takes it not as critical.  To find that the Plaintiff can only succeed here if there is something exposed that is more than a possibility or probability or indicator of fraud is too narrow a view.  "A defendant should not be rewarded by denying defrauded investors recovery simply because the information revealing the alleged fraud was a third party's opinion, notwithstanding the fact such opinion is proven to be true."  In re Winstar Commn's, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006); Id., at *15 ("To require the pleadings establish that when word exposing the falsity of defendants' statements leaked into the market place, it took the form of a factual revelation which was, at that time, verifiably truthful, would place a prohibitively unreasonable burden on a plaintiff."); In re Electronic Data Sys. Corp. Sec. & "ERISA" Litig., 298 F. Supp. 2d 544, 560-61 (E.D. Tex. 2004) (facing the situation where market analysts publicly expressed their speculation regarding the company's

questionable accounting practice, and the district court noted that "[d]efendants cannot escape liability for fraud simply by not admitting the fraud.").

In the Court's view, until the Second Circuit or the Supreme Court dictate otherwise, an announcement regarding a governmental investigation into the precise subject matter which forms the basis of the fraudulent practices at issue can qualify as a partial corrective disclosure for purposes of loss causation.  See In re Omnicom Group, 597 F.3d at 510–11 (finding that the resignation of a key employee and subsequent speculation that it was due to the company's aggressive accounting practices was insufficient because "none of these matters even purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint.").  The announcement of a governmental investigation is the type of non-public new information that was not available to the market, as opposed to something such as reports derived from a company's published financials.  The court cannot conclude that this information was already reflected in the price of Gentiva's securities.  In line with many district courts to have addressed this issue, the Court finds that the fact that Gentiva's stock price dropped after these announcements belies such a conclusion.

For this reason, the announcement of the investigations may qualify as partial disclosures for purposes of loss causation.

**b.  Disappointing Earnings Announcements**

Second, the Plaintiff alleges that Gentiva's earnings releases dated July 20, 2010 and August 4, 2011 also qualify as partial disclosures of securities fraud.  In response to this position, the Defendants contend that an announcement that a company earned less than expected cannot constitute a corrective disclosure.  See In re Initial Public Offering Sec. Litig., 39j9 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005).  On the other hand, the Plaintiff attempts to circumvent this

precedent by asserting that Gentiva's negative earnings announcements revealed that the

company curtailed their fraudulent conduct as a result of regulatory scrutiny of its business

practices.

The Court ultimately agrees with the Defendants that neither of the earnings

announcements contain any disclosure of the alleged fraud, despite reporting reductions in full-

year revenue guidance and earnings expectations.  Speculation will not suffice to link the

explanations actually given in the disclosures—the softness in home health episodic volumes and

new regulatory requirements—and Gentiva's allegedly fraudulent billing.

The Plaintiff points out that this Court previously stated that "Gentiva's announcement on

August 4, 2011 of its second quarter 2011 financial results and revised guidance were done in the

context of the earlier disclosure of the Senate Finance Committee's investigation" and that the

"statements regarding 'new regulations' and 'difficult operating conditions' cannot be viewed in

a vacuum".  Thus, the Court ruled that there was a sufficient basis to find that LACERS could

serve as lead plaintiff even though it sold most of its stock before the final disclosure of

Gentiva's alleged fraud, because there were adequate allegations of prior partial disclosures of

Gentiva's troubles.  However, the Court was careful to note that this determination was made

"for purposes of the appointment of a lead plaintiff."  In re Gentiva Secs. Litig., 281 F.R.D. 108,

116 (E.D.N.Y. 2012).  The Court is not wed to this decision.

For this reason, the Court now finds that these disappointing earnings announcements

may not qualify for purposes of loss causation.

