FILED
CLERK

9/19/2013 11:29 am

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

IN RE GENTIVA SECURITIES LITIGATION

**MEMORANDUM OF**
**DECISION AND ORDER**
10-cv-5064 (ADS)(WDW)

--------------------------------------------------------X

**APPEARANCES:**

**Kaplan Fox & Kilsheimer LLP**
*Attorneys for the Plaintiff Los Angeles City Employees' Retirement System*
850 Third Avenue, 14th Floor
New York, NY 10022
      By:    Frederic S. Fox, Esq.
              Joel B. Strauss, Esq.
              Laurence D. King, Esq.
              Justin B. Farar, Esq.
              Jeffrey P. Campisi, Esq., of Counsel

**Weil, Gotshal & Manges LLP**
*Attorneys for the Defendants Gentiva Health Services, Inc., Ronald A. Malone, H. Anthony*
*Strange, John R. Potapchuk, Eric R. Slusser*
767 Fifth Avenue
New York, NY 10153
      By:    Joshua S. Amsel, Esq.
              Stefania D. Venezia, Esq.
              Matthew E. K. Howatt, Esq.
              John A. Neuwirth, Esq., of Counsel

**SPATT, District Judge.**

The present case is a consolidated securities fraud class action brought on behalf of a class consisting of all persons or entities that purchased the publicly traded securities of Gentiva Health Services**,** Inc. ("Gentiva") between July 31, 2008 and October 4, 2011.  The complaint was filed by the Lead Plaintiff the Los Angeles City Employees' Retirement System (the "Plaintiff" or "LACERS").

On March 25, 3013, the Court dismissed the Plaintiff's original consolidated class action complaint in its entirety. See In re Gentiva Sec. Litig., 2013 WL 1200334 (E.D.N.Y. 2013)(Spatt, J.). In particular, the Court dismissed with prejudice the Plaintiff's claims under §§ 11 and 15 of the Securities Act of 1933 (the "1933 Act"). The Court also dismissed without prejudice the Plaintiff's claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b-5 promulgated thereunder. See 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b–5.

On May 10, 2013, the Plaintiff filed an amended consolidated class action complaint. On June 24, 2013, the Defendants moved to dismiss the amended consolidated class action complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") and the Private Securities Litigation Reform Act ("PSLRA") of 1995, 15 U.S.C. § 78u-4(b)).

For the following reasons, the motion is granted in part and denied in part.

## I. BACKGROUND

### A.  Factual Background

Familiarity with the facts of this case is presumed. However, by way of background, the following facts are drawn from the original consolidated class action complaint and construed in a light most favorable to the Plaintiff.

#### 1.  The Parties

The Defendant Gentiva is a home health care provider corporation with its principal headquarters in Atlanta, Georgia. The Individual Defendants are current and/or former directors and/or officers of the company. The Defendant Ronald A. Malone previously served as Gentiva's Chief Executive Officer from June 2002 until December 2008, and as Chairman of the

Board of Directors until May 2011.  The Defendant H. Anthony Strange served as Gentiva's President beginning in 2007, and served as its Chief Operating Officer from November 2007 through May 2009.  Strange then became the company's Chief Executive Officer in January 2009, and its Chairman in May 2011.  The Defendant John R. Potapchuck served as Gentiva's Chief Financial Officer and Treasurer until May 2010.  He was succeeded in May 2010 by Eric R. Slusser, who currently serves as the company's Chief Financial Officer, Treasurer, and Executive Vice President.

    2.  <u>The HH PPS</u>

The Social Security Act requires that for patients to be eligible for home health benefits such as nursing care, the beneficiaries must be homebound and there must be a medical necessity for the services that are provided.  Medicare pays for these home health services through a prospective payment system or "PPS."  Under this home health prospective payments system (the "HH PPS"), a home health service provider is paid in advance for a substantial portion of the total payment to which they are entitled to for a given patient.  These payments are based on things such as "a predetermined rate schedule established by Medicare," as well as "a pre-treatment assessment of the given patient's condition and proposed plan of care during a 60-day time period." (Compl. ¶ 28.)  Gentiva is one such home health provider that receives payments from Medicare through the HH PPS.

According to the Defendants, both federal regulations and Medicare's Policy Manual make clear that independent physicians, as opposed to the home health provider itself, direct and oversee the billing process.  In other words, a patient will only receive treatment after a physician prescribes a home health plan of care, which includes: the type of services to be provided; the professional who will provide the services; the nature of the individual services; and the

frequency of the services.  See 42 C.F.R. §409.43(b) ("The physician's orders for services in the plan of care must specify the medical treatments to be furnished as well as the type of home health discipline that will furnish the ordered services and at what frequency the services will be furnished.").  In addition, any changes in the plan of care must be approved by a physician.  See id. at § 409.43(c).

On the other hand, the Plaintiff claims that Gentiva had near absolute discretion to dictate the terms and frequency of patient care in order to achieve particular "bonus" thresholds.  The Plaintiff alleges that Gentiva played a critical role in determining how much money Medicare would pay for its services after a physician prescribed a home health plan.  In this regard, the Plaintiff alleges that after a physician prescribed a home health plan of care, a Gentiva nurse or therapist assessed the patient's condition and needs at the beginning of each episode of care.  As part of this assessment, a form was completed entitled the Outcome and Assessment Information Set ("OASIS"), which detailed a patient's condition and expected therapy needs.  This information was used to classify patients in accordance with a classification system known as the "case-mix adjustment" to adjust payments for home health services under the PPS.  This system was developed by the Centers for Medicare and Medicaid Services ("CMS").  Accordingly, the OASIS was utilized to determine how much money Medicare ultimately paid Gentiva for its services.  The Plaintiff alleges that the proper completion of the OASIS by Gentiva – not the physician – was a key and critical factor in determining how much Gentiva would be paid for its services by Medicare.

The above described system is prospective, hence it was a prospective payment system.  Gentiva would generally receive an upfront payment from Medicare of approximately sixty

percent of the estimated payment entitlement.  However, the final payment was ultimately based on the actual number of visits provided to the patient.  (Compl. ¶ 34.)

Prior to and through 2007, the HH PPS provided an additional payment or "bonus" of up to $2,200 if Gentiva provided a patient with ten therapy visits in connection with one individual's treatment cycle, otherwise known as an "episode."  However, in 2008, this "bonus" threshold was modified and the new thresholds became six, fourteen, and twenty therapy visits per treatment cycle.  As a result, Gentiva could potentially obtain higher payments from Medicare if the number of patient visits reached these new thresholds.

Also relevant is that the thresholds needed to be reached within each sixty-day episode period, which is the time period covered by the physician's initial proposed plan of care.  Gentiva would determine after the initial episode of care whether to "recertify" a patient for an additional episode of care.  According to the Plaintiff, re-certifications increased the company's profits because less paperwork was associated with these patients.

In light of the HH PPS and the modified threshold levels for Medicare reimbursement, the Plaintiff alleges that in order to increase revenues and margins per episode, Gentiva's managers and clinicians were pressured by senior executives to provide patients with medically unnecessary visits and services in order to reach the enhanced payment thresholds from Medicare.

