FILED
CLERK

12/10/2013 2:40 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X

IN RE GENTIVA SECURITIES LITIGATION   MEMORANDUM OF
                                      DECISION AND ORDER
                                      10-cv-5064 (ADS)(WDW)

---------------------------------------------------------X

**APPEARANCES:**

**Kaplan Fox & Kilsheimer LLP**
*Attorneys for the Plaintiff Los Angeles City Employees' Retirement System*
850 Third Avenue, 14th Floor
New York, NY 10022
    By:    Frederic S. Fox, Esq.
            Joel B. Strauss, Esq.
            Laurence D. King, Esq.
            Justin B. Farar, Esq.
            Jeffrey P. Campisi, Esq., of Counsel

**Weil, Gotshal & Manges LLP**
*Attorneys for the Defendants Gentiva Health Services, Inc., John R. Potapchuk, and Ronald A. Malone*
767 Fifth Avenue
New York, NY 10153
    By:    Joshua S. Amsel, Esq.
            Stefania D. Venezia, Esq.
            Matthew E. K. Howatt, Esq.
            John A. Neuwirth, Esq., of Counsel

**SPATT, District Judge.**

Familiarity with the facts and procedural history of this case is presumed. By way of background, this is a consolidated securities fraud class action brought on behalf of a class consisting of all persons or entities that purchased the publicly traded securities of Gentiva Health Services, Inc. ("Gentiva") between July 31, 2008 and October 4, 2011. The complaint was filed by the Lead Plaintiff the Los Angeles City Employees' Retirement System (the "Plaintiff" or "LACERS"). According to the Plaintiff, Gentiva, a publicly traded health care

1

provider, artificially inflated its stock price through a scheme that involved ordering unnecessary medical care for clients, and then billing the federal government for these illegitimate expenses. The complaint further alleges that when the scheme came to light, Gentiva's stock price dropped precipitously.

The Individual Defendants originally joined are current and/or former directors and/or officers of the company. Ronald A. Malone previously served as Gentiva's Chief Executive Officer from June 2002 until December 2008, and as Chairman of the Board of Directors until May 2011. H. Anthony Strange served as Gentiva's President beginning in 2007, and served as its Chief Operating Officer from November 2007 through May 2009. Strange then became the company's Chief Executive Officer in January 2009, and its Chairman in May 2011. John R. Potapchuck served as Gentiva's Chief Financial Officer and Treasurer until May 2010. He was succeeded in May 2010 by Eric R. Slusser, who currently serves as the company's Chief Financial Officer, Treasurer, and Executive Vice President.

On March 25, 2013, the Court dismissed the Plaintiff's original consolidated class action complaint in its entirety. In re Gentiva Sec. Litig., 2013 WL 1200334 (E.D.N.Y. 2013)(Spatt, J.). In particular, the Court dismissed with prejudice the Plaintiff's claims under §§ 11 and 15 of the Securities Act of 1933 (the "1933 Act") for lack of standing and for failure to state a claim.

The Court also dismissed without prejudice the Plaintiff's claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b-5 promulgated thereunder. The Court observed that to state a claim under Section 10(b) of the 1934 Act and Rule 10b–5 for misrepresentations, "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's

2

reliance was the proximate cause of its injury." (Memorandum and Order, at 15.)(quotation marks and citations omitted).

The Court found that the Plaintiff adequately pleaded actionable false and misleading statements and loss causation for purposes of the 1934 Act claims. However, the Court held that the Plaintiff failed to adequately plead scienter on the part of the Individual Defendants or Gentiva as a corporate entity.

The Court further held that the Plaintiff, having failed to plead a primary violation under section 10(b) of the 1934 Act, could not state a secondary liability claim under section 20(a).

However, the Court indicated that it believed the complaint's shortcomings with regard to scienter could be cured by amendment. Therefore, as to the 1934 Act claims, the Court afforded the Plaintiff leave to file an amended consolidated class action complaint.