### c.  SFC Report

Finally, the Plaintiff claims that the SFC Report is another example of a partial disclosure

sufficient to demonstrate loss causation.  The Plaintiff states in general terms that the SFC Report

revealed Medicare fraud at Gentiva.  To the contrary, the Defendants argue that the SFC did <u>not</u> make this conclusion, but instead determined only that Gentiva's practices "at best represent abuses of the Medicare home health program" and "at worst may be examples of for-profit companies defrauding the Medicare home health program at the expense of taxpayers."  Thus, the Defendants contend that the Report merely found the risk or potential for fraud at Gentiva, which is insufficient.

For the same reasoning explained above with regard to the announcements of the governmental investigations, the Court similarly finds that the Report itself may qualify as a partial corrective disclosure.  While the Defendants seek to minimize the findings in the Report and characterize them as mere risk or potential for fraud, the Court has already ruled that a finding of actual misconduct is not required.

In sum, the Court finds that two of the three alleged partial corrective disclosures are sufficient to plead loss causation and thus the Defendants' motion to dismiss for failure to plead this requisite is denied.  Nevertheless, because the Plaintiff has failed to adequately plead scienter, its claims pursuant to Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, are dismissed.

### C.  <u>As to Whether the Plaintiffs States a Claim Under Section 20(a) of the 1934 Act</u>

In addition to the primary count addressed above, the Plaintiff alleges a variety of secondary liability claims.   First, the Plaintiff alleges control person liability under Section 20(a) of the Exchange Act.

To state a claim for control person liability under Section 20(a) of the Exchange Act, a plaintiff must show "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a

culpable participant in the primary violation." <u>Boguslavsky v. Kaplan</u>, 159 F.3d 715, 720 (2d Cir. 1998) (quotation marks omitted).  The Defendants' main argument for dismissal of this claim is that if the primary claim fails, so too must the secondary liability claim.  In addition, they note that the Plaintiff has not sufficiently alleged that the Individual Defendants acted with the requisite scienter to plead culpable participation.

The Court finds that the Plaintiff has failed to state a primary violation under Section 10(b).  Also, the Plaintiff has not sufficiently alleged that the Individual Defendants acted with the requisite scienter, so that it cannot establish control person liability under Section 20(a).  For this reason, the Section 20(a) claim is dismissed.

**D.  <u>As to Whether the Plaintiff Lacks Standing to Assert a Claim under Section 11 of the 1933 Act</u>**

The Plaintiff also alleges a violation of Section 11 of the Securities Act of 1933, which provides that if "any part of [a] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security" may sue.  15 U.S.C. § 77k(a).  Counts III and IV of the complaint assert violations of the Securities Act in connection with Gentiva's offering of $325 million of 11.5% Notes.  In the Defendants' motion to dismiss, they raise several arguments with regard to the Plaintiff's claim for recovery under Section 11 of the 1933 Act.  First, they take issue with whether the Plaintiff has standing to raise this claim, and second, they argue that the Plaintiff has failed to state a claim for relief pursuant to this provision.

As in every case that appears before this Court, Article III of the Constitution requires a plaintiff to have standing in order to maintain a lawsuit.  To establish standing, a plaintiff must allege (1) personal injury, (2) that is fairly traceable to the defendant's allegedly unlawful

conduct, and (3) is likely to be redressed by the requested relief.  Allen v. Wright, 468 U.S. 737, 751, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984).  Further, to satisfy constitutional standing requirements, a plaintiff must allege, *inter alia*, that it has suffered an "injury in fact" which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

In addition, and particularly relevant to the case at hand, a plaintiff seeking to represent a class must be a member of the class he purports to represent.  See Bailey v. Patterson, 369 U.S. 31, 32–33, 82 S. Ct. 549, 7 L. Ed. 2d 512 (1962) (citing McCabe v. Atchison, T. & S.F.R. Co., 235 U.S. 151, 162–63, 35 S. Ct. 69, 59 L. Ed. 169 (1914)); Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch., 660 F.2d 9, 17 (2d Cir. 1981).  "Because a plaintiff cannot claim a personal injury in connection with a security he did not purchase, he 'lacks standing to sue on claims arising from . . . offerings which he did not purchase.'"  In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d at 368 (quoting N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., No 08 Civ. 5653, 2010 WL 1473288, at *3 (S.D.N .Y. Mar. 29, 2010)).