### 3.  Former Gentiva Employees As Confidential Witnesses

The original consolidated class action complaint is largely based upon interviews with former Gentiva employees, including managers and clinicians.  The allegations from most of these former employees appear in the complaint as those of confidential witnesses ("CWs").  According to the Plaintiff, these former employees describe how Gentiva executives knew of and

themselves applied pressure on Gentiva managers and clinicians, through periodically scheduled and ad hoc meetings, emails, and conference calls, to violate Medicare rules in order to increase Medicare payments.  Specifically, these executives are alleged to have urged employees (1) to provide medically unnecessary visits to patients in order to reach the thresholds required by Medicare to receive bonus payments (Compl. ¶¶ 52–61); (2) to wrongfully "upcode" in order to increase a patient's "case-mix weight"; (3) to recertify patients for added episodes of care even if additional visits were not medically necessary (Compl. ¶¶ 56–60); (4) to manipulate OASIS forms to increase reimbursement from Medicare (Compl. ¶¶ 53–61); (5) to wrongfully manipulate diagnostic codes in order to generate the greatest reimbursement from Medicare (Compl. ¶¶ 59–60); and (6) to provide medically unnecessary services to increase Medicare reimbursement revenuees and margins (Compl. ¶¶ 52–61).  The allegations by the CWs were as follows:

- CW1, a Physical Therapist, was an Orthopedics Director at Gentiva from April 2004 until May 2010, and played a supervisory role over certain branch offices.  CW 1 stated that throughout the Class Period, either by way of periodic meetings and/or emails, he/she was subjected to pressure from supervisors—an "Area Vice President" (Area VP) and a "Regional Vice President" (Regional VP)—to increase the number of patient visits provided in order to hit the next highest enhanced Medicare reimbursement threshold, regardless of the patients' medical needs.  CW 1 left Gentiva because of the "threshold pressure."  (Compl. ¶ 53.)
- CW2 was Director of Gentiva's Las Vegas, Nevada branch office from July 2006 through April 25, 2010.  From at least January 2010 until this CW's resignation, CW 2 felt frequently pressured by an Area VP to either pressure clinicians to provide medically unnecessary visits to patients to meet the budget projections and/or to pressure clinicians under CW 2's supervision to increase case mix weights assigned to patients in a way that would result in increased payments from Medicare.  In April 2010, CW 2 resigned from Gentiva, primarily because of what CW 2 believed to be undue pressure to engage in improper business practices.  (Compl. ¶ 54.)
- CW3 was the former Branch Director of Gentiva's Albuquerque, New Mexico Office from 2007 through 2010, and was under the same regional direction as CW2.  CW 3 believes that periodic comments made to him/her by an Area VP were intended to put pressure on CW 3 to increase revenue for the

6

Albuquerque branch by providing medically unnecessary services.  This is the same Area VP who allegedly pressured CW2.  (Compl. ¶ 55.)

- CW4, a nurse employed by Gentiva from February 2008 through October 2009, was the manager of Clinical Practice during that time period.  CW 4 described being subjected to pressure from superiors to meet the enhanced Medicare payment thresholds of 6, 14 or 20 visits and noted how this was often referred to internally as "hitting the magic numbers."  CW4 also alleges that during weekly teleconference calls with his/her immediate supervisors and certain unidentified Gentiva executives, he/she was regularly instructed by superiors to relay the message to clinicians that "they were not putting in enough therapies," and that they needed to increase the number of patient visits, which CW 4 interpreted to mean the provision of unnecessary services. (Compl. ¶ 56.)

- CW5 was employed as a Compliance Specialist at Gentiva from December 2002 through May 2009.  CW5 assisted with various internal audits and was also responsible for handling "first line screening" of incoming calls to the Company's compliance hotline.  CW 5 recalled receiving several calls in the 2008 to 2009 time-frame from Gentiva employees from the upstate New York area that felt they were being asked by management to add or provide treatments to patients that were not needed and that at least one therapist described as "not ethically correct."  CW5 passed these complaints along to an individual named Margo Nemet, who in turn reported to the Company's Chief Compliance Officer.  (Compl. ¶ 57.)

- CW6 was a nurse who worked at Gentiva's Binghamton, New York branch from January 2010 through September 2011.  CW6 alleges to have been frequently pressured by her supervisors to complete initial OASIS forms in a way that would result in a higher need for home health services than a patient actually needed and would therefore result in higher payments to Gentiva from Medicare.  CW6 allegedly told his/her Branch Manager that he/she was uncomfortable with patient assessment and Medicare billing practice instructions, and it was CW6's "understanding" that the Branch Manager shared these concerns with unidentified senior Gentiva management.  (Compl. ¶ 58.)

- CW7 was also a nurse who worked at Gentiva's Binghamton, New York branch from January 2009 through August 2011.  CW7 alleges that his/her supervisor, Gentiva's Area Director of Clinical Operations, would ask CW 7 to improperly modify OASIS forms in a way that would result in medically unnecessary services being provided to patients in order to increase Medicare revenue, and also to press clinicians under CW 7's supervision to push for enough visits to patients to hit the next highest enhanced Medicare payment threshold, regardless of the patients' needs or even the patients' desires for such treatment.  The types of wrongful pressures were often exerted through informal discussions between Gentiva management and branch managers and clinicians.  However, according to CW7, it was also exerted through and during more formal and periodic in person and/or telephone meetings during which data listed in various periodic reports was discussed.  In June 2011, CW

> 7 called Gentiva's internal compliance hotline to complain about Gentiva
> clinicians being unduly pressured to provide patients with unnecessary visits
> and/or therapies.  CW 7 sent a resignation letter to his/her supervisor in which
> CW 7 noted that the reasons for CW 7's resignation included the belief that
> the Company exerted continuous pressure on employees to put finances over
> patient care.  (Compl. ¶ 59.)

The Plaintiff also references allegations from two identified individuals.  Former Gentiva employee Holly McComas is a registered nurse who was employed by Gentiva as a case manager at its Charleston, West Virginia branch beginning in 2007.  She alleges that notwithstanding the fact that she was the person who made the intake assessment for patients in OASIS, she was not permitted to code for the diagnoses and treatments related to her assessments.  Instead, this coding was done by the manager of clinical practice at that branch office, which McComas would then write in her own handwriting.  In many instances, McComas believed she was being required to write the codes on the forms in a manner that maximized reimbursement from Medicare rather than being truly reflective of the patients' medical conditions and/or that the number of visits being entered on the OASIS were not medically necessary.  In addition, during her tenure at Gentiva, McComas regularly observed practices aimed at pressuring physical therapists employed by Gentiva to continue physical therapy notwithstanding that the patient had reached maximum medical improvement.  Finally, on January 22, 2010, McComas placed a telephone call to Gentiva's Regional Director of Human Resources to complain about fraudulent Medicare billing practices at Gentiva's Charleston branch. (Compl. ¶ 60.)

The Plaintiff also references allegations from Kim Shah, a Registered Nurse, who began working for Gentiva on or about February 12, 2001 as a manager of clinical practices at the Charleston, West Virginia branch, and was then promoted to director of clinical practices and later to branch director.  According to Shah, employees were regularly told by Gentiva's

Regional VP during weekly conference calls that anyone over 65 needed more than 12 therapy

visits, and that such therapy should be provided as a matter of course.  Shah further related that

she was regularly subjected to pressure by this Regional VP and unidentified others at periodic

meetings to try to get clinicians in the office to increase the number of visits to patients so as to

obtain enhanced payment thresholds from Medicare, even if such visits were not medically

necessary.

    4.   <u>Alleged Misrepresentations</u>

During the Class Period, the Defendants repeatedly represented in SEC filings and other

public statements that Gentiva was "in compliance" with Medicare "standards and regulations".

Furthermore, Gentiva also represented that it maintained a "robust" and "best-[in]-class"

compliance department. (Compl. ¶ 181.) In addition, Gentiva represented to its investors that its

revenues, including its growing profit margins per episode – a metric closely observed by

investors – were being legitimately earned.  However, according to the Plaintiff, a series of

partial disclosures revealed the risks concerning Gentiva's business.