On May 10, 2013, the Plaintiff filed an amended consolidated class action complaint, amending only those allegations relevant to the element of scienter. On June 24, 2013, the Defendants moved pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) to dismiss the amended consolidated class action complaint for failure to state a claim.

On September 19, 2013, the Court granted in part and denied in part the second motion to dismiss. In re Gentiva Sec. Litig., 10-CV-5064 (ADS)(WDW), 2013 WL 5291297 (E.D.N.Y. Sept. 19, 2013). The Court previously found that the Plaintiff adequately pleaded actionable false and misleading statements and loss causation for purposes of the 1934 Act claims. Therefore, the Court only addressed whether the Plaintiff adequately plead scienter on the part of the Individual Defendants and Gentiva, and the potential liability of the Individual Defendants under Section 20(a) of the 1934 Act.

3

Of relevance here, the Court granted the motion to dismiss as to the Defendants Strange and Slusser in its entirety and as against the Defendants Malone and Potapchuck to the extent the Plaintiffs sought to establish their scienter based on a theory of conscious behavior and recklessness.

However, the Court denied the motions to dismiss to the extent the Plaintiff sought to establish scienter on the part of Malone and Potapchuk based on a theory of motive and opportunity. As described in more detail later, the Court relied on allegations regarding insider stock sales by Malone and Potapchuck during the Class Period. The Court also denied the motion to dismiss as to Gentiva because the Court concluded that corporate scienter could be inferred from the "suspicious" insider stock sales by both Malone and Potaphuck. The Court further held that the Plaintiff stated a claim for control person liability under Section 20(a) of the 1934 Act as against Malone and Potapchuck.

On October 3, 2013, Gentiva, Malone, and Potapchuck moved pursuant to Rule 6.3 of the Local Rules of the United States District Court for partial reconsideration of the September 19, 2013 order. Gentiva, Malone, and Potapchuck seek to have the remaining claims against them dismissed. The remaining claims are the section 10(b) claims against Gentiva, Malone, and Potapchuck and the section 20(a) claims against Malone and Potapchuk. The Plaintiff opposes the motion for partial reconsideration.

For the following reasons, the motion for partial reconsideration is granted in part and denied in part.

## I. DISCUSSION

A. <u>Legal Standard on Motion for Reconsideration</u>

Motions for reconsideration may be brought pursuant to Fed. R. Civ. P. 59(e) and 60(b) and Local Rule 6.3. <u>See</u> <u>Wilson v. Pessah</u>, No. 05–CV–3143, 2007 WL 812999, at *2 (E.D.N.Y. Mar. 14, 2007). A motion for reconsideration is appropriate when the moving party believes the Court overlooked important "matters or controlling decisions" that would have influenced the prior decision. <u>Shamis v. Ambassador Factors Corp.</u>, 187 F.R.D. 148, 151 (S.D.N.Y. 1999). Reconsideration is not a proper tool to repackage and relitigate arguments and issues already considered by the Court in deciding the original motion. <u>See</u> <u>United States v. Gross</u>, No. 98–CR–0159, 2002 WL 32096592, at *4 (E.D.N.Y. Dec. 5, 2002) ("A party may not use a motion to reconsider as an opportunity to reargue the same points raised previously."). Nor is it proper to raise new arguments and issues. <u>See</u> <u>Lehmuller v. Inc. Vill. of Sag Harbor</u>, 982 F. Supp. 132, 135 (E.D.N.Y. 1997). Reconsideration may only be granted when the Court did not evaluate decisions or data that might "reasonably be expected to alter the conclusion reached by the court." <u>Wechsler v. Hunt Health Sys.</u>, 186 F. Supp. 2d 402, 410 (S.D.N.Y. 2002) (internal quotation marks and citation omitted).