The general rule is that a plaintiff seeking to assert a securities fraud claim must be either a purchaser or seller of the securities at issue.  Further, a plaintiff must have purchased securities that are traceable to the allegedly misleading registration statement.  See Barnes v. Osofsky, 373 F.2d 269, 273 (2d Cir. 1967) ("[A]n action under § 11 may be maintained only by one who comes within a narrow class of persons, i.e. those who purchase securities that are the direct subject of the prospectus and registration statement.") (quotation marks and citation omitted).

Under the Section 11 claim, the Plaintiff alleges that there were material misrepresentations and/or omissions of material fact in the Registration Statements filed with the SEC on October 21 and 27, 2010 on Form S-4 (the "Registration Statements") and Prospectus

dated November 18, 2010 (the Registration Statements and Prospectus are collectively referred to as the "Offering Documents") in connection with Gentiva's offering of $325 million in 11.5% Notes (the "Offering"). Thus, the claim is brought pursuant to Section 11 of the Securities Act, on behalf of all purchasers of Gentiva 11.5% Notes in or traceable to the Offering. According to the complaint, class members purchased securities issued under or traceable to Registration and were damaged as a direct and proximate result of the untrue statements and omissions in the Registration Statements.

The issue presented here is that while the Los Angeles City Employees' Retirement System ("LACERS") asserts a claim on behalf of all persons that purchased Gentiva securities in connection with the Offering, it itself does not allege that it actually purchased any of the 11.5% Notes. Thus, the Defendants argue that the Plaintiff has not established that it has suffered any injury in connection with the Offering, so that the Section 11 claim must be dismissed.

In response, the Plaintiff implicitly acknowledges that it was not the purchaser of any 11.5% Notes. Nevertheless, it argues that it "unquestionably has alleged a personal injury traceable to Defendants' allegedly unlawful conduct that similarly affected purchasers of both Gentiva common stock and 11.5% Notes. (Pl. Opp. at 39.) However, as the Plaintiff itself notes, the Section 11 claims are "separate from and expressly disclaim the Complaint's fraud allegations." (Pl. Opp. at 38.) Standing to assert one cause of action does not necessarily lead to the conclusion that there is also standing to assert a separate cause of action, even if both claims stem from the same allegedly unlawful conduct. Comer v. Cisneros, 37 F.3d 775, 788 (2d Cir. 1994) ("For federal courts to have jurisdiction over any of these claims, only one named plaintiff need have standing with respect to each claim."). Cf. Gortat v. Capala Bros., Inc., No. 07 Civ. 3629, 2010 WL 1423018, at *4 (E.D.N.Y. Apr. 9, 2010) ("If potential class members allege the

same injury as a named plaintiff, *i.e.*, an invasion of the same legal right, caused by the same conduct, then the named plaintiff has standing to bring claims on their behalf in a class action. There is no requirement that the precise factual circumstances of each class plaintiff's claim be shared by a named plaintiff.").

As one court recently noted "the reason that purchasers of securities from different offerings lack standing to represent each other's claims is because each offering represent[s] a separate act of alleged misconduct by the Defendants, causing separate harm." Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co., 862 F. Supp. 2d 322, 334 (S.D.N.Y. 2012). "In standing terms, the 'injury in fact' that a plaintiff suffers when it purchases securities based on a particular misstatement of a defendant is not 'fairly traceable' to other, unrelated alleged misstatements by the same defendant." Id. Standing is essentially offering based. See, e.g., In re Lehman Bros. Securities and ERISA Litig., 684 F. Supp. 2d 485, 491 (S.D.N.Y. 2010) (holding that the named plaintiff lacked standing to sue on behalf of purchasers in other offerings because "plaintiffs have not alleged any injury traceable to the Certificates in those offerings"). More importantly, the language of Section 11 specifically requires that a plaintiff acquire the security in order to sue. See In re Morgan Stanley Info. Fund Secs. Litig., 592 F.3d 347, 358 (2d Cir. 2010) ("To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering . . ."). The Defendants' attempt to recover from this fatal defect is to argue that that it could likely identify a purchaser of Gentiva 11.5% Notes and to create a subclass of note purchasers. The Court is not persuaded that this would alleviate the concerns with regard to standing.