    5.   <u>The SFC and SEC Investigations</u>

On May 13, 2010, the Wall Street Journal reported that "the [U.S. Senate Finance

Committee or] SFC launched an investigation into the practices of companies that provide in-

home therapy visits reimbursed by Medicare, including Gentiva." (Compl. ¶ 248.)  Further, on

July 13, 2010, Gentiva disclosed that the U.S. Securities and Exchange Commission ("SEC")

had also commenced an investigation relating to Gentiva's participation in the HH PPS.

On October 3, 2011, after a seventeen month investigation, the SFC released a Report on Home

Health and the Medicare Therapy Threshold (the "SFC Report").  The SFC examined the home

health therapy practices of each of the four largest publicly-traded home health companies.  The

Plaintiff alleges that the SFC found, based on nonpublic data provided to it by Gentiva, that when Medicare changed the number of visits required for home health care providers to receive bonus payments in 2008 from ten visits to six, fourteen, and twenty visits, there was a statistically significant drop of twenty-five percent in the number of patients Gentiva provided with ten visits, and at the same time, a statistically significant increase of up to thirty-one percent in the number of Gentiva patients who were suddenly receiving 6, 14, and 20 visits.

Further, the SFC Report describes certain emails and documents that, according to the Plaintiff, demonstrate that the statistical shift was not an accident.  For example, multiple internal email exchanges among senior Gentiva executives, including the Defendant Strange, make clear that in the months leading up to and subsequent to the January 1, 2008 changes in therapy thresholds, the Defendants were attempting to ascertain how the changes would impact the Company's revenue and earnings, as well as how they could increase Medicare revenues in light of the new system.

One particular email emphasized by the Plaintiff – and the only communication directly involving one of the Individual Defendants – was from Perri Southerland of Gentiva's Finance Department to Defendant Strange.  This communication stated that as a follow-up to a discussion they had, Southerland performed an analysis which thought of a way for Gentiva to increase it's per episode reimbursements by $350 to $550 under the new Medicare threshold requirements.  It was made clear that the goal was to reach the six visit threshold for enhanced Medicare payments.  As the Plaintiff points out, the medical needs of the patients were not mentioned as a factor in the analysis.

In response to these allegations, the Defendants maintained that the SFC did not conclude that Gentiva and its senior management caused Gentiva's employees and clinicians to seek

reimbursement from Medicare for medically unnecessary services in direct violation of Medicare standards and regulations.  In this regard, the original consolidated class action complaint did not contain any allegation that the SEC or any other governmental or regulatory agency has instituted any action or proceeding alleging wrongdoing arising from Gentiva's participation in the HH PPS.

**B.  <u>Procedural Background</u>**

On January 27, 2012, the Court granted LACERS' motion to be appointed as lead plaintiff in this action pursuant to 15 U.S.C. § 78u-4(a)(3)(B), as amended by the Private Securities Litigation Act of 1995.  The Court also granted the motion by LACERS for the appointment of Kaplan Fox & Kilsheimer LLP as lead counsel.  A consolidated class action complaint was filed by LACERS on April 16, 2012.  Thereafter, on June 15, 2012, the Defendants filed a motion to dismiss for failure to state a claim.

On March 25, 2013, the Court granted the Defendants' motion to dismiss the original consolidated class action complaint in its entirety.  In particular, the Court dismissed the Plaintiff's 1933 Act claims with prejudice for lack of standing and for failure to state a claim.

The Court observed that to state a claim under Section 10(b) of the 1934 Act and Rule 10b-5 for misrepresentations, "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."  (Memorandum and Order, at 15.)(quotation marks and citations omitted)

As to the materially false or misleading statements or material omissions, the Court

held that Gentiva's representations in its financial results and SED filings that its revenues and margins were growing, and that Gentiva was complying with Medicare standards and regulations, were pleaded with sufficient particularity.  However, the Court held that statements made by Gentiva executives that Gentiva had a "robust" compliance program that was "best-[in]-class" constituted corporate puffery rather than actionable misrepresentations.  Similarly, the Court concurred with the Defendants that their Sarbanes-Oxley certifications could not constitute a misstatement or omission for purposes of Rule 10b-5 liability.

The Court further found that two of the three alleged partial corrective disclosures were sufficient to plead the element of loss causation.  In this respect, the Court agreed with the Defendants that neither of Gentiva's negative earnings announcements could qualify for purposes of loss causation.  Nonetheless, the Court accepted, as a basis for loss causation, the SFC Report and the fact that Gentiva's stock price dropped after the announcements that the SFC launched an investigation into the practices of companies that provide in-home therapy visits reimbursed by Medicare, including Gentiva.  The Court "reject[ed] the idea that the disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure."  (Id. at 54.) In the Court's view,

> [t]o embrace this notion would be to preclude any type of action such as this, where there has been no conclusive finding of fraud by a government agency, or a criminal charge initiated, or a formal corrective disclosure by the defendant. Here, there are factual allegations of fraudulent conduct, and at this stage of the litigation, the Court must accept these factual allegations. To preclude this suit on the basis that there has been no previous actual disclosure of fraud from sources such as whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, or newspapers, misses the mark. The inherent veracity of the information is the paramount concern and the form that it takes it not as critical. To find that the Plaintiff can only succeed here if there is something exposed that is more than a possibility or probability or indicator of fraud is too narrow a view.

(Id. at 54.)

However, the Court held that the Plaintiff failed to adequately plead scienter on the part of the Individual Defendants or Gentiva.

First, the Court held that the Plaintiff failed to allege sufficient circumstantial evidence of conscious misbehavior or recklessness.  In this regard, the court noted that the Plaintiff referenced a number of Gentiva internal documents and emails which, according to the Plaintiff, "demonstrate that in the months leading up to Medicare's changes in the number of visits required for enhanced payments, Gentiva's top executives were apprised of these changes and more importantly, how Gentiva could take advantage of these changes." (Id. at 27.)  In the Court's view, these communications did not suffice, in and of themselves, to establish scienter because they did not "demonstrate a leap in logic from legal behavior – increasing therapy visits in a medically necessary way in order to maximize profits – to illegal behavior – increasing therapy visits in ways that are not medically necessary in order to maximize profits." (Id. at 29.)

The Court next addressed the accounts of the Confidential Witnesses ("CWs") who shared concerns "that they were being subjected to pressure from their direct supervisors to increase the number of patient visits provided in order to hit the next highest enhanced Medicare reimbursement threshold, regardless of the patients' medical needs." (Id. at 31.)  The Court acknowledged that the CWs

> [we]re described with sufficient particularity so that the person in each respective position would have the information that each CW purports to have. The CWs' positions are all amply described, including their title, responsibilities, and duration of employment. In addition, the CWs explain the basis for their allegations, namely the pressure and directives from various supervisors, both by expressly naming these supervisors and by providing the mode through which these mandates occurred.

(Id. at 34.)  Further, the Court noted that the fact that the CWs emanated from

ranks and different geographies supported a finding of scienter.

However, the Court concluded that the "Plaintiff's allegation that the Executive Defendants tolerated [or encouraged medically unnecessary therapy visits for financial gain] is conclusory because [the] Plaintiff does not plead that any of the Executive Defendants were even aware of the practice." (Id. at 35-36.)  In this regard, the Court determined that the Individual Defendants' "[k]nowledge of the company's number of therapy visits and corresponding profits 'does not equate to harboring a mental state to deceive, manipulate, or defraud.'" (Id. at 37.)(citation omitted).