B. <u>Legal Standard on Motion to Dismiss</u>

Under the now well-established <u>Twombly</u> standard, a complaint should be dismissed pursuant to Fed. R. Civ. P. Rule 12(b)(6) only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929, 570 (2007). The Second Circuit has explained that, after <u>Twombly</u>, the Court's inquiry under Rule 12(b)(6) is guided by two principles. <u>Harris v. Mills</u>,

572 F.3d 66 (2d Cir. 2009) (citing Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)).

"First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" Id. at 72 (quoting Iqbal, 129 S. Ct. at 1949). As explained by the Second Circuit, "[i]n considering a motion to dismiss a 10(b) action, we must accept all factual allegations in the complaint as true and must consider the complaint in its entirety." Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010); see Tellabs, Inc. v. Makor Issues & Rights, 551 U.S. 308, 127 S. Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007) ("faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true").

"'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss' and '[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Iqbal, 129 S. Ct. at 1950). Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and . . . determine whether they plausibly give rise to an entitlement of relief." Iqbal, 129 S. Ct. at 1950. This plausibility standard is applicable to securities fraud pleadings. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (observing that to survive 12(b)(6) dismissal, securities fraud plaintiffs "must provide the grounds upon which [their] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level'") (quoting Twombly, 127 S. Ct. at 1965). The issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but

6

whether the claimant is entitled to offer evidence to support the claims." Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

Of particular importance here, "[a] complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Federal Rule of Civil Procedure 9(b) by stating with particularity the circumstances constituting fraud." Slayton, 604 F.3d at 766.

C. Scienter

In order to state a claim under Section 10(b) and Rule 10b–5 of the 1934 Act, the complaint must provide "particular allegations giving rise to a strong inference of scienter"-- "that the defendant acted with the required state of mind." ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009) (internal quotation marks omitted). The "requisite state of mind" in 10b–5 claims is "'intent to deceive, manipulate, or defraud.'" Tellabs, 127 S. Ct. at 2504 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n. 12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)). "Recklessness" also suffices. ECA, 553 F.3d at 198.

Accordingly, in order to satisfy the pleading requirements of § 10(b) and Rule 10b–5 with respect to scienter, the plaintiff may "alleg[e] (1) [facts] showing that the defendants had both motive and opportunity to commit the fraud; or (2) [facts] constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99. "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (internal citation omitted).

The element concerning "motive and opportunity to defraud" requires a showing that the defendants "benefitted in some concrete and personal way from the purported fraud." Novak v. Kasaks, 216 F.3d 300, 307–08 (2d Cir. 2000), cert. denied, 531 U.S. 1012, 121 S. Ct. 567, 148 L. Ed. 2d 486 (2000); but see id. at 311 ("Although litigants and lower courts need and should not employ or rely on magic words such as 'motive and opportunity,' we believe that our prior case law may be helpful in providing guidance as to how the 'strong inference' standard may be met."). Interestingly, the motives "that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation," do not establish the requisite scienter. Id. Typically, a plaintiff must show that officers made false statements in order to sell their own shares at a profit. Id. "Sufficient motive allegations must entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." In re SLM Corp. Sec. Litig., 740 F. Supp. 2d 542, 557 (S.D.N.Y. 2010). A plaintiff must allege a "unique connection between the fraud and the [benefit]." ECA, 553 F.3d at 201 n. 6.

"Regardless of the manner in which a plaintiff attempts to plead scienter, at the end of its evaluation, this Court must be convinced that the inference of scienter is at least as compelling as any competing inferences." Fort Worth Employers' Ret. Fund v. Biovail Corp., 615 F. Supp. 2d 218, 225 (S.D.N.Y. 2009) (internal quotation marks omitted). With regard to the strength of the inference, the inference of scienter must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc., 127 S. Ct. at 2504-05. Thus, the Supreme Court has held that the PSLRA's strong inference standard is satisfied "[w]hen the allegations are accepted as true and taken collectively . . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing

8

inference[.]" Tellabs, 551 U.S. at 326, 127 S. Ct. 2499; see also Akerman v. Arotech Corp., 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009) ("When the competing inferences rest in equipoise, the 'tie . . . goes to the plaintiff.'") (quoting City of Brockton Ret. Sys. v. Shaw Group Inc., 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008)). As the PSLRA requires, a complaint must "state with particularity facts giving rise to a strong inference" of scienter for each defendant. 15 U.S.C. § 78u–4(b)(2).