Therefore, the Court agrees that the Lead Plaintiff here lacks standing to sue pursuant to Section 11 of the 1933 Act. For this reason, this claim is dismissed with prejudice.

61

**E.** **As to Whether the Plaintiff States a Claim Under Section 11 of the 1933 Act**

The Defendants contend that even assuming arguendo that the Plaintiff has standing to sue under Section 11, the complaint nevertheless fails to state a claim under this provision.

**1.   Sounding in Fraud**

First, the Defendants argue that the Plaintiff's Section 11 claim sounds in fraud and thus must comply with the pleading requirements of Rule 9(b), but fails to do so.  Specifically, the Defendants contend that the complaint does not contain allegations of scienter or recklessness in order to meet the heightened pleading requirements.  The reason put forth by the Defendants as to why the claim sounds in fraud is that the allegations underlying both the 1934 and 1933 claims are nearly identical and because these types of allegations are classically associated with fraud.

There is no question that because fraud is not an element of a Section 11 claim, a plaintiff generally is not subjected to the heightened pleading requirements of Rule 9(b).  However, certain circuits have held that if a Section 11 claim sounds in fraud, the plaintiff must abide by Rule 9(b) and thus plead facts with sufficient particularity.  See, e.g., Shaw, 82 .3d at 1222–23 ("[i]t is the allegation of fraud, not the 'title' of the claim that brings the policy concerns [underlying Rule 9(b) ] . . . to the forefront.").  "[T]here is no bright line rule to determine when allegations sound in fraud."  Lenartz v. Am. Superconduct Corp., 879 F. Supp. 2d 167, 188 (D. Mass. 2012); see In re Wachovia Equity Secs. Litig., 753 F. Supp. 2d at 374 ("determining whether Securities Act claims sound in fraud necessarily requires a case-by-case analysis of particular pleadings") (internal citation omitted).

Nevertheless, courts have looked at the following to indicate that a Section 11 claim sounds in fraud: (1) the complaint contains merely a blanket disclaimer that the plaintiffs do not allege fraud for the purposes of the Securities Act claims; (2) the allegations themselves include

classic fraud language; (3) the complaint does not show any basis for the claims that is non-fraudulent; and (4) the plaintiffs do not separate the factual allegations supporting the fraud claims and negligence claims, but rather require the courts to parse the complaints.  See, e.g., Rombach v. Chang, 355 F.3d 164, 171–72 (2d Cir. 2004) (holding that the allegations sounded in fraud because the plaintiffs made only a blanket disclaimer, while the gravamen of the complaint was based on fraud; the allegations utilized words "classically associated with fraud"; and no non-fraudulent basis was put forth for the Securities Act claims).

Here, the Complaint does include disclaimers stating, "For the Securities Act Claims there is no allegation of fraud, scienter or recklessness and these claims do not incorporate any of the allegations contained in Section III" and "For purposes of this claim, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct."  (Compl. ¶¶ 291, 323.).  See In re JP Morgan Chase Secs. Litig., 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) ("[p]laintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness.").  On the other hand, the complaint does contain certain separate factual allegations pertaining only to the Securities Act Claims, which are structurally separate from the rest of the complaint.  (See Compl. ¶¶ 300–21.); In re Wachovia, 753 F. Supp. 2d at 374 ("Although the Court cannot characterize the Equity Complaint as 'carefully structured,' . . . Plaintiffs have nonetheless attempted to draft a separable two-part complaint").  Nevertheless, these factual allegations largely reiterate the company's 10-Q filings, with one paragraph which states:

> The statements alleged in paragraphs 300-19 contained untrue statements of material facts and/or omitted material facts required to be stated in order to make the statements contained therein not misleading because, at the time of the Offering: i) Gentiva, in violation of Medicare standards and regulations, sought reimbursement from Medicare for medically unnecessary services and that Gentiva's reported financial results, including reported increases in revenue and

profit margins (specifically revenue per episode and margins per episode) failed to disclose that such results were materially and artificially inflated and the product of the Company's violation of Medicare standards and regulations; ii) that Gentiva's compliance program was materially defective; and iii) the SOX Certifications signed by Strange and Slusser failed to disclose that Gentiva's disclosure controls and procedures and internal control over financial reporting were materially defective because they allowed Gentiva to report financial results that were based on reimbursements from Medicare for medically unnecessary services.