Second, the Court reasoned, the Plaintiff failed to sufficiently point to the Individual Defendants' potential motives and opportunity to engage in fraudulent behavior.  In this respect, the Court considered the Plaintiff's contention that the Individual Defendants were motivated to engage in wrongful conduct in order to sell inflated Gentiva securities and to raise capital so that it could acquire another company called Odyssey.  The Court held that absent factual allegations regarding the net profits or the timing of these sales, the Plaintiff failed to sufficiently allege motive and opportunity for the Individual Defendants to engage in wrongful behavior.  The Court also rejected the Plaintiff's allegation that the Individual Defendants were motivated to commit fraud in order to acquire Odyssey, particularly because the transaction "occurred over a small subset of time as compared to the lengthy class period." (Id. at 45.)

In addition, the  Court found no basis to impute scienter to Gentiva, and thus no basis for corporate liability, reasoning that "the complaint contains[ed] no allegations as to whether these other unnamed employees were acting within the scope of employment or if there is any other basis to impute their scienter to the employer." (Id. at 47.)

14

The Court further held that the Plaintiff, having failed to plead a primary violation under section 10(b) of the 1934 Act, could not state a secondary liability claim under section 20(a).

However, the Court indicated that it believed "the complaint's shortcomings with regard to scienter could be cured by an amendment." (Id. at 70-71.)  Therefore, as to the 1934 Act claims, the Court afforded the Plaintiff leave to file an amended consolidated class action complaint.

On May 10, 2013, the Plaintiff filed an amended consolidated class action complaint, amending only those allegations relevant to the element of scienter.  The newly-added allegations will be described in greater detail later.  The amended consolidated class action complaint again asserts claims against all named defendants for violations of Section 10(b) of the 1934, and Rule 10b–5, arising thereunder.  The amended consolidated class action complaint also alleges that each of the Individual Defendants violated Section 20(a) of the 1934 Act, thus rendering them jointly and severally liable for damages.  To the extent the Plaintiff re-asserts the 1933 Act causes of action, those claims are dismissed with prejudice in accordance with the Court's original Memorandum and Order.

On June 24, 2013, the Defendants moved to dismiss the amended consolidated class action complaint for failure to state a claim.  Because the Court has previously found that the Plaintiff adequately pleaded actionable false and misleading statements and loss causation for purposes of the 1934 Act claims, this Memorandum and Order will only address whether the Plaintiff has adequately plead scienter on the part of the Individual Defendants and Gentiva as a corporate entity, and potential liability of the Individual Defendants under Section 20(a) of the 1934 Act.

C.  **Other Pending Cases**

In addition, it is important to note that nearly identical actions have been commenced against three other publicly-traded health providers, Almost Family, Inc. ("Almost Family"), Amedisys, Inc. ("Amedisys"), and LHC Group, Inc. ("LHC") in the U.S. District Courts for the Western District of Kentucky, the Middle District of Louisiana, and the Western District of Louisiana, respectively. See In re Almost Family, Inc. Sec. Litig., 10 Civ. 00520 (W.D. Ky.); Bach v. Amedisys, Inc., 10 Civ. 00395 (M.D. La.); City of Omaha Police and Fire Ret. Sys. v. LHC Grp., Inc., 12 Civ. 01609 (W.D. La.).  On February 10, 2012, the Almost Family court dismissed the complaint in that action with prejudice.  On June 28, 2012, the Amedisys court dismissed the complaint in that action.  On April 9, 2013, a motion for reconsideration in the Amedisys action was denied.  Meanwhile, on March 15, 2013, the LHC court denied the defendants' motion to dismiss.  However, on May 23, 2013, the LHC court granted the defendants' motion to certify an interlocutory appeal on the issue of loss causation.

## II. DISCUSSION

A. **Legal Standard**

Under the now well-established Twombly standard, a complaint should be dismissed pursuant to Fed. R. Civ. P. Rule 12(b)(6) only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U .S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929, 570 (2007).  The Second Circuit has explained that, after Twombly, the Court's inquiry under Rule 12(b)(6) is guided by two principles.  Harris v. Mills, 572 F.3d 66 (2d Cir. 2009) (citing Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)).

"First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" Id. at 72 (quoting Iqbal, 129 S. Ct. at 1949).  As explained by the Second Circuit, "[i]n considering a motion to dismiss a 10(b) action, we must accept all factual allegations in the complaint as true and must consider the complaint in its entirety." Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010); see Tellabs, Inc. v. Makor Issues & Rights, 551 U.S. 308, 127 S. Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007) ("faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true").

"'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss' and '[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Iqbal, 129 S. Ct. at 1950).  Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and . . . determine whether they plausibly give rise to an entitlement of relief." Iqbal, 129 S. Ct. at 1950.  This plausibility standard is applicable to securities fraud pleadings.  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (observing that to survive 12(b)(6) dismissal, securities fraud plaintiffs "must provide the grounds upon which [their] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level'") (quoting Twombly, 127 S. Ct. at 1965).  The issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Todd v. Exxon Corp.,

275 F.3d 191, 198 (2d Cir. 2001) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

Of particular importance here, "[a] complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Federal Rule of Civil Procedure 9(b) by stating with particularity the circumstances constituting fraud."  Slayton, 604 F.3d at 766.

## B.  Scienter

In order to state a claim under Section 10(b) and Rule 10b-5, the complaint must provide "particular allegations giving rise to a strong inference of scienter" – "that the defendant acted with the required state of mind." ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009) (internal quotation marks omitted).  The "requisite state of mind" in 10b–5 claims is "'intent to deceive, manipulate, or defraud.'" Tellabs, 127 S. Ct. at 2504 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)).  "Recklessness" also suffices.  ECA, 553 F.3d at 198. Accordingly, in order to satisfy the pleading requirements of § 10(b) and Rule 10b–5 with respect to scienter, the plaintiff may "alleg[e] (1) [facts] showing that the defendants had both motive and opportunity to commit the fraud; or (2) [facts] constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99.  "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."  Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (internal citation omitted).

The element concerning "motive and opportunity to defraud" requires a showing that the defendants "benefitted in some concrete and personal way from the purported fraud."  Novak v.

18

Kasaks, 216 F.3d 300, 307–08 (2d Cir.), cert. denied, 531 U.S. 1012, 121 S. Ct. 567, 148 L. Ed. 2d 486 (2000).  But see id. at 311 ("Although litigants and lower courts need and should not employ or rely on magic words such as 'motive and opportunity,' we believe that our prior case law may be helpful in providing guidance as to how the 'strong inference' standard may be met.").  Interestingly, the motives "that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation," do not establish the requisite scienter.  Id.  Typically, a plaintiff must show that officers made false statements in order to sell their own shares at a profit. Id. "Sufficient motive allegations must entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."  In re SLM Corp. Sec. Litig., 740 F. Supp. 2d 542, 557 (S.D.N.Y. 2010).  Plaintiffs must allege a "unique connection between the fraud and the [benefit]."  ECA, 553 F.3d at 201 n.6.

Alternatively, if a plaintiff pleads scienter under the "strong circumstantial evidence" prong, he or she must "specifically allege [the] defendants' knowledge of facts or access to information contradicting their public statements."  Novak, 216 F.3d at 308.  Further, "[w]here plaintiffs contend [that] defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  Id. at 309 (internal citation omitted); accord ECA, 553 F.3d at 198 (under the alternative "strong circumstantial evidence" prong, circumstances that "may give rise to a strong inference of the requisite scienter" include allegations that defendants "engaged in deliberately illegal behavior," or "knew facts or had access to information suggesting that their public statements were not accurate," or "failed to check information that they had a duty to monitor") (internal citation omitted).