The Second Circuit has clarified this pleading requirement in light of the passage of the PSLRA and explained that a court need not obstinately tie itself to the ideas described above. Rather, district courts are encouraged to look at a variety of factors and keep in mind how other courts have approached the issue of scienter in the securities fraud context. However, generally speaking, the inference of scienter "may arise where the complaint sufficiently alleges that the defendants: (1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." South Cherry St. LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009). The court "must assess 'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" Local No. 38 Int'l Bhd. Of Electrical Workers Pension Fund v. Am. Express Co., 724 F. Supp. 2d 447, 458 (S.D.N.Y. 2010) (quoting Tellabs, 551 U.S. at 323, 127 S. Ct. 2499, 168 L. Ed. 2d 179).

D. Motive and Opportunity: The Defendants' Sales of Gentiva Securities

As noted above, the Court previously found that the Plaintiff failed to allege facts constituting strong circumstantial evidence of conscious misbehavior or recklessness as to any of

9

the Individual Defendants or Gentiva, and motive and opportunity to commit fraud as to Slusser and Strange. However, the Court found that the Plaintiff alleged sufficient facts of motive and opportunity to commit fraud by Potapchuck and Malone, and inferred scienter as to Gentiva, determinations of which that the Defendants now seek reconsideration.

1. As to Potapchuck

The amended consolidated class action complaint alleges that, during the Class Period, Potapchuck acquired 120,505 shares through the exercise or conversion of options at an average price of approximately $11.97 per share. He also allegedly sold approximately 96% of his shares (115,883 shares) at artificially inflated prices, and at an average price of $27.17 per share for gross proceeds of approximately $3.2 million, and "net proceeds" of $1.8 million. Potapchuck allegedly did not purchase any Gentiva shares on the open market. According to the Plaintiff, in the six months leading up to the May 13, 2010 disclosure of a Senate Finance Committee ("SFC") investigation, Potapchuck sold 95,883 Gentiva shares at artificially inflated prices between $23 and $30 per share.

In moving to dismiss the consolidated class action complaint and subsequently the amended consolidated class action complaint, the Defendants asserted that "many" of the stock sales by Potapchuck were made pursuant to 10b5-1 plans or other contractual arrangements. In its memoranda of law, the Defendants did not specifically quantify the number of trades under 10b5-1 plans made by Potapchuck during the Class Period. Rather, the Defendants attached to their briefs "Form 4s" filed with the Securities and Exchange Commission ("SEC") and Annual Proxy Statements filed with the SEC in 2008 and 2011, which indicated that the 95,883 Gentiva shares sold in the six months leading up to the May 13, 2010 disclosure of the Senate Investigation were done pursuant to 10b5-1 plans.

In the order dated September 19, 2013, this Court acknowledged that trades under a 10b–5–1 plan do not raise a strong inference of scienter. The Court considered as "not determinative" but "relevant" the fact that many of the stock sales by Strange and Potapchuck were made pursuant to 10b5–1 plans or other contractual arrangements. The Court concluded that the allegations regarding the "net proceeds" and volume of trading activity by Potapchuck supported an inference of scienter based on a theory of motive and opportunity.

The Defendants now contend that this Court overlooked critical facts regarding Potapchuk's alleged trading – namely, the actual quantity of 10b5-1 trades as compared to the aggregate number of trades – which facts were submitted to the Court on the prior motions to dismiss. Once the 10b5-1 trades are disregarded, the Defendants assert, all that remains are alleged trades that represented 12%, or 20,000 shares, of Potapchuk's total shares and $300,000 in net profit. Further, the Defendants note that the sale of the 20,000 shares not pursuant to 10b5-1 trades all occurred more than six months before the initial disclosure of the SFC's investigation. The Plaintiff does not dispute these figures, but rather argues that the Court previously rejected the Defendants' contentions regarding Potapchuk's 10b5-1 plan trades.