(Compl. ¶ 320.)  These allegations are nearly identical to those asserted in connection with the securities fraud cause of action.  The complaint does not go beyond a "pro forma repudiation of a fraud theory", especially because the pleading takes no care to truly separate the scienter allegations in a distinct section of the complaint.  City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 424 (S.D.N.Y. 2011).  Indeed, the complaint is not carefully structured so as to draw a clear distinction between the negligence and fraud claims, as the defendants' intentions are not couched in negligence language nor is a no-fraudulent basis provided.  In sum, even though the Plaintiff does separate out the factual allegations supporting the fraud claims and negligence claims, the complaint contains a blanket disclaimer that the plaintiffs do not allege fraud for the purposes of the Securities Act claims; the allegations largely parrot the fraud allegations; and the complaint does not show any basis for the claims that is non-fraudulent.  For these reasons, the Court finds that the Section 11 claim sounds in fraud.

The Court's finding is further buttressed by an additional consideration.  As the Second Circuit has held, the wording of the complaint is "classically associated with fraud" if there are accusations that the registration statement was "inaccurate and misleading," that it contained "untrue statements of material fact," and that "materially false and misleading statements" were released.  Rombach, 355 F.3d at 172 (emphasis omitted).  Here, the Plaintiff uses this precise

fraud-type language, stating that the filings at issue contained "untrue statements of material facts and/or omitted material facts required to be stated in order to make the statements contained therein not misleading." (Compl. ¶ 320.)  Although this notion has been criticized, see, e.g., In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) ("the mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently or innocently made) does not make it fraudulent"), it is still worth noting.

Therefore, the Court finds that the Plaintiff here has failed to "specifically [plead] alternate theories of fraud and negligence." In re Refco, 503 F. Supp. 2d at 633.  It has not made it easy to distinguish between the two and the substance of the allegations have not kept the distinction clear, even if the complaint's structure technically separates them.  Accordingly, the Securities claims must satisfy Rule 9(b).  With this in mind, the Court now finds that the Plaintiff has failed to comply with Rule 9(b) with regard to the Section 11 claim, because it expressly disclaims all allegations of scienter and recklessness.  The Defendants' motion to dismiss the Section 11 claim is therefore granted.  Normally when a court is faced with a § 11 claim that sounds in fraud but fails to meet the requirements of Rule 9(b), it will dismiss the claim with leave to replead a § 11 claim based on negligence or strict liability.  However, here, that repleading would be futile in light of the standing issues.  Therefore, the dismissal of this claim is with prejudice.

### 2.  Materially False or Misleading Statements or Material Omissions

The Defendants also contend that similar to the claims under Section 10-b, the Plaintiff has not sufficiently alleged that any of the challenged disclosures were materially false or misleading for purposes of its claims under the 1933 Act.  The Plaintiff alleges that the Bond Offering documents at issue for these claims contained "untrue statements of material facts and

omitted material facts" by failing to disclose that Gentiva "violat[ed] Medicare standards and regulations," and that its "compliance program was materially defective." (Compl. ¶¶ 325, 320.)

The Court now finds that, in accordance with its earlier determinations, statements concerning the rigor of Gentiva's compliance program may not qualify as material misstatements or omissions but any statements concerning Gentiva's compliance with Medicare standards and regulations may constitute actionable misstatements and/or omissions. Therefore, the 1933 Act claims may proceed, at least as to a portion of the alleged misstatements contained in the complaint.