"Regardless of the manner in which a plaintiff attempts to plead scienter, at the end of its evaluation, this Court must be convinced that the inference of scienter is at least as compelling as any competing inferences." Fort Worth Employers' Ret. Fund v. Biovail Corp., 615 F. Supp. 2d 218, 225 (S.D.N.Y. 2009) (internal quotation marks omitted).  With regard to the strength of the inference, the inference of scienter must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc., 127 S. Ct. at 2504–05.  Thus, the Supreme Court has held that the PSLRA's strong inference standard is satisfied "[w]hen the allegations are accepted as true and taken collectively . . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference[.]" Tellabs, 551 U.S. at 326; see also Akerman v. Arotech Corp., 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009) ("When the competing inferences rest in equipoise, the 'tie . . . goes to the plaintiff.'") (quoting City of Brockton Ret. Sys. v. Shaw Group Inc., 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008)).  As the PSLRA requires, a complaint must "state with particularity facts giving rise to a strong inference" of scienter for each defendant. 15 U.S.C. § 78-u4(b)(2).

The Second Circuit has clarified these pleading requirements in light of the passage of the PSLRA and explained that a court need not obstinately tie itself to the ideas described above. Rather, district courts are encouraged to look at a variety of factors and keep in mind how other courts have approached the issue of scienter in the securities fraud context.  However, generally speaking, the inference of scienter "may arise where the complaint sufficiently alleges that the defendants: (1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." South Cherry St. LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009).  The

20

court "must assess 'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" Local No. 38 Int'l Bhd. Of Electrical Workers Pension Fund v. Am. Express Co., 724 F. Supp. 2d 447, 458 (S.D.N.Y. 2010) (quoting Tellabs, 551 U.S. at 323, 127 S. Ct. 2499).

      i.      As to the Allegations of Scienter Against the Individual Defendants

The Plaintiff has made several factual allegations that potentially constitute circumstantial evidence of conscious misbehavior or recklessness as well as allegations concerning the Defendants' motive and opportunity to commit the fraud. The Court will assess all of the Plaintiff's allegations with regard to scienter, keeping in mind that the Court must take a holistic approach to the analysis.

      a.      Conscious Misbehavior or Recklessness:  Internal Documents and Emails
              And Confidential Witnesses

The amended consolidated class action complaint repeats the references to a number of Gentiva internal documents and emails uncovered by the SFC which, the Plaintiff contends, supports an inference of scienter. The Plaintiff also points to what it refers to as the "Parting Comments Email," which was cited in the SFC Report. This email was sent to the Defendant Strange on May 3, 2010 from a Gentiva Physical Therapist and Orthopedics Director, Confidential Witness 1, which states, in part, that this individual has "see[n] the push to treat by metrics not by what the patients need . . . Treating by numbers is also making the clinicians feel their professional judgment is questioned. Again, not sitting on plateaus is understandable but pushing to thresholds based on what their diagnosis is, not by what the patient needs is just wrong."

The Court previously discounted the importance of these emails on the basis that these communications did not suffice, in and of themselves, to establish scienter because they did not

"demonstrate a leap in logic from legal behavior – increasing therapy visits in a medically necessary way in order to maximize profits – to illegal behavior – increasing therapy visits in ways that are not medically necessary in order to maximize profits."  (Memorandum and Order, at 29.)  However, the Court acknowledged that "[t]hese emails may be relevant to the Plaintiff's attempts to set forth a coherent and sufficiently cogent scienter narrative in light of other circumstantial evidence." (Id. at 30.)  In this regard, the Court commented that "while the emails in this case are not conclusive of scienter, they may be part of a bigger picture that when viewed in a timeline, paints a compelling inference of scienter." (Id. at 31.)

Here, in addition to repeating the allegations contained in the original consolidated class action complaint, the Plaintiff alleges that Monica Hullinger, Gentiva's Regional Vice President for the Mid-Atlantic Region, and other Gentiva Executives were aware of two anonymous letters Hullinger received in January 2010 reporting a culture of fraud at Gentiva's Charleston, West Virginia Branch.  (Amended Consol Class Action Compl. ¶ 63.)  One letter discussed instructions that "management expects us . . .  to attain the golden number of twenty . . ." and expressed the view that Gentiva's "business model" was "[i]ncreasing the therapy skilled visits when it's not really called for . . ." (Id.) The second letter, dated January 15, 2010, complained of various directives by management to engage in improper conduct and further complained that "[w]e now have a meeting every Monday at 8:30A.M. so therapists and assistants can be informed how to better defraud Medicare." (Id.)  The Plaintiff alleges that, shortly after receipt of these two letters, Edwina Simpson, Gentiva's Assistant Vice President of Human Resources for the region, met with employees of the Charleston office and thereafter reported to Hullinger that several of the employees she met with did, indeed, raise concerns about Medicare fraud taking place at the office. (Id.).

22

Similarly, the Plaintiff cites a complaint in a separate case filed by Leeveta Holstein, a former nurse at the Charleston branch.  In that complaint, Holstein alleges that Gentiva managers engaged in "upcoding" and altering patients charts in order to increase Medicare reimbursements.  Holstein also alleged that she and other Gentiva employees complained to Gentiva management in February 2010 about the pattern and practice of Medicare fraud at Gentiva's Charleston branch. (Id. at ¶ 62.)

These allegations only concern alleged events at a single Gentiva branch in Charleston, West Virginia and therefore do not speak to a company-wide corporate culture.  As to Holstein's allegations, "Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ.  P. 12(f)." RSM Prod. Corp. v. Fridman, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) (citation omitted.)

In any event, these allegations do little to build upon the allegations in the original consolidated class action complaint because none of them establish, as they must, that the Individual Defendants "knew or had access to information showing that Gentiva was pressuring its staff to provide as many therapy visits as possible to receive extra Medicare payments without consideration of patients' needs." (Memorandum and Order, at 21.)  The Individual Defendants are still "[not] alleged to have knowledge of or access to contemporaneous information that would show that their representations were false." (Id.).

To be sure, "the Court's view of scienter is not confined to these communications but rather is influenced by a holistic approach."  (Id. at 30.) Accordingly, the Court will assess the other allegations supporting an inference of scienter.

Indeed, the original consolidated class action complaint, and now the amended consolidated class action complaint, contain accounts from certain confidential witnesses ("CWs") which generally concern a number of low-level employees who had the impression and/or belief that they were being subjected to pressure from their direct supervisors to increase the number of patient visits provided in order to hit the next highest enhanced Medicare reimbursement threshold, regardless of the patients' medical needs.

As noted above, the Court credited these accounts insofar as the CWS were described with sufficient particularity so that the person in each respective position likely would have had the information that each CW purported to have.  Further, the Court acknowledged that the CWs were from different ranks and from different geographies, thereby supporting a company-wide inference of scienter.  However, the Court observed:

> The main issue with regard to the CW allegations, and one that is potentially fatal, concerns whether the CWs' accounts sufficiently allege that executives at the company—namely the Individual Defendants—knew or had access to information showing that Gentiva was pressuring its staff to provide as many therapy visits as possible to receive extra Medicare payments without consideration of patients' needs.  In other words, the Court must assess whether there are allegations that the CWs were privy to the Individual Defendants' knowledge or had direct contact with the Individual Defendants, such that the Individual Defendants are alleged to have knowledge of or access to contemporaneous information that would show that their representations were false.