As this Court has previously noted, trades under a 10b5–1 plan do not raise a strong inference of scienter, even at the pleading stage. Glaser v. Theo, Ltd., 772 F. Supp. 2d 573, 587 (S.D.N.Y.2011); In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 604 (S.D.N.Y. 2007) ("Because Barton's sales were part of a periodic divestment plan [i.e., at 10b5–1 sales plan], the timing and amount of sales do not raise a strong inference of scienter.").

Here, the Court notes that the Defendants should have specifically quantified the number of 10b5-1 plans in their prior motions to dismiss, rather than relying on the Court to comb through the Defendants' financial records. That said, the Court is persuaded by the argument

11

that, after deducting the actual number of 10b5-1 plan trades by Potapchuck and considering his "net profits" without those trades, the Plaintiff fails to raise the requisite strong inference of scienter as against him. This inference is further weakened by that fact that the non-10b5-1 sales amounting to 12% of Potapchuck's holdings occurred more than six months before the announcement of the government investigation. In re Axis Capital Holdings Ltd. Sec. Litig., 456 F.Supp.2d 576, 595 (S.D.N.Y.2006) ("Moreover, the timing of the Secondary Offering – six months in advance of the filing of the AG Complaint – does not suggest a motive to commit fraud."); Ressler v. Liz Claiborne, Inc., 75 F. Supp. 2d 43, 60 (E.D.N.Y.1998) (timing of stock sales six months before release of negative information "does not suggest that defendants meant to realize profits immediately prior to an expected and dramatic fall in the stock's price"); In re Keyspan Corp. Securities Litigation, 383 F. Supp. 2d 358, 385 (E.D.N.Y. 2003)(finding that two-month gap between sales and public statement disclosing problems was not "strongly suspicious in light of other factors weighing against an inference of fraud"); cf. In re Oxford Health Plans, Inc., Secs. Litig., 187 F.R.D. 133, 139 (S.D.N.Y. 1999) ("In late August 1997, two months before the devastating October 27, 1997 press release and in the midst of a NYSID investigation that was eventually going to reveal Oxford's accounting irregularities and internal control deficiencies, all of the Individual Defendants except Sullivan sold shares of Oxford common stock for aggregate profits of approximately $33,000,000. The timing of these trades is 'suspicious' enough, along with the other evidence, to support a strong inference of scienter.").

Thus, the Court finds that the Court finds that the allegations regarding the "net proceeds" and volume of trade activity – 12% of his Gentiva shares yielding $300,000 in "net profits" – by Potapchuck do not support an inference of scienter based on a theory of motive and opportunity. See Rothman v. Gregor, 220 F.3d 81, 94 (2d Cir. 2000) ("Chaimowitz's alleged

12

$1.6 million profit is not unusual even if we look only to the absolute amount of profit, and certainly not if we consider the fact that Chaimowitz sold only 9.9 percent of his GT stock duringthe class period."); Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995) (trading not unusual where the defendant sold 30,000 shares representing 11% of his holdings); In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 271 & n.5 (S.D.N.Y. 2009) (trades found not to be unusual where sales amounted to only 22.5% and 4.9% of two defendants' respective holdings, including options); In re KeySpan, 383 F. Supp. 2d at 384–85 (a sales of less than twenty percent of holdings insufficient to establish scienter); In re Oxford Health Plans, Inc., 187 F.R.D. 133, 140 (S.D.N.Y. 1999)("Large volume trades may be suspicious but where a corporate insider sells only a small fraction of his or her shares in the corporation, the inference of scienter is weakened."). Accordingly, the Court grants the Defendants' motion for partial reconsideration to the extent that the remaining 10(b) claim against Potapchuck based on a theory of motive and opportunity is dismissed.