### 3. Exchange

The next issue raised by the Defendants' motion to dismiss the 1933 Act claims concerns the argument that even if the Offering Documents were false or misleading, purchasers in the Bond Offering cannot establish that any of the alleged misstaements or omissions were material because the transaction was a mere exchange.

To provide some more detail with regard to the Offering, it allowed Gentiva holders of unregistered bonds to exchange their bonds for registered bonds. The company offered an exchange up to $325,000,000 aggregate principal amount of registered 11.5% Senior Notes due 2018, or the "New Notes", for a like principal amount of its outstanding, unregistered 11.5% Senior Notes due 2018, or the "Original Notes". To be clear, the terms of the New Notes were substantially the same as the terms of the Original notes, except that the New Notes were registered under the Securities Act of 1933. This transaction is known as an "Exxon Capital" exchange. This transaction was, according to the Defendants, contemplated by the terms of a prior private placement.

Specifically, in a private placement on August 17, 2010, Gentiva entered into a registration rights agreement where it agreed to complete a registered exchange offer for the Original Notes. Thus, the Defendants assert that these unregistered bondholders likely knew at the time of their purchase that they would eventually make the exchange for registered bonds when possible because registered bonds are more freely tradable and thus more valuable. Accordingly, the Defendants contend that the registration statement should not be considered a basis for an investment decision because the bondholders likely made their investment decisions before the issuance of the registration statement. In support of this contention, the Defendants cite to a decision from the Northern District of Alabama, in which the court stated that "[e]very court that has addressed this issue . . . has agreed that plaintiffs who acquired registered bonds through a voluntary 144A/ Exxon Capital exchange are precluded from asserting claims under Section 11." In re Healthsouth Corp. Secs. Litig., 261 F.R.D. 616, 647 (N.D. Ala. 2009).

Section 11 appears to "create[] a presumption that 'any person acquiring such security' was legally harmed by the defective registration statement." APA Excelsior III L.P. v. Premiere Techs., Inc., 476 F.3d 1261, 1271 (11th Cir. 2007). "[A]s a matter of law and logic . . . plaintiffs should be entitled to no recovery when it can be established with certainty that they were not harmed in any way by the relevant misrepresentations." In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 634 (S.D.N.Y. 2007). However, while it is certainly possible that the investment decision here was already made at the time that class members purchased the unregistered bonds, so that the decision could not have possibly been affected or impelled by the registration statements, the looming issue here is that this exchange was merely contemplated, not mandated. Cf. id. ("[c]ompletion of the mandated exchange was the performance of a ministerial act.").

Indeed, the terms of the Prospectus appear clear that this exchange was a voluntary one, and one that unregistered bondholders could choose to participate in.  (See Pl. Ex. 9.)  This is highly distinguishable from <u>APA Excelsior</u>, 476 F.3d 1261, 1275–76, where the Eleventh Circuit concluded that where plaintiffs had made a binding and irrevocable commitment to purchase the relevant investments prior to the issuance of the registration statement, there could be no liability under § 11.  <u>See In re Refco</u>, 503 F. Supp. 2d at 635 ("Section 11's presumption of reliance is rebutted, in other words, where the plaintiffs were *irrevocably* committed to purchase the securities before the registration statement issued") (emphasis added).

Thus, as in <u>In re Refco</u>, it cannot be said with certainty that the purchasers lacked the power or authority to back out of the Exxon Capital exchange.  Indeed, the prospectus appears to indicate that this power or authority existed.  As nothing in the Plaintiff's allegations suggest that the purchasers were irrevocably committed to the Exxon Capital exchange, and because the Defendants have pointed to no language in the relevant documents suggesting otherwise, the Court finds that there is at least a question of fact as to whether the Bond Registration Statement could have had any impact on their decision to participate in the Exxon Capital exchange.  "Defendants point out that the unregistered bondholders allegedly decided to buy the unregistered bonds specifically because they understood that the bonds would be exchanged for registered bonds.  Alleging that plaintiffs had made a decision, however, is not the same as alleging that they had entered into a commitment."  <u>Id.</u> at 635.  Further, if a class member purchased Gentiva's 11.5% Notes on the public market, it is possible that they made their decision based upon the alleged false and misleading registration statement, so that these claims would not be dismissed.