(Id. at 36).  In the Court's view, the "Plaintiff's allegation that the Executive Defendants tolerated [or encouraged medically unnecessary therapy visits for financial gain] [wa]s conclusory because [the] Plaintiff does not plead that any of the Executive Defendants were even aware of the practice." (Id.).

In the amended consolidated class action complaint, the Plaintiff introduces the allegations of a former Regional Director of Clinical Operations for Gentiva's Western Region ("CW 8").  CW 8 was employed by Gentiva from approximately January 2010 until July 2012

and, during the relevant time period, reported to John Aurelio, Gentiva's Regional Vice President for the Western Region.  With regard to pressure being asserted on lower level managers and clinicians by senior management to satisfy enhanced Medicare payment thresholds that required 6, 14, or 20 visits, CW 8 recalled that at one particular regularly scheduled regional meeting of executives and managers from the Western Region in 2010, Aurelio, in the presence of various Gentiva executives and managers, told CW 8 something to the effect – "do not tell me that if you can provide 13 visits, you cannot do 14 visits."

However, the amended consolidated class action complaint continues to fail to tie the scienter allegations to any Individual Defendant. See Campo v. Sears Holdings Corp., 371 F. App'x 212, 217 (2d Cir. 2010) (finding that scienter was not alleged where a confidential witness "had no knowledge of whether [the individual defendants] actually accessed or reviewed the reports."); In re Citigroup Inc. Sec. Litig., 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) (holding "[f]atal to plaintiffs' claims[,]" a failure to allege that confidential witnesses presented information to individual defendants); Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) ("Plaintiffs should, but do not, provide specific instances in which Defendants received information that was contrary to their public declarations."); City of Brockton Ret. Sys. v. Shaw Group Inc., 540 F.Supp.2d 464, 472–74 (S.D.N.Y. 2008) (no inference of scienter where the Plaintiffs failed to allege individual defendants were provided with contradictory information); cf. LHC, 2013 WL 1100819 at *4 (W.D. La. Mar. 15, 2013)(finding inference of scienter alleged where the individual defendant Chief Executive Officer allegedly "repeatedly signed certifications attesting that he personally reviewed and evaluated LHC's internal controls").

Each of the CWs, including the new CW 8, are all former Gentiva branch and other clinicians.  The Defendants assert that the CWs were all many levels removed from them and the Plaintiffs do not allege anything to the contrary.

Indeed, the "Plaintiffs allege no direct contact between [the] CW[s] and Defendants," rendering their scienter allegations insufficient as a matter of law. In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 358 (S.D.N.Y. 2011); see also In re Am. Express Co. Sec. Litig., No. 02 Civ. 5533(WHP), 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008) (discounting allegations where Plaintiffs "failed to allege any facts showing that the confidential sources . . . had any contact with the Individual Defendants"); Local No. 38 IBEW Pension Fund v. Am. Express Co., 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (same).  In this regard, the newly-added allegations, considered separately and with the original allegations, fail to remedy the deficiencies in the original consolidated class action complaint previously identified by the Court.  Neither the anonymous letters nor the Holstein lawsuit is alleged to have been addressed or provided to any of the Individual Defendants; the Plaintiff does not allege that any of the Individual Defendants are named in the Holstein lawsuit, or involved in the wrongdoing alleged therein.

Even viewing the allegations of scienter as a whole, the Plaintiff has not alleged sufficient circumstantial evidence of conscious misbehavior or recklessness, and so the amended consolidated class action complaint fails to allege a strong inference of scienter based on this theory.  Accordingly, the Plaintiff will not be permitted to present this theory at the trial.

b.   <u>Motive and Opportunity: The Defendants' Sales of Gentiva Securities</u>

Having failed to allege facts constituting strong circumstantial evidence of conscious misbehavior or recklessness, the Plaintiff may still establish scienter by alleging facts to show that the Individual Defendants had both motive and opportunity to commit fraud.

There is no question that "motive can be shown . . . 'when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit.'" <u>In re Citigroup Inc. Sec. Litig.</u>, 753 F. Supp. 2d 206, 233, 2010 WL 4484650, at *22 (S.D.N.Y. Nov. 9, 2010) (quoting <u>ECA</u>, 553 F.3d at 198).   "However, the mere fact that insider stock sales occurred does not suffice . . . , [instead] [p]laintiffs must establish that the sales were 'unusual' or 'suspicious.'" <u>In re Gildan Activewear, Inc. Sec. Litig.</u>, 636 F. Supp. 2d 261, 270 (S.D.N.Y.  2009) (internal quotation marks and citation omitted).

"Whether trading was unusual or suspicious turns on factors including (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5–1 plans." <u>Glaser v. Theo, Ltd.</u>, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011).

A plaintiff alleging motive and opportunity in connection with stock sales must allege not only the defendants' selling activity during the class period, but also the defendants' net profits rather than their gross proceeds, in addition to the overall percentage changes in the defendants' holdings. <u>See</u> <u>In re eSpeed</u>, 457 F. Supp. 2d at 290 ("The Complaint also omits necessary information concerning (1) the percentage increase in each defendants' holdings during the class

period; and (2) the profit from defendants' sales.  In particular, plaintiffs plead that Amaitis and Noviello realized 'gross proceeds' of $2.8 million, but the Complaint does not disclose whether either made any profit from the sales.").

In the original consolidated class action complaint, the Plaintiff contended that the Defendants were motivated to engage in the wrongful conduct in order to sell inflated Gentiva securities.  The Plaintiff stated that the Defendants Malone, Potapchuk, and Strange respectively sold 98%, 96%, and 28% of the Gentiva shares they acquired during the Class Period for proceeds of $3.1 million, $3.2 million, and $756,712.  (Compl. ¶¶ 19-21, 276.) However, the Court held that Plaintiff failed to allege the net profits as opposed to reaped "proceeds."  The Court also observed that the original consolidated class action complaint, as is required to properly allege motive and opportunity, made no mention of "the change in volume of the insider Defendant's sales; whether sales occurred soon after statements the Defendants are alleged to know to be misleading; whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and whether sales were made pursuant to trading plans such as Rule 10b5–1 plans." (Memorandum and Order, at 43.)  The Court noted that while there appeared to be a high volume of trading activity, absent factual allegations regarding the net profits or timing of the sales, the Plaintiff failed to sufficiently allege motive and opportunity based on trading activity.

                  i.   <u>As to Slusser</u>

In the amended consolidated class action complaint, Slusser is not alleged to have sold any Gentiva during the Class Period. <u>In re eSpeed. Securities Litigation</u>, 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006) ("the dispositive factor is that other insiders, including the other two individual defendants, did not sell during the putative class period").  The fact that (1) Slusser

was not required to publicly report his transactions in Gentiva common stock until he became the Chief Financial Officer and (2) a material portion of his shares were restricted and not vested does not absolve the Plaintiff of its obligation to make the requisite allegations regarding "unusual or suspicious" trading activity. Accordingly, the Court finds that the Plaintiff has failed to allege an inference of scienter as to Slusser based on motive and opportunity to commit fraud.

### ii.     As to Strange

During the Class Period, Strange allegedly acquired 109,608 Gentiva shares through the exercise or conversion of stock options and he sold 31,078 Gentiva shares at artificial prices for proceeds of approximately $756,712. Strange allegedly did not purchase any Gentiva shares in the open market. In November and December 2010, about six months after Strange received the Parting Comments Email, Strange allegedly sold 25,000 Gentiva shares at an average price of $24.84 per share.

However, the Plaintiff still fails to allege Strange's net profits during the Class Period. In fact, Strange actually increased his Gentiva holdings by the end of the Class Period, thereby negating any inference of scienter. See In re Bristol–Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (defendants' increase in company holdings during class period was "wholly inconsistent with fraudulent intent"). Accordingly, the Court finds that the Plaintiff has failed to raise an inference of scienter as to Strange based on motive and opportunity.

### iii.     As to Malone

In the amended consolidated class action complaint, the Plaintiff alleges that at the beginning of the Class Period, Malone held 15,357 shares of Gentiva common stock. It also alleges that during the Class Period, Malone acquired 146,775 Gentiva shares through the exercise or conversion of stock options at an average price of approximately $11.02 per share,

and he sold approximately 99% of his shares (145,018 shares) at artificially inflated prices and at an average price of $21.02 per share, for gross proceeds of approximately $3.1 million, and "net proceeds" of approximately $2.14 million.   According to the Plaintiff, in the six months leading up to the May 13, 2010 disclosure of the Senate Finance Committee investigation, Malone sold 63,018 at artificially inflated prices between $23 and $30.  During the Class Period, Malone allegedly did not purchase any Gentiva shares on the open market.  By the end of the Class Period, Gentiva's stock apparently crashed, closing at $3.02 per share on October 3, 2011, a decline of approximately 90% from the Class Period high of approximately $30 per share.

The Defendants contend that Malone did not exercise and continued to hold hundreds of thousands of vested options at the end of the Class Period.  The Plaintiff counters that it is unremarkable that Malone continued to hold hundreds of thousands of stock options at the end of the Class Period because all of them were below the exercise or strike price – the fixed price at which the owner of the option can buy or sell the underlying security or commodity -- and therefore were "under water."  Under these circumstances, the Court finds that it is at least as plausible as any other inference that Malone did not exercise his options and sell more Gentiva stock because to do so would have required Malone to pay to exercise underwater stock options.

The Defendants also argue that the Plaintiff's allegations fail to establish that the "sales occurred soon after statements the Defendants are alleged to know to be misleading." (Memorandum and Order, at 43.)  Indeed, timing is more typically an indicia of fraud where sales occur shortly after insiders allegedly learn undisclosed adverse information or made affirmative misrepresentations, see, e.g., Stevelman v. Alias Reseearch Inc., 174 F.3d 79 (2d Cir. 1999); Ressler v. Liz Claiborne, Inc, 75 F. Supp. 2d 43, 60 (E.D.N.Y. 1998) ("[T]he Court concludes that the stock sales at issue, being remote in time from any misstatements and in

amounts that do not necessarily support a claim of fraud, were not unusual or suspicious and therefore do not demonstrate that defendants had a motive to commit fraud."), or shortly before corrective disclosures are made in the market, see, e.g., In re Keyspan Corp. Securities Litigation, 383 F. Supp. 2d  358, 385 (E.D.N.Y. 2003)(finding that two-month gap between sales and public statement disclosing problems was not "strongly suspicious in light of other factors weighing against an inference of fraud"); In re Oxford Health Plans, Inc., Secs. Litig., 187 F.R.D. 133, 139 (S.D.N.Y. 1999) ("In late August 1997, two months before the devastating October 27, 1997 press release and in the midst of a NYSID investigation that was eventually going to reveal Oxford's accounting irregularities and internal control deficiencies, all of the Individual Defendants except Sullivan sold shares of Oxford common stock for aggregate profits of approximately $33,000,000.  The timing of these trades is 'suspicious' enough, along with the other evidence, to support a strong inference of scienter.").

Furthermore, the fact that Slusser is not alleged to have sold any Gentiva stock during the Class Period cuts against a finding of scienter as to Malone. See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 814 (2d Cir. 1996) (noting that the failure of some individual defendants to sell stock during class period undermined the plaintiffs' allegations that any defendant intended to inflate stock for personal profit); Acito v. IMCERA Group, 47 F.3d 47, 54 (2d Cir. 1995) ( "The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit.") (quotation and citation omitted). Accord In re Scholastic Corp. Securities Litigation, 252 F.3d 63, 75 (2d Cir. 2001) ("the failure of other defendants to sell their stock undermined the plaintiffs' theories that negative information was withheld to obtain a higher sell price."); In re Glenayre Techs., Inc.

Sec. Litig., No. 96 Civ. 8252, 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998) (concluding that inference of scienter from some defendants' stock sales was undermined when CEO and other top officers did not sell stock during class period: "Certainly, one can assume that these high-ranking corporate officers . . . would be part of any fraudulent scheme to benefit from insider information through pre-emptive stock sales.  The absence of sales from these individuals, then, suggests that . . . trading by [other] defendants does not give rise to a strong inference of scienter."); re Health Mgmt. Systems, Inc. Sec. Litig., No. 97 Civ. 1965, 1998 WL 283286, at *6 n. 3 (S.D.N.Y. June 1, 1998) (single individual defendant's sales of eighty-two percent of holdings not unusual when six other individual defendants' sales comprised only between three and twenty-five percent of each's individual holdings),

Nonetheless, given the allegations regarding the "net proceeds" and volume of trading activity by Malone, the Court find that these allegations support a compelling inference of scienter as required based on a theory of motive and opportunity.  In re SLM, 740 F. Supp. 2d at 558 (sufficiently unusual when individual defendant "dumped nearly all of his shares during the Class Period.").  In the Court's view, this inference is at least as compelling any competing, nonculpable inference.

iv.    <u>As to Popatchuk</u>

In the amended consolidated class action complaint, the Plaintiff alleges that, during the Class Period, Potapchuck acquired 120,505 shares through the exercise or conversion of options at an average price of approximately $11.97 per share.  He also allegedly sold approximately 96% of his shares (115,883 shares) at artificially inflated prices, and at an average price of $27.17 per share for gross proceeds of approximately $3.2 million, and "net proceeds" of $1.8 million.  Potapchuck allegedly did not purchase any Gentiva shares on the open market.

32

According to the Plaintiff, in the six months leading up to the May 13, 2010 disclosure of the Senate Finance Committee investigation, Potapchuck sold 95,883 Gentiva shares at artificially inflated prices between $23 and $30 per share.

It is true that the timing of stock sales six months before announcement of a government investigation is not "unusual" where, as here, there is no allegation that the Individual Defendants could foresee the government's actions. In re Axis Capital Holdings Ltd. Sec. Litig., 456 F. Supp. 2d 576, 595 (S.D.N.Y. 2006) ("Moreover, the timing of the Secondary Offering – six months in advance of the filing of the AG Complaint – does not suggest a motive to commit fraud."); Ressler, 75 F. Supp. 2d at 60 (timing of stock sales six months before release of negative information "does not suggest that defendants meant to realize profits immediately prior to an expected and dramatic fall in the stock's price").

Further, the Defendants assert that many of the stock sales by Potapchuck were made pursuant to 10b5-1 plans or other contractual arrangements. "[I]t is well-established that trades under [a] 10b–5–1 plan do not raise a strong inference of scienter." Glaser, 772 F. Supp. 2d at 592 (quoting In re Gildan Activewear, Inc. Sec. Litig., 636 F.Supp.2d 261, 272 (S.D.N.Y. 2009)); In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 604 (S.D.N.Y. 2007) ("Because Barton's sales were part of a periodic divestment plan [i.e., at 10b5–1 sales plan], the timing and amount of sales do not raise a strong inference of scienter."). However, that axiom does not apply where a 10b5–1 plan is entered into – or strategically amended – to take advantage of an inflated stock price or insider information. See In re CRM Holdings, Ltd. Secs. Litig., No. 10 Civ. 975, 2012 WL 1646888, at *25 (S.D.N.Y. May 10, 2012) (discussing In re Countrywide Fin. Corp. Derivative Litig., 554 F. Supp. 2d 1044 (C.D. Cal. 2008)). Indeed, where 10b5–1 trading plans are entered into during the class period, they "are not a cognizable

33

defense to scienter allegations on a motion to dismiss." Freudenberg v. E*Trade Fin'l Corp., 712
F.Supp.2d 171, 201 (S.D.N.Y. 2011) (collecting cases).  Here, there is no allegation that the
trading plans were adopted during the Class Period.

The Plaintiff cites Freudenberg for the proposition that the existence of a trading plan
pursuant to a Rule 10b5–1 plan is an affirmative defense that cannot be considered on a motion
to dismiss. Id. ("[T]he existence of *201 a Rule 10b5–1 Trading Plan is an affirmative defense
that must be pled and proved."); In re EVCI Colleges Holding Corp. Sec. Litig., 469 F. Supp. 2d
88, 100 (S.D.N.Y. 2006)("The fact that there might be an innocent explanation for the timing of
[defendant]'s sale is not enough to defeat the inference of scienter that arises from plaintiffs'
well-pleaded allegations – which, as defendants keep forgetting, I must accept as true for
purposes of this motion to dismiss.")

These cases are at odds with Glaser, in which the Southern District noted that trades
under 10b–5 plans do not raise a strong inference of scienter, even at the pleading stage. Glaser,
772 F. Supp. 2d at 592 n. 14 (describing "the established law" of the Southern District); George
v. China Auto. Sys., Inc., 11 CIV. 7533 KBF, 2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012)(citing
Glaser for the proposition that, at the pleading stage, courts may take judicial notice of certain
Rule 10b5-1 trading plans).  In the original Memorandum and Order, the Court considered as
"not determinative" but "relevant" the fact that many of the stock sales by Strange and
Potapchuck were made pursuant to 10b-5-1 plans or other contractual arrangements.  Again, the
Court considers the existence of Rule 10b-5 plans at the pleading stage as but one relevant factor
in a holistic analysis. (Memorandum and Order, at 23.)

In the Court's view, as with Malone, the allegations regarding the "net proceeds" and
volume of trading activity by Potapchuck support an inference of scienter based on a theory of

34

motive and opportunity.  LHC, 6:12-1609, 2013 WL 1100819, at *5 (W.D. La. Mar. 15, 2013)(finding motive and opportunity on the part of individual defendant Chief Executive Officer who allegedly sold over $20 million of his personal holdings of LHC stock during the Class Period at fraudulently inflated prices).

    ii.     <u>As to Corporate Scienter</u>

With regard to the liability of the company, to plead scienter when the defendant is a corporation, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." <u>Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.</u>, 531 F.3d 190, 195 (2d Cir. 2008).  "In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant." <u>Id.</u>  However, "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." <u>Id.</u>  For example, the scienter of an employee acting within the scope of employment can be imputed to the employer. <u>See</u> <u>Vining v. Oppenheimer Holdings Inc.</u>, No 08 Civ. 4435, 2010 WL 3825722 at *12 (S.D.N.Y. Sept. 29, 2010) (citing <u>Defer LP v. Raymond James Financial, Inc.</u>, 654 F. Supp. 2d 204, 212 (S.D.N.Y. 2009)).  A strong inference of corporate scienter may also be appropriate "where a corporate statement is so important and dramatic that it 'would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.'" <u>Vining</u>, 2010 WL 3825722 at *13 (citing <u>Teamsters Local 445</u>, 531 F.3d at 196 (internal citation omitted)).

In the consolidated class action complaint, the Plaintiff contended that the allegations supported a strong inference that Gentiva itself acted with the requisite scienter because the allegations suggest that multiple executives at the company such as Area and Regional Vice

Presidents were aware of the wrongful conduct alleged in that complaint.  The Court previously

acknowledged that "it is possible that certain employees who the CWs came into direct contact

with could have had the requisite state of mind." (Memorandum and Order, at 47.)   However,

the Court declined to impute scienter to Gentiva, reasoning that "the complaint contains no

allegations as to whether these other unnamed employees were acting within the scope of

employment or if there is any other basis to impute their scienter to the employer." (Id.)

Here, the Plaintiff's conclusory allegations – e.g., "numerous management employees,

who were acting on behalf of Gentiva and whose scienter may be imputed to the Company,

either directed, knew of and/or recklessly disregarded the wrongful conduct alleged herein" (Am.

Compl. ¶ 11) – are insufficient to establish that such employees "were acting within the scope of

their employment."  However, the Court finds that corporate scienter may be inferred from the

"suspicious" insider stock sales by both Malone and Patophuck, high level executives at Gentiva.

Cf. San Leandro Emergency Med. Group Profit Sharing Plan, 75 F.3d at 813-14 & n. 14  ("[W]e

conclude that the sale of stock by one company executive does not give rise to a strong inference

of the *company's* fraudulent intent; the fact that other defendants did not sell their shares during

the relevant class period sufficiently undermines plaintiffs' claim regarding motive.")  Therefore,

the Court finds that the Plaintiff has stated a violation of Section 10(b) of the 1934 Act against

Gentiva.

**C.  As to Whether the Plaintiffs States a Claim Under Section 20(a) of the 1934 Act**

The Plaintiff also alleges "control person" liability against the Individual Defendants

under Section 20(a) of the 1934 Act.  To state such a claim, a plaintiff must show "(1) a primary

violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that

the controlling person was in some meaningful sense a culpable participant in the primary

violation." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (quotation marks omitted). "To plead control over a primary violator, a plaintiff must allege 'that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 451 (S.D.N.Y. 2005) (quoting S.E. C. v. First Jersey Sec. Inc., 101 F.3d 1450, 1472–73 (2d Cir. 1996)).  However, "[a]llegations of control are not averments of fraud and therefore need not be pleaded with particularity under Rule 9(b) or the PSLRA.  They need satisfy only the less stringent requirements of Fed. R. Civ. P. 8." Id.

The Court previously dismissed the Plaintiff's claim under Section 20(a) of the 1934 Act on the grounds that the Plaintiff failed to (1) state a primary violation under Section 10(b) or (2) adequately allege that the Individual Defendants acted with the requisite scienter.  Here, for the reasons stated above, the amended consolidated class action complaint alleges a primary violation of Section 10(b) by Gentiva, Malone, and Potapchuck.  Further, the Plaintiff has plausibly pled that Malone and Popatchuck possessed control over Gentiva, a primary violator.  Each is alleged to have held a high position as an officer and/or director of Gentiva.  Thus, the Plaintiff's § 20(a) claims are dismissed against the Individual Defendants only to the same extent as its § 10(b) claims.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED**, that the Defendants' motion to dismiss the amended consolidated class action complaint is granted (1) as to the Defendants H. Anthony Strange and Eric R. Slusser in its entirety; (2) as against the Defendants Ronald A. Malone, John R. Potapchuck, and Gentiva to the extent the Plaintiff re-asserts the 1933 Act Claims previously dismissed with prejudice in the

order dated March 25, 2013; (2) as against Malone, Potapchuck, and Gentiva to the extent the Plaintiff seeks to establish their scienter based on a theory of "conscious misbehavior and recklessness;" and it is further

**ORDERED**, that the Defendants' motion to dismiss is denied to the extent the Plaintiff seeks to establish scienter of the Defendants Malone, Potapchuk, and Gentiva based on a theory of "motive and opportunity."

**SO ORDERED.**

Dated: Central Islip, New York
September 19, 2013

___    *Arthur D. Spatt*                    _____
   ARTHUR D. SPATT
United States District Judge