    2. As to Malone

The Court does not reach the same result with respect to Malone. The Defendants contend that because three of the four Individual Defendants – Potapchuk, Strange, Slusser – did not engage in unusual or suspicious trading, there can be no inference of scienter on the part of Malone. To be sure, the fact that Potapchuk, Strange, and Slusser are not sufficiently alleged to have engaged in unusual or suspicious trading "cuts against a finding of scienter as to Malone.'" 2013 WL 5291297, at *18; see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 814 (2d Cir. 1996) (noting that the failure of some individual defendants to sell stock during class period undermined the plaintiffs' allegations that any defendant intended to inflate stock for personal profit); Acito, 47 F.3d at 54 ("The fact that

13

the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit.") (quotation and citation omitted). Accord In re Scholastic Corp. Securities Litigation, 252 F.3d 63, 75 (2d Cir. 2001) ("the failure of other defendants to sell their stock undermined the plaintiffs' theories that negative information was withheld to obtain a higher sell price."), cert. denied, 534 U.S. 1071, 122 S. Ct. 678, 151 L. Ed. 2d 590 (2001); In re Glenayre Techs., Inc. Sec. Litig., No. 96 Civ. 8252, 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998) (concluding that inference of scienter from some defendants' stock sales was undermined when CEO and other top officers did not sell stock during class period: "Certainly, one can assume that these high-ranking corporate officers . . . would be part of any fraudulent scheme to benefit from insider information through pre-emptive stock sales. The absence of sales from these individuals, then, suggests that . . . trading by [other] defendants does not give rise to a strong inference of scienter.").

However, "none of the[] cases [supporting this proposition] established a per se rule that the sale by one officer of corporate stock for a relatively small sum can never amount to unusual trading. Rather, each case was decided on its own facts." In re Scholastic, 252 F.3d at 75.

Here, Malone allegedly sold 99% of his shares during the Class Period for approximately $2.14 million. In that regard, this case resembles In re SLM Corp. Sec. Litig., 740 F. Supp. 2d at 558 (sufficiently unusual when individual defendant "dumped nearly all of his shares during the Class Period."); see also In re Scholastic, 252 F.3d at 75 (sales of eighty percent of holdings sufficiently unusual for single individual defendants).

In this case, as to Malone, the amended consolidated class action complaint alleges that at the beginning of the Class Period, he held 15,357 shares of Gentiva common stock. It also

14

alleges that during the Class Period, Malone acquired 146,775 Gentiva shares through the exercise or conversion of stock options at an average price of approximately $11.02 per share, and he sold approximately 99% of his shares (145,018 shares) at artificially inflated prices and at an average price of $21.02 per share, for gross proceeds of approximately $3.1 million, and "net proceeds" of approximately $2.14 million. According to the Plaintiff, in the six months leading up to the May 13, 2010 disclosure of the SFC investigation, Malone sold 63,018 Gentiva shares at artificially inflated prices between $23 and $30. During the Class Period, Malone allegedly did not purchase any Gentiva shares on the open market. By the end of the Class Period, Gentiva's stock apparently crashed, closing at $3.02 per share on October 3, 2011, a decline of approximately 90% from the Class Period high of approximately $30 per share. There is no contention that Malone sold any of these shares pursuant to 105b-1 plans.

In the Court's view, the Plaintiff has alleged motive and opportunity with respect to Malone. When all of the circumstances surrounding Malone's trading are known, they may ultimately defeat the Plaintiff's claims of individual insider trading and fraud. However, at this point, the Plaintiff's allegations of unusually large insider trades by Malone at suspicious times are sufficient to create a strong inference of scienter as to him. Accordingly, the Court denies the Defendants' motion for partial reconsideration to the extent the 1934 Act claim based on a theory of motive and opportunity against Malone is not dismissed.

    3. <u>As to Corporate Scienter</u>

With regard to the liability of the company, to plead scienter when the defendant is a corporation, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." <u>Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.</u>, 531 F.3d 190, 195 (2d Cir. 2008). "In most cases, the

15

most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant." Id.  However, "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." Id. For example, the scienter of an employee acting within the scope of employment can be imputed to the employer. See Vining v. Oppenheimer Holdings Inc., No 08 Civ. 4435, 2010 WL 3825722 at *12 (S.D.N.Y. Sept. 29, 2010) (citing Defer LP v. Raymond James Financial, Inc., 654 F. Supp. 2d 204, 212 (S.D.N.Y. 2009)).  A strong inference of corporate scienter may also be appropriate "where a corporate statement is so important and dramatic that it 'would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.'" Vining, 2010 WL 3825722 at *13 (citing Teamsters Local 445, 531 F.3d at 196 (internal citation omitted)).

In the order dated September 19, 2013, the Court found that the Plaintiff's conclusory allegations – "numerous management employees, who were acting on behalf of Gentiva and whose scienter may be imputed to the Company, either directed, knew of and/or recklessly disregarded the wrongful conduct alleged herein" (Am. Compl.¶ 11) – were insufficient to establish that such employees "were acting within the scope of their employment."  Nonetheless, the Court found that corporate scienter could be inferred from the "suspicious" insider stock sales by both Malone and Potapchuk, high level executives at Gentiva. In re Gentiva Sec. Litig., 2013 WL 5291297, at *21.

Having now deemed insufficient the allegations regarding Potapchuk's insider stock sales, the Court finds that the Plaintiff has failed to state a violation of Section 10(b) of the 1934 Act against Gentiva. San Leandro Emergency Med. Group Profit Sharing Plan, 75 F.3d at 813-14 & n. 14 ("[W]e conclude that the sale of stock by one company executive does not give rise to a

strong inference of the company's fraudulent intent; the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive.")

    4.    <u>As to Whether the Plaintiffs States a Claim Under Section 20(a) of the 1934 Act</u>

The Plaintiff also alleges "control person" liability against the Individual Defendants under Section 20(a) of the 1934 Act. To state such a claim, a plaintiff must show "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." <u>Boguslavsky v. Kaplan</u>, 159 F.3d 715, 720 (2d Cir. 1998) (quotation marks omitted). "To plead control over a primary violator, a plaintiff must allege 'that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" <u>In re BISYS Sec. Litig.</u>, 397 F. Supp. 2d 430, 451 (S.D.N.Y. 2005) (quoting <u>S.E.C. v. First Jersey Sec. Inc.</u>, 101 F.3d 1450, 1472-73 (2d Cir. 1996)). However, "[a]llegations of control are not averments of fraud and therefore need not be pleaded with particularity under Rule 9(b) or the PSLRA. They need satisfy only the less stringent requirements of Fed. R. Civ. P. 8." <u>Id.</u>

Here, the Court has found that the amended consolidated class action complaint alleges a primary violation of Section 10(b) by Malone, a controlled person. Further, the Plaintiff has plausibly plead culpable participation by Malone. Therefore, the Court denies that part of the Defendants' motion for partial reconsideration seeking to dismiss the Plaintiff's Section 20(a) claims.

17

## II. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED**, that the Defendants' motion for partial reconsideration is granted in part to the extent the remaining claims in the amended consolidated class action complaint against the Defendant John R. Potapchuck – the 10(b) and 20(a) claims under the 1934 Act – are dismissed; and it is further

**ORDERED**, that the Defendants' motion for partial reconsideration is granted in part to the extent the remaining claims in the amended consolidated class action complaint against the Defendant Gentiva – the 10(b) claim under the 1934 Act – is dismissed; and it is further

**ORDERED**, that the Defendants' motion for partial reconsideration is denied in part to the extent the remaining claims in the amended consolidated class action complaint against the Defendant Ronald A. Malone -- the 10(b) and 20(a) claims under the 1934 Act – are not dismissed.

**SO ORDERED.**

Dated: Central Islip, New York
December 10, 2013

                                              *Arthur D. Spatt*
                                              ARTHUR D. SPATT
                                              United States District Judge