Thus, this argument for dismissal of the Section 11 claim is without merit.

**4. Timeliness**

Next, the Defendants argue that the one year statute of limitations began to run on the date of the bond offering—December 16, 2010—and thus expired on December 16, 2011, which is before the filing of the instant complaint on April 16, 2012.  However, the Plaintiff asserts that several class actions were filed between July and October 2011 on behalf of Gentiva's investors, which fell within the one year statute of limitations, and that these complaints were consolidated by this Court on November 2, 2011.  (See DE 25.)  Accordingly, the Plaintiff claims that it is the originally-filed class complaints that are imperative for purposes of statute of limitations, rather than the operative complaint.  In particular, the Plaintiff argues that the initial complaints provided notice that the proposed class included purchases of Gentiva's publicly traded 11.5% Notes, and this would toll the statute of limitations.

The Court agrees with the Defendants that while allegations contained in the original complaints would be timely, any new allegations contained in the amended consolidated class action complaint that the Defendants were *not* put on notice of would be untimely.  Contrary to the Plaintiff's assertion, this Court never expressly expanded the proposed class beyond purchasers of common stock in its November 2, 2011 Order.  In addition, none of the complaints contained any allegations concerning the Offering.  Thus, these initial complaints did not provide notice to the Defendants that the proposed class included purchasers of Gentiva common stock as well as purchasers of Gentiva's publicly traded 11.5% Notes, which would arguably toll the statute of limitations.  For this reason, the Court agrees that the Plaintiff's Section 11 claims are time-barred.  Consequently, on this additional ground, the Defendants' motion to dismiss the Section 11 claims is granted and they are dismissed with prejudice.

### 5. Damages

Finally, the Defendants contend that because the Offering was an Exxon Capital exchange, it cannot establish damages because the transaction involved two sets of identical bonds. The Plaintiff has failed to respond to this argument. The Court agrees with the Defendants' position and concludes that damages cannot be established, at least as to those who made an exchange as opposed to buying the 11.5% Notes on the open market. For this additional reason, the Section 11 claims are dismissed.

### F. As to Whether the Plaintiff States a Claim Under Section 15 of the 1933 Act

As a final matter, the Defendants argue that the Plaintiff has failed to state a claim under Section 15 because it has failed to allege a primary violation under Section 11. In light of the Court's findings above, the Defendants are correct that the Section 15 claim is also dismissed.

### G. Leave to Amend

Although the 1933 Act claims have been dismissed with prejudice on several grounds, the Court must determine whether the Plaintiff should be given leave to re-file its complaint in accordance with this decision with regard to the 1934 Act claims.

A plaintiff subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) is generally allowed "at least one opportunity to plead fraud with greater specificity," ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d at 108, and "it is within the sound discretion of the district court to grant or deny leave to amend," McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007). Here, the Plaintiff has requested leave to re-plead should the Court grant the Defendants' motion to dismiss. The Plaintiff has not yet had an opportunity to amend its complaint since this case has been consolidated and a new lead plaintiff appointed, Cf. ATSI, 493 F.3d at 108, and the Court believes that the complaint's shortcomings with regard to scienter

70

could be cured by an amendment.  <u>See Masters v. GlaxoSmithKline</u>, 271 Fed. App'x 46, 51 (2d Cir. 2008).  Therefore, the Plaintiff shall have thirty days from the date of this Decision and Order to file an amended complaint in accordance with the Court's rulings set forth above.

### III. CONCLUSIONS

For the foregoing reasons, it is hereby

**ORDERED**, that the Defendants' motion to dismiss the Complaint in its entirety is granted; and it is further

**ORDERED**, that the Plaintiff shall have thirty days from the date of this Decision and Order to file an amended complaint in accordance with the Court's rulings set forth above.


**SO ORDERED.**

Dated: Central Islip, New York
March 25, 2013

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge